## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE ROSETSKY, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | No: 07-3167 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS OF THE UNITED STATES | : | |
| OF AMERICA, INC., | : | |
| Defendant | : | |

## MOTION FOR SUMMARY
## JUDGMENT OF DEFENDANT NATIONAL BOARD OF
## MEDICAL EXAMINERS OF THE UNITED STATES OF AMERICA, INC.

Defendant, NBME, moves herein for summary judgment, and in support of its Motion,

relies upon the accompanying Memorandum of Law and Statement of Facts, which are

incorporated herein by reference as if fully set forth herein.

Respectfully submitted,

TROIANI/KIVITZ, L.L.P.

DATE: _November 26, 2007_

Bebe H. Kivitz, Esquire
I.D. No: 30253
Dolores M. Troiani, Esquire
I.D. No: 21283
38 North Waterloo Road
Devon, PA 19333
(610) 688-8400

Attorneys for Defendant
National Board of Medical Examiners Of
The United States of America, Inc.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE ROSETSKY,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **No: 07-3167** |
| | : | |
| **NATIONAL BOARD OF MEDICAL** | : | |
| **EXAMINERS OF THE UNITED STATES** | : | |
| **OF AMERICA, INC.,** | : | |
| **Defendant** | : | |

### ORDER

AND NOW, this         day of                    , 2007, upon consideration of

Defendant's Motion for Summary Judgment, and Plaintiff's Response thereto, it is hereby

ordered that Summary Judgment is GRANTED in favor of Defendant, and accordingly,

plaintiff's claims are hereby dismissed.


BY THE COURT:


_____
                                                            J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE ROSETSKY, | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| vs. | : | No: 07-3167 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS OF THE UNITED STATES | : | |
| OF AMERICA, INC., | : | |
| **Defendant** | : | |

STATEMENT OF FACTS OF DEFENDANT NATIONAL
BOARD OF MEDICAL EXAMINERS OF THE UNITED STATES OF AMERICA, INC.

Defendant, the National Board of Medical Examiners of the United States of America, Inc. ("NBME"), submits the following Statement of Facts in support of its Motion for Summary Judgment.

1. Plaintiff was employed by NBME as a temporary Test and Development Associate I on September 27, 2005. September 27, 2005, Executed Letter of Hire attached as Exhibit "1".

2. Plaintiff also executed an Employer Innovation and Proprietary Information Agreement on September 27, 2005, binding her to the terms and conditions set forth therein. Exhibit "1".

3. Plaintiff was offered and accepted a full-time position as a Test Development Program Assistant at NBME, effective December 19, 2005, which was a newly created position. December 16, 2005, executed Letter of Hire attached as Exhibit "2".

4. Plaintiff was at all times an at-will employee. Exhibits "1" and "2".

5. On plaintiff's Employment Application to the NBME, she was asked to list her full employment record, including her reasons for leaving prior employment. As to the

University of Pennsylvania, plaintiff alleged that she worked at the School of Medicine from June 2004 through October 2004, and that her position had been eliminated. Application attached as Exhibit "3". As to the Wistar Institute, she alleged that she was employed between 1979 and 1985, and her reason for leaving was that she had moved. Exhibit "3".

6.      The Plaintiff agreed by signing the NBME Application that:

> I CERTIFY THAT ALL ANSWERS GIVEN BY ME ARE TRUE, ACCURATE AND COMPLETE. I UNDERSTAND THAT THE FALSIFICATION, MISREPRESENTATION, OR OMISSION OF FACT ON THIS APPLICATION (OR ANY OTHER ACCOMPANYING OR REQUIRED DOCUMENTS) WILL BE CAUSE FOR DENIAL OF EMPLOYMENT OR IMMEDIATE TERMINATION OF EMPLOYMENT, REGARDLESS OF WHEN OR HOW DISCOVERED.

Exhibit "3", p. 4.

7.      Records subpoenaed in this litigation and received on October 5, 2007, from the University of Pennsylvania, including a letter and other documents, Exhibit "4", show that plaintiff left the University of Pennsylvania because plaintiff's employment with the University of Pennsylvania was terminated on September 22, 2004. Plaintiff was advised in writing on September 22, 2004 that "the quality of your interpersonal interactions and the ability to work cooperatively with a diverse constituency did not meet the standards of this office".

8.      On September 23, 2004, Plaintiff e-mailed her supervisor at the University of Pennsylvania, Ms. Bien, stating: " . . . my countenance has unfortunately been perceived by you as threatening." Exhibit "4".

9.      In addition, the University of Pennsylvania's records make clear that plaintiff submitted one resume to the University of Pennsylvania, and a different one to NBME, containing material discrepancies, including the dates of her prior employment. Exhibit "5". (5a. University of Pennsylvania submission) (5b. NBME submission).

2

10.     Plaintiff also worked as a "temporary" clerical assistant for a law firm, Cozen & O'Connor, from April 2005 - August 2005.  In her application for that employment, plaintiff wrote "Position Change" as the reason her University of Pennsylvania employment had ended. Exhibit "6".

11.     Records subpoenaed and received from Wistar Institute in this litigation make clear that plaintiff tendered her resignation to Wistar, not because she had "moved", as she put on her NBME Application (Exhibit "3"), but because she was dissatisfied with her salary and job assignments, and felt that she was overqualified for the tasks she was being assigned.  Relevant Wistar records attached as Exhibit "7".

12.     At plaintiff's deposition, she testified that part of the reason she left Wistar was due to the fact she had moved, and part of the reason she left was because she was being sexually harassed by a male supervisor.  Plaintiff testified that she did not report her harassment to Wistar, the EEOC, or anyone else at the time, because "nobody discussed those things with you . . . before the Judge Thomas thing where the woman complained of sexual harassment."  Plaintiff's Dep., p. 47.  (Full deposition transcript attached as Exhibit "8").

13.     Plaintiff was aged forty seven (47) at the time she was employed by NBME.  She was hired by Kathleen Holtzman, who was then aged fifty five (55), who was her direct supervisor.

14.     NBME provides Role Profiles, which are entered in NBME's Intranet, and may be edited, revised or updated.  Role Profiles describe generally the roles associated with specific positions at NBME, and are considered a dialogue between an employee and his or her supervisor. Role Profiles are often a "work in progress," some of which are incomplete, and this fact is also published on NBME's Intranet.  Exhibit "9".

3

15.     The "Role Profile" for plaintiff's first position, Temporary Test Development

Associate I, published August 24, 2005, contained various general support and assistance tasks

associated with that role, including "assist with others duties as assigned." Exhibit "10". In

addition, all NBME employees, but in particular those hired into support positions, are expected

to perform clerical tasks in support of their supervisors.

16.     Because plaintiff's second position with NBME as a full time Test Development

Program Assistant was a newly created one, there was no Role Profile in existence in December

2005 at the time plaintiff assumed the position.

17.     Plaintiff drafted the Role Profile for Test Development Program Assistant (Role

Profile attached as Exhibit "11"), and plaintiff is the person who entered the newly drafted Role

Profile in NBME's Intranet  (Exhibit "12". December 7, 2005, J. Bird to plaintiff).  Plaintiff's

name is therefore the last one to appear on the profile she created, when NBME accesses the

Role Profile on-line even today.  Unknown to her supervisor, plaintiff removed various "assist"

tasks.  Compare, e.g., Exhibit "11" and "12".  In any event, all NBME employees, not just

plaintiff, are expected to perform all of the job-related and support tasks assigned by his or her

supervisor, whether or not they were expressly designated in a Role Profile.

18.     Plaintiff's duties also included working with the staff of the NBME Information

Technology (IT) Department to develop databases and programs, which would streamline work

flow in Test Development, and the use of Quark and other computer applications.

19.     In April 2006, several of plaintiff's interactions with members of NBME staff

became abrasive and unprofessional.  Plaintiff made several inappropriate and disparaging

remarks about co-workers.  In one e-mail, plaintiff described the Assistant Vice President of

Technology as "rude", characterized his response to her initial e-mail as "juvenile and

4

nauseating", and described how she, a "former domestic goddess", taught him a lesson about technology.  In another, she described the Vice President of Support Services at NBME as the "guy with the little white hot pants."  Exhibit "13".

20.     By June 2006, if not before, plaintiff was actively seeking new employment.  She had sent out her resume, or left her previously forwarded resumes in circulation, seeking interviews with various  potential employers.  Following plaintiff's discharge, NBME discovered various e-mails in which plaintiff was seeking other employment.  E-mails attached as Exhibit "14".  Plaintiff testified that she applied for a position with Drexel University on or before June 2006, and interviewed in June 2006.  She also applied in June 2006 for a position at Temple University.  Exhibit "8"; Plaintiff's Dep., pp. 238-239, 240.  In August, 2006, plaintiff corresponded with  HospitalMedicine.org, concerning other employment. Plaintiff's Dep., p. 241.  In September 2006, plaintiff sought information regarding a position with ALI-ABA.  In October 2006, plaintiff applied for a litigation paralegal position with the University of Pennsylvania.   She testified, "I wasn't actively looking, but you know, I think that anyone that's not self-employed continually sends out resumes.   I mean most of my friends do that.  If someone finds something better, you take it.  If not you stay where you are...".  Exhibit "8"; Plaintiff's Dep., p. 241.

21.     In the resumes plaintiff attached when she sought employment, she described many of her non-clerical Test Development duties at NBME, including the design and creation of several databases, the use of MS Project to monitor test development processes, and the production of slides for physician training.   Resumes attached as Exhibit "14".

22.     Plaintiff received an informal mid-year evaluation around June 2006. Plaintiff recalled "maybe two criticisms" concerning her ability to get along with others. Exhibit "8"; Plaintiff's Dep., pp. 147-152, Plaintiff's June 2, 2006 e-mail attached as Exhibit "15".

23.     Plaintiff, who had been a full-time employee at NBME for less than one year, also applied for other positions at NBME. Open positions were posted on NBME's Intranet. On September 19, 2006, plaintiff asked her supervisor, Ms. Holtzman, whether she was qualified for the position of Test Development Associate I, Special Projects, and she and Ms. Holtzman agreed to discuss the matter further. Plaintiff submitted her resume for consideration for the position on October 18, 2006. By an e-mail dated November 6, 2006, plaintiff unilaterally withdrew her application for consideration for this position. Exhibit "16".

24.     Plaintiff testified at her deposition that the Special Projects position she applied for had been held by Mr. Hussie (under 40), who had then became a manager. Plaintiff admitted that her Complaint was incorrect (paragraph 18(b)), because she did not know if the Special Projects position was ever filled, or if it was, who acquired it. Exhibit "8"; Plaintiff Dep., pp. 123; 126-127.

25.     On October 20, 2006, plaintiff applied for the position of Case Developer at NBME. On November 6, 2006, plaintiff unilaterally withdrew her application from consideration, also before she could be interviewed or considered further. Exhibit "16".

26.     Plaintiff identified multiple non-clerical responsibilities she had throughout her period of employment, which plaintiff agreed were all within the scope of her Role Profiles. These included keeping and organizing physician's contracts (Exhibit "8"; Plaintiff's Dep., p. 78), building a data base with the physicians' information (Plaintiff's Dep., pp. 78-79), cataloguing slides (Plaintiff's Dep., p. 77), building a data base of the catalogued slides

(Plaintiff's Dep., p.p. 101-102), learning and working on applications such as Captivate, Microsoft Project, and End Note (Plaintiff's Dep., p. 104), and editing of a tutorial (Plaintiff's Dep., p.102). Plaintiff's resumes, forwarded while she was at the NBME and following her discharge, enumerate other various non-clerical Test Development responsibilities. Exhibit "14".

27.     Plaintiff explicitly agreed that tasks such as learning Captivate, Microsoft Project, and End Note were contained within her Role Profile. Exhibit "8"; Plaintiff's Dep., p. 105.

28.     As to the clerical tasks she was asked to do by her supervisor, plaintiff testified: "Are you asking me if I could <u>not</u> perform tasks unless they were on my role profile? ... I have no idea. Whatever Kathy would ask me to do I did." Exhibit "8"; Plaintiff's Dep., p. 94. However, plaintiff complained that she should not have to do any clerical tasks for other supervisors. Exhibit "8"; Plaintiff's Dep., pp. 101-103. She testified that the minor clerical tasks which she contended constituted discrimination were "fixing typos for people <u>other</u> than Kathy." Exhibit "8"; Plaintiff's Dep. p. 121. However, plaintiff added, "I didn't say I was pleased with doing them for Kathy, and I didn't say it was discrimination by her telling the other people that they could do - - you know, things for me." Exhibit "8", Plaintiff's Dep. p. 121.

29.     When asked if the Role Profile was considered a work in progress, plaintiff admitted, "supposedly, yes". Exhibit "8"; Plaintiff's Dep., p. 100.

30.     Plaintiff admitted that multiple other employees at NBME performed clerical work, specifying in particular the production assistants, "young girls" in their twenties, her co-workers, Faith Balsama and Debbie Shelmire, and "possibly others that she didn't see." Exhibit "8"; Plaintiff's Dep., pp. 82-83.

31.     Plaintiff claimed to like her supervisor, Kathy Holtzman "in the beginning".
Exhibit "8"; Plaintiff's Dep., p. 83.

32.     Plaintiff testified that she began to feel differently about Ms. Holtzman probably
around September 2006.  Exhibit "8"; Plaintiff's Dep., p. 85.

33.     Kathy Holtzman has worked at the NBME since December 1977.  She is the
Senior Director of Test Development.  Although she is not perceived as an easy supervisor to
work with, she is a highly respected supervisor and editor at NBME.

34.     Plaintiff believed that Kathy Holtzman had been promoted to the point of Ms.
Holtzman's incompetence, citing the "Peter Principle" at her deposition, meaning that plaintiff
believed that Ms. Holtzman was incompetent with technology, but had been promoted anyway.
Exhibit "8"; Plaintiff's Dep., pp. 108-110.

35.     Plaintiff also testified that she believed that  Kathy Holtzman found younger
employees easier to control, and that "she had young patsies all around her", because she "felt
more competent in ruling over young people."  Exhibit "8"; Plaintiff's Dep., pp.110-111.

36.     Plaintiff testified that she was not intimidated by Ms. Holtzman, in that plaintiff
had gained confidence with age, and she and her supervisor were at "peer level".  Exhibit "8";
Plaintiff's Dep., pp. 111-112.

37.     Plaintiff identified two other women over aged forty, who worked at NBME, who
were allegedly discriminated against because of their age, Faith Balsama and Debbie Shelmire.
Each has prepared an Affidavit attached hereto, in which she denies that she has been
discriminated against because of age, or that age is a factor which is considered by NBME in
awarding promotions.

38.     Plaintiff identified two (2) other women she alleged may have been discriminated against, but admitted that she had no personal knowledge. Exhibit "8"; Plaintiff's Dep., pp. 183-184.

39.     Plaintiff was not able to identify from personal knowledge any other person over the age of forty (40) supposedly discriminated against.

40.     Plaintiff identified Keiran Hussie as a supposed comparator, a person under forty (40), who plaintiff claimed was earning $6,000.00 more than plaintiff annually. Mr. Hussie's position at NBME at the time was Test Development Associate, Special Projects. Unlike plaintiff, his job duties and prior experience included working with multi-media. Plaintiff also admitted that Mr. Hussie had knowledge of Dream Weaver, a technological application that plaintiff did not know, and did not know what other skills he had, which she lacked. Exhibit "8"; Plaintiff's Dep., pp. 153-155.

41.     Plaintiff did not believe that Kathy Holtzman was a good editor. Plaintiff believed that she was "definitely" a better editor than her supervisor. Exhibit "8"; Plaintiff's Dep., pp. 106-108.

42.     Plaintiff admitted that she was the only Test Development Program Assistant, and that it was a newly created position. Plaintiff agreed that she had worked on the Role Profile, and entered it in NBME's Intranet, but believed she had done so with Ms. Holtzman's knowledge. Exhibit "8"; Plaintiff's Dep., p. 92.

43.     Plaintiff took on an editing project in October 2006, in which she edited slides for a tutorial. Her supervisor, Kathy Holtzman, edited plaintiff's work, and revised many of plaintiff's edits. Plaintiff did not agree with Ms. Holtzman's edits, because plaintiff felt her own

edits had been superior to those of her supervisor.  Exhibit "8"; Plaintiff's Dep., pp. 103-104, 106.

44.     On October 18, 2006, plaintiff went to see Barbara Davidson, the Director of Human Resources, to complain that Kathy Holtzman had re-edited plaintiff's edits.  Exhibit "8", Plaintiff's Dep., pp. 103-104. Plaintiff admitted that her October 18, 2006 complaint to Barbara Davidson was that Ms. Holtzman wouldn't let anyone use plaintiff's edits . . . even though [plaintiff] saw afterwards that they had learned a lesson from [plaintiff].  Exhibit "8"; Plaintiff's Dep., p. 265.

45.     Plaintiff did not raise her age as an issue at that meeting.  Ms. Davidson prepared notes contemporaneously, memorializing plaintiff's grievance at the time.  See October 18, 2006 notes, attached as Exhibit "17".

46.     Plaintiff began to circulate around the NBME office, showing several editors and others Ms. Holtzman's original work, and comparing it to the version with plaintiff's edits, and asking which they thought was better.  Exhibit "8"; Plaintiff's Dep., pp. 106, 265-266.

47.     There was no one else besides plaintiff who took his or her work, and Ms. Holtzman's, to other editors to review the work and comment on whose edits were better.  Exhibit "8"; Plaintiff's Dep., pp. 263, 264, 266.

48.     Plaintiff also wrote a lengthy e-mail to Ms. Holtzman, reflecting her anger over this issue, prompting Ms. Holtzman to address plaintiff's concerns in response.  Ms. Holtzman explained to plaintiff that she had approved of plaintiff's attempt to edit (as a learning exercise), but that no matter who had edited initially, Ms. Holtzman would have made the final edits.  On October 19, 2006, Ms. Holtzman raised the issued of professionalism with plaintiff, advising her that she did not want plaintiff to share the interactions between them with the editors or others,

10

but also expressed confidence that the two could establish a better working relationship.  Exhibit
"18", October 19, 2006 e-mail to plaintiff.  (String of e-mails attached as Exhibit "18").

49.     From October 18, 2006 forward, plaintiff began to complain consistently to
Barbara Davidson in Human Resources regarding her dislike of Ms. Holtzman.  On October 19,
2006, plaintiff met again with Ms. Davidson.  Ms. Davidson again made notes
contemporaneously with the meeting, memorializing the conversation.  (October 19, 2006 B.
Davidson notes and October 20, 2006 e-mails attached as Exhibit "19").  Plaintiff was unhappy
about her perceived limited role in the unit.  She voiced frustration over not receiving enough
feedback from Ms. Holtzman, and her unhappiness with Ms. Holtzman's management style.
Plaintiff did not raise age as an issue with Ms. Davidson at the October 19, 2006 meeting.

50.     Ms. Holtzman also sought assistance from Human Resources in communicating
better with plaintiff, and requested plaintiff to meet with her concerning their issues.  Exhibit
"20".

51.     In spite of Ms. Holtzman's offers to meet weekly with plaintiff, plaintiff testified
that, "she offered, but we didn't."  Exhibit "8"; Plaintiff's Dep., p. 261.

52.     On October 24, 2006, plaintiff e-mailed a friend of hers who did not work at
NBME, stating:

> Well, the shit hit the fan yesterday.  My "Boss" sent me an e-mail full of crap-
> and I sent one back (about 500 words) that basically I wasn't going to take her derisive
> comments and condescending assignments anymore.
>
> I had a prescheduled meeting that afternoon, and I walked in and asked if we
> still had the meeting.  She said she really didn't have anything to say, and that I should
> not have used the e-mail to voice my feelings-and that I was disrespectful.
>
> Ha!  She then came out and addressed the issue of the database that had taken
> me six months to build-that I was to work with her assistant and fine tune it.

11

I have never felt so good in my life-I had nothing left to lose once she said maybe I should start looking for another job.  Hey-I'm not going anywhere!  I spoke to one of the Senior Management-and they are aware of the problems she is causing here-there have been many complaints.  <u>I should have done this when I was at Penn-I just send all my communications with her to HR</u>.  (Emphasis added).

Following a response from her friend, plaintiff added:

Well-we'll see if they finally drop a house on her (my boss).  Meanwhile, the editing of this tutorial that she took away from me-and claims she never told me to do-I just looked at it.  She gave it to her mini-me-who is just using most of my stuff and calling it her own.  Whatever she changed is terrible-prolix as they used to say at Penn-neither one of them can write.  If you have to read something three times to understand it-then it sucks.

Exhibit "21".  (Discovered after plaintiff's discharge).  Plaintiff put the word "boss" in quotes because she didn't consider "someone that acts with the ethics and morals of this person to be really a boss to anyone", and "she was not morally and ethically the type of person who should have been in that position."  Plaintiff didn't like calling Ms. Holtzman a "boss", because plaintiff did not have respect left for Ms. Holtzman.  Exhibit "8"; Plaintiff's Dep., p. 252.

53.     On October 26, 2007, Ms. Holtzman assigned two database projects to plaintiff. Exhibit "22".  On October 30, 2006, Ms. Holtzman requested plaintiff to identify the time she was spending on the various tasks she worked on, because she wanted to be able to break down plaintiff's time spent on developing the different database applications, and the time spent on the different projects.  Plaintiff responded with this data on one occasion, October 31, 2007.  Exhibit "23".  Following that time, Ms. Holtzman requested the same data several times, in written requests, and plaintiff did not provide it.

54.     Plaintiff felt the request from Ms. Holtzman to account for her time was a "ridiculous request".  Exhibit "8", Plaintiff's Dep., p. 283.

55.     On November 5, 2006, Ms. Holtzman wrote to Human Resources again, concerned that plaintiff was disregarding her request about documenting what she was working

on and how she was charging her time, adding "she seems to want to develop projects according to her own instincts and doesn't much appreciate it if others don't agree." She also requested assistance again in attempting to improve her communications with plaintiff. Exhibit "24".

56.     Ms. Holtzman wrote to plaintiff on November 7, 2007, warning her not to share her frustrations with others (other than Human Resources), which could lead to a Performance Improvement Plan ("PIP"), and also memorialized constructive means of communications moving forward. Exhibit "25".

57.     On November 8, 2006, plaintiff wrote to Ms. Davidson, requesting that she be removed from reporting to Ms. Holtzman, and her cubicle moved. Plaintiff asked to report to another supervisor, but at the same time, requested to keep her Program Assistant position. Exhibit "26".

58.     Despite Ms. Holtzman's explicit requests to plaintiff to stop sharing her frustrations, plaintiff continued to do so. On November 8, 2006, her co-worker, Faith Balsama, asked plaintiff not to continue to involve her in plaintiff's crusade. Exhibit "27". She also wrote to Ms. Holtzman, her supervisor, concerned that the tension between plaintiff and Ms. Holtzman was affecting the work environment. "Exhibit "27".

59.     By November 9, 2006, Ms. Davidson told plaintiff she needed to focus on getting her work done, suggesting that plaintiff was spending too much time focusing on the conflict between plaintiff and her supervisor. Exhibit "28".

60.     Despite that, plaintiff testified that she continued to speak to Debbie Shelmire and Faith Balsama "about what was going on." Exhibit "8"; Plaintiff's Dep., p. 243.

61.     Plaintiff continued to write to Ms. Balsama, on one occasion forwarding her horoscope, which emphasized how "powerful Mars was supporting Uranus", leading to

"unexpected surprise" and "causing turmoil", and on another occasion analogizing plaintiff's

battle to the "Holocaust". Exhibit "27".

62.     Plaintiff referred to Kathy Holtzman to her co-workers as the "witch". Exhibit

"8"; Plaintiff's Dep., p. 292.

63.     On November 8, 2006, consistent with the meeting they had had with Human

Resources on November 7, 2006, Kathy Holtzman e-mailed plaintiff, advising her to return any

NBME data or documents she had at home to NBME, and to remove any NBME files from her

personal computer. Exhibit "29".

64.     Plaintiff used the NBME Values Hotline to make several complaints about Ms.

Holtzman, and to emphasize her own talents. Exhibit "30". At no time in these communications

did plaintiff allege that she was being discriminated against on the basis of age. Although the

reports require that specific classes of complaints be checked, and plaintiff checked "Diversity,

Equal Opportunity and Workplace Respect", the reports themselves contain no specific mention

of her age as a factor in her complaint.

65.     On November 13, 2006, (subject "Kathy quote"), plaintiff forwarded Ms.

Holtzman's warning to plaintiff to Ms. Davidson, then wrote to Ms. Holtzman on November 14,

2006, claiming she was being singled out. Again, this e-mail contained no mention of age

discrimination. It ended with these words to her supervisor, "<u>And if you have a valid complaint -</u>

<u>about my work performance - I need to have it in writing!</u> (Emphasis in original.) Exhibit "31".

66.     On November 16, 2006, plaintiff wrote to Ms. Holtzman concerning a

conversation with Ms. Holtzman and she had had, in which they  discussed a possible lateral

move for plaintiff. Plaintiff, who had been employed full-time for less than one year, felt she

was qualified to be promoted above an assistant role. Ms. Holtzman responded "I suggest you

focus on performing your current role well so that you can be considered a strong candidate for other roles. Once you have done that consistently and successfully, I will be happy to discuss your career development. Thank you." Exhibit "32".

67.     In mid November 2006, plaintiff forwarded by e-mail an article to Debbie Shelmire which had been e-mailed to plaintiff from her husband. Exhibit "33". The article discussed a worker who had shot and killed his supervisor. At her deposition, plaintiff claimed that her husband e-mailed her the article as a "joke", and she forwarded it to Ms. Shelmire to prove that her husband had too much spare time when he was working, rather than as a comment on her feelings about her supervisor. Exhibit "8"; Plaintiff's Dep., pp 113-115. Whether plaintiff was serious or not, NBME considers the threat of workplace violence a serious issue.

68.     Plaintiff's Year-End Performance Review was prepared by Kathy Holtzman. Prior to its preparation in October 2006, Ms. Holtzman also requested comments by others familiar with plaintiff's work. These comments back to Ms. Holtzman included that plaintiff was "pushy and not always polished in the way she speaks to people " (Choe), plaintiff "lacks professionalism and alienates others with her attitude (Albee), she "seems to need more instruction when given a document to create or update" (DeRuchie), and that plaintiff "is often fixated on the task at hand and doesn't necessarily understand we have a lot of things going on and can't necessarily get to her project right away" (D'Angelo). Exhibit "34".

69.     The review, which was "satisfactory", was presented to plaintiff by Ms. Holtzman and Ms. Davidson on November 21, 2006. Ms. Holtzman included in her comments: "Diane's rating of Satisfactory is based on the quality of her work over the year as a whole rather than on her most recent performance which was been less than satisfactory. If she continues to object to performing the duties within her job description and to disrupt the work environment with

15

persistent unprofessional behavior, she will be subject to disciplinary action up to and including termination. It is my hope that Diane will be able to accept appropriate supervision so that she can hear what others have to say and learn from those who have more experience at the NBME. I believe this will help her to gain the respect of others and be viewed as a team player who is willing to work hard to get the job done. Exhibit "35".

70. A "Satisfactory" rating qualified plaintiff for an increase, had she not been terminated, of a minimum of two percent (2%) in January 2007. B. Davidson Affidavit, Exhibit "36".

71. Of the seven (7) employees given performance reviews by Ms. Holtzman, five (5) employees were over the age of forty (40). Of those five (5) employees, two (2) employees had the position of Administrative Support Coordinator (ages 52 and 48) and received ratings of "outstanding"; one (1) was a manager (age 50) who received a rating of "outstanding"; one (1) was a Senior Associate for Quality Assurance (age 59), who received a rating of "very good". The remaining employee was plaintiff, who received a rating of "satisfactory". B. Davidson Affidavit, Exhibit "36".

72. At the time of plaintiff's review, plaintiff also told Ms. Holtzman that "she [Ms. Holtzman] was unqualified to review the building of [plaintiff's] data base because she knew nothing about it." Exhibit "8"; Plaintiff's Dep., p. 146.

73. Plaintiff also declined to attend a meeting with Ms. Davidson and Ms. Holtzman, following her evaluation, saying, "I am not going to sit and listen to some unethical example of the Peter Principle tell lies about me." Exhibit "37".

74. On November 22, 2006, plaintiff e-mailed Ms. Holtzman. In this e-mail, attached as Exhibit "38", plaintiff refused to perform the clerical aspects of her job at her present salary,

and refused to perform any "innovative" work. She told Ms. Holtzman that she "lacks the qualifications" to properly evaluate plaintiff's performance. Plaintiff demanded that Ms. Holtzman change her title and provide her a ten thousand dollar ($10,000.00) salary increase in order for her to continue performing her job. In her November 22, 2006 e-mail, plaintiff also stated that if her salary were not increased to sixty thousand dollars ($60,000.00), "I am sure Technology Services [not plaintiff] could build you anything you need." At her deposition, plaintiff admitted refusing to do the work [data base] that her supervisor gave her a negative review for. Exhibit "8"; Plaintiff's Dep., p. 234. Plaintiff testified further, "a woman that knows nothing about what I was doing decided I wasn't doing it right . . . ". Exhibit "8"; Plaintiff's Dep., p. 235.

      75.     On November 27, 2006, in response to plaintiff's escalating unprofessional conduct and insubordination, her employment with NBME was terminated. NBME advised plaintiff that the job proposed in her November 22, 2007 e-mail was not available and would not be offered to plaintiff. NBME also reminded plaintiff that she was bound by the Employee Innovation and Proprietary Agreement she had executed. Exhibit "39".

      76.     NBME considers it insubordinate for an employee to refuse a reasonable request of his or her employer to perform a routine job-related task. NBME also considers it insubordinate if any employee refuses to perform his or her job, refuses to take instruction from one's supervisor, or advises one's supervisor that he or she is not qualified to evaluate that employee.

      77.     In describing the problems plaintiff had with her supervisors, plaintiff testified that the supervisor at the University of Pennsylvania who terminated plaintiff's employment, Elizabeth Bien, and Kathy Holtzman both felt threatened by plaintiff's skills being better than

theirs.  She testified: so they "start picking on you . . .  and I knew this had already started happening.  Something that Kathy [Holtzman] did, you know, like, with her editing that she didn't know how to write.  And I was trying to help her do some editing that she asked me to ....  but yeah, this is -- you know, she started, they start picking on things . . . when they don't have anything substantial, they'll go around, and they'll start intimidating other people that are beneath them, their subordinates, and try to get them against you.  That is a tactic, you know, that a lot of administrators use.  <u>I know that ... I mean, this is what this woman did and this is what Kathy did.  They're very similar, same age women, no technology skills, [they] just did not want any technology near them.</u>  (Emphasis added).  Exhibit "8"; Plaintiff's Dep., pp. 29-30.

78.     Plaintiff also testified that her prior supervisor at the University of Pennsylvania, Ms. Bien, thought that plaintiff was "pushy".  Exhibit "8"; Plaintiff's Dep., p. 29.

79.     At the time of plaintiff's October 2007 deposition, plaintiff had retained NBME proprietary and confidential data on a personal  thumb drive, and acknowledged that she had not previously returned the data to NBME.  This was in spite of her supervisor's November 8, 2006 instructions to her, NBME's November 27, 2006 correspondence to her, and in violation of the Employee Innovation and Proprietary Information Agreement she had executed.  Exhibit "1"; Exhibit "8"; Exhibit "39"; Plaintiff's Dep., pp. 141, 214-216.

80.     Plaintiff's position was not replaced at the NBME following her termination.  Her duties were redistributed to Faith Balsama, aged fifty-three (53), and Debbie Shelmire, aged forty-nine (49).  Their Affidavits are attached as Exhibit "40".

81.     NBME has researched its records back to 2004, the date requested by plaintiff in her discovery requests, and no NBME employee since that date has been fired for insubordination other than plaintiff.  See B. Davidson Affidavit, Exhibit "36".

18

82.     The NBME is an independent not-for-profit organization that provides high-quality examinations for health professionals, founded in 1915 because of the need for a voluntary, nationwide examination that medical licensing authorities could accept as the standard by which to judge candidates for medical licensure.

83.     As of January 31, 2007, the NBME employs approximately three hundred sixty-four (364) individuals.

84.     The NBME utilizes a merit-based compensation system on the concept of rewarding performance, and it evaluates employees in an annual review.  In addition, there is an informal mid-year evaluation.  These procedures are contained in NBME policies, also provided to every employee via the Intranet.  Exhibit "41".

85.     The NBME also provides to all employees its explicit policy, which is published on the NBME Intranet, prohibiting discrimination of any kind based on one's protected status, including sex, age, race and religion, encouraging reporting of any unwelcome or offensive contact, and explaining the investigation procedure, if such a complaint is made.

86.     Plaintiff's Complaint in this matter was filed on August 2, 2007.  (Docket Entry 1).  Plaintiff's Complaint raises her specific allegations of discrimination in Paragraph 18, and plaintiff has effectively withdrawn Paragraph 18(b) by her deposition testimony.

87.     On December 1, 2006, plaintiff filed an administrative charge with the EEOC.  The charge was cross-filed with the PHRC (Complaint ¶12(a) and (d)).  Plaintiff's counsel requested that the EEOC terminate its proceedings on June 14, 2007, and issue a right-to-sue letter.  Exhibit "42".  However, the EEOC had already issued its Dismissal and Notice of Rights letter on May 7, 2007, stating:

> The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the

statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

After learning that plaintiff filed this action, the PHRC terminated its proceedings on September 18, 2007, within one (1) year of plaintiff's filing. According to the PHRC records received, plaintiff did not object to the closure, nor did she request a preliminary hearing. Plaintiff failed to exhaust her administrative remedies before filing this action. Relevant EEOC and PHRC records attached as Exhibit "42".

Respectfully submitted,

TROIANI/KIVITZ, L.L.P.

DATE: _November 26, 2007_

Bebe H. Kivitz, Esquire
I.D. No: 30253
Dolores M. Troiani, Esquire
I.D. No: 21283
38 North Waterloo Road
Devon, PA 19333
(610) 688-8400

Attorneys for Defendant
National Board of Medical Examiners Of
The United States of America, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE ROSETSKY, | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| vs. | : | No: 07-3167 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS OF THE UNITED STATES | : | |
| OF AMERICA, INC., | : | |
| **Defendant** | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT NATIONAL BOARD OF <u>MEDICAL EXAMINERS OF THE UNITED STATES OF AMERICA, INC.</u>

Defendant, the National Board of Medical Examiners of the United States of America, Inc. ("NBME"), through its undersigned counsel, submits this Memorandum of Law in Support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### I.    <u>INTRODUCTION</u>

This is an action alleging age discrimination and retaliation. The Defendant is NBME, an independent not-for-profit organization that provides high quality examinations for the health professions. In her Complaint, Plaintiff Diane Rosetsky raises claims under the Age Discrimination in Employment Act, 29 U.S.C. §621, et seq. (Counts I and II) , and the Pennsylvania Human Relations Act, 43 P.S. §951, et seq. (the "PHRA") (Count III). She seeks damages including reinstatement, compensatory damages, double damages pursuant to 29 U.S.C. 626 (b) for willful violations, and injunctive relief. (Complaint, Ad Damnum clause).

Because the allegations and discovery establish that there is no genuine issue of material fact, defendant is entitled to summary judgment.

Plaintiff was hired by NBME in September 2005, when she was forty-seven (47) years old, by Kathy Holtzman, who was then fifty-five (55) years old, as a temporary Test Development Associate I. Initial evaluations of plaintiff's performance by Ms. Holtzman were positive. In light of this, plaintiff was offered and accepted a permanent full time position as a Test Development Program Assistant, a newly-created position at NBME effective December 19, 2005. Plaintiff's workload, like that of other employees in a support position, necessarily included some clerical tasks in addition to her other non-clerical responsibilities. Plaintiff's Role Profile for the new position, drafted and entered in NBME's Intranet by plaintiff[1], was considered by NBME to be a work in progress, describing general tasks associated with the position, but subject to revisions as the developing role of the new position of Test Development Program Assistant became clarified. Statement of Facts ("SOF"), ¶ 14; Exhibit "9". Role Profiles were published on NBME's Intranet, and in every case, not just plaintiff's, were noted to be general descriptions and often still works in progress. SOF, ¶ 14; Exhibit "9".

Around October 2006, plaintiff became dissatisfied with the amount of clerical work she was expected to handle, and also began to challenge vocally her supervisor's ability to supervise her, believing that her technological and editing skills were superior to those of her supervisor, Kathy Holtzman. Ms. Holtzman was then a Senior Director of Test Development and a respected editor, having worked at NBME since 1977, who had worked her way up from lower positions to her supervisory position at NBME. Plaintiff also began to vent her frustrations to other employees about her work assignments generally, and about Ms. Holtzman specifically. See, e.g., Exhibit "27". In particular, plaintiff began to complain to other NBME editors about the quality of Ms. Holtzman's work, compared to her own, because plaintiff objected to her

---

[1] The Role Profile used by the NBME is considered an opportunity for dialogue between the employee and supervisor.

supervisor editing plaintiff's work.  In response,  Ms. Holtzman advised plaintiff that she could

of course meet with Human Resources or Ms. Holtzman concerning this sort of issue, but warned

her that she was not free to interrupt plaintiff's work and the work of others with her persistent

complaints.  SOF, ¶ 56; Exhibit "25".

Because of plaintiff's actions, Ms. Holtzman also sought guidance from NBME's Human

Resources Department to improve her communication with plaintiff.  Ms. Holtzman also wrote

to plaintiff concerning constructive change, and offered to meet weekly.  SOF, ¶¶ 50, 51.

Plaintiff continued to vent her frustrations outside the unit, and complain about some of the work

she was asked to handle.  Ms. Holtzman also asked plaintiff to prepare weekly summaries, which

would account for her time spent on various projects, and would allow Ms. Holtzman to track the

time spent on particular data base applications.  Plaintiff prepared just one summary late in

October 2006, then ignored the subsequent and repeated requests from her supervisor, submitting

none.   SOF, ¶ 53; Exhibit "23".

By the time of plaintiff's November 21, 2006, year end performance review, plaintiff

received a "satisfactory" rating from Ms. Holtzman.  Ms. Holtzman noted that plaintiff's rating

would have been lower if based only on plaintiff's more recent performance, but that Ms.

Holtzman was rating her based on the full year's work.  Ms. Holtzman stated:

> Diane's rating of Satisfactory is based on the quality of her work over the year as
> a whole rather than on her most recent performance which was been less than
> satisfactory.  If she continues to object to performing the duties within her job description
> and to disrupt the work environment with persistent unprofessional behavior, she will be
> subject to disciplinary action up to and including termination.   It is my hope that Diane
> will be able to accept appropriate supervision so that she can hear what others have to say
> and learn from those who have more experience at the NBME.  I believe this will help
> her to gain the respect of others and be viewed as a team player who is willing to work
> hard to get the job done.

SOF, ¶ 69;  Exhibit "35", p. 4.

3

On November 22, 2006, plaintiff sent an e-mail to her supervisor, Ms. Holtzman,

essentially refusing to perform her job.  It read:

> Since I received so much negative feedback about the databases that I built and
> created, and as in your words, I was not hired to do this, I am not going to complete any
> further work on them. This will avoid another poor performance rating for me in the
> future- as you lack the qualifications to evaluate my skills in this area.
>
> However, if you would like me to continue my innovative work, I expect to be
> compensated for this level of performance.  This would require a change to an
> information technology-type title, at a salary of at least $60,000. If not, I am sure that
> Technology Services could build you anything you need.
>
> You really need to re-read my role profile- which is not the one you brought to
> HR. You have not given me any assignments that match this profile. I have created
> assignments that are appropriate and innovative for the department on my own- and
> have been penalized for it.
>
> There is nothing in my role profile about clerical work. If you need to replace
> me- I don't think you will find someone for my salary.  SOF, ¶ 74; Exhibit "38".
> (Emphasis added).

Based on this final act of insubordination and the other instances of unprofessional

conduct leading up to it, all of which are contained in defendant's Statement of Facts and

incorporated herein by reference, plaintiff's employment was terminated on November 27, 2006.

For the reasons set forth below, all of plaintiff's claims against the defendant should be

dismissed pursuant to Federal Rule of Civil Procedure 56(c).

## II.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted because plaintiff has failed to produce any evidence

demonstrating that a genuine issue of material fact exists, and based upon the facts shown,

defendant is legally entitled to judgment in its favor.  Defendants will show "that there is an

absence of evidence to support the nonmoving party's case." Celotex  Corp. v. Catrett, 477 U.S.

317, 325-327 (1986).

To defeat a summary judgment motion, plaintiff "may not rest upon mere allegation or denials of [her] pleading;" rather, [she] "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 257 (1986). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Colburn v. Upper Darby Township, 946 F.2d 1017, 1020 (3d Cir. 1991) (to survive a summary judgment motion, plaintiff must introduce more than a scintilla of evidence showing a genuine issue of fact) (internal citations omitted). In considering a summary judgment motion, courts consider only evidence that would be admissible at trial. See Fed. R. Civ. P. 56(e); see also Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (hearsay that would not be admissible at trial cannot be considered at summary judgment).

Applying these principles to this case, summary judgment should be granted because plaintiff has failed to produce evidence demonstrating that a genuine issue of material fact exists as to any of the elements she must prove to establish her claims. Defendant is entitled to judgment as a matter of law.

### B. PLAINTIFF WAS NOT DISCRIMINATED AGAINST BECAUSE OF HER AGE.

An employee, like plaintiff, who sues her former employer under the ADEA, bears the burden of demonstrating that she has been discharged or otherwise discriminated against because she was a member of a protected class. The ADEA provides:

§623. Prohibition of age discrimination.

(a)    **Employer practices.** It [*8] shall be unlawful for an employer - -

(1)     to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2)     to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status of an employee, because of such individual's age; or

(3)     to reduce the wage rate of any employee in order to comply with this Act.

Plaintiff may satisfy her burden by offering direct evidence of intentional discrimination or circumstantial evidence that creates an inference of discrimination.  See, Winter v. Cycam/Med Source Techs, 166 Fed Appx 593, 2006 U.S. App. LEXIS 1059, 2006 WL 91567, No. 05-3593 *2 (3d Cir. Jan. 17, 2006), citing, Potence v. Hazelton Area School District, 357 F. 3d 366, 370 (3d Cir. 2004); Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999); Eaddy v. Pa. Department of Public Welfare Berks County Assistance Office, Civ. Act. No. 04-5909, 2006 U.S. Dist. LEXIS 11674, at * 14 (E.D. Pa. Mar. 20, 2006).

     To the extent that plaintiff alleges that her employment was terminated and she was discriminated against because she was over the age of forty (40), the record is devoid of any direct evidence of age discrimination. Accordingly, plaintiff must rely upon circumstantial evidence to avoid summary judgment, and that the evidence is evaluated under the McDonnell Douglas standard. See Pivirotto, 191 F.3d at 352 n.4; Eaddy, 2006 U.S. Dist. LEXIS 11674, at *16.

     In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court established a burden-shifting framework to assess the evidence presented in employment discrimination cases. Under this framework, plaintiff must first make out a *prima facie case* of discrimination, and if she fails to satisfy this minimal burden, the claims must be dismissed. See Pivirotto, 191 F.3d at 352 n.4. To make *a prima facie* case of age discrimination in the Third Circuit, plaintiff must

show that (1) she was a member of the protected class; (2) she was qualified for her position; (3) she was dismissed from her position; and (4) in the case of discharge, she was replaced by a sufficiently younger person to create an inference of age discrimination.  29 U.S.C. 621 (a)(2); Washington v. Volunteers of America, 05-CV-4186, 2007 U.S. Dist. LEXIS 56583, (E.D. Pa. August 3, 2007);  Simpson v. Kay Jewelers, 142 F.3d 639, 644 n. 5 (3d Cir. 1998).

   If the evidence supported *a prima facie* case—here it does not—the defendant then would bear the burden of showing that plaintiff was terminated for a legitimate, nondiscriminatory reason. Fuentes v. Perskie, 42 F.3d 759, 763 (3d Cir. 1994)[2]. Once the defendant explains the lawful bases for plaintiff's termination, the burden then returns to plaintiff to prove that there is sufficient evidence from which a fact-finder reasonably could either disbelieve the explanation given or believe that, more likely than not, plaintiff's termination was motivated by an invidious discriminatory reason. Id. The ultimate burden of persuading the trier of fact that the NBME acted with discriminatory intent remains on plaintiff. Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999); see also Barber v. CSX Distribution Services, 68 F.3d 694, 698 (3d Cir. 1995).

### 1.     Plaintiff Has Not Established A *Prima Facie* Case Of Age Discrimination

   Plaintiff has failed to satisfy her initial burden of establishing a *prima facie* case of age discrimination. It is undisputed that plaintiff is a member of a protected class and was qualified for the Test Development Program Assistant position she held at NBME. It is also undisputed that plaintiff suffered an adverse employment action when she was fired from her position on November 27, 2006.  Plaintiff cannot show, however, that was she

---

[2] Fuentes is a Title VII case; however, the Third Circuit has recognized that "where appropriate the analysis used in the evidentiary burdens in an ADEA case are also used in Title VII cases. Id. at 764, n.6.  See Adams v. Dupont/Merck Pharmaceutical Co., 93-CV-207, 1994 U.S. Dist LEXIS 17842 n.2 (E.D.Pa Dec. 15, 1994).

discriminated against because of her age, replaced by someone younger, or fired under circumstances that give rise to an inference of age discrimination.   Plaintiff was not replaced by an individual of a favored class. See Hartwell v.  Lifetime Doors, Inc., Civ. Act. No. 05-2115, 2006 U.S. Dist. LEXIS 6026, at *21 (ED. Pa. Feb. 16, 2006) (evidence showing that the position was ultimately filled by a person not of the protected class is a common way for a plaintiff to create an inference of discrimination).   Rather, her duties were redistributed to two (2) of her coworkers, Faith Balsama, aged fifty (53), and Debbie Shelmire, aged forty-nine (49).  SOF, ¶ 80.  Several courts have held that where plaintiff was replaced by someone older, they cannot prove a *prima facie* case of age discrimination.  Washington v. Volunteers of America, et al., 05-CV-4186, 2007 U.S. Dist. LEXIS at *17 (E.D.Pa. Aug. 3, 2007); Gutknecht v. Smith Kline Beecham, 05-CV-6013, 950 F.Supp. 667 (E.D.Pa. 1996). Other courts have modified the fourth prong of McDonnell Douglas in non-reduction-in-force cases, where the discharged employee's responsibilities were assumed by others, by requiring evidence instead that younger employees were treated more favorably.  Steward v. Sears Roebuck & Co., 312 F. Supp 2d 719 (E.D.Pa. 2004). But see, Millard v. Corestates Financial Corp., 98-CV-5028, 2001 U.S. Dist. LEXIS 15873 (E.D.Pa. July 26, 2001), (where two existing employees assumed plaintiff's duties upon his discharge, this did not equate to "replacement", and plaintiff could not meet the fourth prong).  Here, plaintiff cannot satisfy either test; she was not replaced by a younger employee; her duties were absorbed by existing employees, who were in the same protected class, one who is fifty-three (53), and one who is forty-nine (49); and, there is no evidence that younger employees were treated more favorably.

It appears that plaintiff attempts to infer discriminatory intent from the fact that she was asked to perform certain clerical tasks (Statement of Facts ¶ 18(a)), and that her pay raise, because it was based on her "satisfactory" evaluation, was modest. (Complaint ¶18(c)).[3]

## 2. No Adverse Employment Action Prior to Discharge

Not everything an employer does, or that happens to an employee on a job, rises to the level of an adverse action for ADEA purposes. An adverse employment action is an action taken by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997). The concept of an adverse employment action encompasses any "*significant* change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." Weston v. Pennsylvania, 251 F.3d 420, 430-31 (3d Cir. 2001)(quoting Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 749 (1988)) (emphasis added). Plaintiff suffered no adverse employment action from the assignment of clerical work or the promise of a two percent (2%) raise.

First, every employee at NBME, but especially those who serve in support roles, perform some clerical tasks. Plaintiff testified that she agreed it was "not discrimination" to perform clerical tasks for her direct supervisor, Ms. Holtzman, but seemed to feel that it might be discrimination if she was asked to do so for a different supervisor, although plaintiff gave inconsistent testimony in this regard. SOF, ¶ 28; Exhibit "8"; Plaintiff's Dep., pp.101-103; 121.

Plaintiff also complained that the specific clerical tasks she performed were not specified in the newly created Role Profile for her newly created Program Assistant position. However,

---

[3] Plaintiff apparently has abandoned the additional allegations in her Complaint, that a Test Development, Special Projects position she applied for unsuccessfully was given to a younger employee. Indeed, she withdrew her application before she could be considered. Moreover, she testified that she was not even certain the position was filled, or if it was, who had gotten it. See Complaint ¶18(b), SOF ¶24, Exhibit "8"; Plaintiff's Dep., pp. 123, 126-127.

Role Profiles are not mechanical scripts, dictating an etched-in-stone scope of responsibilities, and shielding employees from doing other job-related tasks as necessitated by the job or requested by their supervisors. Rather, each is a "work in progress", setting forth the general parameters of the position. See, SOF, ¶ 14; Exhibit "9". Moreover, plaintiff herself acknowledged that there were many non-clerical tasks she performed, which she agreed were contained in the Role Profile, such as learning and working on data base applications, cataloguing slides, and the like. See, SOF, ¶¶ 26, 27; Exhibit "8"; Plaintiff's Dep., pp. 77-79, 101-102, 104-105 and 114; Exhibit "14".

The assignment of clerical tasks represents the part of plaintiff's job as a Program Assistant that she did not like doing. Not everything that makes an employee unhappy, however, qualifies as an adverse employment action; "otherwise minor actions that an irritable employee does not like would form the basis of a discrimination lawsuit". Robinson v. City of Pittsburgh, 120 F.3d, 286, 1300 (3d Cir. 1997). Moreover, the assignment of clerical tasks is not an employment decision which has a material adverse impact on the terms or conditions of one's employment. Burton v. Pa. Board of Probation and Parole, 02-CV-2573, 2004 U.S. Dist LEXIS 25491, n.4 (E.D.Pa. Dec. 20, 2004).

The other factor which plaintiff alleges as evidence of discrimination is that her November 21, 2006, performance rating was "only" satisfactory, and her pay raise[4] would not have been as large as she believed she deserved. But even an unsatisfactory performance evaluation is not necessarily an adverse employment action. E.g. Spears v. Mo. Dept. of Corrections, 210 F. 3d 850, 854 (8th Cir. 2000); McKenna v. City of Philadelphia, No. 998-CV-5835, 2003 WL 171373, at 10 (E.D.Pa. Jan. 17, 2003). Consequently, a satisfactory evaluation

---

[4] Plaintiff seems to think her pay raise would have been one percent (1%) in January 2007, had her employment not been terminated. The 2007 NBME pay scale called for a salary increase of a minimum of two percent (2%) for employees receiving a "satisfactory rating". SOF, ¶70; B. Davidson Affidavit, Exhibit "36".

cannot be considered "adverse".  By the same token, a projected raise in pay (albeit a smaller raise than one wanted) cannot be considered adverse for ADEA purposes.  Nor does plaintiff's belief in her own abilities change this analysis.[5]  The fact that plaintiff believed she was smarter than her supervisor and others, did not exempt her from carrying out the responsibilities of her Program Assistant job.  Wiggins v. Community College of Philadelphia, 99-CV-1822, 2000 U.S. Dist. LEXIS at  646 *9 (E.D.Pa. Jan. 31, 2000).  ("Plaintiff's belief in her performance abilities, without more, does not establish pretext or discriminatory intent"); see also, Billet v. Cigna Corp., 940 F.2d 812, 825 (3d Cir. 1991).

Prior to the termination of her employment for insubordination, plaintiff clearly was not subjected to any "classic" adverse employment action during her fourteen (14) months at NBME.  She was not suspended without pay, not laid off, not demoted, and not reassigned.  There is no evidence that plaintiff's work schedule changed; she was not transferred; her pay was not reduced and, in fact, would have been increased; and her title remained constant.

### 3. There Is No Basis To Infer Age Discrimination

Even if there were a triable issue on the adverse employment element of plaintiff's age discrimination claim, which there is not, the claim would still fail because of the absence of evidence to support an inference of age discrimination.  Plaintiff cannot show that there were similarly situated employees at NBME under the age of forty (40) who were treated more favorably than she was, which is a crucial aspect of any disparate treatment case.  See Bartholomew v. St. Luke's Hospital -- Allentown Campus, No. 02-CV-2876, 203 WL 21250561, at 5 (E.D. Pa. Apr. 29, 2003).  Nor is there any proof of discriminatory intent on the part of Kathy Holtzman or, for that matter, anyone else at NBME.

---

[5] Plaintiff's only available prior employment records show that plaintiff also believed that she was overqualified for the work she was given at the University of Pennsylvania and at Wistar Institute.  SOF, ¶¶ 7, 8, 11, Exhibits "4" and "7".

First, plaintiff occupied a one-of-a-kind position.  See SOF, ¶16.  The job-related events she complains about, i.e., the supposed assignment of tasks "beneath" her, the supposed assignment of duties "outside" the scope of the Role Profile plaintiff had drafted and entered in the NBME Intranet, could only have happened to plaintiff.  Even if there were similarly situated Test Development Program Assistants, which there were not, there is not one scintilla of evidence that any similarly situated  NBME employee under the age of forty (40) was shielded from the performance of clerical duties.  Indeed, plaintiff testified that the "young girls" and "young production assistants" all performed clerical duties.    SOF, ¶ 30; Exhibit "8"; Plaintiff's Dep., pp. 82-83.  Nor is there evidence that other employees under the age of forty (40) were not given any clerical tasks, unless specifically delineated on a Role Profile.  This is not the case. Indeed, the NBME Role Profile description belies that suggestion - - the Role Profile is always a generic description at best, and a work in progress.  SOF, ¶ 14; Exhibit "9".

To the extent that plaintiff attempted to suggest at her deposition that Kieran Hussie, a younger male, was treated more favorably than she, plaintiff offers no specific facts which can be construed as evidence.  Indeed,  Mr. Hussie was in a completely different position from plaintiff, and cannot be considered a proper comparator.   As Test Development Associate I for Special Projects, his focus was on multimedia, and his prior experience was concentrated in this area.  Plaintiff's Complaint avers that she applied for the Test Development Special Projects position vacated by Mr. Hussie when he was moving to a different unit.  However, plaintiff unilaterally withdrew her application for the position, and has effectively abandoned that aspect of her claim, by acknowledging at her deposition that Paragraph 18(b) of her Complaint is incorrect, and she can't say who, if anyone, was offered that position.  SOF, ¶ 24; Exhibit "8"; Plaintiff's Dep., pp. 123, 126-127.

Plaintiff also pointed to two colleagues in Test Development over aged forty (40), Faith

Balsama, aged fifty-three (53), and Debbie Shelmire, aged forty-nine (49), claiming in Paragraph

19 of her Complaint that they were denied promotions based on their age.  However, the

Affidavits of Ms. Balsama and Ms. Shelmire are attached.  Exhibit "40".  Both women disagree

with plaintiff, and deny that they have been subjected to any age discrimination at NBME.  This

certainly cannot be construed as "evidence" of discrimination.  Nor is it "evidence" for plaintiff

to speculate on whether others who left the NBME may have suffered discrimination, where

plaintiff has no personal knowledge.  Exhibit "8"; Plaintiff's Dep., pp. 183-184.  Rumors and

hearsay do not constitute evidence.

Moreover, when questioned at her deposition as to the basis for plaintiff's contention that

she was intentionally subjected to age discrimination by a supervisor older than she, plaintiff

certainly was bitter, but offered no evidence of discrimination.  She blamed Ms. Holtzman for

making her unhappy, and she blamed NBME for promoting Ms. Holtzman pursuant to the "Peter

Principle", claiming Ms. Holtzman was elevated to the level of her "incompetence."  Plaintiff

offered her own perception, a novel explanation:  Ms. Holtzman could push the younger

"patsies" in the unit around, but not the older confident and strong employees, such as plaintiff.

She blamed "corruption" as the root of her problems, and the basis for promotions and other ills

in organizations.  Plaintiff repeatedly extolled her own virtues, and claimed her own skills to be

superior to those of all of the supervisors who had been threatened by plaintiff's skills at both

NBME and at the University of Pennsylvania.  The Wistar Institute records reflect the same

pattern of grievances.  Exhibit "47".  Plaintiff believed that she was overqualified to handle the

clerical work she was given at Wistar too.  SOF, ¶ 11; Exhibit "7".  Plaintiff's work history

reflects that she is chronically dissatisfied; she alienates her supervisors and other employees,

then either leaves the job or is discharged, believing always that others were threatened by her superior skills or that she has been the victim of discrimination or corruption.  Plaintiff fails to perceive how her own conduct has contributed to any situation.

Without minimizing the problem of age discrimination in American society, defendant submits that plaintiff's own perceptions - - that others are threatened by her superior skills - - and her inflated notion of her value to organizations that she feels have not appreciated her talents - - proves nothing.  Legally, plaintiff's perceptions are not enough to propel her case forward without concrete evidence.

Plaintiff evidently believes that because she <u>is</u> over age forty (40), everything she dislikes that happens to her must be <u>because</u> of her age.  Her self-serving statements are expressions of her perception, but they cannot take the place of factual evidence.  The record contains no <u>evidence</u> from which a fact-finder could infer that anything defendant did, vis-à-vis plaintiff, was done because of her age.

**4.    Defendant Has Articulated Numerous Nondiscriminatory Reasons for Plaintiff's Termination**

Even if plaintiff had established a *prima facie* case of age discrimination, the defendant has articulated legitimate, nondiscriminatory reasons for terminating plaintiff's employment.  Plaintiff engaged in multiple acts of insubordination, essentially refusing to perform her duties.  Plaintiff refused to comply with her supervisor's request to account weekly for the time she was spending on projects; she refused to comply with her supervisor's request to stop complaining about Ms. Holtzman's actions to others (other than Human Resources) outside of the unit.  Even her co-workers wearied of hearing her complaints.  One of them, Faith Balsama, e-mailed plaintiff, advising her that she was no longer going to be part of plaintiff's "crusade".   SOF, ¶ 58; Exhibit "27".  On November 22, 2006, plaintiff wrote an e-mail in which, quite simply, she

refused to do her job. Included in the e-mail was plaintiff's announcement that Ms. Holtzman

was not qualified to supervise plaintiff. Finally, plaintiff engaged in at least potentially

threatening workplace conduct by forwarding an e-mail to a co-worker, which included an article

about a worker who had shot and killed his supervisor. SOF, ¶ 27; Exhibit "33". Defendant

does not know if plaintiff intended it seriously; but, in any event, it constituted inappropriate

workplace conduct.   Plaintiff's insubordination and unprofessional conduct constituted

sufficient grounds for her discharge.

### 5.    Plaintiff Has Not Shown That Defendant's Reasons For Terminating Her Were Pretextual

There is no evidence from which a jury reasonably could disbelieve the legitimate,

nondiscriminatory reasons that NBME has provided for plaintiff's termination or conclude that

those reasons were a pretext for age discrimination.  This is a case in which "the employer

should have been able to take adverse employment actions against the employee without fear of

being embroiled in an expensive law suit". Jones v. School District of Philadelphia, 198 F.3d at

414. See also, Keller v. Bluemle, 571 F. Supp. 364 (E.D.Pa. 1983) (Insubordination grounds for

termination where employee "unvoluntered" to do his job; he also refused to continue doing a

task "next year" unless his job description was changed to include that task specifically).

The defendant has provided compelling reasons for terminating plaintiff's

employment. Just as the Third Circuit stated in Jones, plaintiff can quibble with NBME's

determinations regarding the various workplace conflicts in which plaintiff has been involved, but

she cannot minimize or trivialize the negative impact that her behavior had upon those with whom

she worked and to whom she reported. See Jones, 198 F.3d at 414; see also Nicholson v. Bradley

Graphic Solutions, Inc., Civ. Act. No. 03-2151, 2004 U.S. Dist. LEXIS 7153, at * 15-16 (E.D. Pa

Apr. 24, 2001) ("[d]efendant's explanation that plaintiff's termination was based on defendant's

inability to tolerate his continued intimidation and harassment of its workers is a rational

employment decision that is motivated not by any discriminatory animus, but by legitimate concerns

of maintaining a hostile-free work environment"). Plaintiff may disagree with NBME's decision

to terminate her employment,[6] but her critique carries no weight because the Court should not

second-guess the decision. "[This] Court is not a 'super-personnel department [ ]' that sits in

judgment of business decisions." Cheatom v. Burger King Corp., Civ. Act. No. 05-251, 2006

U.S. Dist. LEXIS 6670, at *16 (ED. Pa. Feb. 22, 2006) (allegations that employer ignored

plaintiff's complaints about workplace issues did not amount to racial animus).

    To survive summary judgment, plaintiff "must show, not merely that the employer's

proffered reason was wrong, but that it was so plainly wrong that it cannot have been the

employer's real reason." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997);

see also Hartwell, 2006 U.S. Dist. LEXIS 6026 at *30 (plaintiff must somehow explain why

the employer's explanation is implausible). This plaintiff simply has not done.

    Alternatively, plaintiff may survive summary judgment by "identify[ing] evidence in the

summary judgment record . . . that proves discrimination . . . based solely on [its] natural

probative force." Keller, 130 F.3d at 1111. Other than voicing her strong personal sentiments on

this issue, plaintiff has provided nothing from which a jury could conclude that her termination

was unlawful. Sarullo v. U.S. Postal Service, 352 F.3d 789, 800 (3d Cir. 2003) (plaintiff's

personal view that her employer's stated reason for his termination was a "sham" falls far short of

establishing pretext).

    As stated, there are no similarly-situated employees with whom plaintiff may

compare herself.  In addition to plaintiff having been the first Test Development Program

---

[6] At one part in plaintiff's deposition, however, she testified that "she was not [here] for the termination", but for other reasons, like the clerical work and failure to be promoted.  Plaintiff -- who had been a full-time employee for less than a year -- felt aggrieved that she had not been promoted.  Exhibit "8"; Plaintiff's Dep. pp. 228-229.

Assistant, no NBME employee over NBME's recent history has been fired for insubordination or the combination of reasons for which plaintiff's employment was terminated. The record demonstrates that no NBME employees were discharged for the same or similar reasons - - such as failure to follow her supervisor's orders, refusing to report to her supervisor, or other insubordination - - for which plaintiff's employment was terminated. SOF, ¶ 81; Exhibit "36", Davidson Affidavit.  When, as in this case, there is no evidence that the employer previously discriminated against other older employees or treated younger employees more favorably, summary judgment is appropriate. Hartwell, 2006 U.S. Dist. LEXIS 6026, at *32.

None of the record evidence would permit a factfinder to disbelieve the proffered legitimate reasons for plaintiff's termination or to believe that, more likely than not, age discrimination was a determinative cause of the termination of plaintiff's employment.

### C.    RETALIATION CLAIMS

Paragraphs 26 through 29 of plaintiff's Complaint alleged that NBME retaliated against plaintiff for engaging in protected activity .  Defendant is entitled to summary judgment on plaintiff's retaliation claim.

The ADEA's anti-retaliation provision provides:

> **(d) Opposition to unlawful practices; participation in investigations, proceedings or litigation.**  It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

29 U.S.C. §623(d)

This provision is not materially different from the anti-retaliation provision contained in Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), which was recently construed by the

United States Supreme Court in <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126

S.Ct. 2405, 165 L.Ed. 2d 345 (2006).

     Under the <u>Burlington Northern</u> analysis, the anti-retaliation provision covers actions that

a reasonable employee would find materially adverse, meaning that "it might well have

dissuaded a reasonable worker from making . . . a charge of discrimination". <u>Burlington</u>

<u>Northern</u> 2006 U.S. LEXIS 2495 at *26-27. Material adversity is required, and must be

separated from trivial issues. <u>Burlington Northern</u>, 2006 U.S. LEXIS 4895, at *27. Thus, an

employee's decision to report discriminatory behavior cannot immunize that employee from

those petty slights or minor annoyances that often take place at work and that all employees

experience. See 1B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed,

1996) (noting that courts have held that personality conflicts at work that generate antipathy and

snubbing by supervisors and co-workers are not actionable under §704(a)).

     Retaliation claims under this statutory provision are analyzed in accordance with a

version of the <u>McDonnell Douglas</u> burden-shifting scheme discussed above. <u>See</u>, <u>e.g.</u>, <u>Shaner v.</u>

<u>Synthes (USA)</u>, 204 F.3d 494 (3d Cir. 2000).

     Again, the <u>McDonnell Douglas</u> process has three stages: first, the plaintiff must make a

*prima facie* case which, in the retaliation context, entails showing that she (1) engaged in

statutorily protected activity, after which she (2) suffered an adverse employment action which

was (3) causally connected to her protected activity. Second, if the plaintiff does this, the burden

shifts to the employer to articulate some legitimate non-retaliatory reason for the challenged

action(s). Third, if the employer meets this burden of production, the plaintiff then must show

that the defendant's stated reasons for its action(s) were pretextual. See Shaner, 204 F.3d at 500-501.

## 1.   No Protected Activity

Plaintiff cannot make out a *prima facie* retaliation case against NBME. She did not complain to Barbara Davidson, aged fifty-nine (59), at Human Resources, or to Ms. Holtzman, that the issues concerning Ms. Holtzman she was complaining about had anything to do with plaintiff's age. Even if she had, plaintiff was discharged for her own escalating unprofessional conduct and insubordination; thus, there is no basis for inferring any casual link between whatever happened to her and any protected activity.

Plaintiff has offered no direct evidence of retaliation. Thus, she must solely rely upon indirect, circumstantial evidence in her effort to survive summary judgment. When plaintiff's retaliation claim is considered under the McDonnell Douglas scheme, as it must be, it must be dismissed. See Barber, 68 F.3d at 694; see also, Hartwell, 2006 U.S. Dist. LEXIS 6026, at *58.

Plaintiff complained to Barbara Davidson in Human Resources, beginning on October 18, 2006. SOF, ¶ 44; Exhibit "8"; Plaintiff's Dep., p. 265. But plaintiff's complaints addressed unfairness, not age. She was angry that she had undertaken an editing project, and that Ms. Holtzman did not value her edits; she was angry that Ms. Holtzman revised her work; she felt that she, plaintiff, was the better editor; she didn't like Ms. Holtzman's ethics, and she didn't like her personally. Ms. Davidson's notes of the October 18, 2006, meeting, made contemporaneously, memorialize the conversation, and do not mention the term "age". SOF, ¶ 45; Exhibit "17". Plaintiff filed two (2) separate NBME Values Hotline reports, checking the form box to "categorize them as relating to "diversity, equal opportunity, workplace respect", but never once mentioning age as the basis of her perceived injustices. In all of her grievances,

plaintiff equated "discrimination" with "unfairness," complaining about Ms. Holtzman's inability to value plaintiff more highly, or get along better with her, and the type of work that plaintiff was assigned.

It is therefore impossible to treat plaintiff's e-mails, complaints to Barbara Davidson at Human Resources, and Hotline complaints as "opposition," duly expressed to NBME, to "any practice made an unlawful employment practice." See Barber v. CSX Distribution Services, 68 F.3d 694, 701-702 (3d Cir. 1995) (letter to Human Resources about unfair treatment in general not "protected conduct"). Bartholomew, 2003 WC 21250561, at *6 (same).

If plaintiff had made an age discrimination complaint to Ms. Davidson, NBME policy would have required Ms. Davidson to investigate it. SOF, ¶85; Exhibit "41". Because plaintiff's complaint did not mention age, and addressed instead many things she disliked about her supervisor, Ms. Davidson did not launch such an investigation. Opposing the conduct of an employer cannot be protected activity if no reasonable person could have believed that the complained-of actions taken by the employer violated [ADEA]. See Clark County School Dist. v. Breeden, 523 U.S. 268, 271 (2001), McKenna, 2003 WL 171373, at *8.

Just having contact with Human Resources personnel, such as Ms. Davidson, cannot in itself constitute protected activity, without regard to the substance of the contact. Otherwise, employees experiencing job-related problems of any nature could "set up" future retaliation claims, merely by dropping in to talk with a Human Resources employees. As broad as the concept of protected "opposition" is, it does not extend this far. All of plaintiff's written complaints, in addition to Ms. Davidson's notes, make clear that plaintiff's complaints were related to her relations with her supervisor, and could not reasonably be construed as

opposition.  Thus, plaintiff did not engage in statutorily protected activity, by contacting

Human Resources or filing Hotline grievances.

> ### 2.    Plaintiff's Discharge Was For Insubordination, And Was Not Casually Related to Any Possibly Protected Activity

The mere fact that an adverse employment action occurs after a complaint will ordinarily

be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two

events". Robinson, 120 F.2d at 1302.  Only if the timing is "unusually suggestive" of

retaliatory motive can a casual link possibly be inferred.  Id.

The timing of plaintiff's discharge was not "unusually suggestive" of a retaliatory

motive. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (articulating

this requirement and citing case in which plaintiff was fired two days after filing a complaint).  It

follows from Clark County School District, 532 U.S. 268, that even if NBME knew about

plaintiff's complaint, it would have acquired that knowledge on October 18, 2006, the day

plaintiff met with Human Resources.  Yet plaintiff's employment was not terminated until more

than five (5) weeks later - - shortly after plaintiff prepared an e-mail stating that she would no

longer perform her job responsibilities.  See, e.g., Shellenberger v. Summit Bancorp., Inc.,

318 F.3d, 183, 189 (3d. Cir. 2003) (holding ten day period between protected activity and

adverse employment action only with other evidence of retaliation comments, was sufficient

to survive summary judgment); DiSilverio v. Service Master Prof'l, 05-CV-1368, U.S. Dist.

LEXIS 24732 *18 (W.D.Pa. Mar. 31, 2007) (five to six week period between protected act

and termination not so close in time to be "universally suggestive" of causation); Zappen v.

Pa. Bd. of Probation & Parole, 00-CV-1409, 2002 U.S. Dist. LEXIS 23424, 2002 WL

32174230, *10 (E.D.Pa. Nov. 25, 2002) (two month period between protected activity and

adverse employment action was not usually suggestive enough to demonstrate causation

without more evidence); Pritchett v. Imperial Metal & Chemical Co., 196-CV-0342, U.S.

Dist. LEXIS 13841, 1997 WL 570929, *4 (E.D.Pa. Sept. 8, 1997) (same). Moreover, from

mid-October through November, 2006, Ms. Davidson was still attempting to mediate the

relationship between Ms. Holtzman and plaintiff. Plaintiff was contacting Ms. Davidson

regularly, who remained responsive to her. Ms. Holtzman, too, was seeking assistance from

Human Resources in communicating better with plaintiff. Ms. Davidson and Ms. Holtzman

certainly would not have made those gargantuan efforts if they had decided to fire plaintiff. It

is equally dubious that they would have engaged in those efforts if they had known that at least

since June 2006, plaintiff was actively seeking job interviews with the University of Pennsylvania,

Temple University, Drexel University and others, and was planning to leave NBME. SOF, ¶ 20;

Exhibit "14". Moreover, even if plaintiff had engaged in protected activity on October 18,

2006, there is no other evidence of any adverse employment actions taken leading up to her

actual discharge.

Plaintiff's Complaint alleges that she applied for, but failed to receive promotions.[7]

First, the Court cannot even consider this allegation of an adverse employment action because

plaintiff submitted, then withdrew her applications for both positions before she could be

interviewed. SOF, ¶ 20; Exhibit "14"; Exhibit "8"; Plaintiff's Dep., pp. 238-239, 240. Nor is

this a situation where the positions were not posted, and therefore plaintiff could not apply.

Keen v. D.P.T. Business School, 00-CV-758, 2002 U.S. Dist. LEXIS (E.D.Pa. Jan. 9, 2002).

Rather, job openings were posted on NBME's Intranet, and plaintiff could apply for any

position she sought. Plaintiff chose to apply on October 18, 2006, and October 20, 2006

---

[7] Plaintiff testified at her deposition that Paragraph 18(b) was incorrect, effectively abandoning this claim. (SOF, ¶ 24; Exhibit "8"; Plaintiff's Dep. pp. 123, 126-127).

respectively, then chose unilaterally to withdraw her applications.  SOF, ¶¶ 23, 24, 25; Exhibit

"16".  NBME could not deny plaintiff's positions which she did not continue to seek.

Further, while Kathy Holtzman suggested in an e-mail and in conversations with

plaintiff that a lateral move might be appropriate, SOF, ¶ 66; Exhibit "32", a lateral move that

does not involve a demotion in form or substance is not an adverse employment action.

Armstead v. Norfolk So. Corp., 04-CV-1675, 2006 U.S. Dist. LEXIS 11953 (E.D.Pa. Mar 3,

2006).  In the e-mail exchanges of  November 16, 2006, plaintiff complains to Ms. Holtzman

about the possibility of any lateral move, and that she might have to work herself up from

"Production Assistant".  Ms. Holtzman responds, "I suggest you focus on performing your

current role well so you can be considered a strong candidate for other roles.  Once you have

done that consistently and successfully, I will be happy to discuss your career development.

Thank you."  Ironically, plaintiff was seeking advancement through the same time period in

which plaintiff was ignoring her supervisor's request, e.g., to submit a weekly breakdown of

her time spent on projects, and ignoring Ms. Holtzman's requests not to take her issues to other

employees other than Human Resources.

To the extent that plaintiff complained about doing clerical work, these assignments

were not retaliatory or new events. Plaintiff was assigned clerical work before and after

October 18, 2006, and cannot seriously contend that there was any material change in the

quality or nature of her work assignment because of her contact with the Human Resources

unit.

Plaintiff's e-mail to a friend, found on her computer after she left NBME's employ,

also supports the conclusion that plaintiff's intent in complaining was to be insubordinate, not

to get true assistance from Human Resources because she was a victim.  On October 24, 2007,

plaintiff wrote to her friend, Renee Brock, "Subject: sparring":

> Well, the shit hit the fan yesterday.  My "Boss" sent me an e-mail full of crap-
> and I sent one back (about 500 words) that basically I wasn't going to take her derisive
> comments and condescending assignments anymore.
>
> I had a prescheduled meeting that afternoon, and I walked in and asked if we
> still had the meeting.  She said she really didn't have anything to say, and that I should
> not have used the e-mail to voice my feelings-and that I was disrespectful.
>
> Ha!  She then came out and addressed the issue of the database that had taken
> me six months to build-that I was to work with her assistant and fine tune it.
>
> I have never felt so good in my life-I had nothing left to lose once she said
> maybe I should start looking for another job.  Hey-I'm not going anywhere!  I spoke to
> one of the Senior Management-and they are aware of the problems she is causing here-
> there have been many complaints.  I should have done this when I was at Penn-I just
> send all my communications with her to HR.  (Emphasis added).

> Following a response from her friend, plaintiff added:

> Well-we'll see if they finally drop a house on her (my boss).  Meanwhile, the
> editing of this tutorial that she took away from me-and claims she never told me to do-I
> just looked at it.  She gave it to her mini-me who is just using most of my stuff and
> calling it her own.  Whatever she changed is terrible-prolix as they used to say at Penn-
> neither one of them can write.  If you have to read something three times to understand
> it-then it sucks.

These were not the words of a victim of discrimination.  Plaintiff's e-mail represented her true

intent: to battle with and defy her supervisor, to cause "turmoil", and to enlist Human

Resources as a strategy in her self-proclaimed war with her supervisor, not as a shield to any

discrimination.  See also, SOF, ¶ 61; Exhibit "27".

The undisputed facts show that plaintiff's defiant November 22, 2006, e-mail was the

culmination of an ongoing pattern of insubordination on plaintiff's part during October and

November 2006, that led to the termination of plaintiff's employment on November 27, 2006.  No

factfinder could reasonably infer a causal connection between plaintiff's assertions that she

complained about age discrimination on October 18, 2006, and plaintiff's discharge more than

five (5) weeks later, given plaintiff's ongoing insubordination beginning in October 2006. See

Rompola v. Lehigh Valley Hospital, Civ. Act. No. 03-2993, 2004 U.S. Dist. LEXIS 4087, at

*20 (E.D. Pa. Mar. 11, 2004) (no causal connection where record is clear that the employment

problems that plaintiff experienced after notifying her employer of her intent to file an EEOC

charge were consistent with the problems she had prior to the notification); Wagner v. Berwick

Industries, 03-CV-3878, 2004 U.S. App. LEXIS 26636, (3d Cir. Dec. 20, 2004). (No causal link

between plaintiff's termination based on performance and plaintiff's complaints of age

discrimination).

Even if plaintiff had established *a prima facie* case of retaliation -- which she plainly has

not - - the defendant has articulated legitimate, nondiscriminatory reasons for firing plaintiff,

which have already been discussed in detail. This case is a "classic illustration of an employee

not taking responsibility for his own imprudent actions and instead blaming the consequences on

everyone but himself." Edwards v. Merck & Co., Civ. Act. No. 05-373, 2006 U.S. Dist.

LEXIS 21111, at *1 (E.D. Pa. Apr. 18, 2006); See also, Adams v. Dupont Merck

Pharmaceutical Co., 93-CV-207, 1994 U.S. Dist LEXIS 17842 at *9 (E.D.Pa. Dec. 15, 1994)

(unsatisfactory performance sufficient basis for termination where plaintiff's supervisors found

him contentious and insubordinate); Walker v. IMS America, Ltd., 94-CV-4084, 1994 U.S. Dist.

LEXIS 18620 at *30 (E.D.Pa. Dec. 22, 1994) (J. Dalzell). Insubordination was a

nondiscriminatory basis for plaintiff's termination, where she refused to report to [her available

director], and plaintiff proferred no evidence to refute her insubordination). Moreover, whether

an employment decision was right or wrong is not the test. See Keller, 130 F.3d at 1108-09

("federal courts are not arbitral boards ruling on the strength of 'cause' for discharge[;] the

question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [plaintiff's protected activity]"); see also Cheatom, 2006 U.S. Dist. LEXIS 6670, at *16 ("The Court is not a super-personnel department that sits in judgment of business decisions") (citation omitted).

Plaintiff must point to evidence from which a factfinder *reasonably* could *reasonably* disbelieve NBME's stated reasons for plaintiff's discharge or believe they were a pretext for a discriminatory motive.[8]  There is none.

Plaintiff engaged in a series of insubordinate acts, escalating and culminating in her November 22, 2007 e-mail.  Her "shooting" article, which she e-mailed to a coworker, was at best a tasteless joke, and at worse, a threat of potential violence.  In either event, it reflected completely inappropriate workplace conduct.  Her combative nature was also reflected in her attitude with coworkers, urging them to fight too, and her communications with her friend, Ms. Brock, taking gleeful pleasure in her "challenge" of her supervisor.  SOF, ¶ 52; Exhibit "21".

"An employer does not violate [ADEA] when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise." Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000); see also Jones, 198 F.3d at 415 ("while it is true that the school district took a series of adverse employment actions against Jones, it is clear that it took the actions in response to Jones's ongoing unacceptable conduct rather than because he filed complaints under Title VII").

Accordingly, summary judgment should be granted with respect to plaintiff's retaliation claim.

---

[8] As argued above, plaintiff has not shown through sufficient evidence that a factfinder could reasonably believe that age discrimination more likely than not motivated her discharge.  See Washco at *34.

### D.   PLAINTIFF'S PHRA CLAIMS MUST BE DISMISSED BECAUSE SHE FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES

On December 1, 2006, plaintiff filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (Complaint ¶12(a)). The Charge was cross-filed with the Pennsylvania Human Relations Commissions ("PHRC") (Complaint ¶12(d)). The EEOC issued its Dismissal and Notice of Rights letter on May 7, 2007,[9] which stated:

> The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

SOF, ¶ 87; Exhibit "42".   The cross-filed PHRC charge remained pending, even though plaintiff filed this action on August 2, 2007 (Docket Entry No. 1).  After being notified that plaintiff had filed this litigation within one (1) year of her PHRC filing, without exhausting her state law administrative remedies, the PHRC terminated its proceedings on September 18, 2007. SOF, ¶ 87; Exhibit "42".

The PHRA grants the PHRC exclusive jurisdiction over claims filed with it for a period of one (1) year.  43 P.S. 8962(c).  A plaintiff has no private right of action until the PHRC has completed its proceedings or one (1) year has passed.  Walker v. IMS America, LTD., No. 94-CV-4084, 1994 WL 719611 at *5 (Dec. 22, 1994) (J. Dalzell); Clay v. Advanced Computer Application, Inc., 559 A.2d 917, 920 (Pa. 1988).

This Court has consistently dismissed PHRA claims filed before the expiration of the PHRC's one (1) year period of exclusive jurisdiction, where, as here, plaintiff has failed to exhaust her administrative remedies.  Tlush v. Manufacturers Resource, 315 F. Supp. 2d 650,

---

[9] Although plaintiff's counsel did request EEOC to issue a right-to-sue letter on June 14, 2007, the EEOC had already acted.  See Exhibit "42".

656 (E.D.Pa. 2002). Lyons v. Springhouse Corp., 92-CV-6133, 1933 WL 69515, at *3 (E.D.Pa.

Mar. 10, 1993); McGovern v. Jack D's, Inc., No. 03-CV-5547, 2004 WL 228667, at *8 (E.D.Pa.

Feb. 3, 2004), citing Clay, supra, (the limited period that a plaintiff has to file a complaint in

federal court after the EEOC issues a right-to-sue letter does not allow plaintiff to circumvent the

PHRC proceedings); Lukus v. Westinghouse Electric Corp., 419 A.2d 431, 454-455 (Pa. Super

1980) ("Allowing a discharged employee to commence an action with the courts without first

exhausting administrative remedies would be logically inconsistent with the legislature's having

created the PHRC to function as an efficient mechanism for handling such disputes").

Moreover, the path that plaintiff chose was the exclusive one.  Fye v. Central

Transportation, Inc., 409 A.2d 2, 10 (Pa 1979), citing Daly v. School District of Darby Twp., 252

A.2d 638 (Pa. 1969) ("the party can opt either to pursue relief under the Human Relations Act or

to pursue whatever other avenues are available, including "civil actions").  Thus, plaintiff cannot

"cure" this administrative defect, because she elected to litigate, and as of December 1, 2007, the

one (1) year period of PHRC's exclusive jurisdiction will have passed. Thus, plaintiff's election

to seek early access to the courts on her ADEA claims was an affective abandonment of her

PHRA claims.

Accordingly, having failed to make a good-faith use of the administrative procedures

required under the PHRA, defendant is entitled to summary judgment on plaintiff's PHRA

claims.

E. **IN ANY EVENT, PLAINTIFF'S DAMAGES ARE LIMITED TO BACK PAY FROM THE DATE OF TERMINATION TO DATE OF DISCOVERY OF APPLICATION FRAUD**

Plaintiff applied for the employment position at issue in the instant matter with defendant

NBME on September 16, 2005.  In her employment application with NBME, plaintiff stated that

her reason for leaving her employment with the University of Pennsylvania School of Medicine

was because her "position [was] eliminated." The NBME four-page detailed employment

application concludes with a Notification and Agreement which provides, in part:

> I CERTIFY THAT ALL ANSWERS GIVEN BY ME ARE TRUE, ACCURATE AND
> COMPLETE. I UNDERSTAND THAT THE FALSIFICATION,
> MISREPRESENTATION OR OMISSION OF FACT ON THIS APPLICATION (OR
> ANY OTHER ACCOMPANYING OR REQUIRED DOCUMENTS) WILL BE
> CAUSE FOR DENIAL OF EMPLOYMENT OR IMMEDIATE TERMINATION OF
> EMPLOYMENT, REGARDLESS OF WHEN OR HOW DISCOVERED.

Plaintiff signed and dated this Notification and Agreement as part of her application. SOF, ¶ 2;

Exhibit "1".

In this litigation, defendant subpoenaed documents from the University of Pennsylvania

School of Medicine relating to plaintiff's employment. One of the documents received from

University of Pennsylvania School of Medicine is a letter addressed to plaintiff, written by

Elizabeth Bien (plaintiff's former supervisor), and dated September 22, 2004. In this letter Ms.

Bien explains that plaintiff's "position with Research Program Development [of the University

of Pennsylvania School of Medicine] is being terminated effective September 30, 2004." Ms.

Bien specifies further that "the quality of [plaintiff's] interpersonal interactions and the ability to

work cooperatively with a diverse constituency, did not meet the standards of this office." SOF,

¶ 7; Exhibit "4".

In addition, NBME also learned on October 5, 2007, that plaintiff provided differing

information in two resumes, one submitted to NBME, and one submitted to the University of

Pennsylvania. In one resume, but not the other, plaintiff includes a five (5) year employment as

an office manager of Checks 54th, Inc., a company she owns with her estranged husband.

Among other things, the dates of her prior employment with Wistar Institute and Jeanes Hospital

differ materially. SOF, ¶ 9; Exhibit "5". On October 24, 2007, plaintiff was deposed by

NBME's counsel.  It was during this deposition that plaintiff also admitted that she had made

and retained copies of confidential documents belonging to NBME on a computer thumb drive.

She did this in violation of NBME's policies, the Proprietary Agreement she executed in 2005,

and against the explicit directions of her supervisor.  In fact, on November 8, 2006, plaintiff's

supervisor had sent plaintiff a detailed and clear email directing her to return all documents to

NBME.  SOF, ¶ 63; Exhibits "1" and "29".  Plaintiff did not do this.

      In her suit against NBME, plaintiff seeks damages for violation of the ADEA.  In light of

the facts described above, however, any damages awarded as backpay must be calculated as

ending no later than October 5, 2007, the date NBME first discovered plaintiff's falsification of

her application for employment.

      In <u>McKennon v. Nashville Banner Publishing Company</u>, 513 U.S. 352, 115 S. Ct. 879

(1995), the United States Supreme Court was presented with a case very similar to the one before

this court.  Ms. McKennon alleged that the Nashville Banner Publishing Company had violated

the ADEA by terminating her employment.  During the discovery process, defendant learned that

Ms. McKennon had made and retained copies of confidential documents belonging to defendant

while in its employ.  Defendant then fired Ms. McKennon (again) for willful misconduct.

      In making its decision, the Supreme Court balanced the purpose and goal of the ADEA of

prohibiting age discrimination with the employer's legitimate concerns with regard to the

employee's wrongdoing.  Noting that "it would be both inequitable and pointless to order the

reinstatement of someone the employer would have terminated, and will terminate, in any event

and upon lawful grounds" (<u>id.</u> at 362, 115 S. Ct at 886),  it focused on backpay as the appropriate

remedy.  Again, balancing two distinct interests,  the Court found:

> Once an employer learns about employee wrongdoing that would lead to a
> legitimate discharge, we cannot require the employer to ignore the information,

even it if is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.  <u>The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered.</u>

<u>Id.</u> (emphasis added).

Here, plaintiff falsified important decision-making information regarding her separation from her previous employer, the University of Pennsylvania School of Medicine, on her application for employment with the NBME, and submitted materially differing resumes to NBME and to the University of Pennsylvania.  Moreover, plaintiff lied on her NBME application when she signed the Notification and Agreement certifying that her application answers were true and accurate.   Plaintiff falsified this information despite the unambiguous warning contained in the Notification and Agreement providing that her employment would be terminated immediately for falsification or misrepresentation on her employment application.

Plaintiff's application and resume fraud provide more than ample cause for immediate termination of employment under NBME's written and practiced guidelines for employment with its agency.  Having learned of plaintiff's wrongdoing on October 5, 2007, NBME was entitled to discharge the plaintiff immediately upon discovery of her falsified application.  <u>See</u> Affidavit of Barbara Davidson, attached hereto as Exhibit "36".

Also egregious were plaintiff's actions in copying and retaining confidential documents and information from NBME.  Plaintiff did this despite being directed by her supervisor to return all NBME documents and information shortly before her termination.  SOF, ¶ 79; Exhibit "8"; Plaintiff's Dep., pp. 141, 214-216.

Accordingly, if damages are awarded in this suit, as a matter of law, plaintiff's damages must be limited to backpay from the date of termination to October 5, 2007.

### F.   PLAINTIFF CANNOT BE AWARDED DAMAGES FOR PAIN, SUFFERING AND HUMILIATION

In her complaint, plaintiff seeks damages for "pain, suffering, and humiliation caused to her by Defendant's actions." The ADEA, 29 U.S.C.S. § 621 et. seq., is clear and provides damages as follows:

> Amounts owing to a person as a result of violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: Provided, That *[sic]* liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

29 U.S.C.S. § 626(b). While the statute provides monetary and liquidated damages to a successful plaintiff based on wages or overtime, it does not provide for any damages for pain, suffering, and humiliation. Baur v. M&M/Mars, 2001 U.S. Dist. LEXIS 24162 *24-27 (E.D.Pa. Oct. 22, 2001). Thus, defendant requests that the Court grant summary judgment to defendant on plaintiff's request for such relief.

### III.   CONCLUSION

For all of the reasons stated above, Defendant NBME respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

TROIANI/KIVITZ, L.L.P.

DATE: _November 26, 2007_

_Bebe H. Kivitz_
Bebe H. Kivitz, Esquire
I.D. No: 30253
Dolores M. Troiani, Esquire
I.D. No: 21283
38 North Waterloo Road
Devon, PA 19333

(610) 688-8400

Attorneys for Defendant
National Board of Medical Examiners Of
The United States of America, Inc.

## CERTIFICATE OF SERVICE

I, Bebe H. Kivitz, hereby certify that the foregoing Motion for Summary Judgment of

Defendant National Board of Medical Examiners of the United States of America, Inc. and its

accompanying Memorandum of Law in Support of Motion for Summary Judgment of Defendant

National Board of Medical Examiners of the United States of America, Inc. was filed

electronically and is available for viewing and downloading from the ECF system.  I further

certify that a true and correct copy of said document was served via regular First Class mail,

postage prepaid, on the following:


Rufus A, Jennings, Esquire
Timothy M. Kolman & Associates
225 North Flowers Mill Road
Langhorne, PA 19047

                                        Troiani/Kivitz, LLP


                              BY:  /s/ Bebe H. Kivitz
                                        Bebe H. Kivitz, Esquire
                                        Dolores M. Troiani, Esquire
                                        Attorneys for Defendant

Date: November 26, 2007