# EXHIBIT "8" - PART 1

Page 3

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                        - - -

 4

 5

 6   DIANE ROSETSKY,          :  CIVIL ACTION
          Plaintiff          :
 7                           :  NO. 07-3167
          vs.                :
 8                           :
     NATIONAL BOARD OF MEDICAL EXAMINERS :
 9   OF THE UNITED STATES OF AMERICA, INC., :
          Defendant          :
10

11                        - - -

12

13

14          ORAL DEPOSITION OF DIANE ROSETSKY, taken

15   before Susan K. MacSorley, Registered Professional

16   Reporter and Notary Public, held in the law offices of

17   Troiani/Kivitz, L.L.P., 38 North Waterloo Road, Devon,

18   Pennsylvania 19333, on Wednesday, October 24, 2007, at

19   10:07 A.M.

20

21                        - - -

22

23

24              Susan K. MacSorley, R.P.R.
                   211 Kleyona Avenue
25            Phoenixville, Pennsylvania  19460
```

Page 2

```
 1   APPEARANCES:

 2

 3          TIMOTHY M. KOLMAN & ASSOCIATES

 4          BY:  RUFUS A. JENNINGS, ESQUIRE

 5          The Shoppes at Flowers Mill

 6          225 North Flowers Mill Road

 7          Langhorne, Pennsylvania  19047

 8          Representing the Plaintiff

 9

10          TROIANI/KIVITZ, L.L.P.

11          BY:  BEBE H. KIVITZ, ESQUIRE

12          38 North Waterloo Road

13          Devon, Pennsylvania  19333

14          Representing the Defendant

15

16   ALSO PRESENT:  SUZANNE WILLIAMS
                    National Board of Medical Examiners
17

18                        - - -

19

20

21                     I N D E X

     Witness                              Page
22
     DIANE ROSETSKY
23
           By Ms. Kivitz                  5
24

25
```

Page 4

```
 1                     E X H I B I T S

 2   Number                                    Marked

 3   D- 1    Ms. Rosetsky's National Board of     18
            Medical Examiners Employment
 4          Application

 5   D- 2    Letter dated September 22, 2004,     20
            to Diane Rosetsky from Elizabeth Bien
 6
     D- 3    E-mail dated 9/23/04 to Liz from Diane  27
 7
     D- 4    E-mail dated 9/24/04 to Liz from Diane  37
 8          Rosetsky

 9   D- 5    E-mail dated 1/12/05 to Dr. Rubenstein  42
            from Diane Rosetsky
10
     D- 6    Letter dated July 22, 2005, to       47
11          Mrs. Alan Gewirtz from Diane Rosetsky

12   D- 7    Resume submitted to the National Board  52

13   D- 8    Resume submitted to the University of  53
            Pennsylvania
14
     D- 9    Employment Reference Check for the    62
15          University of Pennsylvania

16   D-10    Cozen O'Connor Application for        63
            Employment
17
     D-11    Letter dated September 21, 2005,      67
18          to Diane Rosetsky from Meredith
            Friedman, and attached Employee
19          Innovation and Proprietary Information
            Agreement
20
     D-12    Position Editing Administration job   75
21          description for Test Development
            Associate I
22
     D-13    On-line printout entitled            88
23          "Role Profiles"

24   D-14    Letter dated December 16, 2005,      112
            to Diane Rosetsky from Meredith
25          Friedman
```

Page 4

```
 1   EXHIBITS (Continued):

 2   Number                                    Marked

 3   D-15    E-mail dated November 29, 2006,     113
            to Kathy Holtzman from Faith Balsama
 4
     D-16    E-mail dated April 6, 2006, to      192
 5          Kathy Holtzman from Diane Rosetsky

 6   D-17    E-mails dated April 11, 2006,       196
            between Kathy Holtzman and
 7          Diane Rosetsky

 8   D-18    E-mail dated November 22, 2006,     219
            to Kathy Holtzman from Diane Rosetsky
 9
     D-19    E-mails dated June 6 and June 21,   238
10          2006, between Diane Rosetsky and
            Temple and Drexel
11
     D-20    E-mail dated August 22, 2006, to    241
12          HospitalMedicine.org from
            Diane Rosetsky
13
     D-21    E-mails dated November 8, 2006,     249
14          between Diane Rosetsky and
            Faith Balsama
15
     D-22    E-mails dated October 24, 2006,     251
16          between Diane Rosetsky and Renee Brock

17   D-23    E-mails dated October, 2006, between  261
            Diane Rosetsky and Kathy Holtzman
18
     D-24    E-mails dated November, 2006, between  294
19          Diane Rosetsky and Barbara Davidson

20   D-25    2006 Year-End Performance Review    300

21   D-26    E-mail dated November 8, 2006, to    303
            Diane Rosetsky from Kathy Holtzman
22

23

24                        - - -

25
```

1          (It is hereby stipulated and agreed by
2   and between counsel for the respective parties that
3   sealing and certification are waived and that all
4   objections, except as to the form of the question, are
5   reserved to the time of trial.)
6                   - - -
7          DIANE ROSETSKY, having been duly sworn,
8   was examined as follows:
9   BY MS. KIVITZ:
10   Q.    Okay.  Ms. Rosetsky, have you ever had your
11   deposition taken before?
12   A.    Not for this.
13   Q.    In anything?
14   A.    Yes.
15   Q.    Okay.  Let me just give you a few
16   instructions.  You probably heard them before.
17   A.    Uh-huh.
18   Q.    The stenographer is going to write down what
19   you say; so it's important that she hear every word
20   that you say.  People's inclination is to shake their
21   head or nod.  Your response needs to be audible so
22   that she can hear you and then transcribe it.
23   A.    Okay.
24   Q.    The other thing I'd like to tell you is, if I
25   ask you a question and it confuses you or you don't

1   understand it, please tell me, and I'll repeat it in a
2   form that you can understand.  Okay?
3   A.    Okay.
4   Q.    If I ask you a question and you answered it,
5   I'm going to assume that the answer you gave me is
6   what you intended to give me and that you understood
7   the question.  Fair enough?
8   A.    Yes.
9   Q.    Okay.  You said your deposition had been taken
10   before.  Can you tell me in what circumstance that
11   was?
12   A.    A car accident.
13   Q.    Okay.  Was that an action filed against you or
14   that you filed against somebody else?
15   A.    They filed against me.
16   Q.    Okay.
17   A.    And then there was a real estate case, a
18   termite case on my house that I filed.
19   Q.    Okay.  And when was that?
20   A.    Oh, God.
21          MR. JENNINGS:  When was which?
22          MS. KIVITZ:  The termite case.
23          THE WITNESS:  Both of these cases are
24   fifteen to twenty years ago.
25   BY MS. KIVITZ:

1   Q.    Okay.  Do you remember who you sued in the
2   termite case?
3   A.    It was a realtor.
4   Q.    Do you remember the name of the realtor?
5   A.    No, I don't.
6   Q.    Do you remember --
7   A.    Harriet.  That's all I remember.
8   Q.    Do you remember if there was a settlement or a
9   judgment in anybody's favor?
10   A.    There was a settlement in our favor.
11   Q.    And was that a civil suit?
12   A.    Yes.
13   Q.    Are you presently employed?
14   A.    No.
15          MS. KIVITZ:  Just for the record, Rufus,
16   so you know, your legal assistant, when she could not
17   agree to continue today's deposition until tomorrow or
18   Friday so that I could attend a funeral, said the
19   reason she couldn't continue it was that Ms. Rosetsky
20   had taken the day off work.
21          MR. JENNINGS:  I also have depositions
22   all day tomorrow and all day Friday.
23          MS. KIVITZ:  I'm just telling you the
24   reason that was given to me.
25          THE WITNESS:  No, actually I had to do

1   something for my son, and maybe she was talking about
2   that.
3          MR. JENNINGS:  Well, I told her I was
4   unavailable tomorrow or Friday.
5          MS. KIVITZ:  I'm just telling you the
6   legal assistant had said Ms. Rosetsky had taken the
7   day off from work.
8          MR. JENNINGS:  I don't know who you
9   spoke with and, two, what she said.
10          MS. KIVITZ:  Okay.
11          MR. JENNINGS:  So I can't comment on
12   that.
13   BY MS. KIVITZ:
14   Q.    Ms. Rosetsky, can you tell me if you've been
15   employed at all since the day you left National Board
16   of Medical Examiners?
17   A.    No.  No, I have not been employed.
18   Q.    Okay.  Can you tell me briefly about your
19   background starting with your education?
20   A.    I have an English degree from the University
21   of Pennsylvania.
22   Q.    What year?
23   A.    B.A. 1984.  I have a master's degree in
24   education from 1994 from Arcadia University, which was
25   Beaver at the time.

Page 9

1  Q.   Is that in elementary "ed"?
2  A.   Yes.
3  Q.   Okay.
4  A.   And I have a paralegal certification from
5  Manor College, which I got in 2004.  I got another
6  degree every ten years.
7  Q.   Okay.
8  A.   And I have -- I'm halfway through a Web Master
9  Certification at Penn State, which I did not finish.
10 And I have various and sundry technical IT courses
11 that I've taken.
12 Q.   Okay.  Can you tell me briefly your job
13 history, the different places you've worked and when?
14 A.   I worked at Fox Chase and Jeanes Hospital as
15 pathology transcription manager.  I worked at --
16 Q.   Can you tell me the years also?
17 A.   1986 or '87.  Before I got married.
18 Q.   Okay.  And what year did you get married?
19 A.   1988.
20 Q.   Okay.  And so in '86 or '87, you worked where?
21 A.   Fox Chase/Jeanes Hospital.  The pathology
22 office was combined at the time.
23 Q.   Okay.  And how many years did you work there?
24 A.   About a year to a year and a half maybe.  I
25 don't recall exactly.

Page 10

1  Q.   Okay.  And the reason you left there?
2  A.   I was brought in as a manager, and I wound up
3  doing too much of the transcription work; so it was
4  mutual.  I left, collected Unemployment.
5  Q.   Okay.  Did you feel that the transcription
6  work was beneath your ability?
7  A.   No.
8  Q.   Okay.  Why was it a problem that you were
9  doing too much transcription?
10 A.   Because they were asking me to do double work.
11 And I wound up coming in late.  They weren't paying me
12 for it.  I had to come in at night to answer questions
13 because they were open twenty-four hours, and it was
14 just.... They were having a transition with their
15 executives actually.  A lot of people were leaving.  A
16 lot of the doctors left.  It was a bad situation; so I
17 decided to go somewhere else.
18 Q.   Okay.  And upon leaving there, did you go
19 someplace else?
20 A.   Actually I went back to school.  I got
21 married, went to Beaver College.
22 Q.   Okay.  What is the next employment that you
23 had?
24 A.   I worked for the School District of
25 Philadelphia for a while substitute teaching.

Page 11

1  Q.   Okay.  And what years would that be?
2  A.   It was on and off for, you know, when I was
3  raising my kids.  I had a baby in 1989; so I was a
4  stay-at-home mom mostly for most of that time.  I have
5  three children.
6  Q.   Okay.  Can you just, as best as you can, tell
7  me when you believe you did substitute teaching in the
8  Philadelphia schools? the years?
9  A.   Oh, God.  Maybe 1988, 1989, sometime in the
10 90's.  You sign up with this thing called the "Herb
11 (phonetic) System," and it just calls you.  And if you
12 want to take the job, you take it; if you don't, you
13 don't.
14         I was a long-term substitute at the
15 Spruance School for a few months.  I'm trying to think
16 what year that was.  Actually I did some long-term
17 positions a couple times.  I don't know.  You could
18 call the School District.  Maybe they could tell you.
19 Q.   Okay.  At some point did you go back to
20 full-time employ?
21 A.   No.  I was home with my kids.
22 Q.   Okay.
23 A.   And I was getting my master's degree.
24 Q.   Okay.  At any point did you go back to
25 full-time employ?

Page 12

1  A.   No.  I worked -- I did some part-time work for
2  my husband but nothing full time.  I was home with my
3  kids.
4  Q.   Okay.
5  A.   I actually didn't do part-time work for my
6  husband until he owned a store in 2002, 2001 maybe.
7  I don't remember when he bought it.
8  Q.   Okay.  In 2001 or '02 what is the store that
9  he bought?
10 A.   Checks 54th, Inc.
11 Q.   And what type of business is that?
12 A.   It's a check cash.
13 Q.   Okay.  What sort of work did you do?
14 A.   I just did some background checks on people.
15 I did some legal work, filing when there were bad
16 checks and that kind of thing.
17 Q.   Okay.  And when you say you did a background
18 check, what would you do?
19 A.   I did Internet searches, see if the person's
20 Social Security number was active, found their
21 addresses, looked to see if they had any other check
22 fraud against them.  I had some issues with the Social
23 Security Department where, you know, someone had died
24 and they were still cashing checks.  That kind of
25 thing.

## Page 13

1  Q.   Okay.  And when you say you did filing, what
2  type of filing?
3  A.   Filing you mean -- in court for civil.  I
4  would just go to the court and file for civil for
5  collections.  There were actually some criminal
6  actions, but he had to do that on his own.
7  Q.   Okay.  And bad checks are the types of actions
8  that you would typically be responsible for?
9  A.   Right.
10  Q.   Okay.  What was your salary?
11  A.   Maybe $80.00 a week.
12  Q.   And how many hours did you work?
13  A.   It varied.  Maybe ten hours, maybe fifteen.  I
14  didn't keep, you know, really good track of it.
15  Whatever it took me to get it done because, you know,
16  you sat on the phone a lot with Philadelphia, trying
17  to get through.
18  Q.   Okay.  And your husband's business is a check
19  cashing agency?
20  A.   Uh-huh.  Yes.
21  Q.   All right.  Do you hold any corporate office
22  in that business?
23  A.   No.  Not at this time.
24  Q.   Okay.  Did you?
25  A.   Maybe for about six months after we bought the

## Page 14

1  business, but then I was taken off.
2  Q.   Okay.  And what was your corporate role at
3  that time?
4  A.   I think I was Secretary or Treasurer.
5  Q.   Do you know why you were taken off?
6  A.   Yes.  We decided to take me off.  It was just
7  a decision that we made.
8  Q.   Okay.  And how many years did you work at
9  Checks 54th?
10  A.   On and off, you know, while we owned the
11  business.  I guess until maybe I started working at
12  Penn, and then I stopped doing things for him.
13  Q.   Okay.  So '01-'02 to '04?
14  A.   Probably until 2003.  I didn't have time to do
15  anything.
16  Q.   Okay.  Would your income be reflected on your
17  tax returns from those years?
18  A.   Yes.
19  Q.   And following Checks 54th, did you have any
20  other employment?
21  A.   Following Checks 54th?
22  Q.   Or before?
23  A.   Just what's on my resume.  University of
24  Pennsylvania.
25  Q.   Okay.  And when did you work at the

## Page 15

1  University?
2  A.   Oh, no.  And I worked at Cozen O'Connor for
3  three months, which is not on my resume.  I worked as
4  a temp at Cozen O'Connor during the summer.
5  Q.   All right.  And this was before you worked at
6  Penn or before you worked at the National Board?
7  A.   Before I worked at Penn.
8  Q.   Okay.  And did your responsibilities include
9  clerical work?
10  A.   Clerical what?
11  Q.   Did your responsibilities at Cozen O'Connor
12  include clerical work?
13  A.   I was actually, like, cleaning up data because
14  they bought another law firm and it wasn't compatible
15  with their system.  So that's what I was doing,
16  cleaning up computer data and files on their system.
17  Q.   Did you receive a typing test when you began?
18  A.   I think I did.  Yeah.
19  Q.   Was there any typing involved in the work that
20  you did?
21  A.   Keyboarding, yes.
22  Q.   Okay.  Now, you said you also worked at Penn.
23  Is that the University of Pennsylvania?
24  A.   Yes.
25  Q.   All right.  And when did you work there?

## Page 16

1  A.   I worked there for a summer from June -- was
2  it May or June of 2004, I think, or 2005.  I think
3  2004 until October 1, I think.
4  Q.   Okay.  Any other employment?  Any other places
5  you worked?
6  A.   No.
7  Q.   And you said you had children.  Can you just
8  give me their names and ages?
9  A.   Ross is eighteen and a half, Lonnie is
10  sixteen, and Max is twelve.  He's going to be thirteen
11  in December.
12  Q.   Okay.  And, Ms. Rosetsky, in your discovery
13  responses in this case, you indicated that you have
14  filed for divorce.
15  A.   Yes.
16  Q.   Can I just ask you when that was?
17  A.   June.
18  Q.   Of '06? '07?
19  A.   '07.
20  Q.   Okay.  Are there pleadings in that case in
21  which you have made any representations concerning
22  either your income or your earning capacity?
23  A.   Pleadings?
24          MR. JENNINGS:  Object to form.
25  BY MS. KIVITZ:

Page 17

1  Q.   In other words, is there a Divorce Complaint
2  filed?
3  A.   There is a Complaint filed, yes.
4  Q.   Okay.  And that is in Montgomery County?
5  A.   Yes.
6  Q.   All right.  Is there also a Support or Alimony
7  Complaint filed by you or by your husband?
8  A.   A Support Complaint, or is it in the
9  Complaint?
10  Q.   Is there a request in any Complaint or
11  Petition made by you for either support or alimony?
12  A.   I don't know.  I'd have to look.  An attorney
13  wrote it, and I really didn't....
14  Q.   All right.  Have there been any support or
15  alimony or equitable proceedings in Montgomery County
16  before a Judge or a Master?
17  A.   No.  He still lives with me.
18  Q.   Okay.  Do you know if he has filed a Petition
19  or Count for any sort of support or alimony from you?
20  A.   No, he has not.
21  Q.   Are you being paid at this point any sort of
22  temporary alimony or support or alimony pendente lite
23  by Mr. Rosetsky?
24  A.   No.
25  Q.   Is he paying all of the household expenses

Page 18

1  associated with living with you?
2  A.   Yes.
3       MS. KIVITZ:  Okay.  I'm going to ask
4  that this be marked Defense Exhibit 1 and shown to
5  Ms. Rosetsky (indicating).
6       MR. JENNINGS:  Do you have a copy for
7  me?
8       MS. KIVITZ:  I'm going to have you share
9  it with her.
10       (Whereupon the Reporter marked
11  Ms. Rosetsky's National Board of Medical Examiners
12  Employment Application as Exhibit No. D-1 for
13  identification.)
14  BY MS. KIVITZ:
15  Q.   Ms. Rosetsky, I've shown you your Employment
16  Application that you submitted to the National Board.
17  Do you recall that?
18  A.   Yeah.
19  Q.   Okay.  And do you see the Notification and
20  Agreement on the back, certifying that all answers
21  were true, accurate, and complete?
22  A.   Yes.
23  Q.   Okay.  You read that at the time before you
24  signed it?
25  A.   I don't know.  I may have.  Probably not, but

Page 19

1  I had seen what it was.
2  Q.   Do you want to take a minute now and read it?
3  A.   (Complying.)
4       Okay.
5  Q.   All right.  Can you describe to me what that
6  is that you just read?
7  A.   It says to me if this is accurate.
8  Q.   Okay.  And that is your signature on 9/16/05?
9  A.   Uh-huh.  Yes.
10  Q.   Do you see -- if you could, go to Page 2.
11  A.   Yes.
12  Q.   Do you see the "University of Pennsylvania" at
13  the top of the page?
14  A.   Yes.
15  Q.   Okay.  Do you see the reason for leaving?
16  A.   Yes.
17  Q.   Can you tell me what you wrote?
18  A.   I wrote "Position eliminated."
19  Q.   Now, was that the reason that you left the
20  University of Pennsylvania?
21  A.   Yes.  She did not rehire somebody in my
22  position to the best of my knowledge.  She rehired a
23  contract specialist.
24  Q.   I'm sorry.  She did not rehire someone in your
25  position?

Page 20

1  A.   A staff assistant, no.
2  Q.   Okay.  Did you receive correspondence from the
3  University of Pennsylvania telling you that the
4  position was going to be eliminated?
5  A.   No.  She just told me that, the way that I was
6  functioning, she was not interested in somebody doing
7  databases or technical work and that, the way that the
8  position was described, she was going to change it.
9  Q.   She sent you a letter saying that she was
10  going to be changing --
11  A.   No, she didn't send me a letter.  This was
12  discussed by us when I left.
13  Q.   Okay.  Do you recall --
14  A.   And then I have a letter of recommendation
15  from her.
16  Q.   I appreciate that.  But if you could listen to
17  the question, I think this would go faster.
18       Do you recall receiving correspondence
19  from the University of Pennsylvania at the time your
20  employment was terminated?
21  A.   Correspondence, no.
22       MS. KIVITZ:  Okay.  Would you kindly
23  mark that Defense Exhibit 2 (indicating).
24       (Whereupon the Reporter marked a letter
25  dated September 22, 2004, to Diane Rosetsky from

Page 21

1 Elizabeth Bien as Exhibit No. D-2 for identification.)
2     THE WITNESS: Ah, yes, she did give this
3 to me. I thought you meant did I receive it in the
4 mail.
5 BY MS. KIVITZ:
6 Q. Okay. So on September 22, 2004, you recall
7 receiving this letter, D-2, from Elizabeth Bien at the
8 University of Pennsylvania?
9 A. Yes. Un-huh.
10 Q. Okay. And am I correct that it does not say
11 the position was eliminated?
12 A. Yes. Well, it says "terminated."
13 Q. Right. And can you read me the second
14 paragraph in terms of --
15 A. It says -- sorry.
16 Q. -- concerning the basis for the termination of
17 employment?
18 A. "As we discussed, the quality of your
19     interpersonal interactions and the ability to
20     work cooperatively with a diverse constituency
21     did not meet the standards of this office."
22 Q. Okay. And that is what led to the termination
23 on September 30?
24     MR. JENNINGS: Objection to form.
25     THE WITNESS: Well, that's what she

Page 22

1 claimed, but that's not what led to it. You have to
2 understand that her husband has a multi-million dollar
3 grant there. And her position was questionable, but I
4 wasn't going to be able to argue with that.
5 BY MS. KIVITZ:
6 Q. Okay. What I'm asking you, Ms. Rosetsky, is
7 isn't it true that your position wasn't eliminated?
8 It was terminated?
9     MR. JENNINGS: Objection to form.
10     THE WITNESS: I have never said that I
11 was not terminated. I said the position was
12 eliminated.
13 BY MS. KIVITZ:
14 Q. Well, why did you say --
15 A. Because that's what she told me. She could
16 write whatever she wanted to. But what she told me,
17 when I was sitting there, was that I was basically
18 overqualified for the position and that she just
19 wanted somebody to organize retreats and that she was
20 going to change the job description.
21 Q. Okay.
22 A. And she wrote me a letter of recommendation,
23 which I gave to the Board.
24 Q. Okay. Now, in this letter she did not say
25 that you were overqualified for the position, did she?

Page 23

1 A. No, she didn't.
2 Q. Okay. And she also did not say that she was
3 going to change the position and just have someone
4 organize retreats or not organize retreats; correct?
5 A. No. But she said that to me verbally.
6 Q. Okay. But the only correspondence that you
7 received in writing from Ms. Bien was concerning your
8 position being terminated based on your interpersonal
9 interactions and inability to work cooperatively?
10     MR. JENNINGS: Objection to form.
11     THE WITNESS: Well, that's what she
12 said. That was her -- that's what she said because
13 she didn't want to look bad.
14 BY MS. KIVITZ:
15 Q. I'm sorry? She said to you that she didn't
16 want to look bad?
17 A. No. That's what I'm saying. I mean, she can
18 say whatever she wants, but have you checked her
19 personnel records?
20 Q. Well, when you say she didn't want to look
21 bad, I guess I'm asking you just to expand on that. I
22 don't know what you mean.
23 A. Because I tried to bring her into the 21st
24 century because her office was really behind the eight
25 ball as far as Internet technology was concerned. And

Page 24

1 she asked me to make a chart, which is an NIH other
2 support chart, which cross-references all of the money
3 that they received from the government on training
4 grants for all the scientists.
5     And what she asked me to do -- she gave
6 me a two thousand line Excel chart, and it would take
7 me weeks to make the charts that she wanted. So I
8 told her that I could make her a database, that it
9 would take her the push of a button.
10     And she didn't believe that I could do
11 it, but she said, "You know, I don't have anything for
12 you to do this summer; so, you know, if you want to
13 work on that, you can," because they didn't have any
14 retreats or anything.
15     So I produced it. And she wouldn't let
16 me show it to anyone. And I did get to show it to one
17 person, the assistant to a scientist by the name of
18 Skip. I forget his last name. And she loved it. And
19 then the minute after that meeting was over, she said
20 to me, "I don't think you're right for this position."
21     I said, "Why? I just made you something
22 that would have cost you a lot of money to produce."
23     She said, "I don't care," and she went
24 home that day. In the morning she came back and said,
25 you know, "I'm going to terminate your position."

Page 25

1 She did not want the technology near her
2 like Kathy Holtzman, who had the same problem with it.
3 You're talking about two women who were the same age
4 that had no technical skills, you know, that I tried
5 to help. And they were intimidated by it.
6 Q. So you felt that Elizabeth Bien was
7 intimidated by you?
8 MR. JENNINGS: Objection to form.
9 THE WITNESS: She was intimidated by my
10 skills. She didn't expect it because I'd stayed home
11 for fifteen years with my kids. And I think
12 basically, you know, the issue that I've had with
13 these two positions was they did not expect me to have
14 any technology skills that I had.
15 And they were asking me to make card
16 files and those kinds of things. And when I offered
17 to do something more advanced that they didn't
18 understand and -- actually this woman said to me, "I
19 don't want to have to learn a database."
20 And I told her, "Well, you really don't
21 have to learn anything. It's, you know, the theory of
22 encapsulation. You'll just have to bush a button."
23 And she said, "Oh, no, no. You know, we
24 don't want any of that."
25 And actually there was another girl in

Page 26

1 the office who still works there, and she was
2 interested in what I was doing. And she came down to
3 my office, and Liz got angry at both of us because,
4 even though the girl had nothing to do, she came down
5 and was trying to learn from me.
6 BY MS. KIVITZ:
7 Q. Okay.
8 A. You know, it's not always what things look
9 like.
10 Q. The position at Penn was a
11 technologically-based position, was it not?
12 A. Yeah. Actually, as I remember the job
13 description said, she wanted somebody to create and
14 maintain databases for the grants in her office. And
15 she wanted --
16 Q. That did involve technology, did it not?
17 A. Yes. But when I started to do it, she was
18 freaked by it. And she said, "I just want somebody to
19 do retreats."
20 That was another part of the job, doing
21 retreats, which was setting up luncheons and that kind
22 of thing.
23 Q. Your position at National Board of Medical
24 Examiners also was a technologically-based position,
25 was it not?

Page 27

1 A. Part of it. Yeah, it was.
2 Q. Okay. And that's what you were hired to do
3 among the different roles that you were to perform
4 there?
5 A. Yes.
6 MR. JENNINGS: Objection to form.
7 BY MS. KIVITZ:
8 Q. Now, you wrote to Ms. Bien I guess by e-mail
9 on September 23, the day after you got this letter?
10 A. Uh-huh.
11 Q. Okay.
12 A. Did I write to her? Oh, I don't know if I
13 wrote to her. What did I write to her?
14 MS. KIVITZ: I'll ask that this be
15 marked --
16 THE WITNESS: It's over three years
17 ago.
18 MS. KIVITZ: -- as Defense Exhibit 3
19 (indicating).
20 (Whereupon the Reporter marked an e-mail
21 dated 9/23/04 to Liz from Diane as Exhibit No. D-3 for
22 identification.)
23 THE WITNESS: That's one of my e-mails
24 to her.
25 BY MS. KIVITZ:

Page 28

1 Q. I'd like for you to take a second and take a
2 look.
3 A. (Complying.)
4 Who's Chambrel? I don't know anyone by
5 that name. And this looks like it's been retyped in.
6 I don't know anyone by the name of Chambrel. Oh,
7 Chambrel? Yeah. At this point Liz was going around
8 to the different offices --
9 Q. Wait. Just read the whole thing first. Okay?
10 A. (Complying.)
11 Yeah. Okay.
12 Q. All right. Do you recall sending this --
13 A. Yes.
14 Q. -- to Elizabeth Bien?
15 A. I did send it to her.
16 Q. Okay. Do you remember telling her that you
17 managed to get along -- you tried to get along with
18 people as one of the messages in this e-mail?
19 A. Yes.
20 Q. Do you remember telling her that you even got
21 along with a Palestinian supporter you shared the
22 office with?
23 A. That's right.
24 Q. Do you remember telling her that she perceived
25 you as threatening?

Page 29

1   A.   Yes.
2   Q.   Do you remember telling --
3   A.   She perceived my skills as threatening.
4   Q.   Do you remember telling her that you felt your
5   work performance had outweighed any of the minor
6   incidents that she referenced?
7   A.   No.
8   Q.   Would you look at the fifth paragraph, the
9   bottom paragraph on the first page?
10  A.   (Complying.)
11       Yes.  It's in quotes because there
12  weren't any incidents.  She got upset when I went --
13  she kept asking me to get some information from one of
14  the physicians, and he never produced it.  So I went
15  to his office, and he was very glad that I was there.
16  And he sat down with me, and I helped him write a
17  letter that he had to write.
18       And she got really angry because I went
19  to his office, that I was being pushy.  I mean, she
20  was at this point -- when people start to feel
21  threatened that your skills are better than theirs,
22  they start picking on you.
23       And I knew this had already started
24  happening.  Same thing that Kathy did, you know, like,
25  with her editing that she didn't know how to write.

Page 30

1   And I was trying to help her do some editing she
2   asked me to, and then she threw it in the trash can.
3        But, yeah, this is -- you know, she
4   started -- they start picking on things.  When they
5   don't have anything substantial, they'll go around,
6   and they'll start intimidating other people that are
7   beneath them, their subordinates, and try to get them
8   against you.
9        This is, you know, a tactic that a lot
10  of administrators use.  I know that -- and my brother
11  always says that to me.  He's a top administrator at
12  Dow Jones.  I mean, this is what this woman did, and
13  this is what Kathy did.  They're very similar, same
14  age women, no technology skills, that just did not
15  want any technology near them.
16  Q.   Now, did you ever feel in any other position
17  picked on because someone felt inferior to you or
18  threatened by your skills?
19  A.   No.  I hadn't worked in fifteen years.  So
20  really, you know, I just -- I'm trying to remember if
21  I -- no.
22  Q.   Okay.  Can you look at the first -- top
23  paragraph on Page 2?
24  A.   (Complying.)
25       Uh-huh.

Page 31

1   Q.   Do you see how you said you had a strained
2   relationship with Dr. Cheston?
3   A.   Yeah.  I was intimidated by Dr. Cheston; he
4   wasn't intimidated by me.
5   Q.   Okay.
6   A.   You got it reversed.
7   Q.   Well, are these your words:
8        "The reality of this whole situation
9        reminds me of a predicament I was in when I
10       worked at Wistar"?
11  A.   Yeah.  I was intimidated by Dr. Cheston.  I
12  worked for him.  But, you know, I didn't get fired, or
13  I didn't have any trouble with him.
14  Q.   Okay.
15  A.   He was just a lot older than me, and it was
16  intimidating to me.
17  Q.   And what did you mean when you said you had a
18  strained relationship with him?
19  A.   That I was afraid to go sit in his office.  I
20  mean, he was nice to me.  He liked me.  I was just in
21  my twenties, and he was in his sixties, and he just
22  made me a little nervous.
23  Q.   When did you work at Wistar?
24  A.   From 1979 to '85 or '86.  I don't remember
25  exactly.

Page 32

1   Q.   And what was your reason for leaving Wistar?
2   A.   I left Wistar for a variety of reasons, but
3   basically I moved home.  I moved out of town.
4   Q.   Okay.  Meaning you moved to Huntingdon Valley?
5   A.   No.  I moved back to my parents' actually.
6   Q.   In 1986?
7   A.   '85 or '86.  Yes.
8   Q.   And where was that?
9   A.   Philadelphia.
10  Q.   Okay.  So --
11  A.   The outskirts of Philadelphia.
12  Q.   Okay.  So because you were -- and where on the
13  outskirts of Philadelphia?
14  A.   Pine Road.
15  Q.   Okay.  So Pine Road was too far to commute to
16  Penn?
17  A.   I didn't like driving there at that time.  I
18  was not a big driver.
19  Q.   And where did you live when you first had
20  taken the job?
21  A.   In town.
22  Q.   Okay.  So when you moved from center city to
23  Pine Road, you left Wistar?
24  A.   Yeah.  I think that that's when I left.  Or I
25  left, like, a few months afterwards maybe because I

Page 33

1 didn't like the driving.
2 Q.   All right.  Is it possible you were asked to
3 leave?
4        MR. JENNINGS:  Objection to form.
5        THE WITNESS:  No, I was not asked to
6 leave.  Actually this is more complicated than that.
7 I left on my own.
8 BY MS. KIVITZ:
9 Q.   For what reason?
10       MR. JENNINGS:  Objection to form.
11       THE WITNESS:  Well, actually I left
12 because I didn't like the job that I was in.  I left
13 because I didn't like who I was working for.  He was
14 sexually harassing me, if you want to know the truth.
15 BY MS. KIVITZ:
16 Q.   Who was that?
17 A.   Kurt Mayer.  But I never said anything to
18 anyone.
19 Q.   Okay.  Can you tell me what exactly occurred
20 that led you to believe you were being sexually
21 harassed?
22 A.   He was leaning up against me in the office,
23 coming behind the desk.  He was, you know, saying
24 different names to me instead of using my regular
25 name.

Page 34

1 Q.   Okay.  Now, '79 to '86 time frame, you were
2 about how old?  In your twenties?
3 A.   Yeah.
4 Q.   Okay.  And Kurt Mayer -- how old was he?
5 A.   He was in his thirties.
6 Q.   And what about Dr. Cheston?
7 A.   Cheston?  He must have been in his sixties
8 maybe.
9 Q.   Okay.  Now, you said you were intimidated by
10 Dr. Cheston because he was older?
11 A.   Uh-huh.
12 Q.   Correct?
13       MR. JENNINGS:  Yes?
14       THE WITNESS:  Yes.
15 BY MS. KIVITZ:
16 Q.   And --
17 A.   He was nice.  I mean, I liked him.  He just
18 had a big, fancy office.  I used to sit out
19 (indicating), and he could see me, and we used to talk
20 to each other like this.  But his old secretary used
21 to come in, and she was always sitting next to him
22 because I knew her.  Her name was Sue.
23 Q.   Okay.  Now, Kurt Mayer -- can you tell me what
24 his position at Wistar was?
25 A.   Yeah.  They brought him in as a new -- I think

Page 35

1 he was development, a development officer or
2 something, some new position.
3 Q.   All right.  And can you spell his name for me?
4 A.   I think it was M-a-y-e-r.
5 Q.   How about Kurt?
6 A.   K-u-r-t, I think, or C-u-r-t.  I think it was
7 K-u-r-t.
8 Q.   Okay.  Now, when he began to sexually harass
9 you, what did you do?  Who did you talk to about it?
10 A.   Nobody.  Those days you didn't tell anybody.
11 You just -- I just decided leave.  And actually I met
12 someone about five years afterwards.  She had a
13 similar problem with him.  Her name was Sharese
14 (phonetic).  He was harassing her in some manner.
15 Q.   And her last name?
16 A.   Sharese Kent.
17 Q.   And you said in those days you didn't tell
18 anybody?
19 A.   Huh-uh.
20 Q.   So how long did this harassment go on until
21 you left your position?
22 A.   I don't remember.  A few months maybe.  Not
23 too long.
24 Q.   Did you leave it for another job?
25 A.   No.  I just left.

Page 36

1 Q.   Okay.  So if you were to say on various job
2 applications that you left Wistar because you moved,
3 that wasn't the real reason you left.  Am I correct?
4 A.   No.  It's one of the reason why I left.
5 Q.   But you just said the real reason you left was
6 because you had been sexually harassed by Kurt Mayer?
7 A.   Well, one of the reasons was.  It was also I
8 didn't want to drive back and forth.  I drove it for a
9 while back and forth from where my parents live, but
10 you have to come up U.S. 1, and I wasn't a big driver
11 back then.
12 Q.   Well, if you had to say which reason took
13 prominence, which was the more important reason that
14 you decided you couldn't work there anymore?  Which
15 would you have said between those two?
16       MR. JENNINGS:  Objection to form.
17       THE WITNESS:  I'd say they were about
18 equal.  I mean, the two between the stress of having
19 the drive on the expressway and Kurt, you know, being
20 really difficult to work with.
21 BY MS. KIVITZ:
22 Q.   Okay.  So fifty percent Kurt; fifty percent
23 that the expressway was --
24 A.   Maybe.
25 Q.   -- too hard?

Page 37

1  A.   It's subjective what I'm saying but, you know.
2  Q.   Okay.  Do you remember writing to Ms. Bien
3  again after the 23rd?
4       MS. KIVITZ:  I'll ask that this be
5  marked Exhibit 4 (indicating).
6       (Whereupon the Reporter marked an e-mail
7  dated 9/24/04 to Liz Bien from Diane Rosetsky as
8  Exhibit No. D-4 for identification.)
9       THE WITNESS:  That's right.
10 BY MS. KIVITZ:
11 Q.   Okay.  In this memo a day later, you concluded
12 that she had been right that the two of you would be
13 better off not working together.  My first question is
14 what made you change your mind in the interim?
15 A.   I was just appeasing her.
16 Q.   Okay.  And why would that be?
17 A.   Well, it's always good to get, you know, a
18 letter of recommendation.  So I asked her for one.
19 Q.   Okay.  So you didn't agree that the two of you
20 were better off not working together, but you said it
21 so that you might get a letter of recommendation?
22      MR. JENNINGS:  Objection to form.
23      THE WITNESS:  I don't know.  I think
24 that's kind of a crazy question, you know, if I didn't
25 agree or not agree.  I mean, if she'd been willing to

Page 38

1  work with me, I would have continued to work with her.
2  If she would have been willing to, you know, see the
3  value in what I was doing, I was willing to do --
4       You know, I did hole punching for her.
5  I did stapling for her.  I walked letters across
6  campus in a hundred-degree heat until I had blisters
7  on my feet for her, and I didn't complain about any of
8  the treatment.
9       I mean, she had a young girl sitting
10 there with a fan blowing on her with her feet up on
11 the desk and sent me out in a hundred-degree weather
12 to have a piece of paper signed all around the campus.
13 And I came home, and my feet were, like, raw.  And I
14 didn't say a word to her.
15      And, you know, she was doing these kinds
16 of things at that point because I guess she wanted to,
17 you know, make sure that I knew that, you know, I
18 wasn't beyond doing those things.  So I did a lot of
19 clerical stuff for her.
20 BY MS. KIVITZ:
21 Q.   Was hole punching and Xeroxing, the clerical
22 work -- was that part of the job --
23 A.   When you put grants out, everybody kind of
24 does that.  But, you know, we weren't always putting
25 out grants at that point.  She just kind of -- the

Page 39

1  thing with walking around, getting the letter
2  signed -- that was not part of my job description and
3  especially in that kind of heat.  I don't think you
4  would have sent a dog out to do that.
5  Q.   Were you okay with the hole punching and the
6  Xeroxing?
7  A.   Yeah.  Helping with the grants, you know, that
8  kind of thing, yeah.  I did that at Wistar.
9  Q.   Did you feel that that utilized all of your
10 skills?
11 A.   Did hole punching utilize my skills?  I don't
12 know.  Would it utilize yours skills?  I mean, you
13 know, my children like to do hole punching sometimes.
14 I mean, obviously that's kind of a ridiculous
15 question.
16 Q.   Did you feel that it was beneath your skills?
17 I'm just trying to understand.
18 A.   Beneath my skills to hole punch?  No.  I knew
19 how to hole punch.  I had that skill.
20 Q.   Did you feel that that was something that you
21 should be doing?
22 A.   When it came to grants crunch, you know,
23 working with grants on a deadline, I always
24 participated in that.
25 Q.   Okay.  And the Xeroxing?

Page 40

1  A.   Yeah.  Everybody did that when it came down to
2  the deadline.
3  Q.   Okay.  Now, you said that you said that
4  Ms. Bien was right that the two of you would be better
5  off not working together to appease her; correct?
6  A.   Uh-huh.
7       MR. JENNINGS:  Yes?
8       THE WITNESS:  Yes.  Sorry.
9  BY MS. KIVITZ:
10 Q.   And that was in the hope that she would give
11 you a letter of recommendation?
12 A.   You know, you're kind of between a rock and a
13 hard place.  If somebody wants to lie about you to
14 save their own reputation, you know, that's just what
15 you do.  It's political although I'm not a political
16 person, but that's what I did.
17 Q.   You also said:
18      "It's a shame that the database, which
19      is an extremely valuable tool for submitting
20      grants, is so close to being finished."
21 A.   Right.
22 Q.   What did you mean by that?
23 A.   She wouldn't let me -- it wasn't completely
24 finished.  I mean, I can't explain it if you don't
25 know how to build a database.  It's almost like an oil

Page 41

1  painting.  It's never really finished until you say
2  it's finished.  There's always something to be done.
3         There were a couple functions that had
4  to be put into it, you know, nothing major.  Somebody
5  could have -- you know, she had it on the network.
6  Somebody could have picked up on it and finished it
7  for them, but I don't think she ever showed it to
8  anyone because she didn't want to have to use it.
9  Q.   Now, you said in the same memo that you'd be
10 willing to work as an outside consultant and finish
11 it?
12 A.   Right.  I said, "Do you want me to finish it?"
13 because I put so much work into it.  It's kind of like
14 not being allowed to, like I said -- like, you know,
15 starting a painting and somebody taking it away from
16 you and not being allowed to finish it.
17 Q.   Why did you think they would want you to work
18 as an outside consultant if they had terminated you
19 for not getting along with the staff?
20        MR. JENNINGS:  Objection to form.
21        THE WITNESS:  I wasn't terminated for
22 not getting along with the staff.  That was Liz's way
23 of justifying her not having me work there.
24 BY MS. KIVITZ:
25 Q.   Why did you think that Penn would want to hire

Page 42

1  you as an outside consultant if you had been
2  terminated two days earlier?
3  A.   Because they do it most likely with other
4  people.  Depends on who you know there.  And, you
5  know, I didn't think it was a big thing.
6  Q.   Did Ms. Bien rehire you in any capacity?
7  A.   No.  She just probably buried that database
8  somewhere.
9         MS. KIVITZ:  Okay.  I'll ask that this
10 be marked as the next exhibit (indicating).
11        THE WITNESS:  She actually was causing
12 some trouble for me at Wistar afterwards.
13        (Whereupon the Reporter marked an e-mail
14 dated 1/12/05 to Dr. Rubenstein from Diane Rosetsky as
15 Exhibit No. D-5 for identification.)
16        MS. KIVITZ:  Off the record.
17        (Discussion was held off the record.)
18 BY MS. KIVITZ:
19 Q.   Can you first tell me what you mean by she
20 caused trouble for you at Wistar after?
21 A.   I applied for a position there, and I was
22 being considered for it.  And the last person I had to
23 interview with was Meanhart (phonetic) Herlyn.  I had
24 applied for a job there, and I got through -- I think
25 I got through the first interview.

Page 43

1         And I had to interview with Meanhart
2  Herlyn, and he cancelled on me.  And one of the
3  reasons, I'm sure, is because he owns an airplane with
4  Liz Bien's husband, and I'm sure she said something to
5  him.
6         So I sent her a certified letter, on the
7  recommendation of an attorney that I'm friends with,
8  telling her that she's not to discuss my employment
9  there or slander or libel me if I applied for a
10 position because I had a letter of recommendation from
11 her.
12 Q.   All right.  Now, after Ms. Bien did not hire
13 you, did you then write a letter --
14        Would you take a look at the next
15 exhibit, please?
16 A.   Yes.
17 Q.   -- to the Executive Vice President for the
18 Health System?
19 A.   No.  This is Dr. Rubenstein.
20 Q.   Okay.  And what is his position?
21 A.   He's the Dean of the medical school.
22 Q.   Okay.  And you wrote to him on what date?
23 A.   I don't know.  Is there a date on here?
24        January, 2005.
25 Q.   Okay.  So this was several months after you

Page 44

1  had been terminated?
2  A.   Yes.  I guess so.
3  Q.   Okay.  And you started out by saying:
4         "After much debate, I have decided to
5         contact you..."?
6  A.   Right.
7  Q.   Was that some sort of internal debate or a
8  debate you were having with someone?
9  A.   It was an internal debate.
10 Q.   Okay.  And you contacted him also concerning
11 this database?
12 A.   Uh-huh.  I thought he might be interested in
13 it.  Yes.  Then I found out that he doesn't even -- I
14 was told he doesn't even use e-mail and that his staff
15 answers his e-mails.  So the head of this medical
16 school is very non-IT.
17 Q.   All right.  Now, this was after Ms. Bien had
18 made it clear that she was not interested in having
19 this database completed; correct?
20 A.   She never made it clear.
21        MR. JENNINGS:  Objection to form.
22        THE WITNESS:  She never answered me.
23 She said, "I'll consider it."  She sent me an e-mail
24 saying, "I'll consider it.  I'll let you know."
25 BY MS. KIVITZ:

Page 45

1  Q.   Okay.  Did you feel that it was appropriate to
2  go behind her back and write this letter?  Was she
3  copied on it?
4        MR. JENNINGS:  Objection.
5  BY MS. KIVITZ:
6  Q.   Let me ask it that way.
7  A.   Probably not, but I don't think it's going
8  behind her back.  She doesn't own the medical school.
9  She's an employee there.
10 Q.   Okay.  So this was someone else at the medical
11 school?
12 A.   This was the head of the medical school,
13 Dr. Rubenstein.
14 Q.   Okay.  Did he respond to you?
15 A.   No.  Because I found out he actually doesn't
16 even read e-mails, I was told.
17 Q.   Okay.  And who told you that?
18 A.   I went in for an interview there.  Actually it
19 was his assistant, and they said that he doesn't use
20 e-mail.  I don't know if he does now.  This is a few
21 years ago.
22 Q.   Okay.  Now, by the way, at Wistar you had or
23 have a friend there by the name of Ruggiero?
24 A.   Michael.  Yes.
25 Q.   Okay.  Was he your direct supervisor when you

Page 46

1  worked at Wistar?
2  A.   No.  But I had a lot of interaction with him
3  for the grants.
4  Q.   Who were your direct supervisors when you
5  worked at Wistar?
6  A.   She's not there anymore.  Sara McClain
7  (phonetic).
8  Q.   Anybody else?
9  A.   Dr. Cheston.
10 Q.   Okay.  Anybody besides --
11 A.   Kurt Mayer.
12 Q.   Okay.  Anybody else?
13 A.   Linda Bourbon (phonetic).  She was there for a
14 very short time.  She was terminated.
15 Q.   Okay.  Concerning the sexual harassment back
16 then, you didn't file any sort of E.E.O.C. action
17 then?
18 A.   No.
19 Q.   Okay.  Did you report what Mr. Mayer did to
20 either Sara McClain or Dr. Cheston or the other woman
21 that you named?
22 A.   No.  I wasn't working for them.  I was working
23 for Kurt only in his office.
24 Q.   Okay.  Did you report it to Human Resources?
25 A.   No.  They didn't have that then.

Page 47

1  Q.   Okay.  There was no --
2  A.   This is before the Judge Thomas thing where
3  the woman complained of sexual harassment.
4  Q.   Okay.
5  A.   This was before all that.
6  Q.   So in the 80's Wistar had no Human Resources
7  Department?
8        MR. JENNINGS:  Objection to form.
9        THE WITNESS:  They had a Human Resources
10 Department.  I never said that.  They just -- you
11 know, nobody discussed these things with you.
12 BY MS. KIVITZ:
13 Q.   Okay.
14 A.   It was embarrassing more than anything.
15       MS. KIVITZ:  Okay.  I'll ask that this
16 be marked the next exhibit (indicating).
17       (Whereupon the Reporter marked a letter
18 dated July 22, 2005, to Mrs. Alan Gewirtz from Diane
19 Rosetsky as Exhibit No. D-6 for identification.)
20 BY MS. KIVITZ:
21 Q.   Is this July 22, '05, letter the letter to
22 which you referred that you sent to Elizabeth Bien?
23 A.   Yes, it is.  That's exactly what I was
24 explaining to you about with Meanhart Herlyn.  This is
25 the letter I sent her.

Page 48

1  Q.   Okay.  Now, is there some reason why you sent
2  it to her home address and didn't send it to her at
3  the medical school?
4  A.   No.  Just wanted to make sure she got it.
5  Q.   Okay.  Was there some doubt in your mind
6  whether she would get it at the medical school?
7  A.   Yes.
8  Q.   Why?
9  A.   Because it's inter-office mail.  I just sent
10 it to her personally.  It was a personal issue.  This
11 was not a work issue.  As far as I was concerned, this
12 was a personal issue at this point, her conduct
13 between me and her.  It had nothing to do with Penn.
14 It had to do with her personally.
15 Q.   Well, Penn had terminated you; correct?
16       MR. JENNINGS:  Objection to form.
17       THE WITNESS:  No.  She terminated me.
18 Penn had no idea of the job that I was doing there.
19 BY MS. KIVITZ:
20 Q.   But she was acting on behalf of the University
21 of Pennsylvania; correct?
22       MR. JENNINGS:  Objection to form.
23       THE WITNESS:  No.  She was acting on
24 behalf of herself.
25 BY MS. KIVITZ:

Page 49

1  Q.   Your position was -- you were not hired
2  personally by Elizabeth Bien?
3  A.   Yes, I was.
4  Q.   No, no.  My question is:  Who was your
5  employer on your pay stubs?
6  A.   It was Penn.  But, you know, Penn is an
7  aggregation of personalities and people that work
8  there.
9  Q.   Okay.  So my question again is:  Why did you
10  not write this letter to Elizabeth Bien, care of Penn?
11  Why did you choose to write it to Mrs. Alan Gewirtz at
12  her home address?
13        MR. JENNINGS:  Objection.  Asked and
14  answered.
15        You can answer again.
16        THE WITNESS:  I don't see the point to
17  you re-asking the question when I already answered it.
18  BY MS. KIVITZ:
19  Q.   I don't believe I got an answer --
20  A.   You did get an answer.
21  Q.   -- which is why I've asked it again.
22  A.   Well, what is the difference where I sent it
23  to?  It got to her.  And it was sent certified mail.
24  It wasn't sent, you know --
25  Q.   No, no, no.  My question is:  You worked for

Page 50

1  Penn?
2  A.   Yeah.
3  Q.   You were paid by Penn?
4  A.   Right.
5  Q.   Why did you choose to write this to Mrs. Alan
6  Gewirtz at her home address rather than Elizabeth Bien
7  at the Penn address where you had worked?
8  A.   Because --
9        MR. JENNINGS:  I'm going to object.
10  It's been asked and answered.
11        You can answer it once more.
12        THE WITNESS:  Okay.
13        It was a personal issue between her
14  talking to Meanhart Herlyn.  It had nothing to do with
15  the University.  You know, it was her conduct that was
16  unprofessional, and Penn can't stop people from acting
17  in this manner.  And I felt that, you know, it should
18  be sent to her, and I sent it to her the best way that
19  I knew it would get to her.
20  BY MS. KIVITZ:
21  Q.   Okay.  And what happened as a result of your
22  sending this letter?
23  A.   Nothing.
24        MR. JENNINGS:  Objection to form.
25        THE WITNESS:  Nothing that I know of.

Page 51

1  BY MS. KIVITZ:
2  Q.   Well, did you ever receive a response from her
3  or from Penn?
4  A.   No.
5  Q.   Did you ever hire counsel?
6  A.   No.
7  Q.   You said before you have a letter of
8  recommendation --
9  A.   Yes.
10  Q.   -- from the medical school?
11  A.   Yes.
12  Q.   Who --
13  A.   Elizabeth Bien.
14  Q.   Okay.  And when was that dated?
15  A.   I don't know.  It was maybe a week or so after
16  I was terminated.
17  Q.   Okay.  Was it before the date that you wrote
18  this letter?
19  A.   Yes.  I think so.
20  Q.   Now, you said you would have no trouble hiring
21  legal counsel --
22  A.   Right.
23  Q.   -- to pursue this further.  Did you hire legal
24  counsel?
25  A.   No.  Because I actually got another interview

Page 52

1  at Wistar after this.  I don't know if she -- I'm sure
2  she didn't continue saying anything.  But the damage
3  was already done because Meanhart Herlyn is one of
4  the -- he's Associate Director there.  So the damage
5  was already done.
6        MS. KIVITZ:  Okay.  Would you please
7  mark this as the next exhibit (indicating).
8        (Whereupon the Reporter marked a resume
9  submitted to the National Board as Exhibit No. D-7 for
10  identification.)
11  BY MS. KIVITZ:
12  Q.   Ms. Rosetsky, I'm handing you the resume that
13  you submitted to the National Board when you applied
14  for your original employment.  Do you recognize it?
15  A.   Yeah.  It looks like my resume.  Yep.
16  Q.   Okay.  Can you take a look at it, please?
17  A.   Okay.  I'm looking at it.
18  Q.   Is everything on the resume true and correct?
19  A.   Yes.  It should be.  Yep.
20  Q.   Did you work at Fox Chase Cancer Center
21  between 1985 and 1987?
22  A.   I worked in the Jeanes Hospital building and
23  Fox Chase Cancer Center, and Jeanes used the pathology
24  office.  Yes.
25  Q.   Okay.  And did you work at Wistar between '79

Page 53

1  and '85?
2  A.   Yes.  Between '79 and '86 or '79 and '85.
3  Something like that.
4           MS. KIVITZ: I'll ask this be marked the
5  next exhibit (indicating).
6           (Whereupon the Reporter marked a resume
7  submitted to the University of Pennsylvania as Exhibit
8  No. D-8 for identification.)
9  BY MS. KIVITZ:
10  Q.   I'm handing you the resume that you had
11  submitted to the University of Pennsylvania --
12  A.   Uh-huh.
13  Q.   -- in connection with your medical school
14  work.
15  A.   Right.
16  Q.   Now, on this resume you have your paralegal
17  certification as 2003.
18  A.   It's -- okay.  It's probably 2004.
19  Q.   Do you know for sure which year it is?
20  A.   I'd have to look.  I don't remember.  I think
21  it's 2004.
22  Q.   Okay.  Going further down, your employment on
23  the Penn resume you included the Checks 54th, Inc.
24  A.   Right.
25  Q.   '99 to present.

Page 54

1  A.   Right.
2  Q.   Do you see that?
3  A.   Uh-huh.  Yes.
4  Q.   Were those the actual years, '99 to '04, that
5  you worked at Checks 54th?
6  A.   Yes.  To '03 probably.
7  Q.   Beginning in 1999?
8  A.   Whenever he bought the business.  It was
9  either 2000 or 1999.
10  Q.   Okay.  Was there any reason you didn't include
11  your employment at Checks 54th on the resume that went
12  to the National Board?
13  A.   It wasn't relevant.  I tend to just put, like,
14  relevant things.  I didn't put Cozen O'Connor on there
15  either because I wasn't looking for paralegal work at
16  that time.  So it's more like relevant employment
17  that's on there.
18  Q.   Okay.  But this would indicate, at least when
19  you've made statements that you were home for fifteen
20  years before you worked at the National Board, that
21  that is not the case?  You were at least working
22  sometime around 1999?
23  A.   No.  I never left the house.  I worked from
24  home.  And when I did work, it was things for my
25  husband that I did while my kids were sleeping and in

Page 55

1  between breast-feedings.
2  Q.   Now, you said your position at Checks 54th was
3  office manager?
4  A.   Right.
5  Q.   Are you suggesting that you were the office
6  manager from home?
7  A.   From home.  Sometimes I did his Quick Books
8  and those kinds of things and helped him.  It's only a
9  sole proprietorship.
10  Q.   Okay.  And, again, the tax return from 1999
11  through '03 or '04 would show how much salary you
12  earned at Checks 54th?
13  A.   Yeah.  When he decided to pay me.  Yes.
14  Q.   Okay.  Now, on your National Board resume, you
15  indicate that you worked at Jeanes from '85 to '87?
16  A.   Right.
17  Q.   And on your Penn resume, you indicate that you
18  worked there from '87 to '89?
19  A.   Right.
20  Q.   Which of those would be correct?
21  A.   You know, this is, like, a really old resume,
22  and I probably just did it off the top of my head
23  because I don't have any, like, pay stubs or anything.
24  Q.   Which is the --
25  A.   And then I finally called and asked when I

Page 56

1  worked there, and I changed it.  But the amount of
2  years was six or seven years and then about a year and
3  a half at Fox Chase.
4  Q.   Okay.  Wait a minute.  Which of the resumes is
5  an old resume?
6  A.   This one (indicating).
7  Q.   The one you're holding now?
8  A.   Yeah.
9           MR. JENNINGS: Well, it's Exhibit 8, to
10  make it clear.
11           MS. KIVITZ: Okay.
12  BY MS. KIVITZ:
13  Q.   But wasn't this exhibit, Exhibit 8, handed in
14  to Penn just less than a year before Exhibit 7 was
15  handed in to the National Board?
16  A.   I don't know what the date is on this.
17  Q.   Well, when did you apply for your employment
18  with the National Board of Medical Examiners?
19  A.   2005 I guess.
20  Q.   And when did you apply for your employment
21  with Penn's medical school?
22  A.   Over a period of years.  I have hundreds of
23  applications in there.  And you can change this, and I
24  have a lot of resumes in there tailored to different
25  jobs.

CondenseIt!™

Page 57

1  Q.   When did you work there?
2  A.   2004.
3  Q.   Okay.  So is it correct that you left the
4  medical school in October, '04, and began with the
5  National Board less than a year later?
6  A.   '04?  Yeah.  I started at the Board in June of
7  '05 or May of '05.
8  Q.   Okay.  So what I'm asking you is why are you
9  calling D-8 an "old resume"?
10  A.   Because it's an older resume.  I update my
11  resume, you know, all the time.  This is old.  This is
12  before I worked at Penn; so you're talking three, four
13  years ago.
14  Q.   Okay.  Let me try this.  Did you work at
15  Jeanes Hospital from 1985 to 1987, or did you work
16  there from 1987 to 1989?
17        MR. JENNINGS: Objection to form.
18        THE WITNESS: I don't know the exact
19  years.  Maybe 1986 to 19 -- I didn't work there in
20  '89, I don't think, because I think my son was born
21  then.  But it was a time period of a year and a half
22  in either '86 to '87, somewhere around that.
23        And I didn't have any pay stubs or
24  anything, and they don't seem to have any record of me
25  anymore there.  So I don't know exactly when I worked

Page 58

1  there, but I did work there.
2  BY MS. KIVITZ:
3  Q.   Okay.  Would you look at the next entry for
4  Wistar?
5  A.   Uh-huh.
6  Q.   Do you see --
7  A.   That's a typo.  I told Liz that.  That should
8  have been 1979.  And when I went into the interview, I
9  actually said to her, "There's a typo."
10        And she said, "Okay."  And she changed
11  it.
12  Q.   All right.  Well, do you see that on this
13  resume your years say '87 -- I'm sorry -- '76 to '87?
14  A.   Right.
15  Q.   Okay.  Can you take a look at D-7?
16  A.   (Complying.)
17  Q.   What do the years for Wistar say there?
18  A.   Yeah.  Then I called them, and they said it
19  was '79 to '85.
20  Q.   Okay.  So you're saying --
21  A.   You're talking twenty years ago.  You expect
22  me to remember the exact dates?  And I never kept my
23  resume updated when I was home with my kids.
24  Q.   Okay.
25  A.   It was, you know, in my head just when I

Page 59

1  worked there.
2  Q.   I'm just trying to find out what years you
3  worked at Wistar.
4  A.   This is correct (indicating).  I actually
5  called Mike Ruggiero, and he told me it was '79 to
6  '85.
7        MR. JENNINGS: And by "this," you're
8  referring to Exhibit 7?
9        THE WITNESS: Uh-huh.
10        MR. JENNINGS: Is that "yes"?
11        THE WITNESS: Yes.
12  BY MS. KIVITZ:
13  Q.   Okay.  Now, when you applied for temporary
14  employment at Cozen O'Connor, one of the questions
15  they had asked you was to describe your proudest work
16  accomplishment.
17  A.   Uh-huh.
18  Q.   Do you remember saying that that was at the
19  School of Medicine because you had created a database
20  on NIH support tables?  You took an Excel spreadsheet
21  and converted it to Access.
22  A.   Yes.
23  Q.   Okay.
24  A.   I suppose.  If I wrote it -- I don't recall
25  that but....

Page 60

1  Q.   Okay.  Was that your proudest work
2  accomplishment at that time?
3  A.   That was my only work accomplishment there.
4  She didn't really give me anything of substance while
5  I was working there.
6  Q.   Okay.  What other job duties did you have?
7  A.   For Penn?
8  Q.   Yes.
9  A.   At Penn I was supposed to be helping with
10  multi-disciplinary grants although she -- during the
11  whole summer, I think she only put out one.  And I was
12  supposed to organize retreats, and that never
13  happened.
14        The only thing that, you know, she
15  really gave me was to do this chart.  And, you know, I
16  told her that it was a big, cumbersome chart and I
17  could make it into something a lot more efficient.
18  And that's the only thing that I did there really
19  other than being sent out to have papers signed around
20  the campus.
21        She didn't really give me the work that
22  I would have been doing.  I think it was partially
23  because it was really slow in the summer and there was
24  nothing.  There's only, like, one grant deadline I
25  think July 1.

Page 61

1  Q.  Okay.
2  A.  So I helped a little bit with that but not
3  much.
4  Q.  Okay.  My question is:  You had earlier told
5  us that the grant was not completed.  There was work
6  that needed to be done.
7  A.  I'm sorry?  Grant?
8  Q.  I apologize.  My problem.
9       That the database you had prepared at
10 the medical school was not completed?
11 A.  Right.
12 Q.  So my question is why you would have recounted
13 that as your proudest accomplishment if it were not
14 completed.
15 A.  She didn't let me complete it, but it was far
16 enough along that I had put three months of work into
17 it.  It was a lot of work.  I actually kind of have a
18 version of it on a thumb drive with me.  It's a lot of
19 work.
20      If you've never built a database, I
21 can't really explain to you what's involved.  They
22 look really simple, but they're not.  That's all I can
23 tell you.  If you were an IT person sitting here and
24 asking me -- you wouldn't ask me that question.
25      MS. KIVITZ:  Would you mark that D-9,

Page 62

1  please (indicating).
2       (Whereupon the Reporter marked an
3  Employment Reference Check for the University of
4  Pennsylvania as Exhibit No. D-9 for identification.)
5  BY MS. KIVITZ:
6  Q.  I'm showing you what has been marked D-9,
7  which was a reference check that you gave to Penn.
8  And do you see where you listed "Michael Ruggiero"?
9  A.  What am I looking at here?  This isn't my
10 handwriting.  This is not my handwriting.
11 Q.  Okay.  Were you interviewed by Elizabeth Bien
12 April 21, '04?
13 A.  I was interviewed by her for the job, yeah.
14 Q.  Okay.  Do you remember giving her information
15 concerning employment references?
16 A.  Yeah.  Michael -- I told her I didn't have a
17 lot of strong references because I'd been home with
18 the kids for twenty years.  But I gave Michael as a
19 reference.
20 Q.  Okay.
21 A.  I don't know what this thing is but whatever.
22 Q.  Did you tell her that Michael had been your
23 immediate supervisor at Wistar?
24 A.  No.  She wrote that.  This isn't my writing.
25 I said I worked with him.  He was a supervisor in the

Page 63

1  Accounting Department.
2       MS. KIVITZ:  I'll ask that be marked
3  D-10 (indicating).
4       (Whereupon the Reporter marked a Cozen
5  O'Connor Application for Employment as Exhibit
6  No. D-10 for identification.)
7  BY MS. KIVITZ:
8  Q.  All right.  I'm handing you your Application
9  for Employment at Cozen O'Connor.  You remember
10 telling us you had done some temp work there; correct?
11 A.  Right.
12 Q.  Okay.  Can you go to Page 2, where it asks you
13 for your employment history?
14 A.  Yes.  Okay.
15 Q.  Am I correct that you also represented to
16 Cozen O'Connor that the reason you left Penn School of
17 Medicine was because your position had changed?
18 A.  Yes.
19 Q.  And am I correct that you represented your
20 status at Checks 54th as manager/owner?
21 A.  Yes.
22 Q.  Do you also have an ownership interest in
23 Checks 54th?
24 A.  I own a hundred percent of the shares of the
25 company, but I'm not an officer in the business.

Page 64

1  Q.  Okay.  And I take it that is a marital asset
2  then that is subject to distribution in your divorce
3  proceedings?
4       MR. JENNINGS:  Objection to form.
5       THE WITNESS:  Well, it's debatable.
6  BY MS. KIVITZ:
7  Q.  Okay.  You're taking the position that it is a
8  marital asset?
9  A.  I would like it to be, but there is some
10 discussion over whether it is or not.
11 Q.  Okay.  And when you say you own a
12 hundred percent of the shares, you are the sole
13 shareholder --
14 A.  No.
15 Q.  -- or your husband is also a shareholder?
16 A.  We're both a hundred percent shareholders.
17 There's only two stock certificates.  They're both a
18 hundred percent.  That's the way the attorney set it
19 up.
20 Q.  Okay.  As a passive shareholder, have you
21 received income from Checks 54th even when you don't
22 work there?
23 A.  No.
24 Q.  Did you receive any income from Checks 54th in
25 the year 2006?

1   A.   No.
2   Q.   Dividends?  Any type of benefit whatsoever?
3   A.   No.
4   Q.   What about rental income?  Does your husband
5   own the building?
6   A.   No, he does not.
7   Q.   Now, I did notice on one of your tax returns
8   there was reference to, I thought, rental income?
9   A.   Rent that he pays.
10  Q.   Okay.
11  A.   He pays rent.  He doesn't collect rent.  And
12  what you saw was probably a deduction for rent.  He
13  gets a deduction from the government for rent or
14  depreciation or something.  He doesn't own the
15  building.  It's owned by Ron Freeman (phonetic).
16  Q.   Okay.  Now, for Wistar Institute, back to this
17  document, you indicated that your reason for moving
18  was that you had -- reason for leaving was that you
19  had moved; correct?
20  A.   Where is this?  For Penn?
21       Oh, for Wistar?
22  Q.   Right.
23  A.   Yeah.
24  Q.   Okay.  All right.  Can you tell me when you
25  initially applied for your employment at the National

Page 66

1   Board?
2   A.   I actually had applied before, and I was on my
3   way in for the interview, and they cancelled.  And
4   they were, like, apologizing to me.  I forget the
5   girl's name.  She doesn't work there anymore.
6        And then the next time I applied, I
7   don't know if I re-applied or they just called me.  I
8   can't remember.  They said they had a position which
9   might become a temp to hire position.  And I don't
10  remember the dates.  It was sometime in 2005 maybe.
11  Q.   Okay.  And do you remember who you met with
12  first at National Board?
13  A.   The first time I was there?  I never made it
14  in for the first interview.  I met with -- she's not
15  there anymore.  She either quit or was fired.  I'm
16  trying to remember her name.  What was her name?
17  Miriam?
18  Q.   Okay.  Could that be Meredith?
19  A.   Meredith.  That's it.
20  Q.   Okay.  Did you see a job posting?
21  A.   Where?
22  Q.   At National Board.
23       In other words, what drew you to the
24  National Board of Medical Examiners?
25  A.   Maybe I saw it on line possibly.

1   Q.   Okay.
2   A.   I might have seen it on Career Builders or
3   Monster most likely.
4   Q.   Okay.  Do you recall being hired in September,
5   '05?
6   A.   Yes.
7   Q.   Okay.
8   A.   September, '05, I was hired permanently, or
9   was it in December?  I'm trying to remember.  Yeah.
10  September I was hired as a temp, and then December
11  they made it permanent.
12  Q.   Okay.  Do you remember what your position was
13  in September, '05?
14  A.   Yes.  I was a Test Development Associate.
15  Q.   And that was a temporary position?
16  A.   Yes.
17  Q.   Okay.
18       (Whereupon the Reporter marked a letter
19  dated September 21, 2005, to Diane Rosetsky from
20  Meredith Friedman, and attached Employee Innovation
21  and Proprietary Information Agreement as Exhibit
22  No. D-11 for identification.)
23       MR. JENNINGS:  I'm going to object that
24  this document is not complete.  The letter references
25  a number of attachments, only one of which is actually

Page 68

1   attached.
2        Actually before -- can we go off the
3   record for a second.
4        (Brief recess.)
5        MS. KIVITZ:  Okay.  Before we begin,
6   this memorializes the defense request for a copy of
7   any of the Domestic Relations pleadings insofar as
8   they relate to either a request for support or
9   alimony, the granting of support or alimony, or any
10  allegations concerning support, income, or earning
11  capacity.
12       MR. JENNINGS:  I'll just make a request
13  that that be put in writing.
14       MS. KIVITZ:  It is in writing.
15       MR. JENNINGS:  Well, it's in a
16  transcript that I might not get for two and a half
17  weeks.
18       MS. KIVITZ:  Sue, can you expedite just
19  that little portion of it and send it to both counsel?
20  Thank you.
21  BY MS. KIVITZ:
22  Q.   Also before going further, Ms. Rosetsky, I
23  also saw something in one of the prior exhibits about
24  a course you had taken at Temple concerning
25  interpersonal relations.  There was a reference to it,

Page 69

1  I think, in one of the Penn documents.
2  A.    Oh, that was just a Will Smith thing that I
3  took. I was taking communications at Temple when I
4  was nineteen. Are you serious? This is from when I
5  was nineteen. I didn't take it for a reason. I just
6  took it because the course was there.
7  Q.    Okay. And what was the course?
8  A.    Oh, God. I think it was called -- it was
9  about, like, body movements and stuff of how when you
10  talk to people. It was a really interesting course.
11  This guy actually wrote a book, and I think I still
12  have the book. So I was just out of high school then;
13  so I don't quite remember. I'm going to be fifty next
14  month.
15  Q.    Okay. When you were hired by the National
16  Board, how old were you?
17  A.    Forty-eight.
18  Q.    Okay. And if you know, how old was Kathy
19  Holtzman at the time?
20  A.    I think Kathy -- she's seven years older than
21  me maybe. I'm not sure.
22  Q.    Okay. If you know, how old was Barbara
23  Davidson at the time?
24  A.    Barbara? She's older than me. I don't really
25  know. We didn't discuss our birthdays in detail.

Page 70

1  Q.    Okay.
2  A.    Or the year I mean.
3  Q.    Okay. How many other people are you aware of
4  in whatever position that were over the age of forty
5  that worked with you? near you? around you?
6  A.    There was Faith and Debbie, Faith Balsama and
7  Debbie Shelmire. They both started working there in
8  their forties. Who else? There really weren't that
9  many older women. Most everybody was younger than us,
10  you know, in their twenties and thirties that they
11  were hiring in.
12        There was one girl named Jackie. She
13  was hired by Krista, the young director that they
14  hired. And then she -- I heard that she either quit
15  or was fired. I don't know what happened with that.
16  I'm not sure how old Jackie was. She looked older,
17  but I never really asked her.
18  Q.    How old was Dave Swanson, if you know?
19  A.    Oh, Dave? He's the same age as Kathy, I
20  think. They're in their mid-fifties.
21  Q.    What about Ron, if you know?
22  A.    Ron Nungster? How old is Ron? He looks like
23  he might be in his -- you should know. In his
24  sixties? How old is Ron? You worked with him. Okay.
25  I have no idea. I don't know him that well.

Page 71

1  Q.    Okay. Referring your attention back to the
2  exhibit, which is a portion of the letter and a
3  portion of the documents that you received from
4  National Board when you were hired, do you recall
5  receiving this letter from Meredith Friedman?
6  A.    This letter, yeah.
7  Q.    Okay. Do you recall signing the Employee
8  Innovation and Proprietary Information Agreement?
9  A.    I see I signed it.
10  Q.    Okay. And what did that Agreement mean to
11  you?
12  A.    It looks like some kind of nondisclosure
13  agreement for anything that, you know, was invented
14  there. That's what it looks like. Of course, the
15  test questions are, you know, supposed to be
16  confidential, whatever. That's it.
17  Q.    Okay. Do you see the portion "Documents,
18  Memoranda, and Notes"?
19  A.    "Documents, Memoranda, and Notes"?
20  Q.    Yes. What did that mean to you?
21  A.    It just meant that all notes, records,
22  reports, programs, and unpublished documents belonging
23  to -- I'm just reading it. I just means that, you
24  know, anything that I had at the Board, records or
25  anything, were to be given back to the Board.

Page 72

1  Q.    Okay. Did you remove any items, documents,
2  memoranda, notes, or e-mails upon your departure?
3  A.    Did I remove them upon my departure? No. I
4  was not allowed back into my office to get anything.
5  Q.    Did you remove any such documents, memoranda,
6  notes, or e-mails prior to your departure?
7  A.    I don't understand the question.
8  Q.    Did you take any --
9  A.    What you do mean "remove"? Did I pick them up
10  and take them? No.
11  Q.    What did you do?
12        MR. JENNINGS: Objection to form.
13        You can answer if you can.
14        THE WITNESS: I don't have anything --
15  notes, records, reports, or unpublished documents that
16  belonged to the NBME other than what they gave me to
17  take home, my employee book. Things like that.
18  BY MS. KIVITZ:
19  Q.    What about e-mails?
20  A.    E-mails? I have -- do I have e-mails from
21  NBME? Yes, that people sent. Yes.
22  Q.    Okay. And how did you go about reproducing
23  them?
24  A.    Reproducing e-mails? You mean reproducing
25  them for whom?

Page 73

1  Q.    When did you remove them?
2  A.    I didn't remove them. I forwarded some of my
3  e-mails to myself.
4  Q.    Okay. And did you also forward other's
5  e-mails to you?
6           MR. JENNINGS: Objection to form.
7           THE WITNESS: Other's e-mails to me?
8  BY MS. KIVITZ:
9  Q.    To you?
10 A.    You mean like things from Barbara Davidson?
11 Q.    People from the NBME.
12 A.    Yes. They were mine. Yes. Addressed to me,
13 yes.
14 Q.    Okay. And where did you forward them?
15 A.    To my house.
16 Q.    And when did you forward them?
17 A.    While I worked there so I could read things
18 from home. I did some work from home.
19 Q.    Did you forward them for any other reason?
20 A.    For my records.
21 Q.    Okay. And when did you begin to forward
22 documents for your records?
23 A.    The whole time I was there. If it was
24 something that I needed maybe to work from at home or
25 whatever, I would forward it to myself. Or if I had

Page 74

1  to remind myself to do something the next day, I would
2  forward it to myself.
3  Q.    Okay. When was the first time you ever met
4  with Counsel, Mr. Jennings, in this matter? First
5  time ever? Not what you said to him or what he said
6  to you. Just the date?
7  A.    I don't remember.
8  Q.    Okay. How about the month?
9  A.    I'm trying to remember. It might have been
10 January.
11 Q.    Of what year?
12 A.    Trying to remember. January, 2007. Could
13 have been December, 2006.
14 Q.    Okay. Did you ever speak to him or any other
15 attorney while you were still employed by the National
16 Board of Medical Examiners?
17 A.    No.
18 Q.    Now, looking at Defense Exhibit 11 in front of
19 you, what did this language mean to you at the time
20 you were hired?
21           "We recognize that you retain the
22      option, as does NBME, of ending your
23      employment with the company at any time, with
24      or without notice and with or without cause.
25      As such, your employment with NBME is at-will,

Page 75

1      and neither this letter nor any other oral or
2      written representations may be considered a
3      contract."
4  A.    What does that mean to me? Exactly what it
5  says.
6  Q.    So you were aware that you were an at-will
7  employee; correct?
8  A.    Yes.
9  Q.    And "at-will" means what?
10 A.    It means there's no contract.
11 Q.    It means what?
12 A.    There's no contract between us.
13 Q.    Okay.
14 A.    For a definite period of employment.
15 Q.    Okay. Now, your original posting --
16           MS. KIVITZ: I'll ask that this be
17 marked (indicating).
18           (Whereupon the Reporter marked the
19 Position Editing Administration job description for
20 Test Development Associate I as Exhibit No. D-12 for
21 identification.)
22 BY MS. KIVITZ:
23 Q.    All right. Do you recognize what D-12 is?
24 A.    I'm not really sure whether this is the --
25 which one this is. There are several Test Development

Page 76

1  Associate positions on their Web site, and I can't
2  tell you offhand if this is the one that was for the
3  temporary position or for the full. I can't tell what
4  this is from the way this is printed out.
5  Q.    Okay. Does this look familiar to you as if
6  you've ever seen it?
7  A.    It looks -- some of it does.
8  Q.    Okay.
9  A.    This actually does not look like my position.
10 If you're saying this is supposed to be my position,
11 my position had a master's degree. This one says
12 bachelor's degree. This is not my position if that's
13 what you're trying to bring out.
14 Q.    All right. Are you saying that this is not
15 the position -- the temporary position that was posted
16 on August 24, '05?
17 A.    I have no idea. I couldn't tell you. I did
18 not memorize the job description.
19 Q.    Okay.
20 A.    So I didn't know.
21 Q.    Okay. You don't recall what the job
22 description or the role profile was for your original
23 temporary work?
24 A.    It was called a "Test Development Associate."
25 That I remember. And I didn't memorize the job

Condenseit!

**Page 77**

1 description; so I really -- if I said to you that I
2 knew that that is exactly what it was, I would be
3 lying.
4 Q. Okay. Would you look at those
5 responsibilities?
6 A. Yes.
7 Q. Does it accurately describe some or all of the
8 tasks that you were performing as a temporary Test
9 Development Associate?
10     MR. JENNINGS: Objection to form.
11     THE WITNESS: No. Actually maybe one or
12 two things on here I did, but most of this work I was
13 never really given.
14 BY MS. KIVITZ:
15 Q. Okay. What would you say --
16 A. "Assist with examination production;
17     translation of items for international
18     examinations, CBT, and Web-based exams."
19     I was never given the opportunity to do
20 that.
21 Q. Okay. Let me just ask you this: What is the
22 work you were given that is described on here?
23 A. Creating and cataloging slides for
24 presentations and workshops. I didn't really create
25 them. I was cataloging them. She asked me to

**Page 78**

1 organize her slides for her.
2 Q. Who is "she"?
3 A. Kathy Holtzman.
4 Q. Okay.
5 A. And what else? Let's see here.
6 Q. What else did you do as a temporary Test
7 Development Associate?
8 A. Not much. I kept her contracts. I kind of
9 organized them for her. She could never find them; so
10 she said, "Can you make me a system so I can find
11 these?" So I made her a system which basically
12 consisted of putting them in binders so she could find
13 them.
14     I did some typing for her, like fixing
15 Excel charts. Nothing of substance. Oh, one thing
16 that I did do that was pretty much in line with my
17 skills was I created these -- with Microsoft Access I
18 created registration sign-in databases where they --
19     They used to just come in, and the
20 doctors had to fill out their information on the piece
21 of paper when they registered at workshops that they
22 traveled to. And I made them a database where they
23 had a laptop and the doctor's information. I would
24 pre-load it, and then they would answer a
25 questionnaire.

**Page 79**

1     And I built that for her. And each time
2 they needed to go to a different place, I had to re-do
3 the database to be in line with the school or the
4 workshop that they were doing.
5 Q. Okay. Anything else that you recall doing as
6 a temp?
7 A. As a temp just, you know, some clerical stuff.
8 I don't remember. I mean, most of my time was taken
9 up doing that because it's really time-consuming to
10 build these databases. I mean, I did some other stuff
11 for her.
12 Q. What sort of clerical stuff? You said, "Some
13 clerical stuff."
14 A. There were these -- what are they called? --
15 annual reports and things that they got, and I had to
16 take them down to this massive drill press. And I
17 spent hours down there, hole punching them to put them
18 into binders. That's what she had me do.
19 Q. Okay.
20 A. And then I actually made her a way to see that
21 the contracts were -- what phase they were in. I made
22 her an Excel chart. I was going to make her a
23 database, but she didn't want it. I made her an Excel
24 chart to see where the contracts were at. I kept that
25 updated for her.

**Page 80**

1 Q. Okay.
2 A. I'm trying to remember what else. I really
3 can't remember.
4 Q. Did you see anyone else ever performing
5 clerical activities?
6 A. "Anyone else ever performing clerical" -- I
7 don't understand that.
8 Q. Okay. Did you ever see Kathy Holtzman do
9 anything clerical?
10 A. No.
11 Q. Okay. Did you ever see Faith Balsama do
12 anything clerical?
13 A. Yes.
14 Q. What sort of stuff?
15 A. She used to go to the copy room and copy
16 things for them. Oh, and I did some of that too. I
17 did copying.
18 Q. Okay.
19 A. Dave used to give me things to copy. Oh, and
20 I did some stuff for Dave. I actually did a big thing
21 for Dave actually. I made his resume digital so that
22 he could find his three hundred or so publications. I
23 took his resume, and I made it hyperlinks on his
24 publications.
25     And then I scanned all of his hundreds

Page 81

1 of publications into Adobe. And then I made a link to
2 the Adobe file so that, when he wanted to find a
3 publication, he could just go to his resume, click on
4 it, and it would open up, and he could print it out.
5 Q. Did you ever see Dave do anything clerical?
6 A. No.
7 Q. Did you ever see Debbie Shelmire do anything
8 clerical?
9 A. Yeah. Me and Debbie used to hole punch
10 together sometimes.
11 Q. Did Kathy Holtzman have a secretary?
12 A. Well, she wasn't called a "secretary," but I
13 would say it would be Faith is her assistant.
14 Q. Okay. Did you ever see Kieran do anything
15 clerical?
16 A. No.
17 Q. Did you ever see Krista do anything clerical?
18 A. No. As a matter of fact, Kathy had Krista
19 give me her typos to fix and copying to do. So she
20 had Krista giving me some clerical work.
21 Q. Did you ever see Kathy Angelucci doing
22 anything clerical?
23 A. No.
24 Q. Did you ever see Barbara Davidson do anything
25 clerical?

Page 82

1 A. No. She doesn't work anywhere near me. She
2 worked two floors below me; so I didn't see her do
3 anything ever.
4 Q. Okay.
5 A. She's the Director of Human Resources.
6 Q. Was there anyone besides the people you've
7 just identified you ever observed also doing some
8 clerical work, either Xeroxing, hole punching,
9 anything else as the job required?
10 A. Not really. There were editors behind me that
11 were sitting there, editing. I didn't particularly
12 see anybody -- oh, there was some production
13 assistants, these young girls. They used to do a lot
14 of copying and things.
15 Q. And who were they?
16 A. I don't remember their names. They were --
17 most of them were in their twenties. I'm trying to
18 think of their names. There was one little girl with
19 the black hair. I don't remember their names.
20 Q. Okay. So the young girls in their twenties
21 did copying. You did some. Faith did some. Debbie
22 did some?
23 A. Right.
24      MR. JENNINGS: Objection to form.
25      THE WITNESS: Right. You know, I really

Page 83

1 can't say that other people did not do any clerical
2 work, but I didn't see them. We're in cubbies, you
3 know, with -- I guess they would go to the copy room.
4 I don't see the relevancy of this, but yes.
5 BY MS. KIVITZ:
6 Q. Okay. Now, at some point you had an
7 opportunity to have permanent work at National Board.
8 Can you describe to us what happened?
9 A. Kathy decided to hire me permanently because I
10 was such a good worker, never was late, came in on
11 time, had no problems with anyone, and she liked me.
12 Q. Did you like her?
13 A. In the beginning.
14 Q. When did your feeling change?
15 A. You know, she would intermittently exclude me
16 out of things that I was supposed to be doing in my
17 job description and just give me more menial work.
18 Q. Okay. But my question is: When would you say
19 your transformation occurred? When did you start to
20 feel that way is what I'm trying to pinpoint?
21 A. Probably pretty close towards the end after I
22 had done all this technical work for her and I had
23 tried to apply for a more technical position. And she
24 kept putting me down, telling me that, you know, my
25 education was outdated and I was older and all this.

Page 84

1      So I just, you know -- she was
2 insulting. She insulted me once in front of someone.
3 She didn't give me hardly any work to do. I was
4 mostly on things that I produced myself, and I was
5 standing there with Christine --
6 Q. Can I just direct you back for one second?
7 A. Uh-huh.
8 Q. I'm just trying to ask you around when you
9 felt that it changed. Just give me a month or a time.
10 A. I can't do that because she -- you know, she
11 would intermittently just do things that were just
12 kind of, you know, belittling.
13 Q. Okay. But when would say it was the first
14 time you ever felt belittled?
15 A. I was trying to tell you. Christine DeRucci
16 (phonetic) was standing there, and she said -- she
17 brought an Excel chart over to me for me to fix. And
18 she said, "Here, why don't you do something useful for
19 a change?" She said it in front of another employee
20 when I was always coming in there, asking her, "Do you
21 need any help with anything?"
22 Q. Okay. So let's try again. When was that?
23 A. I think it was around, like, the holidays.
24 Q. Which holidays?
25 A. You know, I really can't remember. I couldn't

Page 85

1  tell you. I mean, I was there for eighteen months.
2  And, you know, in the beginning, you know, I was
3  tolerating not really being given appropriate work.
4  And, you know, as I --
5  Q.   Were you there for eighteen months?
6  A.   I think so. It was September to September.
7  Sixteen months. Okay. So it -- was it sixteen
8  months? September, 2005, till September, 2006, and
9  then to December 1.
10  Q.   All right. How many months is that?
11  A.   I think it's sixteen. Is it sixteen? Okay.
12  Q.   Okay. And you said that this Christine
13  DeRucci thing was around the holidays. Was it the
14  summer? Was it the fall?
15  A.   I'm trying to remember. I seem to remember it
16  being -- maybe it wasn't around the holidays. I seem
17  to recall, like, it wasn't summer. Maybe in September
18  probably.
19  Q.   All right. So around September --
20  A.   I don't remember. I don't see what the
21  difference is when it was. I just remember her doing
22  it.
23  Q.   Around September, '06?
24  A.   Maybe. I'm not going to commit to it because
25  I can't really remember.

Page 86

1  Q.   Okay. Is it true that you liked your job well
2  enough that you were willing to undertake permanent
3  work in December of '05?
4  A.   That I liked my job well enough that I was
5  willing to take permanent work? I don't think it was
6  a matter of liking the job well enough. I needed a
7  job. I had three kids. They were paying my health
8  insurance. I mean, it wasn't my ideal situation
9  because I felt that I wasn't being included in what I
10  was -- you know, what was in my job description.
11  Q.   Okay. Well, we just went over the August,
12  '05 job description, and you described things on the
13  job description that you were given to do; correct?
14  A.   Couple things. Right.
15  Q.   Okay.
16  A.   A lot of them were my suggestions except for
17  one thing.
18  Q.   Okay.
19  A.   The one thing was the sign-in database. Kathy
20  asked me to do that.
21  Q.   Okay. And then your job description was going
22  to change with your new permanent employment; correct?
23  A.   Kathy and I made the job description together.
24  Q.   Okay. Now, what was your new permanent
25  employment? What was your position called?

Page 87

1  A.   She changed it to Test Development Program
2  Assistant.
3  Q.   Okay. When you say "she changed it," you knew
4  the title of your permanent employment was Program
5  Assistant Test Development; correct?
6  A.   Right. It was a new position. There had
7  never been anyone called that before.
8  Q.   Okay. Do you remember what grade it was in
9  terms of salary?
10  A.   Did it have a grade? Oh, no, I don't
11  remember.
12  Q.   Okay.
13  A.   I can't remember the way they did it. No, I
14  don't remember.
15  Q.   Okay. How did it come to be that a new role
16  profile was going to be developed?
17        MR. JENNINGS: Objection to form.
18        You can answer.
19        THE WITNESS: How did it come to be? I
20  don't understand the question.
21  BY MS. KIVITZ:
22  Q.   Okay.
23  A.   So rephrase that.
24  Q.   Okay. Was there a new role profile developed
25  for the new position Program Assistant Test

Page 88

1  Development?
2  A.   Yes. Kathy and I developed it together.
3  Q.   Okay.
4  A.   Well, it was mostly Kathy developing it.
5  Q.   Okay. Well, who, between you and Kathy,
6  approached John Bird to get the ability -- in other
7  words, to get the ability to go on line and prepare a
8  role description?
9  A.   I suppose Kathy did it. I couldn't do that.
10  Q.   Who drafted the first draft of the role
11  profile?
12  A.   Kathy.
13        MS. KIVITZ: Okay. I'll ask that this
14  be marked the next exhibit (indicating).
15        (Whereupon the Reporter marked an
16  on-line printout entitled "Role Profiles" as Exhibit
17  No. D-13 for identification.)
18  BY MS. KIVITZ:
19  Q.   Have you ever seen this description on line
20  concerning role profiles at the National Board of
21  Medical Examiners?
22  A.   I don't know what this is.
23  Q.   Okay. Have you ever seen it?
24  A.   I don't think so. What is it? It's some kind
25  of instruction on role profiles from --

Page 89

1  Q.   Correct.
2        MR. JENNINGS:  The question was have you
3  seen it before?
4        THE WITNESS:  I may have.  It doesn't
5  really look that familiar.
6  BY MS. KIVITZ:
7  Q.   Okay.  Were you familiar with the idea that
8  role profiles are a work in progress?
9  A.   I guess you can change anybody's job
10 description if you want to.  Is that what you're
11 asking me?
12 Q.   You were familiar with what a role profile
13 meant -- correct? -- that they were always at every
14 moment a work in progress?
15 A.   No.
16        MR. JENNINGS:  Objection to form.
17        THE WITNESS:  No.  I'm not familiar with
18 that, that, you know, one day she can tell me my role
19 is to take out the trash.  No.
20 BY MS. KIVITZ:
21 Q.   Okay.  Now, you indicated that Test
22 Development Program Assistant was a new position that
23 had been created in December, '05; correct?
24 A.   As far as I knew, I don't think the last three
25 people before me had that title.

Page 90

1  Q.   Okay.
2  A.   I think that's because nobody made it past
3  being a temp.  Or actually there were two permanent
4  people.  I think they were also terminated by Kathy.
5  Q.   Okay.  Do you recall yourself ever going on
6  line and drafting or revising your role profile with
7  suggestions of what you thought it should encompass?
8  A.   No.  Me and Kathy sat down together -- or
9  Kathy and I sat down together, and she was totally in
10 control of everything that was going to be in that
11 role profile.  I was not allowed to change anything
12 without her okay.
13 Q.   Okay.  Did you change things and give them
14 back to her for her okay?
15 A.   Not really.  It was kind of like a
16 collaborative effort -- the whole thing.  You know, I
17 corrected some of the English in it, but basically
18 they were all Kathy's idea.
19 Q.   And when would you say --
20 A.   I did put the education in there.  I said,
21 "Shouldn't that be a master's degree since that's what
22 I am?"
23        So she said, "Yeah.  Okay.  You can put
24 that in there."
25 Q.   Okay.  What other input did you have besides

Page 91

1  master's degree?
2  A.   She basically took a lot of the Test
3  Development Associate things, and she put some of
4  those in there.  And then I think she added some kind
5  of thing about interaction with vendors and doing --
6  you know, reviewing office processes and trying to
7  make the office more efficient, that kind of thing,
8  which I think was also in the initial Test Development
9  Associate position when I first got there.
10 Q.   How was a role profile published?  Do you know
11 that?
12 A.   How was it published?  Yeah.  It was an
13 on-line system where you would pull up a template and
14 then type it in and then....
15 Q.   Okay.  When you pulled up a template, would
16 the name of the last person who worked on it be
17 present on the template?
18 A.   I don't think so.  I have no idea really.
19 Q.   Okay.  Would the name of the person who
20 created the role profile, let's say, the primary
21 person -- would that name be on it?
22 A.   I have no idea.
23 Q.   In this particular case who pressed the button
24 to publish the role profile in December?
25 A.   I don't know.  Kathy had the option.  She

Page 92

1  could get into it as well as I could.  If she went
2  into it after I typed it for her, she could have.  I
3  can't really attest to that.
4  Q.   Do you remember pressing the button to publish
5  this role profile?
6  A.   Do I remember pressing the button to publish?
7  When Kathy told me to, I most likely did.
8  Q.   Now, you said this was a collaborative effort
9  and you met with Kathy.
10 A.   Right.
11 Q.   Did you meet with her in person to discuss
12 this?
13 A.   Yeah.  Sitting in her office.
14 Q.   How many times did you meet?
15 A.   I don't remember.  A few times.
16 Q.   When?
17 A.   When?  I don't remember when.  I mean, you
18 could find that out.  Just go on the network and see
19 when it was published.
20 Q.   Do you remember when you published it?
21        MR. JENNINGS:  Objection to form.
22        THE WITNESS:  Do I remember when I
23 published it?  Whenever Kathy told me to publish it is
24 when I published it.
25 BY MS. KIVITZ:

Page 93

1   Q.    My question is:  Do you remember what month
2   that was?
3   A.    Let me think.
4            MR. JENNINGS:  Objection to form.
5            THE WITNESS:  I guess it had to have
6   been before she hired me permanently.  So it must have
7   been in November or December.  Wouldn't she have had
8   to have the position in place before she hired me?  I
9   guess she did.  So I guess it must have been, like,
10  around Thanksgiving of 2005.  Yeah, I think it would
11  be around maybe in the winter.
12  BY MS. KIVITZ:
13  Q.    Okay.
14  A.    It had to have been before she hired me
15  because she needed a title; so it must have been
16  before December of 2005.
17  Q.    Okay.  Now, was it your understanding that you
18  could only perform the jobs that were specifically
19  stated on your role profile?
20  A.    Say this again?
21  Q.    What was your understanding concerning what
22  the role profile meant?
23  A.    "What the role profile meant?"  I don't have
24  it memorized.  I'm not sure what you're asking me.
25  Q.    Well, was it your understanding that you could

Page 94

1   only perform tasks if they were specifically
2   identified on your role profile?
3   A.    That I could -- are you asking me if I could
4   not perform tasks unless they were on my role
5   profile?
6   Q.    Correct.
7   A.    That I could not perform tasks.  I have no
8   idea.  Whatever Kathy would ask me to do I did.
9   Q.    I'm going to ask you again, because I'm
10  confused myself, what the role profile meant to you in
11  terms of your ability to perform tasks or not perform
12  tasks.
13  A.    That I would be participating in test
14  development and in procedures to improve the
15  efficiency of test development such as making
16  databases, participating in acquiring information for
17  test development.
18            I'm trying to think.  I was supposed to
19  help with the budget.  That never happened.  What
20  else?  Since I never got to do any of the things, I
21  don't really -- couldn't tell you because I was
22  excluded from doing anything on there and basically
23  wound up intermittently doing the databases or
24  doing -- fixing typos for other people, Xeroxing for
25  other people.  I wasn't given the work that was on my

Page 95

1   job description.
2   Q.    Okay.  Let me go back.  What else was your
3   understanding of what you were supposed to be doing
4   besides making databases, participating in acquiring
5   information for test development, and helping with the
6   budget?
7   A.    I was supposed to be helping with the flexible
8   blueprinting at one point.  And that wound up -- she
9   downgraded it to me just editing stuff for someone
10  else when I had actually gone through an entire
11  tutorial that Kieran Hussie was working on.
12            I was supposed to be helping him with
13  flexible blueprinting.  They were producing a tutorial
14  for it.  And actually Krista gave me a tutorial that
15  she said she wanted all these slides edited -- there
16  were hundreds of them -- before Kathy got back in four
17  days.  And I did all that, took it home with me,
18  worked on it at home.
19            And when Kathy saw that I edited it, she
20  said, "You were only supposed to be doing cutting and
21  pasting of other people's editing."  And she threw it
22  out and said, "No one can use it."  So anything that I
23  did of any substance Kathy kind of took away from me.
24  Q.    I'm going to go back --
25  A.    Because I had two bosses at this point.  I had

Page 96

1   Krista, and I had Kathy.
2   Q.    Okay.  Other than the items you've told me,
3   what else did you feel your job description did
4   encompass?
5   A.    Did it or was it supposed to encompass?  Are
6   you asking me what I thought I was supposed to be
7   given or what I was given?
8   Q.    What you thought your role profile meant you
9   would be given.
10  A.    I thought I would be participating in a lot of
11  the IT work that they were starting up in Test
12  Development such as the development of flexible
13  blueprinting.
14  Q.    Okay.  What else?
15  A.    Dealing with vendors.  I was supposed to be
16  more involved with vendors.  When I say "vendors," I
17  mean client programs, contracts, that type of thing.
18  I was never involved with any of that.
19            You know, it was not supposed to involve
20  secretarial work such as fixing typos for people,
21  going to the copy machine, that type of thing.  That
22  was not in my job description.  There is nothing in my
23  job description for clerical work.
24  Q.    Okay.  Who did you feel should have been
25  fixing typos and going to the copy machine?

Page 97

1 A.    The people who produced the work.
2 Q.    And who were they?
3 A.    Who were they?  Krista Allbee.
4 Q.    Right.
5 A.    Kieran.
6 Q.    Right.
7 A.    Whoever produced the work.
8 Q.    Okay.  So I just want to be clear, it wasn't
9 beneath you --
10         MR. JENNINGS:  She was still trying to
11 answer the question.
12         You can finish your answer.
13         THE WITNESS:  Also I was still required
14 to do hours of hole punching for the contracts.  When
15 she said I was going to be involved in contracts, I
16 thought she meant I was going to be involved in the
17 producing of the contracts and dealing with the
18 vendors.  Instead she just gave me filing of the
19 contracts and the hole punching of the annual reports.
20 BY MS. KIVITZ:
21 Q.    Okay.  And who do you mean by "she"?
22 A.    Kathy Holtzman.
23 Q.    Okay.  Now, I just want to ask you:  Who did
24 you think should be doing the hole punching?
25 A.    The production assistants were the clerical

Page 98

1 workers.
2 Q.    Okay.  So the production assistants, the
3 younger girls that you identified before --
4 A.    They weren't all younger.  I don't know how
5 old they were.  I'm not going to say.  I just said
6 they had less education and they had less skills and
7 they were hired as clerical workers.
8 Q.    Okay.
9 A.    That's what they called "production
10 assistants."  As far as I know as to what those girls
11 would do, they were usually copying, hole punching,
12 and doing that type of labor.
13 Q.    All right.  So you felt that hole punching
14 should go to the production assistants and that Krista
15 and Kieran and Kathy Holtzman should be fixing their
16 own typos?
17 A.    Kathy Angelucci.
18 Q.    Okay.  And Kathy Angelucci.  The supervisors
19 and the other people there should have been fixing
20 their own typos and doing their own copies?
21 A.    Right.  I was not --
22         MR. JENNINGS:  Objection to form.
23         THE WITNESS:  I was hired to produce
24 work, not to fix other people's work.  She didn't have
25 to hire somebody with a master's degree and two other

Page 99

1 college degrees.  You know, that was my understanding
2 that I was going to be involved in test production,
3 not involved in the clerical portion of it.
4 BY MS. KIVITZ:
5 Q.    Okay.  Now, you were aware that your title was
6 assistant -- program assistant; correct?
7 A.    Test Development Program Assistant.  Yes.
8 Q.    Okay.  And in your role at Penn and in your
9 role at Wistar as part of the team, you had also been
10 involved in tasks that required you to do copying and
11 hole punching and things of that nature; correct?
12 A.    Yes.  But so did my supervisors.  They did it
13 along with us when we had a grant deadline.
14 Q.    But you were also aware that copying and hole
15 punching and all that clerical stuff is necessary
16 often for the production of a final product?
17 A.    Generally when I worked at Wistar and I was
18 assistant manager, I did not do that.  The editorial
19 assistants did it.
20 Q.    Okay.  But you would agree with me that
21 somebody has to do it -- correct? -- for the
22 production of a final product?
23 A.    Well, Kathy never did it.  I never saw her do
24 any clerical work.  Kathy Holtzman.  And I never saw
25 Krista Allbee or Kathy Angelucci do any clerical work.

Page 100

1 It was basically me, Faith, and Debbie.
2 Q.    Okay.  But am I correct that they were not
3 program assistants?  Isn't that right?
4         MR. JENNINGS:  Objection to form.  Who?
5         MS. KIVITZ:  Kathy Holtzman and Kathy
6 Angelucci.
7 BY MS. KIVITZ:
8 Q.    They were not program assistants; correct?
9 A.    Well, I don't see what the difference is.  If
10 it wasn't in my job description and it's not in Kathy
11 Holtzman's job description, then why couldn't she do
12 it?  Was it below her to do that?  Was it below Kathy
13 Angelucci to do that?  Was it below Krista, who was
14 only thirty years old and had five years of job
15 experience?  Was it below her to do that?  Why was she
16 giving it to me?
17 Q.    So you thought the role profile was a work in
18 progress; correct?
19 A.    Supposedly, yes.
20 Q.    Okay.  And you also thought and have told me
21 that your position was the first of its kind;
22 correct?
23         MR. JENNINGS:  Objection to form.
24         THE WITNESS:  There is another program
25 assistant, but it's not in Test Development.

Page 101

1 BY MS. KIVITZ:
2 Q. Okay. So the Test Development Program
3 Assistant was new; right?
4 A. As far as I know. I don't know if they had
5 one previous years before me, but as far as I know,
6 that was the only one at that time with that title.
7 Q. Okay. Ms. Rosetsky, is it your position that
8 someone had to change the role profile every single
9 time you did a task that wasn't specifically
10 identified?
11 A. No. But I wasn't given any other work in my
12 job description. I was just being given clerical
13 work.
14 Q. Okay. Now, didn't you previously testify to
15 other work you were given that was included in your
16 job description?
17 A. Well, actually the cataloging of the slides,
18 which is sort of like clerical work -- I suggested
19 that it be made into a database.
20    And she said, "Go ahead and do it if you
21 have -- you know, if there's nothing else for you to
22 do, and, you know, if you have nothing else to do,
23 then you can work on it."
24    And that's what I did. I turned it into
25 what could have been making card files into building a

Page 102

1 database.
2 Q. Okay.
3 A. And she allowed me to do that. And then the
4 only thing that she really gave me, which was on par
5 with what I should have been doing, was making the
6 sign-in databases.
7 Q. Okay. What else? Again I'm going to ask you
8 what else you did that you felt was included in your
9 job description and not beneath you.
10    MR. JENNINGS: Objection to form.
11    THE WITNESS: I did editing of the
12 tutorial. There were bubbles on the tutorial for the
13 physicians to read as they went through. It was a
14 tutorial to teach them how to use the flexible
15 blueprinting.
16    And I spent hours and hours editing it
17 even though Kathy got angry at Krista for allowing me
18 to do that and wouldn't let anybody use it. Although
19 I did see afterwards that they had used some of my
20 editing and called it their own.
21 BY MS. KIVITZ:
22 Q. Okay. But you would agree with me also that
23 Kathy Holtzman was your boss; correct?
24 A. She was my boss and so was David and
25 apparently so was Krista but not officially. But they

Page 103

1 were all giving me things to do.
2 Q. Okay. But the person you directly reported to
3 was who?
4 A. It was Kathy and Dave.
5 Q. All right.
6 A. I guess it was Kathy. I mean, I was supposed
7 to be doing stuff for Dave also. I did do some things
8 for him. He gave me some research to do in the
9 library a little bit for him.
10 Q. Okay. And isn't it true that you were upset
11 that Kathy edited edits that you had done?
12 A. No.
13 Q. Okay.
14 A. Kathy was upset that I edited her edits.
15 Q. Isn't it true that you were so upset that
16 Kathy Holtzman had edited your work that you went to
17 complain to Barbara Davidson?
18 A. No. What I went to complain to Barbara
19 Davidson about was that I had taken work home with me
20 because Krista had given me a time limit, before Kathy
21 got back, to edit hundreds of slide tutorials. And
22 then after I finished editing it, Kathy came back and
23 was yelling at Krista for allowing me to do that even
24 thought I was way more qualified than the other people
25 that were editing it because I have an English degree

Page 104

1 and I've had formal editing courses.
2    Kathy was mad that I'd been given the
3 work, and she wrote me an e-mail where she said to me,
4 "You were only supposed to be cutting and pasting
5 other people's editing," like I was supposed to be
6 fixing typos and then cutting and pasting it into the
7 tutorial.
8    As a matter of fact, I had to learn
9 something called "Captivate." And that was another
10 thing. She had me learn three or four different
11 programs while I was there: Microsoft Project,
12 Captivate, End Note.
13    She would say, "Can you learn this? Can
14 you learn that?" I picked up each one, and I learned
15 it like that, like that, like that (snapping fingers).
16 And --
17 Q. Well, was that in your job profile?
18    MR. JENNINGS: She was in the middle of
19 answering.
20 BY MS. KIVITZ:
21 Q. Was that included in your role profile?
22    MR. JENNINGS: No. Please let her
23 complete her answer.
24    THE WITNESS: Microsoft Project she --
25 when she hired me, she said, "Can you learn it?"

Page 105

1    I said, "Yes."
2         Oh, and that was another thing that
3  happened, if you want me to go into that, where I set
4  up sixteen Microsoft Projects. And Kathy was in a
5  fight with IT because she was afraid of using it, and
6  she canned it after I did all that work.
7  BY MS. KIVITZ:
8  Q.   Ms. Rosetsky, listen to this question.
9  A.   Okay.
10 Q.   Learning Captivate and Microsoft Project and
11 End Note -- was that within your role profile?
12 A.   Was it within my role profile?  Yes.
13 Q.   Okay.
14 A.   Not exactly those programs, but it kind of
15 said, "Ability to review new applications and decide
16 if they could be used in Test Development."
17 Q.   Okay.
18 A.   And I did that in a limited amount. And after
19 doing a lot of work for it, Kathy kind of just canned
20 it.
21 Q.   Okay. Now, you also said that the reason you
22 complained to Barbara Davidson is Krista had given you
23 a time limit?
24 A.   Right.
25 Q.   And then after you did the work and Kathy

Page 106

1  Holtzman edited it, she yelled at Krista?
2  A.   She yelled at Krista for giving me substantial
3  work to do. She just wanted me to do the clerical
4  portion of it, which was cutting and pasting. And
5  actually I took the editing that I did, and I showed
6  it to some of the editors and then showed her what
7  Kathy was -- before I was editing Kathy.
8         Kathy wasn't editing me; I was editing
9  what Kathy had put. They said that mine was far
10 superior to hers and that -- and I told Kathy that.
11 And I said, "This is how you do journalistic editing,"
12 because she didn't have the skills. But everybody was
13 afraid of her. So, you know, that was kind of....
14 Q.   So you felt you were a better editor than
15 Kathy?
16 A.   Oh, definitely. She doesn't have any
17 training.
18 Q.   Okay.
19 A.   And I have the examples of it, and I showed
20 her, you know, this is -- instead of saying something
21 in twenty words, you can say it in seven.
22 Q.   Okay. And even though Kathy was seven years
23 older than you, you felt that your experience was
24 better than hers in editing?
25      MR. JENNINGS: Objection to form.

Page 107

1         THE WITNESS: It has nothing to do with
2  age.
3  BY MS. KIVITZ:
4  Q.   Why does it have nothing to do with age?
5  A.   At that point with the editing, it had to do
6  with my training. I just felt the overall way she was
7  treating me was because I was older and I had come
8  back to work from being home with my kids. And she
9  told me that my education is old and that I'm older
10 and I should be satisfied, you know, that she gave me
11 a chance to be working and all this.
12        And it was the same thing with Faith and
13 Debbie. They both had tried to apply for promotions
14 and were turned down. We were all the same age, and
15 we were all kept doing clerical work.
16 Q.   Okay. Let me ask you this: Did you think
17 that the fact that Kathy Holtzman had worked at the
18 National Board for so many years had qualified her at
19 all to do editing the way the National Board perhaps
20 wanted it done?
21      MR. JENNINGS: Objection to form.
22        THE WITNESS: Did I think that she was a
23 good editor because she worked for that long?
24 BY MS. KIVITZ:
25 Q.   Do you think Kathy Holtzman had more

Page 108

1  experience than you at the National Board of Medical
2  Examiners?
3  A.   Did she have more experience at the Board?
4  Yes. But did she have more experience or was she a
5  good editor? I don't think that qualified her.
6  There's something called the "Peter Principle." I
7  won't go into that but....
8  Q.   What is the Peter Principle?
9  A.   That people will be promoted to the point of
10 their incompetence.
11 Q.   So your understanding was what?
12 A.   That Kathy -- people were very intimidated by
13 her, the way that she -- you know, they had an
14 executive coach come in for her.
15 Q.   I'm sorry. What did you mean by -- I don't
16 understand your reference to Peter Principle. Who was
17 promoted?
18 A.   Just because you're at the job for a length of
19 time, you know, does not mean that you're doing it
20 right. I mean, who knows why you're promoted? You
21 know, there's different reasons. We all know how
22 corrupt this country is if you want me to go into it.
23 You know, corruption takes place.
24        You know, I'm not going to say that
25 she's in the position that she was in because she was

Page 105 - Page 108

Page 109

1  the best person for the job. I mean, apparently --
2  you know, I never said any of this to Kathy. I just
3  kept my mouth shut.
4           But she had an executive coach come in
5  by the name of -- her first name was Kenny
6  (phonetic) -- because apparently they had had issues
7  with her before discriminating against people and, you
8  know, inappropriate behavior.
9  Q.   What did you mean by the Peter Principle
10 concerning Kathy Holtzman?
11 A.   What I mean concerning it? I just stated it.
12 Peter Principle is a saying that people will be
13 promoted in the point of their incompetence. Like,
14 say you were at one level, but then you were promoted
15 to the next level. You may have been good at the one
16 level, but when you got to the next level, you were
17 above your head.
18 Q.   Okay. So did you feel that Kathy Holtzman was
19 incompetent?
20 A.   I felt in certain areas. Like, she knew a lot
21 about Test Development. She didn't know anything
22 about IT, and she resented IT. She had a lot of
23 battles with the IT Department that she put me in the
24 middle of because, as a lot of people are -- there's,
25 like, a dichotomy right now between the people that

Page 110

1  can deal with computers and those that won't.
2           And Kathy was one of those that, you
3  know, she's always calling me into her office to ask
4  me, "How do you do this? How do you do that?" with
5  Microsoft Word and things like that. And she really
6  was not a technology person. So in that respect, you
7  know, she was good at some things, and some things she
8  wasn't.
9           But she was -- she just wanted to be,
10 you know, controlling and keep everyone in their
11 place. And in order to control people, she found that
12 the younger people were easier to control. I mean,
13 she had young patsies all around her.
14          And when people were, you know, older
15 like Faith and Debbie and I, she did not want to deal
16 with the older people being in any kind of position to
17 make decisions.
18 Q.   So who were the young patsies, in your words?
19 A.   Kathy Angelucci and especially Krista Allbee,
20 who went from being a production assistant to being
21 director of the department in five years. And she
22 didn't even live -- she lived in Chicago; so she was
23 telecommuting, which was really hard on everybody.
24          But Kathy somehow bullied, you know,
25 Melnick into letting her do this. Who knows? Maybe

Page 111

1  they had an affair thirty years ago. I have no idea.
2  As my friend always says, maybe she had pictures. I
3  don't know how all this went about, but it was all the
4  young people that were promoted.
5  Q.   So you believe that Kathy Holtzman felt that
6  she could control the younger people but not someone
7  like you?
8  A.   I think that she felt more competent in ruling
9  over the younger people.
10 Q.   And did you believe that Kathy couldn't
11 control you because of your age or because of the
12 strength of your personality?
13 A.   I think it was not a matter of trying to
14 control me. She didn't want to give me any position
15 where I would be in a meeting to be heard by anyone
16 else because, you know....
17 Q.   "Because" why?
18 A.   Because of my age. Because I had more life
19 experience in general. And then these young kids
20 would just sit there, and they were very intimidated
21 by her. I was not intimidated by Kathy.
22 Q.   And are you saying that was because of your
23 age or that was because of the strength of your
24 personality?
25 A.   I would say it was because we were -- you

Page 112

1  know, at peer level. Something that you gain with
2  age. You gain confidence with age.
3  Q.   Okay. Do you consider yourself a very
4  confident person?
5  A.   Yes.
6  Q.   Do you consider yourself a strong person?
7  A.   Yes.
8  Q.   Okay. Now, do you recall, when you received a
9  letter hiring you permanently for the Test Development
10 Program Assistant, you received another letter from
11 Meredith Friedman? a separate letter?
12 A.   I don't recall.
13          MS. KIVITZ: Okay. I'll ask that that
14 be marked (indicating).
15          (Whereupon the Reporter marked a letter
16 dated December 16, 2005, to Diane Rosetsky from
17 Meredith Friedman as Exhibit No. D-14 for
18 identification.)
19 BY MS. KIVITZ:
20 Q.   Do you recall --
21 A.   Yes.
22 Q.   -- still being bound by the confidentiality
23 agreement?
24 A.   Do I recall?
25 Q.   Agreeing that you were still bound?

Page 113

1  A.   I assumed that I was bound by it.
2  Q.   Okay.  And do you recall also agreeing that
3  you were still an employee at-will, that this was not
4  considered a contract?
5  A.   Right.  Uh-huh.
6  Q.   Okay.  And you signed that?  That is your
7  signature on this document?
8  A.   Yes.
9  Q.   Okay.  All right.  I'm going to ask you about
10  an incident, Ms. Rosetsky, and then I'm going to go
11  back to some of the legal pleadings in the case, and
12  then I'm going to try to finish with a few e-mails and
13  get you out of here.  All right?
14  A.   Okay.
15      MS. KIVITZ:  Let me mark that
16  (indicating).
17      (Whereupon the Reporter marked an e-mail
18  dated November 29, 2006, to Kathy Holtzman from Faith
19  Balsama as Exhibit No. D-15 for identification.)
20  BY MS. KIVITZ:
21  Q.   Can you take a look at that?
22  A.   (Complying.)
23      Yes, I recognize it.
24  Q.   Okay.  Can you tell me what this is?
25  A.   It's a newspaper article that my husband sent

Page 114

1  me.
2  Q.   Okay.  And do you know why he sent it to you?
3  A.   Because he knew I wasn't getting along with my
4  supervisor.  This was in November.  He sent it as a
5  joke.
6  Q.   Okay.  Do you know where he sent it from?
7  A.   He probably sent it from his store.
8  Q.   Okay.  And you received this at National
9  Board?
10  A.   Yes.
11  Q.   And what did the story reference?
12  A.   A computer technician shot his -- killed his
13  supervisor before taking his own life in -- what state
14  is this?  I don't know.  Wherever it's from.  I don't
15  know where he got it.
16  Q.   Okay.  Now, you said he sent it to you as a
17  joke?
18  A.   Uh-huh.
19  Q.   How do you know that?  Did the two of you
20  discuss this?
21  A.   No.  Did I discuss it was a joke?  Well,
22  obviously, for him to send me something like this was
23  a joke.
24  Q.   Okay.  Now, he sent this late November, 2006?
25  A.   It looks like it.  November 29, 2006.  No.

Page 115

1  No.  Faith sent it.  That was after Kathy called Faith
2  into her office.  Kathy started calling people into
3  her office and telling them not to talk to me after I
4  went down to HR in October.
5  Q.   Okay.  I appreciate that.  But I'm trying to
6  focus you on this article.
7  A.   Uh-huh.
8  Q.   Do you remember when your husband forwarded it
9  to you?
10  A.   Whenever the network has it.  They have
11  everything on the network, and they can tell you that.
12  I don't remember.
13  Q.   Okay.  Now, when you received this from your
14  husband, did you think it was funny?
15  A.   I called him, and I said, "Don't send me
16  anything like this to work."  I wasn't happy that he
17  did it.
18  Q.   What did you do with it?
19  A.   What did I do with it?  I sent to Debbie, and
20  I said, "This is -- my husband has nothing else to do.
21  He always tells me he's so busy."
22  Q.   Did you send it to Faith Balsama or to Debbie
23  Shelmire?
24  A.   I think I just sent it to Debbie, who may have
25  sent it to Faith.

Page 116

1  Q.   Did you make them uncomfortable by forwarding
2  this to either one of them?
3      MR. JENNINGS:  Objection to form.
4      THE WITNESS:  You'd have to ask them.
5  BY MS. KIVITZ:
6  Q.   Did anyone say anything to you about this
7  article?
8  A.   No.
9  Q.   Did either Debbie or Faith say, "I'm not
10  comfortable doing this"?
11  A.   No.  I didn't send it to Faith, I don't think.
12  I think I just sent it to Debbie.
13  Q.   Do you remember a time that Faith said to you,
14  "Diane, get off your crusade.  I don't want to be
15  involved anymore"?
16  A.   After -- yeah.  After she told me to go down
17  to HR and complain about Kathy.  That's how much she
18  hated Kathy.
19  Q.   Do you remember if Faith told you she didn't
20  want to be involved in your crusade anymore before or
21  after you sent this article to Debbie Shelmire?
22  A.   I don't remember in respect to this article,
23  but I remember her saying that.  But Faith is a good
24  instigator, and then she backs down.
25  Q.   Okay.  Now, when you called your husband and

Page 117

1  you said, "Don't send me anything like this," did he
2  laugh?  What was his reaction?  What did he say?
3  A.   "Okay."
4  Q.   And did he laugh?
5  A.   No.  He just said, "Okay."
6  Q.   Well, how did you know then that he sent it as
7  a joke?
8  A.   Why else would he send it?
9  Q.   Well, you're saying you construed it as a
10  joke; correct?
11  A.   Yes.
12  Q.   Did you think that, if Kathy Holtzman saw
13  this, she would construe it as a joke?
14  A.   Maybe.  I have no idea.
15      MR. JENNINGS:  Objection to form.
16      THE WITNESS:  She had a little bit of a
17  sense of humor.  She used to send me silly things all
18  the time.  Sent them to all of us.
19  BY MS. KIVITZ:
20  Q.   Okay.  Did you think it was appropriate
21  workplace etiquette to be forwarding an e-mail to your
22  co-worker concerning an employee who shot the boss he
23  wasn't getting along with?
24  A.   Did I think it was appropriate etiquette?  At
25  the time it was not sent for that reason.  It was sent

Page 118

1  because -- I thought my husband was an idiot for
2  sending it, and he's always telling me how busy he is.
3  And I sent it to Debbie and said, "This is what my
4  husband has time for when he's supposed to be
5  working."
6  Q.   Okay.  I'm going to ask you again if you
7  thought it was appropriate workplace etiquette --
8  A.   To forward it?  No.
9  Q.   -- to send --
10  A.   But that isn't why I forwarded it.  I
11  forwarded it because me and Debbie were discussing
12  my -- something about my husband previously.
13  Q.   Okay.  You acknowledge that it would not be
14  appropriate workplace etiquette to forward something
15  like this as joke or not as a joke; correct?
16  A.   No.  But I had lots of things forwarded to me
17  that were inappropriate at the National Board.
18  Q.   Okay.  I'm just trying to ask you about this.
19  We're still on the same exhibit.
20  A.   Right.
21  Q.   Do you acknowledge that it was inappropriate
22  workplace etiquette to send this whether it was
23  considered a joke or not a joke?
24      MR. JENNINGS:  Objection.  Asked and
25  answered.

Page 119

1      You can answer it once more.
2      THE WITNESS:  I'm not going to answer it
3  again.
4      MR. JENNINGS:  Answer it once more.
5      But that's it.
6      THE WITNESS:  Okay.
7      I already told you I did not forward it
8  in a malicious manner.  It was forwarded because I
9  didn't think it was appropriate for my husband to have
10  sent it to me.
11  BY MS. KIVITZ:
12  Q.   So you didn't think it --
13  A.   So I was just sharing it --
14  Q.   -- was appropriate to receive it --
15  A.   I was sharing it with these two women that I
16  talked to multiple times during the day and sat next
17  to me.  So I didn't think it was appropriate for him
18  to have sent it to me, and I sent it to them because I
19  thought it was inappropriate.
20  Q.   Okay.
21  A.   But they were my friends.  So that's why I --
22  I thought they were my friends.  Obviously not.  But
23  that's why I sent it.
24  Q.   All right.  So I just want to be clear.
25  Instead of sending a note to your husband not to do

Page 120

1  this or erasing it and deleting it, instead you
2  forwarded it on to a co-worker; correct?
3      MR. JENNINGS:  Objection to form.
4      You can answer.
5      THE WITNESS:  I forwarded it to Debbie
6  to make a point.  Yes.
7  BY MS. KIVITZ:
8  Q.   Okay.  Now, you have filed a Complaint in this
9  action, and you have made certain allegations.  And I
10  just want to be clear that we understand what your
11  allegations are.
12  A.   Uh-huh.
13  Q.   In your Complaint you say at all times
14  relevant plaintiff was supervised by Kathy Holtzman.
15  Now today you've testified that you had other
16  supervisors.  I just want to be clear.
17  A.   I had no other official supervisors.
18  Q.   Okay.
19  A.   Officially Kathy was supposed to be my
20  supervisor, but she did allow other people to give me
21  work to do.  That does not mean that I had other
22  supervisors.
23  Q.   Okay.  You contend in Paragraph 18 that,
24  during the course of your employment, you were
25  subjected to a pattern of discrimination including,

Page 121

1  but not limited to, being assigned to minor clerical
2  task not included in your job description?
3  A.   Yes.
4  Q.   Can you tell me what each of those minor
5  clerical tasks were which you contend constituted
6  discrimination?
7  A.   Fixing typos for people other than Kathy.
8  Doing hole punching, copying, for people other than
9  Kathy.  Just an overall downgrading of what the
10  position was supposed to be.
11  Q.   Okay.  But if Kathy gave you those same jobs
12  to do, that was not discrimination; correct?  Doing
13  them for Kathy was okay?
14  A.   I felt that, in light of the fact that she
15  gave me no substantive work, that she was
16  discriminating against me.
17  Q.   Okay.  Maybe I misunderstood.  You identified
18  three things for me.  And you said if you had to do
19  them for people other than Kathy, that constituted
20  discrimination?
21  A.   I didn't say that I was pleased with doing
22  them for Kathy, and I didn't say it was discrimination
23  by her telling the other people that they could do --
24  you know, things for me.  I felt overall Kathy's
25  manner towards me in not allowing me to be promoted,

Page 122

1  in giving me inferior work to do with my education was
2  discriminating.
3  Q.   Okay.  Let me --
4  A.   She denied me a promotion and then retaliated
5  against me, and that's why I'm here.
6  Q.   Okay.  Ms. Rosetsky, did you consider it
7  discrimination to fix typos or copy or punch holes if
8  Kathy asked you to do it for her, for Ms. Holtzman?
9  A.   Did I consider it?  Not really direct
10  discrimination.  She discriminated against me by not
11  allowing me to be promoted and telling the people that
12  I would have been working for not to hire me and then
13  retaliating against me in a very vicious manner.
14  Q.   Okay.  Listen.  I'm going to ask a question.
15  I know this is hard because I know you have a lot
16  vented up that you want to talk about too.
17  A.   Uh-huh.
18  Q.   But I'm going to ask you really to try to
19  answer my question.  Okay?  When your attorney asks
20  you questions, you're going to talk to your heart's
21  delight.  But when I ask you, I'm going to ask you to
22  try to answer what I'm specifically asking.  Okay?
23  A.   I thought that I was answering what you were
24  asking.
25  Q.   All right.  You also said that it was

Page 123

1  discrimination when you were denied a promotion for
2  which you were qualified and the position was
3  subsequently given to a younger employee.  Can you
4  tell me exactly what you're referring to there?
5  A.   I don't know if that position was going to
6  another employee.  But a young employee, who was there
7  the same amount of time as me, was promoted into a
8  manager position above the position that I was
9  applying for.
10  Q.   All right.  First I want to know --
11  A.   Well, that's not completely accurate.  That's
12  why I'm correcting it.
13  Q.   All right.  So you're saying this is not true:
14  that you were denied a promotion that was given to
15  somebody younger?  That's not true?
16       MR. JENNINGS:  Objection to form.
17       THE WITNESS:  I don't know who was put
18  into that position at this point.
19  BY MS. KIVITZ:
20  Q.   All right.  Let's do it this way.  What
21  position are you talking about there?
22  A.   It was Test Development Associate, and it was
23  advertised as I/II -- I'm not sure of the difference
24  between the two -- which is the same title that I was
25  originally hired in as a temp.

Page 124

1  Q.   Okay.  And when are you suggesting that
2  position was available?
3  A.   When was it available?  I saw it on the Web
4  site in -- it was either September or October of 2006.
5  Q.   Okay.  And you're saying that there was this
6  Test Development Associate I/II position available.
7  Did you apply for that position?
8  A.   Yes.
9  Q.   Okay.  Now, I had seen two jobs you applied
10  for.
11  A.   Uh-huh.
12  Q.   One of them was for Special Projects?
13  A.   It's called "Test Development" -- okay.  I'm
14  wrong.  It's Test Development Associate for Special
15  Projects.  It might have been.  I don't remember the
16  exact title except for that it was Test Development
17  Associate.
18  Q.   Okay.
19  A.   And it was either I or II or Special Projects.
20  I think it was Special Projects.  You're right.
21  Q.   So you are talking in 18(b) about your
22  application to be a Test Development Special Projects
23  Associate?
24  A.   Test Development Associate for Special
25  Projects.

Page 125

1  Q.   Okay.   Am I correct that you withdrew that
2  application?
3  A.   After I heard Kathy telling people -- she was
4  sitting right there -- the people I'd been working for
5  not to feel that they should hire me.  She was telling
6  them, "Don't hire her."
7  Q.   Okay.
8  A.   So instead of being humiliated and having to
9  interview because the people that were promoted, such
10  as Kieran Hussie and Krista -- I mean, Kieran didn't
11  even have to interview.  He was just promoted with no
12  interview.
13  Q.   Okay.  I'm going to come back to this.  This
14  is my question now, though.
15  A.   Okay.  Yes, I withdrew it.  I withdrew my
16  application after I knew that Kathy was not going to
17  allow them to hire me because I heard her.
18  Q.   Who did you give your application to?
19  A.   I gave it to -- I think I sent it to Human
20  Resources.
21  Q.   And who was the supervisor for that position?
22  A.   Well, it wasn't clear.  It was either -- it
23  might have been -- they were promoting Kieran into
24  manager, and I think they -- and the current manager
25  was Kathy Angelucci.  And I think they were going to

Page 126

1  upgrade her to something else.  So I don't know
2  whether I would have been working directly for Kieran
3  or for Kathy Angelucci.
4  Q.   Okay.  Now, you say the position was
5  subsequently given to a younger employee.  Who?
6  A.   No, that's not the position that was given to
7  a younger employee.  I don't know who it was given to.
8  That's what I'm telling you.  I know that Kieran got
9  that position right before I was there as he was a
10  Test Development Associate for Special Projects.
11       Then he was there the same amount of
12  time as me.  He was being promoted into manager.
13  That's what I'm telling you.  He was promoted, and I
14  was actually applying for his -- I guess it would have
15  been his position.
16  Q.   All right.  So what you're actually saying is
17  the person who had had that position was promoted?
18  A.   He was promoted, yes, into manager, I think.
19  He was supposed to be.
20  Q.   But you are not alleging that the Special
21  Projects Test Development Associate was given to a
22  younger employee?
23       MR. JENNINGS: Objection to form.
24       THE WITNESS: I don't know that.
25  BY MS. KIVITZ:

Page 127

1  Q.   Okay.
2  A.   I don't know if they ever hired anyone
3  actually.
4  Q.   Okay.
5  A.   All that I know is that she wouldn't let me
6  move into the position.
7  Q.   So that allegation is not true in the
8  sense that you can't say that the position was given
9  to a younger employee?
10  A.   Right.
11  Q.   Whether it was or wasn't, you don't know?
12  A.   Right.
13       MR. JENNINGS: Objection to form.
14  BY MS. KIVITZ:
15  Q.   Now, you also allege, as evidencing a pattern
16  of discrimination, that you were given the smallest
17  possible salary increase.
18  A.   That was actually retaliation.
19  Q.   Okay.  What form of retaliation?
20       MR. JENNINGS: Objection to form.
21       THE WITNESS: What do you mean, "What
22  form of retaliation?"
23  BY MS. KIVITZ:
24  Q.   Why was that retaliation?
25  A.   That she took my raise away?

Page 128

1  Q.   That who took your raise away?
2  A.   Kathy Holtzman.
3  Q.   Okay.  Now, what raise do you believe you were
4  getting that was taken away?
5  A.   I was an excellent employee.  I should have
6  gotten the top at least.  She had no complaints about
7  me.  As a matter of fact, Kathy liked good and cheap.
8  So she had someone with a master's degree that was
9  really good, that was really cheap, and that's why I
10  was in the position that I was in because I was older
11  and I was good and I was very reliable.  And she liked
12  that, and she wanted to keep me in that position.
13  Q.   Okay.  So you felt you should have been given
14  the top raise.  But no one ever told you you were
15  getting the top raise and it was taken away; correct?
16  A.   Yes.
17       MR. JENNINGS: Objection to form.
18       THE WITNESS: I was told because I got
19  my evaluation, and it was really, really poor.  So
20  when you get a poor evaluation, there's raises that go
21  along with that.  So I knew that she was giving me
22  1 percent.
23       And Barbara Davidson told me.  I said,
24  "Barbara, am I going to get a raise?"
25       She said, "She's only giving you

Page 129

1 1 percent."
2 BY MS. KIVITZ:
3 Q.   Okay.  Now, your evaluation was satisfactory,
4 was it not?
5 A.   Whatever.  I don't know.  I don't remember
6 what the grades were.
7 Q.   Do you remember what Kathy Holtzman said as to
8 why it was satisfactory and not unsatisfactory?
9        MR. JENNINGS: Objection to form.
10       THE WITNESS: whatever she said was
11 after I complained about her to HR, and it was totally
12 untrue.  Every single thing on there she fabricated.
13 BY MS. KIVITZ:
14 Q.   Okay.  Do you remember what she said as to why
15 it was satisfactory --
16 A.   She said it took too long to build a database,
17 which she didn't even want me to build but, you know,
18 told me I could keep working on it.  She knew nothing
19 about databases.  As a matter of fact, I told her to
20 go down to Debbie Brown, who was the Microsoft Access
21 expert, because I had spoken to Debbie on the length
22 of time it was taking.
23        And she said, "You did it in a
24 reasonable -- more than a reasonable amount of time."
25 Q.   Okay.  Is that your understanding of why she

Page 130

1 told you your evaluation was satisfactory --
2 A.   You can read my evaluation --
3        MR. JENNINGS: Objection to form.
4        THE WITNESS: Why don't you just read it
5 to me?  You have it.
6 BY MS. KIVITZ:
7 Q.   Did you not meet with Kathy Holtzman at the
8 time you received the end-of-year performance
9 evaluation?
10 A.   No.  I met with her with Barbara Davidson.  I
11 didn't meet with Kathy alone in her office like
12 everyone else did.  She had me come down to HR and had
13 Barbara Davidson there.
14 Q.   Okay.  And when you received your evaluation,
15 there was also discussion; is that correct?
16 A.   Yes.
17 Q.   Tell me what the process was.
18 A.   I went down to Barbara Davidson's office, and
19 Kathy was there, and Barbara was there.  And we were
20 just talking.  I was talking about, you know, what
21 happened with when I asked for the promotion or
22 whatever.  Then Kathy just gave me the evaluation.  I
23 read it, and it was, like, disgraceful, and it was a
24 bunch of lies.
25 Q.   All right.  What did you do in response?

Page 131

1 A.   Nothing.
2        What did I do in response?
3 Q.   Did you make comments?
4 A.   Oh, I e-mailed Barbara.  I was pissed off as
5 anybody would be.  You know, everything was after
6 October.  After I went down to complain about her the
7 first time, she started doing all the things that
8 everybody said she would do.  She started manipulating
9 everybody, telling them not to talk to me.  She was
10 nasty.
11        You know, she started asking me to
12 account -- doing things that nobody else had to do, to
13 account for every second of my time of what I was
14 doing when.  And none of the other employees had to do
15 this.
16        She told people not to talk to me.  I
17 was walking down the hallway, and people that had
18 always talked to me, been polite, that I was friendly
19 with -- none of them would even pick their heads up.
20 They were just walking right by me.  And I knew,
21 because Faith had told me that she would do that, that
22 Kathy had done that.
23 Q.   All right.  Okay.  Am I correct that, if your
24 evaluation had been unsatisfactory, there would have
25 been no raise involved with it?

Page 132

1        MR. JENNINGS: Objection to form.
2        THE WITNESS: I have no idea.
3 BY MS. KIVITZ:
4 Q.   Okay.  Do you know what an unsatisfactory
5 evaluation results in promotionwise?
6 A.   No.
7 Q.   Raisewise?
8 A.   No.  All I know is there is a minimum and a
9 maximum.  I mean, I suppose you could get zero.  I
10 don't know if you can get zero.  I guess it was --
11 1 percent was probably the lowest.
12 Q.   Okay.  But you did not get zero; correct?
13 A.   I don't remember.  I think I got 1 percent.  I
14 don't remember if I was there long enough to even get
15 it.
16 Q.   Do you remember if it was 1 percent or
17 2 percent?
18 A.   It was definitely not 2 percent.  Barbara told
19 me it was going to be 1 percent.  This is what Barbara
20 Davidson, the Director, told me.  "You're only going
21 to get 1 percent."  That's what she told me.
22 Q.   Okay.
23 A.   After Kathy left the room, I was sitting
24 there, talking with Barbara.
25 Q.   You said other employees over the age of forty

Page 133

1   were also denied promotions by Ms. Holtzman?
2   A.   Yes.
3   Q.   Okay.  Can you identify who you mean by that?
4   A.   Debbie Shelmire and Faith Balsama had
5   repeatedly over the years, even before I was there,
6   tried to move into other positions.  And Faith
7   actually told me she went down to complain to HR.  And
8   she said, "What do I have?  Kathy slime on me, you
9   know, that I can't get out of this position because of
10  Kathy?"
11          So, you know, that was perceived by all
12  of us.  We were the three older ladies that were all
13  hired in our forties, and we're all sitting there as
14  Kathy's flunkies that couldn't get out of these
15  positions.
16  Q.   Okay.
17  A.   And the only people that lasted were people --
18  she had three people in my position before me.  And as
19  far as I know, two were fired -- three were fired.
20  One was a temp.  Two were permanent.  They were older
21  women.
22  Q.   Okay.  Are you referring to any other
23  employees over the age of forty denied promotions by
24  Ms. Holtzman other than Debbie Shelmire and Faith
25  Balsama?

Page 134

1   A.   I'm trying to think if there was anybody else.
2   No.  Because they were the people that I had contact
3   with.
4   Q.   Okay.
5   A.   Or maybe -- who was demoted?  What was her
6   name?  Barbara -- what was her name? -- who was in the
7   position before me.  She was treated really poorly
8   also.  I'm not sure how old she was.  She was older.
9   She went to work for another department.  I can't
10  remember her name.
11  Q.   Okay.  Debbie Shelmire, Faith Balsama, and
12  Barbara all still work at the National Board?
13  A.   I don't know.  How would I know?
14      THE WITNESS:  Do they work there?
15          I don't know.  Why are you asking me
16  that?
17  BY MS. KIVITZ:
18  Q.   You're not --
19  A.   I don't talk to them.
20  Q.   You have not had contact with them since you
21  left?
22  A.   No.
23  Q.   Okay.
24  A.   Are you kidding me?  They're scared to death
25  of Kathy.

Page 135

1   Q.   You said on October 18 you complained to
2   Barbara Davidson, the Director of Human Resources?
3   A.   Whatever the date was I first went down.
4   Sometime in October.
5   Q.   Was that the same meeting you have described
6   to me concerning the edits and the timing and Kathy
7   Holtzman being angry at Krista?
8   A.   I'm trying to remember.  I went down.  I don't
9   know whether it was the same meeting where I
10  complained.  I said that I wanted to apply for a job.
11  I actually went to Kathy Angelucci first.  I e-mailed
12  Kathy Angelucci, which I included in my Complaint I
13  think.
14          And I asked her, "Since you'll be the
15  one that I think will be directly over this position,
16  the Test Development Special Projects, you know, I'm
17  interested in the position."  I said, "Do you think I
18  could be qualified and I could apply for it?"
19          And she said, "I don't know anything
20  about it.  You'll have to ask Kathy Holtzman."
21          And Kathy Holtzman e-mailed me back and
22  said, "I don't have anything to do with it.  You'll
23  have to ask Kathy Angelucci."  Now, everybody knows
24  that Kathy Holtzman controls everything in there; so
25  it was definitely Kathy Holtzman.

Page 136

1           And then after that I asked Kathy
2   Holtzman, and she said to me, "I really don't think at
3   this time that you would be, you know, qualified for
4   the position."
5           And I said, "Why not?  I learned all
6   these other programs for you.  I know Dream Weaver.  I
7   can do editing.  I know about IT."
8           She said, "I just don't feel that at
9   this time."  She says, "I will -- I'm going to move
10  you as Kieran's assistant."
11          I said --
12          "You know, not a Test Development
13  Associate but as Kieran's assistant.  I can move you
14  in to work with him, and then you can work your way
15  up."  So she was going to give me a lateral move.
16          So I went down to HR, and, you know, I
17  told them about it.  They said, "Well, you can still
18  apply."
19          And I said, "Oh, well, I don't need her
20  permission to apply?"
21          And they said, "No, you don't."
22          And I said, "But what are my chances?
23  If she's already telling me and telling Kathy
24  Angelucci you're hiring him, why should I bother?"
25          And she said, "I'm just telling you that

Page 133 - Page 136

Page 137

1  you can apply without your supervisor's permission."
2      So I applied. And then after I applied,
3  I was sitting in my office, which is about from here
4  to your seat, and she called in --
5      MR. JENNINGS: Just about four or five
6  feet?
7      THE WITNESS: Yeah. Maybe a little bit
8  further.
9      And she called in Kathy Angelucci and
10 Kieran Hussie. And they were discussing it in front
11 of me. Like, she knew I could hear them. And she
12 said, "Don't feel like you have to hire her. I don't
13 feel she's really qualified."
14     And then when they walked out of there,
15 I walked over to Kieran. I said, "Was she telling you
16 not to hire me?"
17     And he said, "Yes, basically."
18     I said, "Was she discouraging you from
19 hiring me, Kieran?"
20     And he said, "Yes."
21 BY MS. KIVITZ:
22 Q.  Okay. Now, you also allege that on
23 November 27, '06, you were terminated without good
24 cause. I assume you meant '06, November 27, 2006?
25 A.  Yeah. It was November -- yeah. December 1

Page 138

1  maybe. November 27, 2006. What did I say?
2  Q.  Well, the Complaint reads '07.
3  A.  Oh, no.
4  Q.  Okay. Now, you recall writing an e-mail to
5  Kathy Holtzman before you were terminated in which you
6  said you weren't going to do your job any longer at
7  the salary which you had been hired?
8  A.  I said something along those lines but not
9  exactly.
10 Q.  Okay. I'll pull it out when I get to it.
11 A.  Oh, I know what I said to her. When she was
12 sitting with Barbara Davidson, she said in front of
13 Barbara Davidson that I was not hired to build
14 databases. And then she wanted me to build a database
15 for --
16 Q.  Wait. Wait. Ms. Rosetsky --
17 A.  I'm trying to answer your question.
18 Q.  My question --
19 A.  What was contained in the e-mail? Why don't
20 you show me the e-mail?
21 Q.  All right. I'm going to show it to you.
22 A.  Okay.
23 Q.  But all my question is is do you remember
24 writing such an e-mail --
25 A.  Not in what you're saying.

Page 139

1  Q.  -- immediately before being terminated?
2  A.  Not containing what you're saying.
3  Q.  Okay. I will pull it out in fairness to you.
4  A.  Okay.
5  Q.  Okay. If you did write an e-mail in which you
6  refused to perform your job at the salary for which
7  you were hired, do you believe that would constitute
8  insubordination?
9      MR. JENNINGS: Objection to form.
10     THE WITNESS: No.
11 BY MS. KIVITZ:
12 Q.  Okay.
13 A.  Because she told me that I was not hired to
14 build databases and at the same time she asked me to
15 build a database in the same sentence. You know, she
16 asked me to continue building these sign-in databases.
17 While I was with Barbara Davidson, she told Barbara
18 that I was never hired to do databases.
19     So I said, "So if I wasn't hired -- why
20 are you asking me to do it?" And I was not being paid
21 on an IT scale. I mean, I was doing things at an IT
22 scale in my old age that they were being paid double
23 what I was being paid. And Kathy knew that; so she
24 was really taking advantage of me.
25 Q.  Okay. Why don't we break for about ten

Page 140

1  minutes, have a piece of pizza, and resume at
2  one o'clock.
3      (Lunch recess.)
4  BY MS. KIVITZ:
5  Q.  Before going through some e-mails, I just want
6  to go revisit something you had said earlier. When
7  you were talking about leaving your employment at
8  Penn, you said that you had taken a thumb drive with
9  you. And you made a joke about, "Do you want to see
10 it?" or something like that.
11 A.  No, that's not from Penn. Oh, yeah. No.
12 That was from Penn.
13 Q.  Can you just tell me the circumstances of your
14 taking it and what it enabled you to do once you had
15 it?
16 A.  The thumb drive was when I was developing the
17 database at my house. I worked on it at night. So
18 actually the copy that I did for Penn I do not have.
19 I only have something that I did that doesn't really
20 function off the network.
21 Q.  Okay. When you left your employment, did you
22 return the thumb drive to Liz Bien?
23 A.  It's my thumb drive. I bought it. They
24 didn't have thumb drives then. Actually it wasn't a
25 thumb drive. It was a CD.

Page 141

1  Q.   Okay.
2  A.   And when you copy this database onto the CD,
3  you can't really do anything with it but look at it.
4  It's read only.
5  Q.   Okay.  Did the thumb drive enable you to
6  download materials that you had worked on --
7  A.   There were no thumb drives invented then.  It
8  was a CD only.
9  Q.   Okay.  You said, "Thumb drive."  Believe me, I
10  didn't say that.
11  A.   You're confusing Penn with the National Board.
12  I have my database from the National Board on my thumb
13  drive because I worked on it at home.  And Kathy knew
14  that because she also allowed me to work on it through
15  Citrix, the Citrix system where I could log in from
16  home.
17  Q.   Okay.  And you have that database today;
18  correct?
19  A.   Yes.  But the slides on it are all obsolete
20  slides, though.  It's really nothing that is secret.
21       MS. KIVITZ: Mr. Jennings, I'll talk to
22  you after the deposition about the return of
23  proprietary materials.
24       THE WITNESS: There's no way to return
25  it.  It's my thumb drive.  I bought it.  There's

Page 142

1  nothing to return.
2       MS. KIVITZ: I think that, when the
3  deposition is over, we should speak for a minute.
4       MR. JENNINGS: All right.  I'll discuss
5  it with you.
6  BY MS. KIVITZ:
7  Q.   All right.  I want to just ask you about a few
8  responses you gave in discovery in this matter.
9  A.   Uh-huh.
10  Q.   I guess this goes again to the Complaint
11  allegations.  In Interrogatory No. 9 what we received
12  from you was that you were denied a promotion and
13  asserts on information and belief the position was
14  given to a younger employee.  Now, I just went through
15  the Complaint with you, and you said, "I don't know
16  who got that position."
17  A.   Right.
18  Q.   So is this Interrogatory Answer similarly
19  incorrect?
20  A.   What Interrogatory?
21  Q.   It says that plaintiff was denied a promotion
22  and asserts on information and belief --
23  A.   Yes.  I don't know who got the job.  As a
24  matter of fact, they may have hired someone, and then
25  I just saw the job advertised again.  I don't know if

Page 143

1  it was the same job, but it looks like it.
2  Q.   Okay.  I just want to be clear, though, that
3  that statement is incorrect?
4  A.   Yes.
5       MR. JENNINGS: Objection to form.
6       THE WITNESS: It's an error.
7  BY MS. KIVITZ:
8  Q.   Okay.
9  A.   I don't really know.  What I was talking about
10  was Kieran Hussie, who's younger than me and had been
11  there the same amount of time with less education and
12  was promoted.
13  Q.   Okay.  In Interrogatory No. 10 you said:
14       "Plaintiff's salary increase was
15       actually removed.  She received 1 percent out
16       of 10 percent, which plaintiff asserts was
17       certainly the smallest salary increase of
18       any one of her counterparts."
19       I just want to be clear on a couple of
20  things.  You didn't receive any salary increase
21  because the salary increase would have started after
22  you had already been terminated; correct?
23  A.   Right.  But that was the proposed salary
24  increase according to Barbara Davidson.
25  Q.   Okay.  Did you look at any information which

Page 144

1  would correlate a finding of satisfactory on your
2  performance evaluation to a percentage increase?
3  A.   Say this again?  Did I correlate....
4  Q.   What were you relying on?  You had said that
5  there are --
6  A.   Relying on Barbara Davidson.
7  Q.   Okay.  You're aware, though, that there are
8  posted salary increase percentages which are tied into
9  the performance evaluation?
10  A.   According to Barbara, yes.
11  Q.   Okay.  Are you aware that the salary increase
12  for a satisfactory is actually 2 percent, not
13  1 percent?
14  A.   I was told I was getting 1 percent.  I don't
15  know whatever manipulation the Board wants to do with
16  that.  I was just told it was 1 percent.  And, you
17  know, relative to what the salary increases could have
18  been and how hard I worked and how good of an employee
19  I was, it was retaliation because Faith told me she
20  got the highest salary.  And I can tell you Faith did not
21  work as hard as I did.
22  Q.   Okay.  And Faith also was how old?
23  A.   Faith's older than me.
24  Q.   Okay.  And she got the highest salary
25  increase?

Page 145

1  A.  Yes.
2        MR. JENNINGS:  Objection to form.
3  BY MS. KIVITZ:
4  Q.  What about Debbie Shelmire, if you know?
5  A.  Debbie told me -- now, this is hearsay, you
6  know -- that she did not get good salary increases
7  until Kathy was trying to rally people onto her side.
8  And the first really good raise that she ever got was
9  when I went down to HR and all this started.  All of a
10  sudden Kathy started being really nice to Debbie.
11  Q.  So what was Debbie's percentage increase, if
12  you know?
13        MR. JENNINGS:  Objection to form.
14        THE WITNESS:  She didn't tell me, but
15  she was really happy because she'd gotten low
16  increases before.
17  BY MS. KIVITZ:
18  Q.  Okay.  So it's your testimony that your not
19  getting along with Kathy Holtzman somehow bolstered
20  Debbie Shelmire's status in the Department?
21        MR. JENNINGS:  Objection to form.
22        You can answer.
23        THE WITNESS:  According to Debbie,
24  that's what Debbie thought.
25  BY MS. KIVITZ:

Page 146

1  Q.  Did she say that to you?
2  A.  Yes.  She said, "I guess she's trying to rally
3  support for herself."
4  Q.  Okay.  Now, did it make you angry that Kathy
5  Holtzman gave you a poor review and you felt that she
6  had no technology skills herself?
7        MR. JENNINGS:  Objection to form.
8        THE WITNESS:  I told her that she was
9  unqualified to review the building of the database
10  because she knew nothing about it.  And I asked her to
11  go to IT and talk with Debbie Brown, who I often
12  discussed the database with, on how long it takes to
13  do these things because they look simple on the
14  surface.  But unless you ever built one, you would
15  never know what it took to build one.
16  BY MS. KIVITZ:
17  Q.  In what other areas did you feel that Kathy
18  Holtzman was unqualified to review your work?
19  A.  Just with the IT I would say basically.
20  Q.  Did you feel that she was qualified to review
21  your interactions with others, the quality of your
22  interpersonal communications with co-workers?
23  A.  No.
24  Q.  Okay.  Why was she not qualified to evaluate
25  your performance communicating with others?

Page 147

1  A.  Because she was getting executive coaching
2  because her personality had been so discriminating and
3  difficult with other people that it would be, like,
4  you know, the pot calling the kettle black.  You know,
5  I didn't feel that she was a good judge of character
6  at all at that point.
7  Q.  Okay.  But as your supervisor, did she have
8  the skills necessary to determine whether you were
9  getting along with other co-workers?
10        MR. JENNINGS:  Objection to form.
11        THE WITNESS:  Well, up until that point,
12  yeah.  She gave me a good review.  I mean, I had a
13  mid-year review, and I got a great review.
14  BY MS. KIVITZ:
15  Q.  Okay.  What was your mid-year review?
16  A.  It was good.
17  Q.  Was there any criticism that you received?
18  A.  I don't remember.  I'm trying to remember.
19  You have it here somewhere.  Why don't you just pull
20  it out, and we'll see?
21  Q.  Did you receive any criticism in terms of your
22  ability to get along with other people?
23  A.  I don't think so.  I don't remember.  It was a
24  good review.
25  Q.  Do you remember which people evaluated you?

Page 148

1  A.  Yeah.  Usually you're supposed to pick your
2  own, but Kathy picked them for me.  Krista Allbee,
3  Debbie.  You know what?  I don't remember all of them.
4  She maybe used someone in IT that she pitted me
5  against.  It was -- who was it?  It was either Debbie
6  or the Asian girl.  I'm trying to remember her name.
7        I don't remember the other girl's --
8  Leslie.  It was either Leslie or Debbie.  I'm not sure
9  which one.
10  Q.  Okay.  Anybody else that you recall?
11  A.  I think there were five or six people.  I
12  don't remember who the others were.
13  Q.  Okay.
14  A.  That might have been it.
15  Q.  How was the mid-year evaluation presented to
16  you?
17  A.  Did she e-mail it to me?  I'm trying to
18  remember.  I think you just go on line and read it.
19  They have this system.  I'm trying to remember.  I
20  think that's what we did.  We just read it on line.
21  Q.  Was it a summary of people's comments, or did
22  you go on line and read the comments that each person
23  had offered?
24  A.  You could see the comments, but you couldn't
25  see who wrote them.

Page 145 - Page 148

Page 149

1  Q.   Okay.  Did you feel that there was anything in
2  these comments that was critical of your ability to
3  get along with others?
4  A.   There were some issues, but they were caused
5  by Kathy because Kathy had an ongoing battle with the
6  IT Department.  And she put me in the middle of it,
7  and she used to make me write e-mails that I didn't
8  want to write to people and say things that I didn't
9  want to write.  So those people took it as, you know,
10  that it was me, and it was Kathy.
11  Q.   Okay.  So, first of all, can you tell me who
12  the -- what the issues were?
13  A.   It was either Leslie or Debbie.
14  Q.   All right.  And do you remember --
15  A.   Actually I got along with Debbie pretty well
16  usually, but I don't know.  A lot of manipulation was
17  going on with this system because I was supposed to --
18  Q.   Remember I asked you to just listen to the
19  question first?
20       Okay.  Do you remember what the issues
21  were that came up in your mid-year evaluation and from
22  who? the specific people who raised them?
23  A.   No.  But you can see them on the network.
24  They probably have them.
25  Q.   You don't remember anything now?

Page 150

1  A.   I don't have it memorized.  I just told you.
2  Now you're asking me the same question again.  I just
3  told you there may have been an issue with Leslie or
4  Debbie.  You're supposed to pick your own people to
5  review you, but in my case Kathy picked people.
6       And Kathy's very manipulative.  She
7  manipulates everything in the system to her advantage.
8  So she was thinking ahead just in case she didn't want
9  me to be proud of myself.  So all the people that she
10  had pitted me against in the IT Department -- she went
11  and had someone -- and actually someone from the IT
12  team was not supposed to review me.
13       It was supposed to be in the Department.
14  And she had me -- this is what HR told me.  And she
15  had someone in IT review me, and they didn't even work
16  with me.
17  Q.   Didn't you just tell me you couldn't see, when
18  you went on line, who had given you the evaluation?
19  A.   Right.
20  Q.   Just what was written?
21  A.   Right.  But you could see who they were, and
22  you could see the comments.
23  Q.   What do you mean, "You could see who they
24  were"?
25  A.   You could see five names and five comments,

Page 151

1  but you couldn't see -- they weren't matched up.  But,
2  you know, I could tell who wrote what because somebody
3  wrote something about computers or whatever.  But it
4  wasn't that bad.  You know, it was still a good
5  evaluation.
6  Q.   Was it your testimony that you only remember
7  one criticism of your ability to get along with others
8  out of these five?
9  A.   Maybe it was Krista and someone from IT.
10  Krista, who is Kathy's patsy.  That's the young,
11  thirty-year-old girl who went from being a production
12  assistant to being a director in five years.
13  Q.   Okay.
14  A.   She was Kathy's patsy.  These people are all,
15  like, afraid for their jobs because of Kathy because
16  she has been known -- there was another lawsuit
17  concerning somebody else that was having problems with
18  Kathy.
19  Q.   What did Krista criticize about you, if you
20  recall?
21  A.   Krista?  Whatever Kathy probably told her to
22  say.  I'm not really sure.
23  Q.   Do you remember what you read at the time?
24  A.   It wasn't that bad.  None of that was bad.  I
25  mean, I got basically a good evaluation.

Page 152

1  Q.   Okay.  Do you remember the criticism part?
2  A.   No, I don't.
3  Q.   Okay.  Did it have to do, at least as to
4  Krista, with your ability to get along with co-workers
5  or others?
6       MR. JENNINGS: Objection to form.
7       THE WITNESS: I don't remember.  But I
8  don't put much merit to it because it's all Kathy
9  talking.
10  BY MS. KIVITZ:
11  Q.   Okay.
12  A.   Nobody says anything without Kathy telling
13  them to say it.
14  Q.   What about the IT criticism?  Did that have to
15  do --
16       MS. KIVITZ: Can we go off the record
17  for a second.
18       (Discussion was held off the record.)
19  BY MS. KIVITZ:
20  Q.   Now, the IT criticism -- do you remember what
21  that was?
22  A.   Not exactly.  No.  Why don't you just pull it
23  out?  You have it.  I don't see why you're asking me.
24  It's here somewhere.
25  Q.   Because I want to know your perception of what

Page 153

1   the evaluations are.
2   A.   But I don't remember.  You're talking two
3   years ago of something that -- you know, basically I
4   had a good evaluation, and there were some comments
5   from people that -- to my feeling, all the -- any
6   negative comments were created by Kathy Holtzman.
7        I mean, if you take a look at her
8   personnel file, I'm sure there's, like, a stack of
9   complaints against her because I know.  People told me
10  that they complained about her, and they told me that
11  she was going to do this, if I caused any problems,
12  that she was going to do this.
13  Q.   Okay.  Is it your recollection that two out of
14  the five evaluations contained criticism and no
15  others?
16  A.   I think so.  Yeah.  It was just Krista and
17  maybe the IT person, but they weren't that bad of a
18  criticism.  They were, you know -- there were some
19  compliments in there.
20  Q.   Okay.  Now, you also alleged that Kieran
21  Hussie was being paid $6,000 more than you and he --
22  you had more education and comparable technology
23  skills?
24  A.   Yes.
25  Q.   So let me start by saying do you believe your

Page 154

1   technology skills were comparable to Kieran Hussie?
2   A.   Yes.  I knew different things but....
3   Q.   Were there things that Kieran Hussie knew that
4   perhaps you did not know?
5        MR. JENNINGS:  Objection to form.
6        THE WITNESS:  At the time, yeah.  But it
7   was basically Dream Weaver.  And, you know, they had
8   asked me to learn so many applications that, you know,
9   she knew that I could have just picked that up and
10  started using it.
11  BY MS. KIVITZ:
12  Q.   Okay.  Other than Dream Weaver were there
13  other technological skills that Kieran Hussie had that
14  you did not?
15       MR. JENNINGS:  Objection to form.
16       THE WITNESS:  I really don't know, but I
17  would say no.  I probably have more skills than him.
18  BY MS. KIVITZ:
19  Q.   Okay.  You said, "Probably."  Is that because
20  you don't know for sure what his technological skills
21  are?
22  A.   Well, you're asking me a question where you,
23  know, you're asking me to suppose that I do know, or
24  you wouldn't be asking me the question.  I mean,
25  you're asking me if Kieran has more skills than me.

Page 155

1   That's too broad of a question to answer and something
2   that I would not know.
3        He may use an application at home that I
4   don't know about, and I may use things -- you know, he
5   explained to me, you know, one time when I was talking
6   to him, that, you know, databases were really
7   difficult.  He saw what I had done.  He was impressed
8   with it.
9        And, you know, databases are a lot
10  harder to do than Web pages.  I can tell you that.  So
11  that's the best way.  I don't know -- I know Kieran
12  doesn't know how to do databases.
13  Q.   But when you said you have the same
14  technological skills --
15  A.   You asked me, "Comparable," and I said,
16  "Comparable," which means I'm at a level at least of
17  Kieran.  And I am very capable of learning very easily
18  what Kieran knows, but he probably would have trouble
19  learning what I know.
20  Q.   Now, do you remember completing a harassment
21  questionnaire for the E.E.O.C., which your attorney
22  sent to us?
23  A.   Yes.
24  Q.   Okay.  In that questionnaire you claim that
25  you were told by the Director of Human Resources that

Page 156

1   you had to do whatever your supervisor demanded even
2   if she was being unethical or, quote, they would take
3   further action.
4   A.   Yes.
5   Q.   Can you tell me what you're talking about
6   there?
7   A.   Kathy asked me to write e-mails about people
8   that I really didn't want to write, people that were
9   involved with the IT Department, because Kathy thinks
10  that work is a political game.  And she did not want
11  to have people like Erik Soijka or Barbara Scaramalino
12  (phonetic) encroaching on her authority in Test
13  Development.
14       And the more technology that you brought
15  into Test Development, there was a big issue with
16  Microsoft Project because there's something called
17  "active directory," where they can actually control
18  how much access you have to things on there and your
19  ability to get information.
20       So at the time -- even before I got
21  there, someone by the name of Joy Bouldin had this
22  same issue with Kathy, and I think that Kathy fired
23  her.  Kathy didn't understand how to use Microsoft
24  Project and that you had to use it in a certain
25  manner.

Page 157

1   So she was pitting me against IT and
2   getting me to write e-mails about Barbara Scaramalino
3   and Erik Soijka, who, I think, was Barbara's boss, you
4   know, because she wanted to get rid of Microsoft
5   Project.  She didn't want to use it.
6   Q.   Okay.  Can I ask one question before you
7   finish that?
8   A.   Uh-huh.
9   Q.   Isn't it true that, before you wrote a memo or
10  corresponded back with IT, that you had gotten an
11  e-mail from Erik Soijka that you described as
12  "juvenile and nauseating" and sent it to Kathy
13  Holtzman?
14  A.   No.  I sent it to -- I made those statements
15  to Kathy, not to Erik Soijka.
16  Q.   Correct.
17  A.   Right.
18  Q.   But isn't it true that his e-mail to you is
19  what prompted your opinion that his e-mail was
20  nauseating and juvenile --
21  A.   Right.  That was when she had --
22  Q.   -- and you sent that to Kathy Holtzman?
23  A.   Right.  That was after -- so what?  That was
24  after she already pitted me against him and had me go
25  up there.

Page 158

1   Q.   Okay.
2   A.   She wasn't even there, and she got really
3   pissed off because I went up to his office without
4   her.  And then he sent me an e-mail that aggravated
5   me.
6   Q.   Okay.
7   A.   I'm not the first person that she put in
8   between IT and Test Development.  I'm, like, the
9   third.
10  Q.   But you took Erik on without Kathy Holtzman?
11  A.   No.
12  Q.   You decided to go there by yourself?
13  A.   No, no, no, no, no, no.  And I have an e-mail
14  attesting to this.  What happened was Barbara
15  Scaramalino, when Kathy was in Europe, came to my desk
16  and said, "I want you to come upstairs with me now and
17  meet with Erik."  I didn't know she was coming, and so
18  my supervisor wasn't there; so I went.
19         And Kathy got really pissed off.  And
20  when she came back, she was -- like, she wrote me an
21  e-mail.  She was in Florida.  She wrote me an e-mail
22  saying, "I'm really upset that you did that.  Erik
23  Soijka has a way of twisting things and making them
24  our fault."  And that's exactly what's in the e-mail.
25  Q.   Okay.  I've seen it.  But I just wanted to ask

Page 159

1   you isn't it true --
2   A.   I didn't --
3   Q.   Isn't it true that you complained to her about
4   Barbara coming to your desk, and you also complained
5   to her about Erik's e-mail, finding it nauseating and
6   juvenile?
7   A.   No, I did not.
8         MR. JENNINGS:  Objection to form.
9         THE WITNESS:  I did not complain to her
10  about Barbara.  Actually I wrote on the end of my
11  e-mail that I really feel that Barbara was trying to
12  be diplomatic about the situation.  I wasn't upset
13  with Barbara.
14         We kind of were sparring at my desk, but
15  we were on good terms until, you know, Kathy had me
16  write a letter about --
17         And she wrote the letter.  I mean -- and
18  I have an e-mail attesting to that.
19         -- against Barbara Scaramalino.  So
20  Kathy was doing a lot of unethical things and forcing
21  people to say things about people.
22  Q.   Ms. Rosetsky, didn't you complain that, when
23  Barbara came to your desk, it was embarrassing, and
24  other co-workers who were nearby could hear her?
25  Weren't you upset by that at the time?

Page 160

1         MR. JENNINGS:  Objection to form.
2         THE WITNESS:  Actually Kathy said to me
3   that she heard through the grapevine that Barbara had
4   come to my desk and that she was loud and that
5   everybody heard us.  That was Kathy saying that, not
6   me.
7   BY MS. KIVITZ:
8   Q.   Okay.  Was your reaction that you were pleased
9   that Barbara had done that?
10  A.   I wasn't that upset until Kathy got really
11  angry.  At first I didn't really see it as that bad of
12  a thing, and I was kind of glad to have kind of gotten
13  everything out in the open because, if Kathy was
14  there, it would have gone a different -- she probably
15  wouldn't have allowed me to talk to her.
16  Q.   What about Erik Soijka's e-mail to you that
17  caused you to write to Kathy and to be upset with him?
18  A.   What about the e-mail where --
19         MR. JENNINGS:  Objection to form.
20         THE WITNESS:  -- I had offered him some
21  information that I found on the Internet and he said
22  he didn't --
23  BY MS. KIVITZ:
24  Q.   In other words, did Kathy prompt you to be
25  angry with Erik, or were you angry with Erik and you

Page 157 - Page 160