**EXHIBIT "8" – PART 2**

Page 161

1  told Kathy about it?
2  A.   No.  Kathy was egging me on, and she was,
3  like, behind the whole thing, the whole thing from the
4  beginning.  Even before I got there, she wanted to
5  sabotage Microsoft Project.  And I spent a lot of time
6  setting up all these Projects, and all I did was get a
7  lot of flak from Kathy that it wasn't working right.
8  People weren't using it.
9         And I said, "Well, if you let me tell
10 them that they have to use it, let me train people" --
11 she never let me do that.
12 Q.   All right.
13 A.   She never let me go forward with actually
14 getting --
15 Q.   Okay.
16 A.   -- people to use it appropriately.  And she
17 didn't understand how it had to be used --
18 Q.   All right.
19 A.   -- although IT understood how it had to be
20 used.
21 Q.   Let me go back to a question.  Okay?
22 A.   Uh-huh.
23 Q.   When you told the Director of Human Resources
24 that Kathy Holtzman was being unethical, were you
25 referring to Kathy Holtzman telling you to prepare a

Page 162

1  memo about Barbara and Erik?
2  A.   That was one of the things, yeah.  I really
3  didn't feel -- you know, I thought Barbara was
4  basically trying to be diplomatic.  And Kathy said,
5  "Oh, no.  You have to tell -- you know, put down a
6  tone of voice and put down, you know, what actually
7  happened.  You have to cover -- you know, basically
8  cover your ass," and all this stuff.
9  Q.   Was there anything else you were referring to
10 by her unethical conduct?
11 A.   Besides her asking me to be manipulative and
12 write things about people I didn't really feel, that
13 was basically unethical enough.
14 Q.   All right.
15 A.   I'm not going to commit to saying there was
16 nothing else.  But at this point that's what comes to
17 my mind right now.
18 Q.   All right.  Now, this issue with Erik and
19 Barbara -- this was in April, 2006; correct?
20 A.   It was ongoing.
21 Q.   Why did you wait until October to go to the
22 Director of Human Resources if Kathy Holtzman told you
23 to do something you considered unethical in April of
24 '06?
25 A.   Because that's not what I went to Human

Page 163

1  Resources about.  I went to Human Resources about the
2  way that she would not promote me and was not giving
3  me work according to my job description.
4  Q.   All right.  Now, earlier you complained about
5  the edits and Krista and the typing; correct?
6  A.   That was in October.  Right.
7  Q.   Okay.  But here it says, if you were subjected
8  to unwanted harassment, was your employment status in
9  any way threatened if you did not go along?
10 A.   Obviously.  Look what happened.
11 Q.   Right.  But you said, "I was told by the
12 Director of Human Resources that I had to do whatever
13 my supervisor demanded even if she was being
14 unethical"?
15 A.   Yes.
16 Q.   Okay.  And my question to you is that meeting
17 at the earliest was October 18, '06; correct?
18 A.   Yes.
19 Q.   If you felt that you were being asked to do
20 something unwanted or unethical in April, 2006, why
21 did you not complain sooner?
22 A.   Because that wasn't one of my complaints.  Why
23 would I complain?  Would I want to lose my job?  If
24 she already knew that Kathy acted this way -- and she
25 apparently knew.  She said --

Page 164

1         Oh, one of the other things that she
2  said to me that is really important is "I can't do
3  anything about Kathy.  She has too much power.  I
4  can't tell you how they deal with her, you know, that
5  they have problems with her.  I can't do anything
6  about it.  You just have to do what she says."  And
7  she wrote that to me in an e-mail.
8  Q.   Okay.  Now, on the same document there's
9  remedy information, and you completed that.  And it
10 says:
11        "Other than loss of salary, what money
12 have you lost?"
13        You go through a list.
14 A.   Health insurance, my kids' braces.
15 Q.   Okay.
16 A.   I'm losing my house.  I had a second home.  I
17 can't pay for it.  It's going into foreclosure.  What
18 else?
19 Q.   Where is your second house?
20 A.   It's in the mountains.
21 Q.   Where?
22 A.   Lake Naomi.
23 Q.   What's the address?
24 A.   26 Hemlock Circle.
25 Q.   Okay.  Is that house being sold as a result of

Page 165

1 the divorce proceeding, or is it being foreclosed on?
2 A.   It's not in foreclosure yet. If I can pay
3 next month, it won't go. But it's not a result of the
4 divorce. It's the result of me not being able to pay
5 for it because, when I got the job at National Board,
6 I refinanced and did some repairs on the house. So I
7 upped the mortgage, and now I can't pay for it.
8 Q.   All right. Is your husband paying for it?
9 A.   We can't afford to pay for it with just his
10 salary. I have another mortgage on a home here, and I
11 have three children to support, and we pay our own
12 health insurance now.
13 Q.   When did you stop paying the mortgage on the
14 Lake Naomi property?
15 A.   I'm late this month. This is the last month.
16 I used up all of my savings paying the mortgage.
17 Q.   So this is the first month that the mortgage
18 has not been paid?
19 A.   We used up our savings. We have no savings.
20 Q.   Who told you that after missing one month's
21 payment the house would be foreclosed next month?
22         MR. JENNINGS: Objection to form.
23         THE WITNESS: I didn't say that it would
24 be foreclosed. I said it's going to go into
25 foreclosure because I don't have any way to pay it

Page 166

1 from now on. We used up -- oh, my -- our son's bar
2 mitzvah cannot be paid for because I used that up to
3 pay for the mortgage.
4 BY MS. KIVITZ:
5 Q.   Have you gotten in hand a foreclosure notice
6 from any lender?
7 A.   No. No. But I will. And when I get one,
8 you'll be the first to know.
9 Q.   Now, you said you're paying $1,500 per month
10 for family health insurance. Am I correct that you
11 did not --
12 A.   It's more than that actually.
13 Q.   -- elect COBRA benefits --
14 A.   No. I did go on COBRA. You have to pick up
15 the exact same policy. You can't change it. So you
16 have to pay exactly what the National Board was paying
17 until it runs out. So after -- I think it was March.
18 Up until March I owed them, like, 5 or $6,000 in
19 arrears for health insurance because you cannot
20 switch.
21         I said, "Can I switch my policy?"
22         And they said, "No." For you to be on
23 COBRA, you have to keep the same exact benefits which
24 was very expensive. And then my husband has
25 preexisting conditions; so we're having a problem

Page 167

1 getting other insurance.
2 Q.   Did you elect COBRA benefits when you left the
3 National Board?
4 A.   Well, yeah. I had no choice. I had to get
5 health insurance.
6 Q.   Did you pay for COBRA benefits?
7 A.   Yes. For three months or four months, and
8 then it runs out.
9 Q.   Okay. What health insurance do you have now?
10 A.   Same. Which we're trying to switch, but it's
11 been difficult because my husband has some preexisting
12 conditions. And when you're not in a group plan, what
13 they make you do is you have to pay a year on one
14 health insurance -- you have to pay two health
15 insurances for a year. You can't get off it.
16 Q.   Okay. Now, you also said you were losing a
17 pension to be determined?
18 A.   Right.
19 Q.   What are you referring to?
20 A.   I would have had a pension at the National
21 Board.
22 Q.   After what period of time?
23 A.   I was pretty close, I think. I don't know.
24 Is it two years?
25 Q.   And you said you were also missing tuition,

Page 168

1 $4,000 per year. What did that refer to?
2 A.   They give a tuition benefit.
3 Q.   Were you in school when you were at the
4 National Board?
5 A.   That was another issue where she discriminated
6 against me. I asked to take some courses, and she
7 said, "No." She meanwhile was letting other people
8 take courses that were completely irrelevant to the
9 job. Debbie was taking, like, social worker courses.
10 I asked to take some IT courses at Drexel, and she
11 said, "No."
12 Q.   Okay. Were you ever enrolled in any
13 program -- tuition program during the entire time you
14 worked at the National Board?
15 A.   No. The only thing she would let me take were
16 in-house IT training.
17 Q.   Okay. You said that you were missing
18 transportation costs to work. Was the National Board
19 paying your transportation costs?
20 A.   Sort of. They were giving me $100 a month for
21 a rail pass or a trail pass.
22 Q.   You said you're missing the cost of
23 orthodonture for your two children?
24 A.   Yes. They were paying for braces, and now
25 they're not; so I have to pay the balance, whatever

Page 169

1  the insurance company isn't paying.
2  Q.   Who paid for braces?
3  A.   The National Board. It's a benefit.
4  Q.   The National Board itself or your insurance
5  coverage? Who paid for orthodonture?
6  A.   The insurance was -- was it United Concordia?
7  Maybe it was United Concordia. It was a dental
8  benefit paid for by the National Board.
9  Q.   Okay. And when I just asked you what
10 coverage you had when the COBRA ended, you said the
11 same coverage.
12 A.   No. When it ends? I have the same health
13 insurance company. It's not the same coverage. I'm
14 mistaken. It's still called "Personal Choice," but
15 it's a very watered down version of it. Like, most of
16 our prescriptions are not paid for, and I have two
17 children on prescriptions that are not being paid for.
18 Q.   And who is currently paying the cost of health
19 care coverage?
20 A.   My charge card.
21 Q.   Is that something that you're seeking to have
22 your husband reimburse in the divorce proceedings?
23 A.   It's our charge card. It's in both our names.
24 Q.   Well, the two of you are presently separated
25 within the same household; correct?

Page 170

1  A.   Yes.
2  Q.   Okay. What I'm asking you: Is that a charge
3  that you're asking for your husband to reimburse?
4  A.   These are just mutual debts that we now have,
5  and I have no idea. I can't answer that question.
6  I'm not my attorney. I don't know what you're allowed
7  to ask for; so I can't answer that question.
8  Q.   Okay. You also said, "Loss of Social Security
9  contributions." What did you mean by that?
10 A.   Well, obviously, since I'm not working, I'm no
11 longer paying into the system. So, you know, when I
12 reach sixty-five or whatever, if we still have a
13 Social Security system, it's going to be less,
14 obviously.
15 Q.   Okay. Have you seen any therapist,
16 psychologist, psychiatrist, or medical doctor since
17 you were terminated or as a result of the termination
18 from the National Board?
19 A.   I have seen my doctor, you know, but I'm not
20 the kind of person that goes to complain.
21 Q.   And who is your doctor?
22 A.   Pam Fenstemacher.
23 Q.   You'll have to spell that.
24 A.   F-e-n-s-t-e-m-a-c-h-e-r.
25 Q.   All right. Have you seen her in reference to

Page 171

1  medical complaints? psychological complaints?
2  A.   I've seen her in reference to not really --
3  you know, I didn't really complain to her about, you
4  know, mental problems.
5  Q.   Where is she located?
6  A.   She's at Abington Hospital.
7  Q.   What type of doctor is she?
8  A.   She's a general practitioner.
9  Q.   You said, "I didn't really talk to her about
10 psychological issues." Do you remember what you saw
11 her for?
12 A.   What I saw my doctor for? That's personal.
13        THE WITNESS: Do I have to answer that?
14        MR. JENNINGS: Ask if it had anything to
15 do with her employment. If it didn't have anything to
16 do with her employment --
17        MS. KIVITZ: Well, I tried that. I did
18 ask that.
19        MR. JENNINGS: I don't think you asked
20 it that bluntly.
21 BY MS. KIVITZ:
22 Q.   You want to answer that?
23 A.   There were conditions that I have that were
24 exacerbated by unemployment.
25 Q.   All right. Then I'm going to have to go

Page 172

1  further and ask you what conditions were exacerbated.
2  A.   I had stomach problems, and I was depressed.
3  Q.   All right. And you went to see
4  Dr. Fenstemacher for the stomach problems and the
5  depression?
6  A.   Basically, yes.
7  Q.   Now, you saw the Interrogatory Answers you
8  filled out in this case that we received; correct?
9  A.   Right.
10 Q.   Do you recall answering those Interrogatories
11 that you have not seen a doctor as a result of your
12 termination from the National Board?
13        MR. JENNINGS: Objection to form. I'm
14 not sure if that was the exact language of the
15 Interrogatory. I don't have it in front of me.
16        THE WITNESS: I have seen a doctor. But
17 like I said --
18 BY MS. KIVITZ:
19 Q.   Related to your termination?
20 A.   Well, these were conditions that were
21 exacerbated by being terminated, but I would have gone
22 to her anyway because she's my doctor.
23 Q.   Okay. Have you struggled with depression over
24 the years?
25 A.   Not really. Well, a little bit when I was

Page 173

1  younger.
2  Q.   Okay.  Who did you see in those years?
3  A.   Her.
4  Q.   Okay.  Same doctor?
5  A.   Same doctor.  She contributed it to menopause.
6  It was after I turned -- in my forties.
7  Q.   All right.  Do you mind -- because you've said
8  your stomach problems were exacerbated, I have to ask
9  you what type of stomach problems.
10  A.   Irritable bowel syndrome, and I also have
11  reflux disease.
12  Q.   Okay.  For these conditions have you seen
13  anyone other than Dr. Pam Fenstemacher?
14  A.   Since I stopped work at the Board?
15  Q.   Before or after.
16  A.   I've been to gastroenterologists in the past.
17  Q.   And can you give me their names, please?
18  A.   I don't remember them.  I really don't.
19  Q.   Do you remember where they're located?
20  A.   It was a long time ago.  Basically it's
21  treated with over-the-counter with -- they're now over
22  the counter.  But for years I had prescriptions for
23  Prilosec, and I've been taking that for a long time.
24  Q.   And who gives you the prescriptions on that
25  now?

Page 174

1  A.   They're not prescription anymore.  It's over
2  the counter.  It used to be from Fenstemacher.
3  Q.   Okay.
4  A.   And I had also had a prescription for
5  something called "Dycyclomine," which is for irritable
6  bowel syndrome.  It's a prescription from
7  Fenstemacher.
8  Q.   Okay.  When is the first time in your life you
9  had any issue with depression?  How hold were you?
10  A.   In my forties.
11  Q.   Okay.  Do you remember where you were working
12  at the time?
13  A.   I wasn't.  I was home with my kids.  And it
14  wasn't really diagnosed as depression.  She said she
15  felt that it was menopausal symptoms, but at this
16  time, you know, I was really upset with what happened
17  at the Board.
18  Q.   And you went to see her because you were upset
19  at what happened at the Board?
20  A.   Uh-huh.  Yes.
21  Q.   Okay.  We asked you in an Interrogatory, if
22  you were claiming that you had any emotional damages,
23  who you had seen.  And your Answer was:
24       "Plaintiff has not gone to the doctor
25  for the foregoing pain, suffering,

Page 175

1       humiliation, depression, and anxiety."
2       Do you recall giving us that Answer?
3  A.   Yes.  But there's a reason because these were
4  conditions that I had, and they come and they go
5  according to my -- what stress I'm under.  So I did
6  not completely attribute it to going -- because of the
7  National Board.  I didn't walk in and say, "I lost my
8  job, and I'm depressed."  You know, I walked in, and I
9  said, "You know, I want this and this for these
10  conditions which I have," and that's it.
11  Q.   Okay.
12  A.   It was more, you know, like -- actually, it
13  was, like, a regular checkup that I went in and I
14  talked to her.  And I told her what was going on.
15  Q.   Okay.  We're going to ask you to sign what's
16  called a "HIPAA Release" so that we can get the
17  records from the doctor because a regular subpoena
18  won't be enough.  So don't go anywhere after your
19  deposition.  I'll have one made up.  Okay?
20  A.   Uh-huh.
21       THE WITNESS:  Do I have to have all my
22  medical records released?
23       MR. JENNINGS:  We'll look at what the
24  Release says and then decide what we're going to do
25  with it.

Page 176

1       MS. KIVITZ:  I mean, you know, Rufus,
2  it's your Answer.  "Plaintiff has not gone to the
3  doctor for the foregoing" --
4       MR. JENNINGS:  It's not my personal
5  Answer.
6       THE WITNESS:  It was my Answer.
7       MS. KIVITZ:  It's your Verification.
8       MR. JENNINGS:  It's not my personal
9  Answer.
10       THE WITNESS:  I mean, I don't have a
11  problem with you seeing that I went to the doctor
12  during -- anytime I went during when I was employed or
13  after, but I'm not going to release my records from
14  before that.
15  BY MS. KIVITZ:
16  Q.   You know, that's actually the Court's
17  determination if we don't agree.
18  A.   Right.  Okay.
19  Q.   It's not yours; it's not mine.
20  A.   Okay.
21  Q.   It goes to the Court.
22  A.   Well, I thought --
23       MR. JENNINGS:  Diane?  Diane?
24       You can argue those issues with me, not
25  with my client.

Page 177

1     MS. KIVITZ: Well, I didn't try.
2     MR. JENNINGS: Well, no, you did. If
3  you have that issue, you can argue it with me. You're
4  not to argue those sort of things with my client.
5     MS. KIVITZ: You know, Mr. Jennings, I'm
6  not the one who answered the Interrogatory that I
7  haven't gone to the doctor.
8     MR. JENNINGS: You can move on with the
9  deposition, if you like.
10    MS. KIVITZ: Okay. But I mean, you
11 know, I'm sitting here dealing with an Interrogatory
12 Answer, and all of a sudden we learn this information
13 contrary to a sworn Interrogatory Answer. So, you
14 know, don't tell me, "You can't ask this," or "You
15 can't say that." I mean, give me a break here.
16    MR. JENNINGS: I'm not saying you can't
17 ask questions. I am saying don't argue those issues
18 with my client.
19    MS. KIVITZ: I'm not arguing anything
20 with Ms. Rosetsky.
21    MR. JENNINGS: You were, and the record
22 will make that clear. You may continue with your
23 deposition, if you like.
24    THE WITNESS: I'm just not sure the
25 doctor --

Page 178

1     MR. JENNINGS: Diane? Diane? There's
2  no question pending.
3  BY MS. KIVITZ:
4  Q.   You can finish your answer. I don't mind.
5     MR. JENNINGS: No. There's no question
6  pending.
7     THE WITNESS: Go ahead. Ask me another
8  question.
9  BY MS. KIVITZ:
10 Q.   Okay. You started to say, "I did not go
11 specifically for this."
12    MR. JENNINGS: Objection to form.
13    THE WITNESS: I have ongoing health
14 problems which, when I get stressed out and when
15 things happen to me, they get worse.
16 BY MS. KIVITZ:
17 Q.   Okay.
18 A.   So you asked me, you know, did I go
19 specifically, whatever. I can't prove to you that,
20 you know, I got diarrhea because I got fired. But I
21 can surmise that this was, you know, happening to me.
22 So that's why I said I didn't go call up a
23 psychiatrist and say, "I want to come in. I'm
24 severely depressed." This is a doctor that I've been
25 with for fifteen years.

Page 179

1  Q.   Can you tell me the other periods in your life
2  that you have felt sufficiently stressed that you've
3  had the same symptoms? You said once during -- in
4  your forties when you were home with the kids.
5  What are other times when you have felt the same type
6  of stress that would bring on these symptoms?
7     MR. JENNINGS: Objection to form.
8     THE WITNESS: Well, let me see. I went
9  about ten years without sleep because I breast fed
10 three kids. That was really stressful. And I had
11 stomach problems at that time. I actually had a
12 blockage.
13    And what other times? That was probably
14 the worst time in my life. Oh, I have a child who's
15 disabled; so, you know, that caused me a lot of
16 distress. And, you know, as he got older and did not
17 develop properly, you know....
18    But we've come to terms with that. He's
19 a pretty good kid. He can read and that kind of
20 thing; so it hasn't recently caused me any stress.
21 BY MS. KIVITZ:
22 Q.   Okay. But your periods of sleeplessness, your
23 period when you were, I guess, pre-menopausal, your
24 son's disability -- all of those have been stressful
25 periods where you've had similar symptoms?

Page 180

1  A.   On and off, yeah. When I was -- you know,
2  when the kids were younger.
3  Q.   What about other jobs ending? In other words,
4  when you left Penn or when you left Wistar or when you
5  left --
6  A.   Well, I wasn't happy. Wistar -- that was so
7  long ago. You know, when you're a kid, everything --
8  when one door closes, another door opens I looked at
9  that as. With Penn I wasn't happy. I mean, she was,
10 like -- you know, it wasn't great obviously. You
11 know, I come back into the workforce and, you know,
12 because I'm older, people are treating me like all I
13 can do is, you know, change diapers.
14    So, you know, if I came in -- back in
15 the workforce as a young mother, they were all treated
16 royally. You know, they had their maternity leave and
17 came back and still had their jobs. I was not being
18 treated that way.
19 Q.   Okay. My question is: Did you have any
20 medical symptoms when you left Penn or when you left
21 Wistar or when you left Jeanes?
22 A.   I was upset after Penn. After Wistar I really
23 couldn't tell you. You're talking twenty years ago.
24 I don't think I really cared that much. I mean, I was
25 upset with the way I was being treated by that man,

Page 181

1  but, you know.  But when you're in your twenties, you
2  don't really....
3  Q.   What about your divorce?  Has that caused you
4  any emotional stress?
5  A.   Do you really want me to answer that?
6  Q.   Well, I have to ask you.
7  A.   No.  It doesn't cause me any emotional
8  distress.  I mean, of course.  I mean, I have three
9  children involved.  The divorce -- I mean, everything
10  in the relationship got worse after the money problems
11  got worse and we couldn't pay our health insurance.
12  There's no question that what happened at the National
13  Board absolutely was the coup de grace to my marriage.
14         I mean, you know, I couldn't even pay
15  for my sons' prescriptions.  I mean, I have two
16  children with Tourette syndrome.  I had $900 in unpaid
17  prescriptions that are on my charge card.  I couldn't
18  pay for, you know, the health care.  When you pay for
19  it as a single person on your own, it's not covering
20  like anything.
21  Q.   Ms. Rosetsky, I have seen an e-mail -- I don't
22  have it here but -- where you, I guess, got angry with
23  your husband while you were still at National Board
24  and e-mailed him that you had gotten notices of
25  insufficient funds and, you know, accused him in the

Page 182

1  e-mail of not providing responsibly.
2  A.   He forgot to put the money in?
3  Q.   Yes.
4         Did you have those -- were those
5  financial issues or your ability -- strike that.
6         Were those issues with your husband
7  ongoing?
8         MR. JENNINGS:  Objection to form.
9         THE WITNESS:  No.  We didn't have money
10  issues.  He would just forget to put the money in the
11  bank, and I would get -- and I had things that were on
12  auto pay.  So if you don't put it in before the auto
13  pay, then you get NSF.  And that's what you're
14  referring to.
15  BY MS. KIVITZ:
16  Q.   Okay.  Well, this was while you were still
17  employed at National Board in, I think, the summer?
18  A.   Right.  So, you know, we weren't rich, but we
19  had things under control, you know.  But then when I
20  started working, I kind of upped the ante by
21  renovating one of my houses and that type of thing.
22  Q.   Okay.  Now, I'm going to talk to you later
23  about your efforts to find employment since you've
24  left.
25  A.   Uh-huh.

Page 183

1  Q.   But I just want to be clear on this, and then
2  we can get more into it later.  Have you done
3  anything, whether Checks, Inc., under the table,
4  anything since you've left National Board?
5  A.   No, I haven't worked for my husband.
6  Q   Okay.  In the same questionnaire on the
7  discipline version of the questionnaire, they asked
8  for all persons in comparable positions who have had
9  performance or conduct problems.
10  A.   What is this for?
11  Q.   In your questionnaire that you filled out,
12  discipline questionnaire.  And you indicated Joy
13  Bouldin, B-o-u-l-d-i-n.
14  A.   Yeah.  She had the job before me where she had
15  some kind of -- I'm not saying there were discipline
16  problems.  I'm saying she had issues with Kathy with
17  Microsoft Project.
18  Q.   Okay.  Do you know firsthand what happened
19  with Joy Bouldin?
20  A.   Not firsthand.  But Faith and Debbie told me.
21  Q.   Told you what?
22  A.   Told me that Joy was siding with the IT
23  Department, that she was an older black woman, and
24  Debbie felt that she was being treated differently
25  because she was black.  And they said that, because

Page 184

1  she was siding with the IT Department, that Kathy just
2  wanted to get rid of her.
3         And that's all that I know of it.
4  Q.   Okay.  You don't know of personal knowledge --
5  A.   I never met her because she was gone before I
6  got there.
7  Q.   Okay.  Now, you also said you heard from
8  others about Dawn Willis?
9  A.   Yes.
10  Q.   Okay.  Again, do you have any personal
11  knowledge --
12  A.   She was gone before I got there.  I just know
13  what I heard from Debbie and Faith.
14  Q.   Okay.  And what did you hear?
15  A.   You know, that her and Kathy were at odds,
16  that they were, you know, about the same age.  She'd
17  been there for fifteen years and that she was
18  terminated.  That's all I know.  And that there was
19  some kind of a settlement or something.  I don't know
20  a lot about it.
21  Q.   In our attachment you said that, of the eight
22  managers or directors under Ms. Holtzman, only three
23  were over forty.  Is that correct?
24  A.   I think less than that.
25  Q.   I have "only three are over forty."

Page 185

1  A.    Wait. Connie Murray. Let me think. Connie
2  Murray. She was grandfathered in before Kathy became
3  in charge. Peg Johnson was grandfathered in. She was
4  there before Kathy was in charge. And who was the
5  third person? Is it Sue Jachavino (phonetic)? I
6  don't know if Sue was working for her. I forget. But
7  Sue is older, and Sue was demoted when Kathy came into
8  power.
9  Q.    Okay. Do you know if others have been
10 promoted since you left? People over the age of
11 forty?
12 A.    The only one that -- oh, over the age of
13 forty? No. I know somebody left because she didn't
14 like the way she was being treated. Her name was
15 Jackie.
16 Q.    And what's the last name?
17 A.    I don't know. She was there for, like, not
18 long. I heard she was there -- actually, I was
19 talking to a Human Resource person when I went for a
20 job that knew her, and I don't really know what
21 happened. She was there less than a year. She did
22 complain to me about Kathy.
23 Q.    Who complained to you about Kathy?
24 A.    Jackie.
25 Q.    Do you know of any employee under the age of

Page 186

1  forty who complained about Kathy Holtzman?
2  A.    Probably Chris DeRucci. I just know a lot of
3  people were really unhappy with her. It could have
4  been Sue behind me. You know, I know people went up
5  to Ron Nungster and were complaining about the
6  department since Kathy's been there in the last four
7  years that they -- I don't know.
8          You know, I don't have firsthand
9  knowledge, except I was told by Faith Balsama that
10 Chris DeRucci had complained about her. And that's
11 all I know. She's actually one of the managers.
12 Q.    Okay.
13 A.    She's in her mid-thirties, I think.
14 Q.    Okay. So you would agree that, of people who
15 complained about Kathy Holtzman generally, they were
16 both under forty and over forty?
17         MR. JENNINGS: Objection to form.
18         THE WITNESS: I don't really know. The
19 only one I really know of is Chris DeRucci. I mean,
20 you'd have to go through her personnel file. I mean,
21 she's no Mother Teresa, but she's a very manipulative
22 woman.
23         She kept everything segregated. Like,
24 she had certain people in certain jobs of one age and
25 certain people in another job of other ages. That's

Page 187

1  the way that it was there. She only promoted -- I do
2  know that no one got promoted there that was older
3  that I saw when I was there.
4          She promoted Krista Allbee, like I said,
5  who was thirty years old and wasn't even there -- she
6  was in Chicago -- you know, to a position, you know,
7  from kindergarten to twelfth grade with not having to
8  do anything in between.
9  BY MS. KIVITZ:
10 Q.    Is it true that there were also people under
11 the age of forty who did not get promoted?
12        MR. JENNINGS: Objection to form.
13        THE WITNESS: I don't know.
14 BY MS. KIVITZ:
15 Q.    Can you think of any?
16 A.    People under forty who did not get promoted?
17        MR. JENNINGS: Objection to form.
18        THE WITNESS: I have no idea because
19 most of the people that I talked to there were in my
20 peer group, and they were the two women sitting on
21 either side of me. And we were all in our forties
22 except for Faith, who was now going into her fifties.
23 BY MS. KIVITZ:
24 Q.    Okay. I'm going to mark some of these, but
25 I'm going to try not to mark all of them so the

Page 188

1  deposition transcript is not, you know, ninety million
2  pages long.
3  A.    Okay.
4  Q.    So I'm going to ask you if you remember this.
5  But in fairness, if you need to see anything I ask you
6  about, I'm happy to mark it. Okay?
7  A.    You're going to go through all those
8  (indicating)?
9  Q.    Well, some of them, the stickered ones.
10        Do you remember that in March, '06, you
11 wrote an e-mail to Kathy Holtzman because Krista had
12 brought you some items and she wanted you to fix
13 twenty pages of commas and spelling errors?
14 A.    Uh-huh.
15 Q.    You complained to Kathy Holtzman?
16 A.    Yes.
17 Q.    Do you recall, at the end of this March 20
18 e-mail, you said:
19        This was around 3:30.
20        "It's still on my desk to be finished.
21     I would like to know what is expected of me
22     with respect to these situations. Obviously,
23     it's your call"?
24 A.    Right.
25 Q.    Do you remember saying that?

Page 189

1   A.   Uh-huh.
2        MR. JENNINGS:  Yes?
3        THE WITNESS:  Yes.
4   BY MS. KIVITZ:
5   Q.   What did you mean by "Obviously, it's your
6   call"?
7   A.   Krista was not my supervisor and was giving me
8   work to do, which basically she should have been doing
9   herself because she was just sitting there, talking to
10  people, doing nothing, and she handed that to me.  So,
11  you know, I said to Kathy, "I'm supposed to be working
12  for you, Kathy.  Am I supposed to be fixing typos for
13  Krista?"
14       So I said, "It's your call.  If you want
15  me to do it, I'll do it, but I'm not happy about it,
16  and I don't feel" -- you know, I didn't really feel
17  that I should be doing that.
18  Q.   Okay.  And what was Kathy's response?
19  A.   Well, she called me into her office and said,
20  "You know, do you feel it's below you, you know?"
21       And I said, "You know, no.  I'll do it
22  if you want me to."  Well, what I really felt was, "Do
23  you think it's below you?"  I mean, Kathy has one
24  third of my education also I should say.  So, you
25  know, I felt that it was not my place to be fixing

Page 190

1   typos as a secretary for Krista.  I wasn't hired to do
2   that.
3   Q.   Okay.  But did Kathy Holtzman tell you that
4   was part of what you were being asked to do?
5   A.   No.
6   Q.   Okay.
7   A.   But I did it.  I said, "I'll do it if you want
8   me to."
9   Q.   Okay.  And did you do it?
10  A.   Yeah, I did it.
11  Q.   All right.  Do you remember writing an e-mail
12  on March 21 in which you said:
13       "Sorry I said -- Sorry," it looks like,
14  "what I said yesterday because it was late
15  when I wrote the e-mail"?
16  A.   No.
17  Q.   No.  Do you remember saying that:
18       "When we went over my role profile, you
19  asked me what I don't like to do"?
20  A.   Uh-huh.
21  Q.   "And I couldn't think of anything"?
22  A.   Right.
23  Q.   Okay.  And then you said:
24       "Well, fixing typos for anyone besides
25  you and Dave is something I didn't expect to

Page 191

1   be doing"?
2   A.   Yes.
3   Q.   You said:
4       "I'm looking forward to working with
5   Kathy, Kieran, and Krista"?
6   A.   Uh-huh.
7   Q.   "But I presumed it was with them, not just for
8   them"?
9   A.   Yes.
10  Q.   Was that your perception that, by fixing
11  someone else's work, it meant that you were working
12  only for them and not with them?
13  A.   Yes.  I wasn't allowed to give them any of my
14  work to fix.  I wasn't allowed to do any work.
15  Q.   Okay.  Do you remember then saying about Kathy
16  Angelucci:
17       "I haven't had a problem working with
18  anyone, but you need to have some redeeming
19  quality.  I never even got a 'hello'" -- I'm
20  sorry.  Strike that.
21       Let me repeat it so it's correct.
22       "I haven't had a problem working with
23  anyone, but you need to have some redeeming
24  quality.  I never even got a 'hello' or a
25  smile from Krista all day."

Page 192

1   A.   Right.  Krista didn't talk to me or say, "Good
2   morning," or anything to me.  She just dumped work on
3   my desk.
4   Q.   Okay.  You then said:
5       "You said, when you interviewed me, you
6   needed someone that doesn't get insulted
7   easily.  Well, I don't."
8   A.   Right.
9   Q.   Do you believe that you don't get insulted
10  easily?
11  A.   Right.  Kathy asked me that.  "Do you get
12  insulted easily?"
13       And I said, "Is that a premonition of
14  what's to come?"  Apparently it was.
15  Q.   Okay.  Now, we've talked about Erik Soijka
16  and --
17  A.   Leslie and Debbie.
18  Q.   Right.
19       MS. KIVITZ:  Let me mark this one
20  (indicating).
21       (Whereupon the Reporter marked an e-mail
22  dated April 6, 2006, to Kathy Holtzman from Diane
23  Rosetsky as Exhibit No. D-16 for identification.)
24  BY MS. KIVITZ:
25  Q.   Do you want to take a second?

Page 193

1  A.   No.  Because I remember this.
2  Q.   Okay.  Do you remember bringing to Kathy
3  Holtzman's attention how this whole development with
4  Erik Soijka and Barbara had occurred?
5  A.   Say it again?
6  Q.   Okay.  Do you now remember -- does this
7  refresh your memory that you brought this whole Erik
8  Soijka issue to Kathy Holtzman's attention to begin
9  with?
10  A.   No, I didn't bring this to her attention.
11  This was ongoing.  This is when Barbara came and took
12  me up to Erik Soijka's office when Kathy was in
13  Florida.  There was already tension and problems way
14  before this.  That's why she came and took me to Erik
15  Soijka's office.  I didn't start this.  This started
16  way before I was there.
17         And, you know, both Debbie and Faith
18  said, "This thing with Microsoft Project started way
19  before you, and Joy Bouldin had the same problem that
20  you had with Kathy, Microsoft Project, and being in
21  between IT and her."
22  Q.   Okay.  Tell me what you meant by:
23         "So after this half-hour discussion,
24         it's still up in the air.  And Erik Soijka got
25         a lesson about technology and the evolution of

Page 194

1         the office end users from some former domestic
2         goddess."
3  A.   Yeah.  So?
4  Q.   Just tell me what you meant by that.
5  A.   I was talking to him about the technology and
6  how we were using it down in our office.  And I called
7  myself a "former domestic goddess," not Erik Soijka
8  and not Kathy.  I was referring to myself.  And this
9  letter was not to Erik Soijka.  It was to Kathy.  And
10  this was, you know -- I don't know.  It didn't have
11  much meaning to it at all.
12         I mean, Erik thought that I didn't know
13  anything about the technology and that, you know, the
14  end user portion of it -- that we were in the wrong.
15  This was between him and Kathy on how the end users
16  were going to use Microsoft Project.  Okay?
17         So I told him basically that I had
18  studied the situation and that I did know what I was
19  talking about but that I did not completely agree with
20  her in the way she was doing things but that I let him
21  know that I knew what I was doing.  So that's all that
22  that meant.
23  Q.   Okay.
24  A.   And I still think it's funny.
25  Q.   Okay.  And when you say he got a lesson about

Page 195

1  technology from you --
2  A.   Right.
3  Q.   -- what does that mean?
4  A.   Because Erik Soijka told me he didn't know
5  that much about Active Directory, which is what we
6  were talking about.  So I went, and I researched it,
7  and I sent him some articles on it.  He had admitted
8  that he was out of touch with what was going on in
9  Test Development.  He had no idea.
10         It was Leslie and Barbara Scaramalino
11  and Debbie Brown.  So when we went up to Erik's
12  office, he really had no idea what was going on.
13  Q.   Did you feel that your technological skills
14  were comparable to his, surpassed his --
15  A.   I have no idea what Erik Soijka's are; so this
16  was just in jest.  I mean, you're kind of
17  nit-picking into things which were tongue in cheek
18  obviously.
19  Q.   Well, was it tongue in cheek when he wrote you
20  the e-mail and you said that you found it juvenile and
21  nauseating?
22  A.   No.  That was just, you know, what I felt.
23  But I didn't say that to him.  I said it to Kathy.  So
24  what's the difference?
25  Q.   What did you mean when you sent Kathy an

Page 196

1  e-mail in April saying:
2         "Soijka doesn't work for Joe Crick.  He
3         works for the guy with the little white hot
4         pants"?
5  A.   Oh, there was a guy that I didn't know who he
6  was down in the -- we have a gymnasium, and he came
7  into the gym wearing little short white pants.  And it
8  was really inappropriate, and he kind of, like, laid
9  down in front of me on a ball and was stretched
10  backwards.  And he came, and he did it a couple times
11  in front of me when I was on the elliptical.
12         And I said something to Kathy, and she
13  said, "Well, who was it?"
14         "I have no idea."
15         But then I saw him come up one day and
16  walk in front of me, and I said, "There he is."
17         And she said, "Oh, he's one of the
18  Vice Presidents."
19         So I didn't know his name; so I said,
20  "The guy in the white pants."
21         MS. KIVITZ:  I'll ask that this one be
22  marked (indicating).
23         (Whereupon the Reporter marked e-mails
24  dated April 11, 2006, between Kathy Holtzman and Diane
25  Rosetsky as Exhibit No. D-17 for identification.)

Page 197

1  BY MS. KIVITZ:
2  Q.   Is this the e-mail, on the bottom part of the
3  page, that you wrote to Kathy Holtzman concerning Erik
4  Soijka on April 11, '06?
5  A.   What did you ask me?  If I saw this e-mail
6  before?  Yes.
7  Q.   Okay.  When you say that:
8       "I have to wonder if Joe Crick is a more
9       secure administrator and interested in doing
10      the right thing instead of trying to just look
11      like he is in charge."
12      Are you suggesting here that Soijka was
13  not secure and was not interested in doing the right
14  thing?
15  A.   I don't see the relevancy of this.  I'm just
16  wondering why you're asking me about --
17      MR. JENNINGS:  Diane, just answer the
18  question.
19      THE WITNESS:  I don't think that Erik
20  Soijka, like I said before, knew what was going on.
21  BY MS. KIVITZ:
22  Q.   Okay.  Well, you said here that decisions were
23  based on not liking to be told what to do?
24  A.   Yes.  I thought his decisions were based -- he
25  wrote an e-mail to me.  Do you have that one where he

Page 198

1  wrote an e-mail to me or -- I think he wrote it to me
2  and Kathy -- where he didn't want my input and he
3  wasn't -- because I had sent him some articles off
4  the Internet about how Active Directory could be
5  used.
6       I kind of researched it because he said
7  that he had to research it, that he wasn't sure, and
8  that he wasn't interested.  He said he didn't want
9  me -- I don't remember.  Something about, you know,
10  "doesn't care what it said" or whatever.
11      He didn't care what it was.  He didn't
12  seem to care whatever information I sent him, and I
13  thought it was kind of rude that I went to the trouble
14  to find the information for him.
15  Q.   Okay.  Was it your impression that he didn't
16  like you telling him what to do?
17  A.   I wasn't telling him what to do.  I was giving
18  him information, and he didn't want my input.
19  Q.   Okay.  Why did you then say:
20      "It is obvious his decisions were based
21       solely on not liking to be told what to do"?
22  A.   Because he had issues with Kathy trying to
23  tell him how they were going to use Microsoft Project.
24  And Kathy and I had had a lot of discussions over
25  this, and that's what I was referring to.  She wanted

Page 199

1  to know -- you know, she would constantly be going
2  back and forth with him over how much information that
3  they had to give them off of Microsoft Project.
4  Q.   Okay.
5  A.   And he did not want my input on how different
6  ways that Active Directory could be used.  Active
7  Directory is actually, like, the security system for
8  it.  And he didn't know how to use it, and he said he
9  wasn't familiar with it, that he was kind of removed
10  as an administrator.
11      So Kathy had said to me many times that,
12  you know -- she didn't like Erik Soijka, and she wrote
13  to me an e-mail something to that effect.  "He twists
14  things.  You know, be careful what you say to him."
15      So that's what that was about.
16  Q.   Okay.  And you sent that e-mail to Kathy
17  basically saying, you know, "What do we do here?"
18  A.   Yeah.  I just wanted her to know what went on
19  because she was upset because she hadn't been there.
20  Q.   And this was during the period when you and
21  Kathy Holtzman, at least in your testimony, were still
22  getting along; correct?
23  A.   Yeah.  She had no complaints with me.
24  Q.   And you had no complaints at this time;
25  correct?

Page 200

1  A.   No, I didn't say that.
2      MR. JENNINGS:  Objection to form.
3      THE WITNESS:  I didn't say that.  I
4  didn't complain to anyone but....
5  BY MS. KIVITZ:
6  Q.   Okay.  But you trusted her enough that you
7  forwarded the e-mail of someone that you found
8  juvenile and nauseating to get input from her;
9  correct?
10  A.   I didn't forward it to her.  I think it was
11  written to both of us.
12  Q.   Okay.  In any event, you consulted her for her
13  input in terms of how to deal with Soijka; correct?
14  A.   No.  I wasn't supposed to deal with him
15  anymore.  She had told me to -- before I said anything
16  to Erik Soijka, including the information that I had,
17  I asked her first, "Can I send this to Erik Soijka?"
18      And she said, "Yes."
19  Q   Okay.  Look at the top e-mail on that.
20  A.   (Complying.)
21      Uh-huh.
22  Q.   Isn't that when Kathy told you not to go out
23  on your own until you and she had spoken?
24  A.   Yes.  But we did speak.
25  Q.   Okay.  But didn't you send the first e-mail to

Page 197 - Page 200

Page 201

1  Kathy, seeking her input?
2  A.   Yeah.  But I didn't send anything to Erik
3  Soijka.  I sent it to Kathy.
4  Q.   Correct.  But I'm just saying --
5  A.   I don't understand the point here.
6  Q.   Am I correct that you valued her consultation
7  enough that you forwarded this to Kathy Holtzman?
8  A.   No, I didn't value her consultation.  I knew
9  that Kathy could get really nasty if you did anything
10 without her --
11        She was a control freak.  Okay?
12        -- if you did anything without asking
13 Kathy first, and everybody knew that.  Even Dave
14 Swanson, who was supposed to be her superior -- he
15 constantly went in and asked Kathy what to do in front
16 of me.  She was controlling everything, not Dave.
17 Dave was supposed to be in control, but Kathy was.
18 Q.   Okay.
19 A.   So that's why I did this.  I didn't do
20 anything without asking Kathy first.  She knew every
21 single thing that I did except for when I went up to
22 the meeting with Barbara Scaramalino when she was in
23 Florida because I just felt under pressure to go with
24 Barbara.
25        She was one of the managers.  She said,

Page 202

1  "Let's go.  We're going upstairs to talk to Erik
2  Soijka."
3  Q.   Was this around the time that Kathy Holtzman
4  asked you to prepare a memorandum, sort of setting
5  forth the interactions?
6  A.   The memorandum about Barbara?  Yeah, it was
7  around this time.
8  Q.   Okay.
9  A.   I think it was -- yeah.  You should have that
10 memorandum.
11 Q.   Okay.  Now, you did compose such a memo;
12 correct?
13 A.   With Kathy's help, yes.
14 Q.   Okay.  And at least at that time April 11/12,
15 you did not complain to anyone about being asked to do
16 so; correct?
17 A.   I did.  I said something to Faith.
18 Q.   Okay.  Did you ever say to Kathy Holtzman,
19 "Gee, I'm uncomfortable doing this"?
20 A.   Yes.
21 Q.   Did you?
22 A.   I kind of said, "You know, I really don't want
23 to put -- do I really have to put this stuff in
24 there?"
25        And she's, like, "Yes.  You need to put

Page 203

1  tone of voice and, you know, that Barbara was
2  yelling."
3        And I said, "Well, she wasn't really
4  yelling.  We were just kind of talking."
5        "You need to put in, you know, certain
6  things."
7        She definitely was bullying me into
8  putting things in the e-mail that I did not want to
9  put in there.
10 Q.   Okay.  Now, did you have some concern that
11 Erik Soijka and his department would be angry at
12 either you or Kathy or your department for a
13 professional disagreement?
14 A.   I already knew he was angry with the
15 department way before I got there; so I just did what
16 Kathy wanted me to do.
17 Q.   Okay.  Did you feel that the memo was in part,
18 if not in full, directed at sort of protecting your
19 department?
20 A.   I was -- you know, it was, like, a chess game
21 for Kathy.  You know, whatever chess move Kathy was
22 making at that point, you know, that's the way she
23 looked at everything.  It wasn't a business
24 atmosphere.  It was a circus.
25        You know, it was just, like, Kathy was

Page 204

1  all about being in charge, being manipulative, not
2  producing quality work, not getting the best people to
3  do the jobs, you know, the best people for the jobs.
4  She was all about everything had to be her way, which
5  is why they got her an executive coached named Kenny.
6        I'll say it again.  You know, she
7  discriminated against people.  You know, that's the
8  way that she was, and I was afraid for my job just
9  like everybody else was.  Faith and Debbie -- Debbie
10 was a single mother.  She was scared to death of
11 losing her job.
12        And Faith was the sole support of her
13 Vietnam vet husband whose business was going under.
14 So, you know, the two of them on either side of me
15 constantly told me, "Be careful of her.  You know,
16 this is the way that she is."
17        They kept telling me they wanted to get
18 out of this job.  They applied for other jobs.  And
19 Faith always called it "Kathy slime" that she
20 couldn't get out of there.  Kathy wouldn't let
21 her out of the position.
22        So I'm telling you that whatever went on
23 here -- this is part of Kathy's manipulation of
24 everyone.  That's what it is.  And when you have
25 children and you have a job that depends on it -- I

Page 205

1 stayed there as long as I could and, you know, be
2 stomped on and, you know, belittled and whatever.
3 I stayed there as long as I could. And
4 when I saw that there was a job that I could do and I
5 could do really well and that she could have just put
6 me into without me having to interview, I went for it.
7 And the only reason that she didn't do it was because
8 I'm older and she just wanted to deal with younger
9 people.
10 Everybody was younger. That's what she
11 did. She just felt like, you know, "Let's keep the
12 old ladies in the secretary positions." That's what
13 she was doing.
14 Q. Now, I guess this question goes to Kathy
15 Holtzman and Elizabeth Bien. When you look back on
16 your employment at Penn and the National Board, both
17 jobs of which you've lost --
18 A. Right.
19 Q. -- and you know that both Penn and the
20 National Board would deny that there was any form of
21 discrimination or retaliation --
22 A. Uh-huh.
23 Q. -- my question to you is: Do you ever think
24 there were things that you could have done
25 differently?

Page 206

1 A. No.
2 MR. JENNINGS: Objection to form.
3 THE WITNESS: There was nothing I could
4 have done differently. If people are in charge of
5 you -- and this is not a secret to the rest of the
6 world -- they want a drone. They want somebody that's
7 going to be not as qualified as they are, not to put
8 in any ideas or be creative or anything like that.
9 First of all, with Elizabeth Bien I was
10 not hired full time at that time. I was in a
11 probationary period. And so the job was not really
12 clear cut what it was. But I just will say that, you
13 know, when your husband has a multi-million dollar
14 grant at the University of Pennsylvania and they hand
15 you a $100,000 job and the people that are working for
16 you are just "yessing" you to death, that's just the
17 way that it was.
18 And did I run into two people like this
19 in a row? Yeah, I did.
20 BY MS. KIVITZ:
21 Q. But let me ask you this, Ms. Rosetsky: If you
22 feel that a supervisor wants a drone in a position and
23 doesn't want any creativity or things of that nature,
24 why would you ever apply for any position in which
25 you're an assistant?

Page 207

1 A. That's a ridiculous question because a job
2 description is never, you know, going to be completely
3 what you're going to be doing. How did I know, when I
4 came in there, that I'm not going to be doing what the
5 job description is? I mean, the job description was
6 what I looked at.
7 Just because it's called an
8 "assistant" -- I mean, look at a nurse practitioner.
9 What are you? You're a nurse. So, you know, you're
10 still going to get paid less and be pushed around by
11 the doctors. Why do you take the job? Because there
12 are other aspects of the job that you hope it will end
13 up being okay. That is not what happened.
14 They are not the only people that
15 discriminated against you. When I go in even now, you
16 know, they talk to me on the phone, and they say I'm
17 qualified. You know, I'm not saying that I don't get
18 hired because, you know, I come in and they see a
19 fifty-year-old woman.
20 I mean, I don't know if Kathy is unique,
21 you know, what she did. I'm sure she isn't. That's
22 why we have E.E.O.C. laws. Did she do it? Yeah,
23 there's no question that she did it. Did she do it to
24 other people? I don't think there's any question that
25 she did it to other people either, that she keeps

Page 208

1 people in a position, you know, according to age and
2 who's easier to manipulate.
3 So there's no question. Why did I take
4 the job? I needed a job just like you have a job.
5 That's a ridiculous question.
6 Q. What I'm asking you, though, Ms. Rosetsky, is
7 don't you also see a pattern of your being
8 terminated --
9 A. No.
10 Q. -- for not getting --
11 A. No.
12 Q. -- along with people?
13 A. No. I see a pattern --
14 MR. JENNINGS: Objection to form.
15 THE WITNESS: I see a pattern of society
16 where they discriminate against people for age, and
17 that's why we have E.E.O.C. laws. That's what I see.
18 BY MS. KIVITZ:
19 Q. But I'm asking you if you think it's
20 coincidental that --
21 A. Two times don't make a pattern. So you need
22 to go back and review your statistics. Okay?
23 Q. Okay. But you've also referenced problems
24 that you had at Wistar and problems --
25 A. I didn't have problems at Wistar.

Page 205 - Page 208

Page 209

1   Q.   -- you had at the National Board.
2   A.   I had no problems at Wistar.  Go review my
3   personnel records.  They had no problems.  Actually I
4   was promoted.  If you'll look, I started out as an
5   Editorial Assistant, and I was promoted to Assistant
6   Manager.  And then I was the Executive Assistant to
7   the Associate Director.  I was promoted in there; so I
8   don't know what you're talking about.
9   Q.   Okay.  The only thing I'm asking you is if you
10  ever question whether your own behavior and
11  intolerance of some of the people you worked
12  with --
13  A.   No.  I never questioned --
14  Q.   -- was a factor in your termination?
15           MR. JENNINGS: Objection to form.
16           THE WITNESS: I was never intolerant of
17  people, and I was really nice to everyone.  It's Kathy
18  that had the executive coach, not me.
19  BY MS. KIVITZ:
20  Q.   Okay.  I'm going to move on.
21           MR. JENNINGS: Let's take a little
22  break.  Five, ten minutes.
23           MS. KIVITZ: Okay.
24           (Brief recess.)
25           MS. KIVITZ: I just want to put on the

Page 210

1   record that an issue arose, while the witness was
2   still under oath, that we raised with Counsel
3   concerning a thumb drive.  And I wanted to come in and
4   ask questions without the witness being prepared
5   pursuant to the Hall case as well as the Federal
6   Rules.
7           Mr. Jennings walked the witness outside
8   of the conference room and outside of the office in
9   order to have a conference with her, and I want that
10  clear so that there is a record of it.  It was
11  before -- it was in the middle of questioning and
12  before we were about to question concerning what we
13  had discussed during the break.
14           MR. JENNINGS: And just for the record,
15  there was no question pending, and obviously the Hall
16  decision only affects discussions of substantive
17  testimony at a deposition.  It's also a fairly old
18  decision.  It is not really binding in terms of
19  precedent.  And the Federal Rules do not address the
20  issue of discussions between counsel and a deponent
21  concerning nonsubstantive testimony.
22           So you can proceed with questioning.
23           MS. KIVITZ: I just want to say that the
24  Federal Rules memorialize the principles that were
25  enunciated in the Hall decision.  And they're

Page 211

1   memorialized in the Federal Rules of Civil Procedure.
2           MR. JENNINGS: And the Hall decision
3   does not apply in this case.
4           THE WITNESS: It's getting warm in here.
5           MS. KIVITZ: There was going to be a
6   question pending of which Counsel was aware.
7           MR. JENNINGS: And may I also say for
8   the record that in a break Defense Counsel addressed
9   two issues with me, one concerning a HIPAA Release and
10  one concerning a return of documents or a file on a
11  flash drive.
12           I told Counsel I would speak to my
13  client about it, and they refused to give me the
14  opportunity to discuss the issues which they arose.
15           MS. KIVITZ: Because there was an issue
16  with a --
17           MR. JENNINGS: Excuse me.  I have not
18  finished.
19           If Counsel wished to ask those
20  questions, they could very well have waited until --
21  to address them with me.
22           You can go ahead and question --
23           MS. KIVITZ: Because there was an issue
24  concerning a violation of confidentiality concerning
25  the National Board's materials, we felt that it was

Page 212

1   important enough to proceed without any separate
2   guidance for the witness.  And because of that, we
3   believe very strongly that the Federal Rules have been
4   violated as well as the principles enunciated in the
5   Hall decision.
6           MR. JENNINGS: And if Counsel feels that
7   strongly, I encourage her to file a motion.
8           THE WITNESS: Kathy knew I took this
9   stuff home.
10          MR. JENNINGS: There's no question
11  pending, Diane.
12          THE WITNESS: Okay.
13  BY MS. KIVITZ:
14  Q.   My question, Ms. Rosetsky, is:  Once you left
15  the National Board, you still have that thumb drive.
16  Am I correct?
17  A.   It's my thumb drive.  Yes.
18  Q.   Okay.  And what is on the thumb drive?
19  A.   A lot of things:  music, documents of my own,
20  letters, pictures of my children, different things.
21  Q.   Okay.  What from the National Board of Medical
22  Examiners?  What materials are on the thumb drive?
23  A.   To be honest with you, I don't even know if
24  it's still on there.  How's that?  I mean, it was on
25  there at one time.  I haven't looked at it for a

Page 213

1  really long time.  So, you know, it's got some things
2  on it, a lot of pictures.
3  Q.   All right.  We are --
4  A.   To be honest with you, I probably have a copy
5  of it.  No one's ever seen it.  I haven't tried to
6  sell it.  I haven't done anything with it.  It's just
7  there.  There was no intention to do anything with it.
8  I'm not making any money off of it, and nobody's seen
9  it but me.
10         I doesn't mean anything to anybody but
11  me.  And, you know, it's just there because it's on my
12  hard drive probably on my laptop, and that's it.
13         MS. KIVITZ:  Okay.  We are asking -- and
14  there's no way we can now know this for sure,
15  Mr. Jennings, because the testimony has been diluted
16  by the conference in the interim.  But we are asking
17  that the thumb drive be submitted to you in exactly
18  the status it is now.
19         And if it becomes an issue at to whether
20  Judge Del Sole needs to take a look at other materials
21  on it that may or may not be redacted, so be it.  But
22  we're asking that it not be deleted and that it be
23  made in -- whatever is on it now be maintained, not
24  deleted, not altered in any way, and made available.
25         MR. JENNINGS:  Can we go off the record

Page 214

1  for a second?
2         MS. KIVITZ:  No, we can't.
3         MR. JENNINGS:  Okay.  Do you have a
4  computer here she can plug it into?
5         MS. KIVITZ:  Yeah.  Sure.
6         MR. JENNINGS:  Fine.  Give us a
7  computer.  Let us sit.  She will transfer the file to
8  a computer of your choice.  Obviously I'm not going to
9  let you watch her transfer the file.  I will be there,
10  as an officer of the court, to make sure the file is
11  not modified in any way.
12         MS. KIVITZ:  I'd rather it be the Court.
13  That's my concern.
14         THE WITNESS:  You're making a big deal
15  over obsolete slides that they used to teach
16  physicians how to write questions.  There is nothing
17  confidential within this database, nothing.  I'm not
18  using it to sell it.  The while thing --
19         MR. JENNINGS:  Diane?  Diane?  There is
20  no question pending.
21         And, Counsel, if you have an issue, you
22  can address it with me unless you have a specific
23  question.
24         THE WITNESS:  It's a waste of time --
25         MR. JENNINGS:  Diane?  Diane?  I'm

Page 215

1  instructing you not to --
2         MS. KIVITZ:  If the thumb drive is here
3  and available, what I'd rather is that we put an
4  agreement -- we make a stipulation on the record, we
5  keep it --
6         Wait.  Just listen.
7         -- that we agree not to review it absent
8  the Court intervening or being present, that you
9  obviously agree not to review it, that it remain
10  intact, and we all stipulate to that.  And
11  Judge Del Sole can enter it as an Order.
12         But then we can see what's on it that is
13  relevant to the National Board of Medical Examiners
14  without any tampering by anyone.
15         MR. JENNINGS:  She's testified as to
16  what may or may not be on it.  And I am telling you
17  that, if you give me access to a computer in this
18  office right now, she will transfer any and all files
19  relevant to the National Board of Medical Examiners to
20  that computer and then delete them from the flash
21  drive.
22         THE WITNESS:  Can I ask her a question?
23         MR. JENNINGS:  No.
24         MS. KIVITZ:  How long would it take?
25         MR. JENNINGS:  It's a flash drive.  Very

Page 216

1  little time.  It's a U.S.B. connection.
2         THE WITNESS:  If I have it on there, I'm
3  not sure.
4  BY MS. KIVITZ:
5  Q.   How long would it take?
6  A.   Not long.
7         MR. JENNINGS:  Couple minutes.
8         THE WITNESS:  If it lets me.  Do you
9  have Microsoft Access on your computer?
10         MS. KIVITZ:  Yes.
11         THE WITNESS:  Do you have Office
12  Professional?
13         MS. KIVITZ:  Yes.
14         THE WITNESS:  It might let me.  I don't
15  know.  Sometimes, because of the security on it, it
16  doesn't let you copy it.  I could try.
17         MS. KIVITZ:  Yeah.  I would say let's
18  finish the questioning.  We'll give it a shot.  If
19  not, we can put something on the record.
20         MR. JENNINGS:  I'll state for the
21  record, if that does not work, Ms. Rosetsky will
22  transfer a copy of the file to me in uncorrupted form.
23  I will immediately transfer it to you in uncorrupted
24  form.  And upon signal from you, she will delete it
25  from her computer and from any other drive it is

Page 217

1  sitting on.
2       MS. KIVITZ: The device is here today;
3  correct?
4       MR. JENNINGS: She's not sure.
5  BY MS. KIVITZ:
6  Q.   The device itself -- is that here today?
7  A.   I have a thumb drive with me, but I'm not sure
8  what's on it. I had it at one point on there.
9  Q.   Right.
10      MS. KIVITZ: So we could also agree, if
11 it's not transferable, that the device itself --
12 nobody transfers it to anything. We simply have the
13 device for now, and then when we need to play it, we
14 can do it with the Court being privy to it, if
15 necessary.
16      MR. JENNINGS: No, we're not agreeing to
17 give you the thumb drive.
18      THE WITNESS: You can't have my thumb
19 drive. It's got other personal things on it.
20      MR. JENNINGS: Diane? Diane? Unless
21 there's a question pending --
22      THE WITNESS: Okay. Sorry.
23      MS. KIVITZ: I mean, here's my problem.
24      MR. JENNINGS: Apparently you don't
25 trust me with the thumb drive. Why should I trust you

Page 218

1  with the thumb drive?
2       MS. KIVITZ: Because what I'm saying is
3  we would put a stipulation on the record punishable by
4  contempt and sanctions.
5       MR. JENNINGS: Fine. I'll take the
6  thumb drive.
7       THE WITNESS: Okay. You need to turn
8  down the air conditioner now because there's no air in
9  there. I'm getting really hot, and I'm menopausal.
10 Would you turn down the air a little bit? There's no
11 air in here. You guys are producing too much hot air.
12      MR. JENNINGS: I'll take the thumb
13 drive. I'm not going to stipulate that you get it.
14 If you do not trust me with the thumb drive, you know,
15 you can explain to Judge Del Sole why you don't trust
16 me with the thumb drive.
17      MS. KIVITZ: I mean, my problem is I
18 wanted to go on the record with this issue, and you
19 insisted on conferencing contrary to the Federal
20 Rules. So I have lost some modicum of trust.
21      MR. JENNINGS: I did absolutely nothing
22 contrary to the Federal Rules.
23      MS. KIVITZ: You did. And now --
24      MR. JENNINGS: I did absolutely nothing
25 contrary to the Federal Rules.

Page 219

1       MS. KIVITZ: All right. We will --
2       MR. JENNINGS: Point to the specific
3  section of any rule that I violated.
4       MS. KIVITZ: All right. We will see if
5  the thumb drive can be transferred onto a computer at
6  the close of the deposition. I want to move on.
7       MR. JENNINGS: Go ahead.
8  BY MS. KIVITZ:
9  Q.   All right. Ms. Rosetsky --
10 A.   Yes.
11      MS. KIVITZ: I'm going to ask that this
12 be marked as the next exhibit (indicating).
13      THE WITNESS: Call me "Diane."
14      (Whereupon the Reporter marked an e-mail
15 dated November 22, 2006, to Kathy Holtzman from Diane
16 Rosetsky as Exhibit No. D-18 for identification.)
17 BY MS. KIVITZ:
18 Q.   Would you take a look at that, please?
19 A.   Yes. (Complying.)
20      Okay.
21 Q.   Do you recall drafting that e-mail to Kathy
22 Holtzman?
23 A.   Yes.
24 Q.   Okay. And that e-mail followed your year-end
25 evaluation?

Page 220

1  A.   Yes.
2  Q.   Okay. And you attached to that the role
3  profile title that you had drafted and published?
4       MR. JENNINGS: Objection to form.
5       THE WITNESS: Because Kathy brought the
6  wrong one. There was actually one with a similar
7  title, but it was not in her department. So that's
8  what that meant. She brought the wrong one.
9  BY MS. KIVITZ:
10 Q.   Okay. Do you remember what she did bring?
11 what it was called?
12 A.   You know what? I have it at home. I might
13 have it with me. It would take me a while to find it.
14 It was actually a Program Assistant, Test Development
15 Program Assistant for Test Services, I think, or, you
16 know, Test Services where they actually go out to the
17 site, I think.
18 Q.   Okay.
19 A.   You know, that reminds me. Yeah, there was
20 something that was almost the exact title, and Kathy
21 brought it down, and then I told her that was not it.
22 Q.   Okay. And am I correct also that on the role
23 profile that you did draft in terms of the various
24 factors where it said "Responsibility for People and
25 Performance," there was none? Is that correct? If

Page 221

1  you go to 5.1?
2  A.    There were none.
3  Q.    Okay.  And then same thing under 6.2,
4  "Supervisory/Management Responsibility"?
5  A.    None.
6  Q.    Okay.  So is it safe to say that you knew from
7  the beginning yours was not a managerial or
8  supervisory position?
9  A.    Yes.
10  Q.    Okay.  Now, you said to Kathy Holtzman in this
11  e-mail:
12          "I am not going to complete any further
13      work on the databases."
14          MR. JENNINGS:  Objection to form.
15          THE WITNESS:  Well, it's out of context.
16  BY MS. KIVITZ:
17  Q.    Okay.  Why don't you in your own words tell me
18  what you said and what you meant?
19  A.    When I went to my review, Kathy was -- let me
20  see how to put this.  When I went down to the review,
21  Kathy both said that my databases were taking me too
22  long to build and she didn't know how good they were.
23  But on the other hand -- and that's what most of the
24  negative feedback was on my review.  And then after
25  the review, she tells me that she wants me to build

Page 222

1  another database.
2          And also in front of Barbara Davidson
3  during that review, she said, "I didn't hire you to
4  build databases."  So here she didn't hire me -- I
5  wasn't being paid an IT scale.  She criticized the
6  databases with having absolutely no idea anything
7  about what databases are or how they're constructed.
8          And so I told her, "At this point, you
9  know, you're telling me I wasn't hired to do it.  You
10  tell me I don't know what I'm doing.  It's taking me
11  so long.  So I'm not going to do it anymore, you know,
12  unless you move me into another position and pay me
13  what other people are being paid to do this.  You
14  know, I'm being discriminated against here."
15  Q.    Okay.
16  A.    That's what I meant.
17  Q.    Okay.  Now, you also said to her:
18          "This will avoid another poor
19      performance rating for me in the future as you
20      lack the qualifications to evaluate my skills
21      in this area."
22  A.    Yes.
23  Q.    What did you mean by -- strike that.
24          You knew that Ms. Holtzman was your
25  direct supervisor; correct?

Page 223

1  A.    Yes.
2  Q.    And she was your only direct supervisor;
3  correct?
4  A.    No.  I think Dave was supposed to be also, but
5  I'm not sure.
6  Q.    Well, we went to your -- the allegation in
7  your Complaint before, and you've told me that you
8  alleged that Kathy Holtzman was your only direct
9  supervisor.
10  A.    She is.  She doesn't let Dave say anything.
11  Q.    And that was true in the Complaint?
12  A.    I guess.
13  Q.    Okay.  So you knew she was your supervisor.
14  What did you mean saying to your boss, "...you lack
15  the qualification to evaluate my skills in this area"?
16  A.    Exactly that.  She doesn't know anything about
17  IT.  She could barely use Microsoft Word.  So she was
18  trying to evaluate something.  She's telling me that I
19  took too long.  I couldn't even get her to look at it.
20  I sent her e-mails.
21          I said, "Why don't you please give me
22  some feedback on this database and see if I'm going in
23  the right direction with it."
24          She said, "You're going to need to sit
25  down with me and go over it.  I don't know how to work

Page 224

1  it."  You know, she was very intimidated by it.  I did
2  this a couple times.  And then in the end, when she
3  wanted to retaliate against me, all of a sudden she's
4  a database expert.  You know, she's telling me --
5          I told her -- you know, I said to her
6  verbally, "Why don't you involve Debbie Brown in
7  this?  She's the only expert on Microsoft Access in
8  this building that I know."  There might be some
9  others.
10          But, you know, she had no -- everything
11  that she wrote on my evaluation she had no idea what
12  she was talking about:  how long it took, what was
13  involved with it, you know, the scope of what it could
14  do.  She just was all in retaliation.
15  Q.    Okay.
16  A.    So that's what I meant.  She was unqualified.
17  It's like if I asked you to translate something from
18  Chinese.  Could you do it?
19  Q.    Okay.  But if Kathy Holtzman was your only
20  boss, who did you expect to evaluate you?
21  A.    To evaluate my databases?
22  Q.    Your work.
23  A.    Dave.  Dave had -- you know, Dave loved the
24  databases that I built.  He was just afraid of Kathy.
25  Dave could have had input with this, but --

Page 225

1  Q.    Understand my question. You've alleged in
2  your Complaint that the only person you reported to
3  was Kathy Holtzman, your direct supervisor. Who did
4  you expect to evaluate your work?
5         MR. JENNINGS: Objection. Asked and
6  answered.
7         THE WITNESS: Yeah. I mean --
8         MR. JENNINGS: You can answer it one
9  more time.
10        THE WITNESS: You know, sometimes when
11 you are at a job and you're doing things for someone,
12 like --
13        Let me give you an example.
14        -- someone that's managing a project,
15 you have people working for you, and you don't
16 necessarily know all the applications as well as the
17 people that work for you know them.
18        You can do, like, a mock-up or a story
19 board of what you want and what you want the database
20 to do, but you don't know how to build that database.
21 So Kathy didn't know at that level -- she knew kind of
22 what the database was going to do. It was going to
23 catalog her slides.
24        As far as how long it took to build and
25 how it was working, she never got involved with it.

Page 226

1  And she had no skills to evaluate it. I mean, it's,
2  like, you can't know everything. You have to have
3  people working for you.
4         But don't criticize my work, without
5  going to someone that does know what I'm doing, and
6  give me a poor review just to retaliate against me
7  because I went to HR. I mean, she had no way -- like
8  I said, can you translate Chinese? No. But you could
9  hire somebody to help you with a Chinese client.
10 Q.    Okay. But then you said to her:
11        "If you want me to continue my work for
12 you, I expect to be compensated" --
13 A.    Right.
14 Q.    -- "at a salary of at least $60,000."
15        Correct?
16 A.    Right.
17        MR. JENNINGS: Objection to form.
18 BY MS. KIVITZ:
19 Q.    Now, you were aware that at least the base on
20 your position before any increase or other issue was
21 $50,000; correct?
22 A.    I don't know what the base is. There's
23 actually a chart on line where you can see where it
24 goes from here to here. I mean, I don't really --
25 Q.    Okay. Well, your starting salary had been

Page 227

1  what?
2  A.    Twenty-seven-and-something cents an hour.
3  Q.    Okay. And annually that was roughly $50,000;
4  correct?
5  A.    Roughly?
6  Q.    I think it was.
7  A.    Yeah.
8  Q.    I think I've seen something that it was
9  50,000.
10 A.    Roughly.
11 Q.    Okay. So, in effect, you were basically
12 saying, "I won't do this job for 50,000. If you want
13 me to do it, pay me 60,000"; correct?
14        MR. JENNINGS: Objection to form.
15        THE WITNESS: I asked for a promotion,
16 and that's what I was referring to.
17 BY MS. KIVITZ:
18 Q.    Okay. But it was more than asking --
19 A.    She took away my raise because I went down to
20 HR to complain. And what she used against me was what
21 I had taken home, worked on overtime for her, and
22 broken my back to do. And then she used it against
23 me. So whatever I said I meant. If she wanted me to
24 continue working in this manner, she had to stop
25 discriminating against me in the manner she was.

Page 228

1  Q.    Okay. But I just want to be clear. What this
2  read -- and you said, "I mean what I said," and I
3  agree with that.
4  A.    I'm not here for the termination. I'm here
5  because I was not promoted and because I was
6  retaliated against terribly. For the last amount of
7  time I was there, it was awful. That's what I'm here
8  for. Whether or not I decided --
9  Q.    What do you mean you're not here for the
10 termination?
11 A.    Well, you know, I was terminated, and they're
12 saying that I refused to do my job. I asked for
13 another position in there, not only for a promotion.
14 I said, "Can you just move me to another department?"
15 because they knew how difficult she was being.
16        They said, "We can't do that," although
17 they had done it before for other people. And that's
18 what I'm here for. I was not promoted because I was
19 older. That's what I'm here for. And I was
20 retaliated against when I complained about that.
21 Q.    Okay. But when you say you're not here for
22 the termination, are you saying, "I agree they should
23 have terminated me based on this e-mail"?
24 A.    No, I'm not saying that at all.
25 Q.    Okay. Well, then what do you mean you're not

Page 229

1 here for the termination?
2 A.  Because my primary complaint was that -- what
3 started this whole thing was that she promoted other
4 people, would not promote me, was not giving me the
5 respect or, you know, the work that was in my job
6 description.
7        She was trying to keep me and the other
8 old ladies in line.  And when I went down to
9 complain -- and I was not the only one to complain
10 about this -- she started doing all kinds of things to
11 me.  And I had the e-mail that I sent to you what she
12 was doing.
13 Q.   Okay.  But I still don't understand what you
14 mean by "I am not here because of the termination."
15 What do you mean by that?
16 A.   Well, my main complaint is that she
17 discriminated against me for the promotion and that
18 after that her retaliation was that she got me fired.
19 Q.   But you said to me -- I'm still trying to
20 understand what you meant by "I'm not here because of
21 the termination.  I'm here because of other things."
22 A.   Well, what started it was the discrimination,
23 not being promoted, and the retaliation.  So I guess,
24 you know, I misspoke if the termination is part of the
25 retaliation.

Page 230

1 Q.   Okay.  Now, you said to her in this e-mail:
2        "If you would like me to continue my
3        innovative work, I expect to be compensated
4        for this level of performance."
5 A.   Right.
6 Q.   "This would require a change to an information
7 technology type-title at a salary of at least
8 $60,000."
9 A.   Right.
10 Q.   "If not, I am sure that Technology Services
11 could build you anything you need."
12 A.   Right.
13 Q.   Okay.  Didn't you feel that you were inviting
14 the National Board to terminate you and have
15 Technology Services build them whatever they needed?
16        MR. JENNINGS:  Objection to form.
17        THE WITNESS:  She had already decided to
18 fire me.  Barbara, you know, made that clear.
19 BY MS. KIVITZ:
20 Q.   Well, you had just received a modest promotion
21 at your evaluation, had you not?
22 A.   No.  Where did you get that from?
23 Q.   Well, you were deemed satisfactory, and you
24 were going to receive a 2 percent increase in your
25 salary, were you not?

Page 231

1        MR. JENNINGS:  Objection to form.
2        THE WITNESS:  No.  That's a lie.  First
3 of all --
4 BY MS. KIVITZ:
5 Q.   Well, you think it was 1 percent.
6 A.   I was told by Barbara Davidson that it was
7 1 percent.  And do you consider that a promotion?
8 That's a slap in the face when everybody else is
9 getting, you know, 8 and 10 percent.  How dare you.
10 Q.   Well, my information is 2 percent.
11        But I'm saying the day before or a short
12 time before you wrote this e-mail, you had been
13 advised that you would be receiving a raise, had you
14 not?
15 A.   No, I was not.  No.
16 Q.   But you knew with the satisfactory evaluation
17 it would be accompanied by a modest raise, did you
18 not?
19        MR. JENNINGS:  Objection to form.
20 BY MS. KIVITZ:
21 Q.   You've testified to that.
22        MR. JENNINGS:  Objection to form.
23        THE WITNESS:  1 percent to me is not a
24 raise.  You figure it out.
25 BY MS. KIVITZ:

Page 232

1 Q.   Is 1 percent more than zero percent?
2 A.   You need to look at this in context in the
3 comparison of what she was doing.  This is 200 percent
4 retaliation.  She knew it.  She did it intentionally.
5 There's no one else -- you show me someone else that
6 got 1 percent in there.
7 Q.   Okay.  Is 2 percent more than 1 percent?
8        MR. JENNINGS:  Objection to form.
9        THE WITNESS:  It's nonsense.  I'm not
10 going to answer it
11 BY MS. KIVITZ:
12 Q.   Okay.  Do you know what 2 percent of
13 50,000 is?
14 A.   2 percent of 50,000?
15        MR. JENNINGS:  Objection to form.
16        THE WITNESS:  Yes.
17 BY MS. KIVITZ:
18 Q.   What is it?
19 A.   $1,000.
20        MR. JENNINGS:  You can do the math.
21        THE WITNESS:  1,000 divided by three
22 hundred fifty-six days a year.  How much would that
23 give me?
24 BY MS. KIVITZ:
25 Q.   Okay.  So --

Page 233

1 A. Fifty cents a day more. Thank you.
2 Q. So you wrote this the day after you knew you
3 would be receiving a $1,000 annual increase?
4 MR. JENNINGS: Objection to form.
5 THE WITNESS: No.
6 BY MS. KIVITZ:
7 Q. Well, when did you write it?
8 A. Didn't I write it the same day?
9 Q. Okay. I'm sorry. You wrote this the same day
10 then that you knew you were receiving a $1,000 annual
11 increase?
12 A. Well, I'll tell you what. If the jury thinks
13 that out of 10 percent I got a 1 percent --
14 MR. JENNINGS: Diane? Diane? Please
15 just answer the question.
16 THE WITNESS: I don't consider that an
17 increase. Okay? That was done in retaliation after I
18 worked overtime, was not paid for it, never was late,
19 hardly out at all, did all of my work perfectly. This
20 whole thing was in retaliation, and I would swear on a
21 stack of Bibles and on the lives of my children that
22 this is what this woman did. Okay?
23 BY MS. KIVITZ:
24 Q. Okay. But, Ms. Rosetsky, didn't you, when you
25 wrote this e-mail, really tell your supervisor you

Page 234

1 weren't going to do this work anymore?
2 A. I was not going to do the work that she gave
3 me a negative review for. Yes. She was criticizing
4 me. And I think anybody else that saw this clearly
5 what happened where I was criticized by an English
6 person that doesn't speak Chinese for my Chinese, you
7 know, diction --
8 Q. Okay.
9 A. You know, it was ridiculous. The whole thing
10 was in retaliation. And for me to have to keep
11 repeating myself --
12 Q. Okay.
13 A. It's retaliation. That's all.
14 Q. Now, the database work that you were doing was
15 part of your role profile; correct?
16 A. Yes.
17 Q. Okay. So wasn't this a way of saying, "I'm
18 not going to work on the database anymore, plus I'm
19 not going to do clerical work for you either"? I
20 mean, didn't you really say both things?
21 MR. JENNINGS: Objection to form.
22 THE WITNESS: Actually she told me, when
23 I was in HR that same day, that I was not hired to do
24 databases. She said it in front of Barbara Davidson.
25 So after she said that, I said, "If you want me to do

Page 235

1 databases, pay me on an IT scale, and I'll do it."
2 BY MS. KIVITZ:
3 Q. Okay. But I'm just looking at your words.
4 A. You're going to have to ask her why she said I
5 was not hired to do databases, that I was taking too
6 long, and whatever else. I wish you would pull out
7 the -- her criticism of me. You know, why don't you
8 pull that out and read that because that's really
9 helpful what she did.
10 A woman that knows nothing about what I
11 was doing decided that I wasn't doing it right but
12 that she still wanted me to do it but for, you know,
13 a fraction of what the other people were doing it for.
14 Q. Okay. But --
15 A. And that's all I'm going to say about it. And
16 I think I've made myself really clear.
17 Q. Well, I appreciate your clarity, but I just
18 want to understand this.
19 A. You understand it. I'm finished.
20 Q. Excuse me?
21 A. I'm finished with that question.
22 Q. Okay. I'll ask you another one. That's my
23 job at a deposition. You understand that?
24 A. Okay.
25 MR. JENNINGS: Well, Counsel, please do

Page 236

1 not argue with my client. You may ask her questions.
2 You may not argue with her.
3 MS. KIVITZ: Mr. Jennings, I think I've
4 been rather patient under the circumstances.
5 MR. JENNINGS: That does not give you --
6 please do not argue with my client.
7 BY MS. KIVITZ:
8 Q. Ms. Rosetsky, you were looking for other
9 employment throughout the time that you worked at the
10 National Board, were you not?
11 MR. JENNINGS: Objection to form.
12 THE WITNESS: Once in a while I sent out
13 resumes towards the end.
14 MR. JENNINGS: My objection is the word
15 "throughout" is vague. It implies she was looking for
16 work since day one. If you'd like to clarify a
17 specific time frame, I'll remove the objection.
18 THE WITNESS: I had resumes that were
19 still pending from other places.
20 BY MS. KIVITZ:
21 Q. Okay. Where were some of the places you were
22 looking?
23 A. A majority of them were University of
24 Pennsylvania.
25 Q. Okay. Now, you had been terminated from the

Condensit!

## Page 237

1  University of Pennsylvania just the summer before;
2  correct?
3  A.   Yes.  And my supervisor told me to -- "You may
4  look for other jobs at Penn."
5  Q.   Okay.  But did you think it might be more
6  fruitful to look other places also where you had not
7  been previously terminated?
8  A.   No.  It didn't matter because there's so many
9  different Human Resource Departments there and
10  different colleges.  It's very dispersed.
11  Q.   Okay.
12  A.   And I had a recommendation from her.  So, you
13  know....
14  Q.   Where were some of the other places you
15  looked?
16  A.   Drexel, drug companies, all different places.
17  Q.   Okay.  When did you decide that you did not
18  want to stay at the National Board?  What month would
19  you say?
20  A.   October.
21  Q.   Of what year?
22  A.   Let's say it was about October when she
23  just -- you know, she just really started getting out
24  of hand.
25  Q.   Okay.  Isn't it true that you actually began

## Page 238

1  looking much earlier than October for another
2  position?
3  A.   No, not really.  I think most people send out
4  sporadic resumes, just fishing.
5        MS. KIVITZ:  Do you want to mark that
6  (indicating).
7        (Whereupon the Reporter marked e-mails
8  dated June 6 and June 21, 2006, between Diane Rosetsky
9  and Temple and Drexel as Exhibit No. D-19 for
10  identification.)
11  BY MS. KIVITZ:
12  Q.   All right.  I'm showing you an e-mail sent out
13  June 6 -- a couple of them, and then another one sent
14  June 21.  Do you see those?
15  A.   Right.
16  Q.   Can you tell me what they are?
17  A.   They are from a doctor at Penn.
18  Q.   Who is a doctor at Penn?
19  A.   No, she's not.  She's a Director of Finance at
20  Penn, Marie Nanashee.
21  Q.   Right.  Is it Penn, or is it Drexel?
22  A.   This is Penn or Drexel?  Oh, it's Drexel.
23  Okay.
24  Q.   All right.  So is it correct that you had
25  applied for a position with Drexel back in June, 2006?

## Page 239

1  A.   I may have applied even before that.  I mean,
2  it could have just been in their database.
3  Q.   Okay.  And you had an interview --
4  A.   Uh-huh.
5  Q.   -- in June?
6        MR. JENNINGS:  Is that "yes"?
7        THE WITNESS:  Yes.
8  BY MS. KIVITZ:
9  Q.   Okay.  And that was during a period of time,
10  at least that you've indicated, you were not unhappy
11  at the National Board?
12        MR. JENNINGS:  Objection to form.
13        THE WITNESS:  I did not indicate that.
14  BY MS. KIVITZ:
15  Q.   Okay.
16  A.   You asked me when did I decide to start
17  looking for other jobs?
18  Q.   Right.  You told me October.
19  A.   Yeah, generally.  But I still sent out some
20  other resumes.  I didn't say I didn't.
21  Q.   Okay.
22  A.   Well, this one actually probably was really
23  old.  It may have been from the September before.
24  Sometimes it takes them six months to get to you.
25  Q.   Okay.

## Page 240

1  A.   And I'm thinking that's what happened here
2  because it says I needed to attach an updated resume
3  because it was old and outdated.
4  Q.   All right.  But you --
5  A.   This is from before I worked at the Board.
6  Q.   All right.  But you accepted the interview;
7  correct?
8  A.   Yes.
9  Q.   Okay.  And you had a job interview on June 6?
10  A.   Uh-huh.  Yes.
11  Q.   Okay.  Now, could you look at the next page?
12  A.   Yes.
13  Q.   This was a Temple position?
14  A.   Uh-huh.
15        MR. JENNINGS:  Is that "yes"?
16        THE WITNESS:  Yes.
17  BY MS. KIVITZ:
18  Q.   And is that also a position you applied for?
19  A.   Yes.  But it was probably a long time ago
20  because they're asking for an updated resume.
21  Q.   All right.  And that was also in June of 2006?
22  A.   Yes.  And I never went to any interviews at
23  Temple.
24  Q.   Okay.
25        MS. KIVITZ:  And then I guess we'll mark

Page 241

1   this the next exhibit (indicating).
2          (Whereupon the Reporter marked an e-mail
3   dated August 22, 2006, to HospitalMedicine.org from
4   Diane Rosetsky as Exhibit No. D-20 for
5   identification.)
6   BY MS. KIVITZ:
7   Q.   Can you tell me what that is?
8   A.   Actually I'm not really sure where this is
9   from.  "HospitalMedicine.org."  It could have been a
10  headhunter that contacted me.  I don't know.
11  Q.   All right.  And what date was that?
12  A.   Was this?  August.
13  Q.   Okay.  During the time period that you worked
14  at the National Board, did you ever stop looking for
15  another position that might be --
16  A.   I wasn't actively looking, but, you know, I
17  think that anyone that's not self-employed continually
18  sends out resumes.  I mean, I know most of my friends
19  do that.  I mean, if somebody finds something better,
20  you take it.  If not, you stay where you are.  I
21  didn't know it was against the law.
22  Q.   Now, there also came a time that Kathy
23  Holtzman asked you to start keeping track of your
24  hours?
25  A.   That was after I complained at HR.  She

Page 242

1   started singling me out.
2   Q.   Do you remember when it was that she asked you
3   initially to keep track?
4   A.   Yes.  It was after I went down to complain to
5   HR.  She sent me an e-mail that very day.  "I want to
6   know exactly what you're doing hour to hour.  I want
7   you to start billing your time."  She never asked me
8   to do any of this before.
9   Q.   Okay.  And did there also come a time when she
10  asked you not to discuss your issues with her with
11  other employees in the office?
12  A.   Yes.  And she also said to me, "I don't want
13  you discussing" -- after we came back from HR, she
14  said, "I don't want you discussing these issues with
15  anyone."  And what she was referring to was she didn't
16  want me discussing these issues with HR.  That's what
17  she was talking about.
18  Q.   Okay.  But was there also a time that she
19  asked you specifically not to discuss issues that you
20  and she were having with other employees?
21          MR. JENNINGS: Objection.  Asked and
22  answered.
23          You can answer it once more.
24          THE WITNESS: After we had the meeting
25  and she was called to HR, that's when she said that to

Page 243

1   me.  And I took it as referring to the fact that she
2   didn't want me talking about her to HR.
3   BY MS. KIVITZ:
4   Q.   Okay.  After you had the discussion with her
5   about not talking to other employees, did you stop
6   talking to either Faith Balsama or Debbie Shelmire
7   about your grievances with Kathy Holtzman?
8   A.   Actually I asked Debbie what was going on
9   because she -- Kathy called both Faith and Debbie into
10  her office -- and this was as per Debbie Shelmire --
11  and asked them to sign off and write bad things about
12  me, and they refused.  So I did somewhat talk to them
13  about what was going on.  Kathy tried to get them to
14  write negative things about me, and they both refused.
15  Q.   All right.  Now, I know in November you had
16  forwarded the shooting article to Faith Balsama and
17  Debbie Shelmire.
18  A.   Uh-huh.
19          MR. JENNINGS: Objection to form.
20  BY MS. KIVITZ:
21  Q.   But did you also have other e-mails to either
22  one of them concerning your communications with Kathy
23  Holtzman?
24  A.   Maybe.  I don't remember.
25  Q.   Was it after she specifically asked you not to

Page 244

1   bother other employees with these issues?
2          MR. JENNINGS: Objection to form.
3          THE WITNESS: I don't remember.  If you
4   have e-mails, then you can show them to me.
5   BY MS. KIVITZ:
6   Q.   Okay.
7   A.   Actually as I recall, Faith came up to me and
8   asked me what was going on several times, and so did
9   Debbie.
10  Q.   Was it after a time that Kathy Holtzman had
11  asked you not to speak to other people?
12  A.   Yes.  They came up to me and started asking me
13  questions.
14  Q.   Did you speak to them?
15  A.   I don't remember.
16          Well, obviously I must have said
17  something.  I said, "I just had a meeting.  That's
18  all."
19  Q.   Did you e-mail Faith Balsama?
20          MR. JENNINGS: Objection to form.
21          THE WITNESS: Did I e-mail Faith?
22  Faith, who was spraying the holy water on Kathy's
23  office every time she wasn't there?  This is true.  I
24  don't remember, to tell you the truth.
25  BY MS. KIVITZ:

Page 245

1  Q.   Okay.  Do you remember e-mail communications
2  between you and Faith on November 8, 2006, where Faith
3  told you basically before that, "I'm not on your
4  crusade"?
5  A.   Now she wasn't on my crusade.  Right.
6  Q.   Okay.
7  A.   First she was on my crusade and encouraged me
8  to go down to HR and complain about Kathy.  And all of
9  a sudden when it was raise time, she wasn't on my
10  crusade.
11  Q.   Okay.  And do you remember she -- you wrote to
12  her on November 8 and said, "It's not a crusade.  She
13  was going too far.  Remember she threw my edits in the
14  trash.  She belittled me with copying and sorting"?
15  A.   Right.
16  Q.   "She was disrespectful."
17  A.   Right.
18  Q.   Do you remember that?
19  A.   I don't remember, but it's possible.
20  Q.   Okay.  And do you remember that Faith turned
21  around and said:
22        "You need -- it's like poker.  You need
23        to know when to show them and when to hold
24        them.  Now you're on your way to the OK Corral
25        shoot-out."

Page 246

1  A.   She probably said that because -- actually
2  yes.
3  Q.   You remember that?
4  A.   She did say that, and that really showed her
5  colors a lot, what she was really about.
6  Q.   Okay.  Do you remember your response was:
7        "I kept my mouth shut with an almost
8        identical situation at Penn, and look where
9        that got me.  I had nothing to lose.  Either
10        way she was making this situation very
11        uncomfortable for me."
12  A.   Right.
13  Q.   Okay.  So when you say you kept your "mouth
14  shut with an almost identical situation at Penn," what
15  did you mean there?
16  A.   When I worked for Liz Bien, it was the same
17  thing that happened with the technology.  And, you
18  know, she just figured I was some diaper changer that
19  had come back to work, and she just wanted me to
20  organize her luncheons.  And she became intimidated by
21  the technology and just wanted me to do clerical work
22  and that kind of thing.
23        And I never said anything.  I just went
24  along with it.  And no matter what I did and how much
25  work I did --

Page 247

1        It was like I had the same feeling where
2  I keep taking work home and felt like I was working,
3  working, working.  I was doing her database.
4        -- they didn't care.  All they cared
5  about was -- they didn't care about the quality of
6  work or how the department was.  All they cared about
7  was how it looked for them being in charge and them
8  making the decision and them being the creative ones.
9        And I kept my mouth shut.  It doesn't
10  matter when you keep your mouth shut.  If the person,
11  you know, has made a decision that you're maybe a
12  threat to their position or you're not submissive
13  enough that, you know, something's going to happen.
14  And that's the same feeling I was getting.  Whether or
15  not you are an excellent worker, it doesn't matter.
16  People just don't really seem to care.  Certain
17  people.
18  Q.   Okay.  Now, do you remember when Faith said to
19  you that same day:
20        "Your crusade has gone too far now.  You
21        need to back off and move on.  I think that
22        the damage that's been done is permanent, and
23        I don't want to be involved in this mess"?
24  A.   Uh-huh.
25        MR. JENNINGS:  Is that a "yes"?

Page 248

1        THE WITNESS:  Yes.
2  BY MS. KIVITZ:
3  Q.   Did you stop e-mailing her after that time?
4  A.   I don't remember.  She came over to my desk
5  and was talking to me, and we had a little argument
6  for the first time.  We had actually been really good
7  friends, but, you know, it was, like, you know, what
8  Kathy had done to my predecessors, turning people
9  against them.
10        So, you know, basically people are
11  worried about their salaries especially, like, Debbie
12  and Faith, who don't have any other income.  So you
13  know, they will go where the money is, and that's the
14  way people are, and I'm not.  I'm a very -- you know,
15  I don't know how, but I still haven't lost my ideals,
16  and the rest of the world has.
17  Q.   Okay.  Do you know what Faith meant when she
18  said to you that same day:
19        "You still have your power of free will
20        choice which can influence your destiny"?
21        Do you know what she was referring to?
22  A.   Yes.  That if I wanted to stay there and be an
23  idiot and, like, you know, just be complacent with
24  doing a job that wasn't effective or I was
25  overqualified for, that I would just sell out for the

Page 249

1  money and just stay there for the money. That's what
2  it means to me.
3  Q.    Well, hadn't you sent her first an e-mail that
4  talked about "powerful Mars, the planet of surprises
5  and breakthroughs"? Do you recall that?
6  A.    No. That would be her sending it to me.
7  Faith is a religious fanatic and, like, a
8  spiritualist. So I don't think I sent that.
9          MS. KIVITZ: Do you want to mark this
10 (indicating).
11         THE WITNESS: I'm not superstitious.
12         (Whereupon the Reporter marked e-mails
13 dated November 8, 2006, between Diane Rosetsky and
14 Faith Balsama as Exhibit No. D-21 for identification.)
15         THE WITNESS: Oh, I copied her my
16 horoscope. I didn't write this. This is a cut and
17 paste from a horoscope.
18 BY MS. KIVITZ:
19 Q.    Okay. And what was the reference "powerful
20 Mars"? Was that --
21 A.    I have no idea because I don't understand
22 astrology. I was giving it to her for her to explain
23 it to me. She was into that stuff.
24 Q.    Okay. Didn't you mean by that that you were
25 out there and you were taking on Kathy Holtzman and

Page 250

1  you were going to be powerful?
2          MR. JENNINGS: Objection to form.
3          THE WITNESS: No. I'm true to myself.
4  That's the only one that I'm true to. I'm just being
5  true to my ideals and my beliefs. And I'm a person
6  that doesn't sell out for money like the other two
7  did.
8          They were suffering -- those two people
9  that I worked with. Faith was crying at times often
10 while I was there by the way Kathy treated her and
11 spraying holy water in her office. Debbie was totally
12 depressed. She hated her job. She consistently
13 stated how she wanted to get away from Kathy and how
14 she had applied for other jobs and she couldn't get
15 out of that position.
16         And I said, "You know, did you ever
17 think that it's because we're all older? We're all
18 the same age here. Look at the three of us. We're
19 all in our forties, and we can't get out of this
20 position here."
21         So that's what it meant. I am true to
22 myself.
23 BY MS. KIVITZ:
24 Q.    Okay. Now, you have a friend Renee Brock?
25 A.    Yes.

Page 251

1  Q.    Okay. And she wrote a reference for you?
2  She's an attorney in-house someplace?
3  A.    Yes.
4          MS. KIVITZ: Okay. Would you mark this,
5  please (indicating).
6          (Whereupon the Reporter marked e-mails
7  dated October 24, 2006, between Diane Rosetsky and
8  Renee Brock as Exhibit No. D-22 for identification.)
9  BY MS. KIVITZ:
10 Q.    Let's go to the first one first, the one at
11 8:51 in the morning.
12 A.    Uh-huh.
13 Q.    Can you read that?
14 A.    "Well, will see if they finally drop a house
15        on her."
16 Q.    No, no,no, no. The bottom one first, 8:51.
17 A.    "Well, the shit hit the fan yesterday. 'My
18        boss,'" in quotes, "sent me an e-mail full of
19        crap, and I sent one back about five hundred
20        words that basically I wasn't going to take
21        her derisive comments and condescending
22        assignments anymore."
23 Q.    Okay. First of all, why did you put "boss" in
24 quotes?
25 A.    Why did I put "boss" in quotes?

Page 252

1  Q.    Yes.
2  A.    Because I don't consider someone that acts
3  with the ethics and morals of this person to be really
4  a boss to anyone.
5  Q.    Okay. But she really was your supervisor at
6  the National Board; correct?
7          MR. JENNINGS: Objection. Asked and
8  answered.
9          THE WITNESS: Yes. But she didn't
10 belong being -- you know, she just was not morally and
11 ethically the type of person that should have been in
12 that position. And I didn't like calling her a "boss"
13 because I didn't have any respect left for her the way
14 that she operated.
15 BY MS. KIVITZ:
16 Q.    Okay. Do you want to read the next part?
17 A.    "I had a prescheduled meeting that afternoon,
18        and I walked in and asked if we still had the
19        meeting. She said she really didn't have
20        anything to say and that I should not have
21        used the e-mail to voice my feelings and that
22        I was disrespectful."
23         Yeah. She didn't like e-mail traces.
24 So I was told by Faith to make sure that I use the
25 e-mail when I discuss anything with her so that

Page 253

1  there's a record of it.  And that's what I did.
2  Q.    Okay.  The next line?
3  A.    "Ha!  She then came out and addressed the
4      issue of the database that had taken me six
5      months to build, that I was to work with her
6      assistant and fine tune it.
7          "I never felt so good in my life.  I had
8      nothing left to lose once she said maybe I
9      should start looking for another job.  Hey,
10     I'm not going anywhere.  I spoke to one of the
11     senior management, and they are aware of the
12     problems she is causing here.  There have been
13     many complaints.  I should have done this when
14     I was at Penn.  I just send all my
15     communications with her to HR."
16  Q.    Okay.  So you felt it was a better strategy,
17  when you didn't like your supervisor, to deal with HR
18  rather than the supervisor?
19  A.    I tried to deal with her, and then after that
20  didn't work, I went to HR at Faith's suggestion
21  several times.  "Go to HR."  So I went to HR.
22  Q.    And in second-guessing what happened at Penn,
23  you felt that, instead of dealing directly with
24  Elizabeth Bien, you should have started dealing with
25  HR?

Page 254

1  A.    Right.  Uh-huh.
2  Q.    And when you said, "Hey, I'm not going
3  anywhere," what did you mean by that?
4  A.    That I wasn't going to quit, that I was going
5  to try to stay there and see if I could get another
6  position.
7  Q.    Well, hadn't you already been looking for a
8  job, as you said, on and off for really the full year?
9  A.    Not seriously.  No.  I mean, every job that I
10  ever had I've sent out resumes while I was there.  I
11  think everyone does that unless you own your own law
12  firm, of course.
13  Q.    Okay.  But you had sent out resumes, and you
14  had gone to some interviews; correct?
15  A.    I went to, I think, one interview.
16  Q.    Which one?
17  A.    Drexel.  I'm trying to remember.  I think I
18  had an interview at Drexel.
19  Q.    Did you have any interviews at Penn during --
20  A.    Actually I think I did have an interview -- I
21  think one interview at Penn.
22  Q.    When was that?
23  A.    I don't remember.
24  Q.    Does August sound about right?
25  A.    Maybe.

Page 255

1  Q.    Okay.  Do you remember which department that
2  was?
3  A.    Family Medicine.
4  Q.    Okay.  And you interviewed at Drexel in June?
5  A.    Uh-huh.
6  Q.    Did you interview anywhere else?
7  A.    No.  I don't think so.
8  Q.    Would you have interviewed at Temple if they
9  had offered you an interview?
10       MR. JENNINGS:  Objection to form.
11       THE WITNESS:  Yes.
12  BY MS. KIVITZ:
13  Q.    Okay.  So I'm curious why you said, "I'm not
14  going anywhere," if you actually were looking to
15  leave?
16       MR. JENNINGS:  Objection to form.
17       THE WITNESS:  I don't understand the
18  question.
19  BY MS. KIVITZ:
20  Q.    Well, let me go back and ask you this way:
21  What did you mean by "I have never felt so good in my
22  life"?
23  A.    Because I stood up for myself for someone that
24  I knew was doing something wrong to me and
25  inadvertently would cause problems in my family life.

Page 256

1  And that's it.
2  Q.    Okay.  And you felt so good about it that you
3  told your good friend Renee Brock what you had done;
4  correct?
5  A.    Yes.
6  Q.    Okay.
7  A.    Because I held it in for a while there, what
8  was going on.
9  Q.    Okay.  And she wrote back with some
10  suggestions maybe to work from home and do consulting
11  and things like that?
12  A.    Uh-huh.  Right.
13  Q.    Okay.  And what did you write back to her that
14  same day?  Just the first line.
15  A.    "Well, will see if they finally drop a house
16  on her," and in parentheses, "my boss."
17  Q.    What did you mean by that?
18  A.    Well, it's from the "Wizard of Oz."  When
19  someone's like a witch, you know, the house was
20  dropped on her.  I just meant that finally, after all
21  the complaints and all the people -- four people that
22  had been in my job, that maybe the administration
23  would finally stand up to her.
24  Q.    Okay.  Did you agree with Renee Brock that
25  women are harder to work for than men?  Women

Page 257

1 supervisors?
2 A.   Did I agree with her?  I had never worked for
3 a man; so, you know, I really didn't have any --
4 couldn't give her any input on that.
5 Q.   Well, didn't you work for Dr. Cheston at
6 Wistar?
7 A.   Oh, yeah, I did work for him.
8 Q.   And Kurt Mayer?
9 A.   Yeah.  I forgot that.  That's twenty years
10 ago.  I guess I really didn't take that into account.
11 But, no, I didn't necessarily agree with her.  I
12 just --
13 Q.   Okay.  So your reference to finally dropping a
14 house on her meant that she was a witch, you know; so
15 it was as analogy to "Wizard of Oz," that she was a
16 witch?
17 A.   Yes.
18 Q.   Okay.
19 A.   I didn't call her the "B" word.
20 Q.   Okay.  And you felt good because you had stood
21 up to the witch?
22 A.   I just was going home and feeling terrible
23 about myself, taking it out on my family.  It was not
24 a healthy situation for me to be in, to be treated
25 like this and allow somebody to do it when I was -- I

Page 258

1 felt like I was working, working, and working, and
2 bringing work home and trying to please this woman,
3 and there was no pleasing her.
4 Q.   When Kathy Holtzman asked you to start to give
5 her an idea of the time you were spending on projects
6 at the end of October, '06, how many times do you
7 recall that she wrote to you and asked you to give her
8 back an accounting of your time?
9 A.   Two or three times.
10 Q.   Okay.  Could it have been more than that?
11 A.   It could have been.  I don't remember.
12 Q.   Okay.  How many times did you give her an
13 accounting of your time, if you remember?
14 A.   A couple times, but each time she wasn't happy
15 with it.  It wasn't detailed enough.  That's all I
16 remember of it.  And I said to her, "How come I'm the
17 only one that has to do this?  And all of a sudden
18 after working here all this time and after I
19 complained to HR, all of a sudden you're treating me
20 like this?"
21 Q.   Did Kathy Holtzman have some concern that you
22 were also spending too long on certain projects?
23 A.   No.
24        MR. JENNINGS: Objection to form.
25        THE WITNESS: Not until after I went to

Page 259

1 HR.  As a matter of fact, I tried to get her to look
2 at what I was doing to make sure I was going in the
3 right direction, and she refused to look at it.  She
4 never had time.  And also she was yelling at me that I
5 wasn't allowed to come in her office.  I wasn't
6 allowed to talk to Dave.
7        She yelled at me down the hallway
8 because I was talking to Dave.  She said, "You're not
9 allowed to talk to Dave."  And then after I went to HR
10 and I told them that, all of a sudden I get this
11 e-mail that "And you can go to Dave if you have a
12 problem."
13        But I'm not the only one that she did
14 that to.  She yelled at Faith and Debbie -- Faith that
15 she's not allowed to talk to Dave.  I think she said
16 this to Debbie too.  Anything -- you know, even though
17 he was supposed to be the head of everything, you
18 weren't allowed to talk to Dave, which I don't
19 understand.
20        And Dave used to come out and talk to
21 me, and she used to get pissed off.  There was a rumor
22 going around.
23 BY MS. KIVITZ:
24 Q.   Did Kathy Holtzman ever attempt to improve the
25 working relationship between the two of you?

Page 260

1 A.   Not until I went to HR.
2 Q.   Okay.  Accepting that that's your perception,
3 what did she do after you went to Human Relations to
4 try to improve communications between the two of you?
5        MR. JENNINGS: Objection to form.
6        THE WITNESS: She started harassing me,
7 telling people not to talk to me.  She called Faith
8 and Debbie into her office and tried to get them to
9 write negative things about me.  She started trying to
10 make me -- I wasn't allowed to talk to anybody in the
11 hallway or anywhere else.
12        I was being treated, I felt, sort of
13 like when I was teaching elementary school.  That's
14 the way I was being treated, like I was six years old.
15 BY MS. KIVITZ:
16 Q.   Okay.  My question was: Accepting your
17 perception for the moment that she tried to improve
18 communications and the working relationship between
19 the two of you after October 18, 2006, what do you
20 recall Kathy doing to improve the relationship?
21 A.   Nothing.
22 Q.   Okay.
23        MS. KIVITZ: I'll ask that that be
24 marked (indicating).
25        (Whereupon the Reporter marked e-mails

Page 261

1  dated October, 2006, between Diane Rosetsky and Kathy
2  Holtzman as Exhibit No. D-23 for identification.)
3  BY MS. KIVITZ:
4  Q.    Before I ask you any questions about this
5  document, do you recall her offering to meet with you
6  on a weekly or other basis to discuss issues?
7  A.    Yeah.  When I came in the first time, she
8  said, "I don't want to talk to you," and she told me
9  to go out.  And that was in the e-mail.
10  Q.    Do you recall her offering to meet with you on
11  a regular basis?
12  A.    Yes.  She offered, but we didn't.
13  Q.    Do you recall her ever trying to explain to
14  you what her edits meant on the project that you've
15  described?  The edits to the edits?
16  A.    No.  It wasn't an issue of meaning.  It was an
17  issue of -- you know, you would have to just see two
18  comparisons I could give you, which I have actually.
19  And I think they're in one of the e-mails there.  A
20  comparison of how she wrote and how I edited it.
21  Q.    Okay.  I'm not asking you about the merits of
22  who's a better editor.  I'm asking you what efforts
23  Kathy Holtzman made, after you complained to HR, to
24  try to improve communications between the two of you.
25  A.    She didn't.  She just -- the way that she went

Page 262

1  about it I construed as further harassment.
2  Q.    Okay.  What was harassing to you other than
3  her asking you not to speak to other employees about
4  the issues you were having with her?
5  A.    What was harassing?  No one was talking to me
6  anymore, people that I had spoken to.
7  Q.    Well, you were still e-mailing --
8         MR. JENNINGS:  Please let her finish her
9  answer.
10         THE WITNESS:  No.  There were other
11  people.  There were four hundred people that worked
12  there.  And, you know, as I walked through the
13  hallway, they weren't allowed to talk to me.  Peg
14  Johnson, Jackie, the other people in Client Programs,
15  the other Client Programs Manager.  You know, they
16  weren't talking to me.
17         I mean, it was -- you don't have to be a
18  rocket scientist to see why people are afraid to talk
19  to you.  And she kept asking me to write down every
20  second of what I was doing so that I couldn't do
21  anything.
22         It was -- like, when I would switch from
23  one thing to the next, she wanted me to write down
24  exactly what I was doing.  And no one else was
25  expected to do that except for me.  I construed it as

Page 263

1  harassment.
2  BY MS. KIVITZ:
3  Q.    Okay.  I think what your answer -- you said,
4  "I construed it as harassment."  Can you agree, at
5  least from her perception of it, that it wasn't
6  harassment?  It was a way to keep track of your time?
7         MR. JENNINGS:  Objection to form.
8         THE WITNESS:  No.
9  BY MS. KIVITZ:
10  Q.    Okay.  You can't even see that; correct?
11  A.    No.  I can't because I was being singled out.
12  And being singled out is harassment.
13  Q.    Okay.  Was there anyone in your unit of which
14  you're aware who was going to talk to other people
15  outside of the unit and showing them Kathy Holtzman's
16  edits and asking if they agreed with them?  Was anyone
17  else doing the same type of things you were doing?
18  A.    How would I know?
19         MR. JENNINGS:  Objection to form.
20  BY MS. KIVITZ:
21  Q.    Do you know of anyone?
22  A.    No.
23  Q.    Okay.
24  A.    But I didn't go outside the unit.
25  Q.    Okay.  Well, you said you went to some of the

Page 264

1  editors; correct?
2  A.    They're in my unit.  One sits behind me.  One
3  was a senior manager who also agreed with me that my
4  editing was -- she said, "But get used to it because,
5  you know, Kathy -- whatever she says has to go whether
6  it's good or not."
7  Q.    Was anyone else going to the editors, when
8  Kathy was editing their work, to complain about
9  Kathy's edits of their work?
10         MR. JENNINGS:  Objection to form.
11         THE WITNESS:  I don't understand that.
12  You have to say it again.
13  BY MS. KIVITZ:
14  Q.    Okay.  You took Kathy's edits of your work and
15  brought them to show to editors to prove that you
16  could do better work?
17  A.    No.  What I did was I brought the work before
18  I edited it.  I didn't bring Kathy's edits.  I brought
19  the work before it was edited and after I edited it.
20  I did not show anyone Kathy's edits of my edits.  It
21  was before Kathy and after I had edited it.
22  Q.    Okay.  Wasn't your complaint to Barbara
23  Davidson that Kathy had edited your changes?
24  A.    No.
25  Q.    Re-worked the changes that you had done?

Page 265

1   A.    No, that wasn't the complaint. The complaint
2   was that they wouldn't let anyone use my edits --
3   Q.    Okay.
4   A.    -- even though I saw afterwards that they had
5   learned a lesson from me. And I saw the style of the
6   editing from Kathy Angelucci especially was mine.
7   Q.    Okay. How do you know that someone else
8   thought your edits were better if you didn't also show
9   them Kathy's work?
10  A.    I did show them Kathy's work. I didn't show
11  them Kathy's editing of my work. She wrote these
12  bubbles that went into the tutorial, and then I was
13  asked to edit them by Krista. And I edited them, and
14  Krista had no problem with them.
15        Then Kathy was, like, "Who did this?"
16        And she said, "I gave it to Diane."
17        And she, you know, went ballistic.
18  Q.    Okay. Now, my question is: Was anybody else
19  in Test Development taking Kathy's work and running to
20  the editors to ask if they liked Kathy's work or they
21  liked that person's work better?
22  A.    I have no idea.
23        MR. JENNINGS: Objection to form.
24  BY MS. KIVITZ:
25  Q.    Okay. Is it fair to say that you were the

Page 266

1   only one who was engaging in that type of conduct?
2         MR. JENNINGS: Objection to form.
3         THE WITNESS: No, it's not fair to say.
4   And also I didn't tell anybody which one was mine and
5   which one was hers.
6   BY MS. KIVITZ:
7   Q.    Okay. But my question isn't whose edits were
8   better. My question is: Weren't you the only one who
9   was challenging Kathy Holtzman's writing in that way
10  and running to the editors?
11        MR. JENNINGS: Objection to form.
12        THE WITNESS: I have no idea. That's my
13  answer.
14  BY MS. KIVITZ:
15  Q.    Do you know of anyone else who was doing it?
16  A.    I have no idea. I don't have -- I don't know.
17  Q.    Okay. Do you think that your time with the
18  editors was also taking time away that you could be
19  working on other jobs within your role profile?
20  A.    No. Because I didn't have any other jobs that
21  she was giving me.
22  Q.    Well, you've testified to several including
23  the database work?
24  A.    Right. This was the job I was given, to do
25  the editing.

Page 267

1   Q.    But you had other jobs at the same time?
2   A.    Well, yes. They were ongoing. Nothing that
3   she paid any attention to.
4   Q.    Okay. But wasn't your time spent with the
5   editors taking away from time you could spend on other
6   projects?
7   A.    No. I did it at lunch.
8   Q.    Okay. And who did you meet with during the
9   lunch hour?
10  A.    Maybe Sue that sat behind me and Peg Johnson.
11  Q.    Okay. And what is Sue's last name?
12  A.    I don't know. It's a long name. Something
13  with a "C." It's an Italian long name.
14  Q.    Okay. Now, if you could go back to the
15  e-mails that were in front of you, take a look at
16  them.
17  A.    (Complying.)
18        Yes. I attached this to my Complaint.
19  Q.    All right. Now, this e-mail from you to Kathy
20  on October 23 --
21        MR. JENNINGS: Which page are you on?
22        MS. KIVITZ: Page 1.
23        THE WITNESS: Okay.
24  BY MS. KIVITZ:
25  Q.    Was that the e-mail that you were referring to

Page 268

1   in your e-mail to Renee Brock, that you had written a
2   long e-mail and you felt so good? Or was that a
3   different e-mail?
4   A.    I don't know.
5   Q.    Okay. And this contained your grievances;
6   correct?
7   A.    Yes.
8   Q.    Did you put everything in this memo that
9   bothered you at the time?
10  A.    I don't know.
11  Q.    All right. Would you take a look at it?
12  A.    (Complying.)
13        Just about. Pretty close. I can't say
14  that it was everything, but it looks like a lot of it.
15  Q.    Okay. Can you just -- the e-mail above
16  that --
17  A.    "Flex B video screens"?
18  Q.    Yeah.
19  A.    Yes.
20  Q.    Do you see how that was sent from you to
21  "diane1120@comcast.net"?
22  A.    Yes.
23  Q.    Is that your home?
24  A.    Yes.
25  Q.    And what did you send?

Page 269

1  A.   What did I send?
2  Q.   What did you forward home?
3  A.   This (indicating).
4  Q.   Okay.  And you did that on October 23, 2006?
5  A.   Uh-huh.  Yes.
6  Q.   And was that before or after you had met with
7  Counsel?
8  A.   That was before.  I didn't meet Rufus until I
9  was not working there anymore.
10  Q.   Did anybody tell you to start to forward
11  e-mails home?
12       MR. JENNINGS:  Just in case, I'm going
13  to object and instruct you don't answer that to the
14  extent it deals with an attorney other than me because
15  I don't know.  I don't know, but I just want to make
16  sure I give you that warning.
17       THE WITNESS:  There's a lot of people
18  that do it.  Debbie Shelmire forwarded her e-mails and
19  different things.  You know, I wasn't the only one
20  that was doing it.  Yes, somebody said you could
21  forward your e-mails.
22       Actually one of the IT people told me to
23  forward my e-mails because, if you get personal
24  e-mails there -- he actually used NIH -- not NIH --
25  the NBME Web site as his e-mail address.  He didn't

Page 270

1  really use the personal one.  He only used it to, you
2  know, like, forward things to his house.  So basically
3  when he gave out his e-mail for personal and business,
4  it was the Board's e-mail.
5  BY MS. KIVITZ:
6  Q.   Okay.  What were the attachments?  Do you see
7  that?
8  A.   Yeah.  I don't know if the attachments were
9  actually attached.  That was -- you know, sometimes if
10  you forward an e-mail, the attachments -- they get
11  taken off by Outlook Express.  So I just probably just
12  forwarded it for this.
13       But what those are are the demo files
14  that Kieran probably sent to me for editing.  They
15  were the demo files, Flex B video screens.  Yeah,
16  that's what that is, the tutorial.
17  Q.   Okay.  And that would all be proprietary
18  information; correct?
19  A.   Right.  But I don't think it came to me.
20  Like, if you forward something -- like, you can send
21  something, but if you forward it, it doesn't -- the
22  attachments don't always go with it.
23  Q.   Okay.  Well, did you get those attachments at
24  home?
25  A.   I couldn't tell you.  I have a thousand

Page 271

1  e-mails on my system or more.
2  Q.   Okay.  But you would agree with me that the
3  actual tutorial is proprietary?
4       MR. JENNINGS:  Objection.  Asked and
5  answered.
6       You can answer it one more time.
7       THE WITNESS:  I was asked to work on it
8  from home; so I don't know what to tell you.  Krista
9  said, "Finish it by Thursday."
10  BY MS. KIVITZ:
11  Q.   This goes to our concern on the here and now.
12       MR. JENNINGS:  Objection.  Is that a
13  question?
14       THE WITNESS:  I don't think that I have
15  this.
16       MR. JENNINGS:  I'm going to object.
17  There's no question pending.  There's nothing to
18  answer.
19       THE WITNESS:  Okay.
20  BY MS. KIVITZ:
21  Q.   All right.  Look at the next page, Page 2.
22  A.   (Complying.)
23       Uh-huh.
24  Q.   Kathy's e-mail to you.
25  A.   Yes.  I remember this one.

Page 272

1  Q.   Why do you remember that?
2  A.   Because it was nonsense.  All these people
3  were sitting there, and they heard her, especially
4  Kieran and Krista, telling me to edit, not just cut
5  and paste.  There were witnesses there at the meeting.
6  This was the first meeting she ever let me go to
7  because it was after I complained about her to HR that
8  she wasn't involving me in anything.
9       So she decided to let me go to a
10  meeting, and then she's telling me all I was supposed
11  to do was cut and paste other people's editing.  And
12  that's not what Kieran heard and not what Krista
13  heard.  And that's why Krista gave me the editing to
14  do when Kathy was away and why Kieran was working with
15  me.
16  Q.   Okay.  But do you see that Kathy said you had
17  misconstrued your role in the project?
18  A.   Misconstrued?
19  Q.   Misconstrued.
20  A.   Yeah, I see it, but I didn't misconstrue it.
21  She's just backtracking to make it look like I wasn't
22  supposed to do anything.
23  Q.   Okay.  Did you disagree with her that at least
24  one of your roles in the project was to provide
25  support for the team as Project Assistant?

Page 269 - Page 272

Page 273

1  A.    All she has to do is edit.  I don't know what
2  other support there was.
3  Q.    Okay.
4  A.    Cutting and pasting.
5  Q.    Did you agree with that or disagree?
6  A.    I don't know --
7        MR. JENNINGS:  Can you please rephrase
8  it?
9        THE WITNESS:  Rephrase it.  What do you
10  mean by "support"?  I mean, support people by editing?
11  Yes.
12  BY MS. KIVITZ:
13  Q.    Okay.  Do you support people by other than
14  editing too?
15        MR. JENNINGS:  Objection to form.
16        THE WITNESS:  "Do you support other
17  people by" -- I suppose so.
18  BY MS. KIVITZ:
19  Q.    Okay.  Were you insulted that she told you it
20  was never her intention for you to play a lead role on
21  the project?
22  A.    Well, considering that was, you know, what her
23  idea of a lead role was, you know, yes, because I was
24  supposed to be working with them on this project.
25  Q.    Okay.

Page 274

1  A.    She was the only lead role.  Kathy doesn't
2  allow anyone to be a lead role.  Everybody there was
3  subordinate to her.  She was a leader, and we were all
4  supporting her.
5  Q.    Okay.  Now, she said to you she was surprised
6  that you had the impression you would be doing the
7  editing, but you presented a good case about your
8  background, and it was reasonable to let you try.  Do
9  you see that?
10  A.    Yes.
11  Q.    Okay.  She viewed it as a good opportunity for
12  you to learn about an important new product and see
13  what you could do with editing; correct?
14  A.    That's what she said.
15        MR. JENNINGS:  Objection to form.
16        THE WITNESS:  Trying to be
17  condescending, yes.
18  BY MS. KIVITZ:
19  Q.    Now, why is that condescending that that would
20  be a good opportunity for you to learn?
21  A.    Because she knew that I'm a trained editor, I
22  graduated from the University of Pennsylvania with an
23  English degree, and that I had a lot of Web site
24  experience, that I had a lot of IT experience.  And
25  there was nothing for me to try.

Page 275

1        I mean, I could have written that entire
2  tutorial, but I was editing it.  And it's Kathy-isms.
3  This is where, you know, Kathy belittles people.  This
4  is a tactic that she used.  I'm sure you can see by
5  the way that it's written that this was to be
6  condescending and treat me like a six year old.
7        She was giving me an opportunity to
8  learn about an important new product?  I understood
9  the flexible blueprinting more than she did.  I had
10  seen it before, and I went on the Internet, and I
11  studied about it.  And they thought they were the only
12  ones doing it, and they weren't.
13        So, you know, no, I wasn't learning
14  anything from her.
15  Q.    Did you give her any credit that, you know,
16  she had been an editor with the National Board for
17  many years more than you had?  Did you think that you
18  should give her any deference in terms of what she had
19  learned at the time at National Board about the way it
20  edited?
21        MR. JENNINGS:  Objection to form.
22  BY MS. KIVITZ:
23  Q.    Do you understand that question?
24  A.    No, I don't.
25  Q.    Okay.  Did you feel that she was entitled to

Page 276

1  any deference as a National Board-trained editor over
2  the many years?
3  A.    Yes.  But this was not item editing.  She had
4  edited items.  This was a tutorial for an application
5  for physicians to use on line.  It was not the same
6  thing as editing an item.  When you do documenting for
7  an application, it's a different ball game, and she
8  had no experience in documenting instructions to use
9  an application.
10        This is the "help" files basically.
11  Well, when you go into "help," you know, when you hit
12  "help" on Microsoft Word or there's a tutorial in
13  there, this is what this was.  And you're talking
14  about someone that didn't even know how to use most of
15  Microsoft Office.
16  Q.    Would you go to the third page, bottom, middle
17  paragraph?
18  A.    Uh-huh.
19  Q.    When this first started, do you remember that
20  she said to you:
21        "As we discussed, I appreciate all of
22  the work you did on the editing.  I know from
23  personal experience how hard it is to deal
24  with having others change your work after
25  you have put so much of your heart and soul

Page 277

1  into it"?
2  A.   She didn't even look at most of it.  I must
3  have edited -- there were binders this big
4  (indicating) that I took home with me, like, two or
5  three of them.
6      MR. JENNINGS:  And just for the record,
7  the witness is indicating approximately eight inches.
8      Would you agree, Counsel?
9      MS. KIVITZ:  Sure.
10     THE WITNESS:  About the size of a phone
11 book.  How's that?
12     And she only looked at a little bit of
13 it until she went ballistic and found out that I had
14 edited it.  And I was told that she was yelling at
15 Krista for allowing me to do it.  She never looked at
16 the rest of it.  All the work that I did -- she would
17 not even look at it.
18     And then I saw them using my style and
19 technique for dialog into journalistic-style editing
20 instead of conversational or prose.  And then she got
21 pissed off because she saw that I did it.  But they
22 weren't pissed off enough not to use my work but just
23 not give me credit for it.
24     And, you know, they were smart enough to
25 start -- you know, Kathy Angelucci and Krista -- to

Page 278

1  see the technique because it's not really that hard to
2  pick up.  So they took, like, the first binder, and
3  Krista read through it and had no problem with it.
4      Kathy saw it, wouldn't look at any of
5  the rest of the binders, and starting putting it back
6  to the way that it was.  And Kieran and I were looking
7  at it, and it was, like -- we were both, like,
8  appalled.
9  BY MS. KIVITZ:
10 Q.   Do you see where she said she'd be happy to
11 talk to you afterwards to meet and go over the changes
12 she made?
13 A.   Yes.
14 Q.   Did you ever come to her and say, "Let's meet
15 and talk about those changes"?
16 A.   She never had time for me.  When I walked in
17 her office, she would tell me to get out, that I
18 wasn't allowed to come in without permission.  You
19 know, I asked to meet with her, and she was not
20 interested in my work.
21 Q.   Was there any e-mail that you can point to
22 where you followed up and said, "I'd like to meet with
23 you concerning -- to discuss the changes"?  That you
24 can point to?
25 A.   I don't know.  I probably said something to

Page 279

1  her.  I'm sure that I said something to her.  And all
2  she said was, "You were only supposed to cut and
3  paste."
4  Q.   Okay.
5  A.   And it's clear in the first e-mail that she's
6  saying that I misconstrued what I was supposed to do.
7  And then she backtracks and said, you know, "I was
8  happy to give you a chance to learn something by
9  editing."  First she says I've misconstrued my role,
10 and then she's saying I was supposed to edit.  Which
11 is it?  I was or I wasn't?
12 Q.   Now, after you met with Barbara Davidson
13 October 18, you were still receiving assignments from
14 Kathy Holtzman to do other projects for the
15 department; correct?
16 A.   Not really.  I was still working on the same
17 things that I've been working on.
18 Q.   All right.  Weren't you asked around
19 October 25 to work on an Access database that Krista
20 had requested based on your expertise with Access?
21 A.   Right.
22 Q.   Okay.  And then you were asked to focus on a
23 second project concerning user testing?
24 A.   User testing?  I'm trying to remember.
25 Q.   With Faith.  What needed to be adjusted, if

Page 280

1  anything.
2  A.   I don't know what you're talking about.
3  Q.   Okay.  Do you remember --
4  A.   Oh, okay.
5  Q.   "I'd like you to work with Faith" --
6  A.   Faith was finally --
7  Q.   -- on user testing to see what needs to be
8       adjusted, if anything."
9  A.   Finally, after me working on the database and
10 her refusing to look at it, she let Faith try to use
11 it, and Faith loved it and wrote her an e-mail saying
12 what a great tool that it was.
13 Q.   Okay.
14 A.   That was my database.  It wasn't user testing.
15 It was my database.
16 Q.   Okay.  Would you say that those assignments
17 were within your role profile?
18 A.   I suppose so.
19 Q.   Okay.  So you were still receiving assignments
20 within your role profile?
21 A.   They weren't new assignments.  They were from
22 before I went down to HR.  Those assignments I had --
23 I had kind of started the one on the database with
24 Krista.  I had sort of started it before that, but
25 then she gave me that editing to do too.

Page 281

1   Q.   Okay.  Do you remember objecting --
2   A.   Actually Dave gave that to me.  Excuse me.
3   Kathy did not give that assignment to me.  The
4   database for -- what I was doing was making a database
5   for the responses from the physicians who critiqued
6   the items questions that were going to be actively put
7   in the NBME item pool.  And it was Dave that I was
8   working with.  It wasn't her.
9   Q.   Okay.  Do you remember, when you were being
10   asked to respond again to how much time you were
11   putting into projects, responding to Kathy that you
12   didn't want to do it because what she was asking you
13   to do would take as much time to track as it does to
14   build a database?
15   A.   Yes.
16   Q.   Okay.  So were you essentially refusing to
17   account for your time?
18   A.   No.  I told her how much time I worked on the
19   database, but she wanted me to break it down, which
20   she didn't understand, you know, how much time writing
21   select queries, how much time, you know, with the
22   story board, how much time with the user interface,
23   changing colors, changing fonts, how much time
24   changing the menus.  I mean, she wanted me to write
25   all this down.  It was ridiculous.

Page 282

1   Q.   But isn't it true that, after you did give her
2   a breakdown on October 31, 2006, you did not ever
3   really give her a breakdown of your time again in this
4   format at least?
5          MR. JENNINGS:  Objection to form.
6          THE WITNESS:  I don't remember.
7          MR. JENNINGS:  Why don't you mark it as
8   an exhibit so she can see the format?
9          THE WITNESS:  That wasn't the format.
10   The format was supposed to be an Excel chart that she
11   wanted me to make.  She wanted me to make an Excel
12   chart and start filling it in as I was working, like,
13   minute by minute, which was harassment.
14   BY MS. KIVITZ:
15   Q.   All right.  So you never did an Excel chart?
16   A.   Yeah, I did.  She has it.
17   Q.   Okay.  And the October 31 breakdown of your
18   day time -- okay? -- how many days it took you to do
19   the project -- did you ever give that to her again?
20   Did you ever break down your time again?
21   A.   After I had worked on this database, she
22   wanted me to break down what I had done in the past
23   four or five months on each thing after the fact.  You
24   know, then she decided, "Okay.  When you built this
25   database, how much time did you spend on user

Page 283

1   interface?  How much time did you spend cleaning up
2   the Power Point slides?"
3          After everything was almost done, then
4   she's asking me to backtrack, and I said, "I can't do
5   that.  It's impossible."
6   Q.   Okay.
7   A.   And besides I didn't work on that all the
8   time.  Sometimes I was, you know, doing copying for
9   clients and managers.  I was doing different things.
10   It was a ridiculous request, and it was pure
11   harassment.
12   Q.   Okay.  But it was a request that had come from
13   your supervisor; correct?
14   A.   Right.  That I could not fulfill and that no
15   human could have fulfilled honestly.  I could have
16   lied, but I'm not a liar.
17   Q.   Okay.  So it was your intention not to comply
18   with that question because you thought it was silly;
19   correct?
20          MR. JENNINGS:  Objection to form.
21          THE WITNESS:  No.  I couldn't do it
22   honestly is what I thought.  I could never have done
23   it.  It was impossible.  How can you go back -- why
24   don't you tell me how long it took you to cook dinner
25   last Sunday and the steps that it took while you were

Page 284

1   cooking dinner?  How long did it take you to crack the
2   egg?  You know, it was impossible.
3          I mean, if she wanted me to do that, she
4   should have started it from when I first started
5   working there on the database.
6   BY MS. KIVITZ:
7   Q.   But did it ever occur to you to record your
8   time contemporaneously with the project?
9   A.   I was not required to do that, and she never
10   required me to do that.
11   Q.   Okay.  But if you did that, that would be
12   an easier, simpler way to break down your time
13   afterwards; correct?
14          MR. JENNINGS:  Objection to form.
15          THE WITNESS:  I don't understand what
16   you're asking me.
17   BY MS. KIVITZ:
18   Q.   In your scenario, if you wrote down how much
19   time the cooking took at the time you cooked, it would
20   be easy to compile that information a week later;
21   correct?
22          MR. JENNINGS:  Objection to form.
23          THE WITNESS:  To break it down if you
24   can break it down?  You know, if you want me to show
25   you how to build a database, I can show you, and then

Page 285

1  you can decide for yourself if you can break it down.
2  BY MS. KIVITZ:
3  Q.   Okay.  So is the reason you refused to do it
4  because you thought it was silly or because it was too
5  time consuming or something else?
6        MR. JENNINGS:  Objection to form.
7        THE WITNESS:  It was impossible.
8  BY MS. KIVITZ:
9  Q.   Why impossible?
10  A.   I already told you.  It was something that was
11  done months before, and then she was asking me to
12  backtrack on it.  And I actually called the IT
13  Department, and I told her to call the IT Department
14  and talk to Debbie Brown.
15       I said, "Debbie, do you have to write
16  your time down when you're working with Microsoft
17  Access on how much you spent on each part of it?"
18       She said, "It's impossible to do that.
19  I wouldn't be able to do that.  I'm not required to do
20  it."
21  Q.   Okay.
22  A.   She bills clients who, you know, she does
23  things for around the building.  And I specifically
24  told Kathy to, "You know, go confer with Debbie
25  Brown."  What she's asking me to do -- "There's not an

Page 286

1  IT person in the world that's going to do that for
2  you.  It's close to impossible."
3  Q.   Did there come a time when you were no longer
4  authorized to work at home?
5  A.   No.  Oh, yeah.  Finally, after I went down to
6  HR and complained about her, she decided that I wasn't
7  supposed to work from home, that I wasn't allowed to
8  although she knew that I had before previously.
9  Q.   Okay.  Do you remember being asked, if you
10  have any materials at home, please return them to the
11  office immediately and remove any NBME files from your
12  personal computer?
13  A.   Yes.
14  Q.   Did you do that?
15  A.   From my personal computer?  The only thing I
16  have on there is the database.  That's it.
17  Q.   Okay.  Did you return the materials you had at
18  home?
19  A.   Yeah.  They're all there.
20  Q.   Well, I mean, we've talked about this at
21  length today.  You still have the thumb drive;
22  correct?
23  A.   Yeah.  But that's not NBME's.  That's my thumb
24  drive.
25  Q.   But it's NBME's materials on your thumb drive;

Page 287

1  correct?
2  A.   That she knew that I had used to take stuff
3  home to work on it.
4  Q.   Right.  But when she asked you on November 8
5  to return the information to the office immediately,
6  did you ever -- before today did you ever do that?
7  A.   Everything has been returned.  I mean, what
8  you're talking about is digital information that --
9  you know, I can erase it, but, you know, I don't
10  physically have their files or their passwords to get
11  into their files or the Power Point slides that I
12  printed out.  Everything was there at my desk when I
13  left.
14  Q.   Now, there were also two positions within the
15  National Board that you applied for and then withdrew
16  your applications?
17       MR. JENNINGS:  Objection to form.
18       THE WITNESS:  Yes.
19  BY MS. KIVITZ:
20  Q.   Can you tell me about each of them and why you
21  chose to withdraw your application?
22       MR. JENNINGS:  Objection to form.
23       THE WITNESS:  I don't remember the first
24  one.  But the second one was the one where Kathy told
25  them not to hire me.  So instead of being humiliated

Page 288

1  through an interview with people that I knew and
2  worked with every day, I withdrew it.
3  BY MS. KIVITZ:
4  Q.   Okay.  And which one was that?
5  A.   That was the Test Development Associate for
6  Special Projects.
7  Q.   And what about -- there was a case developer
8  position you applied for.  Why did you withdraw that
9  one?
10  A.   I'm trying to remember.  I don't remember.  I
11  think that's the same one that Faith applied for.  I
12  don't really remember why I withdrew or if I actually
13  formally applied for it.
14       Did I formally apply for it?  I don't
15  remember.
16  Q.   I think you did and then withdrew it.
17  A.   Okay.
18  Q.   We have two applications that you submitted
19  and then withdrew.
20  A.   Okay.  I don't remember why I withdrew it.  It
21  might have been during this time of turbulence where I
22  just withdrew it.
23  Q.   All right.  And the Special Projects
24  position you withdrew, at least in your opinion,
25  because you felt you might not get it?

Page 285 - Page 288

Page 289

1    MR. JENNINGS: Objection to form.
2       THE WITNESS: I knew I wasn't going to
3   get it because she intimidated them into not hiring --
4   Kieran expressed to me how scared he was of Kathy.
5   And when he was at meetings with her, he said he
6   couldn't think and that, you know, she was very
7   intimidating. And, you know, he's a really nice guy,
8   and she was just, you know, sitting there and being
9   nasty to everyone.
10  BY MS. KIVITZ:
11  Q.    All right. And Kieran is under the age of
12  forty?
13  A.    Kieran is under the age of forty.
14  Q.    Okay. And you felt that he was --
15  A.    Afraid of Kathy, yes.
16  Q.    -- equally afraid of Kathy?
17  A.    I'm not afraid of Kathy. I just don't like
18  her anymore because I see what kind of person she is.
19  I'm not afraid of her at all. That was the issue.
20  She wanted people to be afraid of her. Once you got
21  one foot in the grave, you're not afraid of much of
22  anything.
23  Q.    At some point you came to believe that Kathy
24  had to give you her permission for you to apply for
25  another job?

Page 290

1   A.    I wasn't sure. Yeah.
2   Q.    Okay. And is it correct that she clarified
3   for you that you did not need her permission to apply?
4   A.    After I went to HR. But I had already asked
5   her about the position, and she was promoting people
6   without even interviewing, like Kieran and Kathy
7   Angelucci. You know, they didn't even interview.
8   They were just put into the job.
9         And me -- she's telling me, "Oh, well,
10  you know, I don't think you're right for it."
11        So then I went down to HR, and they
12  said, "Well, you can still apply." And then, you
13  know, after I heard her talking to Kieran and Kathy
14  about me, I just thought, "You know, why should I
15  humiliate myself? They're not going to hire me."
16  Q.    Now, you were also interested in a business
17  analyst position at some point?
18  A.    Right.
19  Q.    Were your qualifications appropriate for that
20  position, if you know?
21  A.    I don't know. I mean, you know, I was hoping
22  that they were. I was trying to learn UML. So, you
23  know, I was hoping to maybe go in the position. I
24  spoke to one of the other business analysts about it
25  who -- she didn't have a degree in any of it either.

Page 291

1   She just was learning it on the job.
2         But Faith and I were actually discussing
3   it, and she said, "Kathy -- she's just going to give a
4   bad reference. You're never going to get that job."
5   Q.    But my question is: Do you know if your
6   qualifications independent of Kathy Holtzman were
7   appropriate for the position?
8   A.    They could have been. I wasn't exactly sure.
9   I mean, there was nothing -- you know, one thing I do
10  know is that I know how to learn.
11  Q.    Okay. You did not submit a formal application
12  for that position?
13  A.    I don't remember. I may have.
14        Did I?
15  Q.    Not that I've seen.
16  A.    Okay. I really can't remember.
17  Q.    In one e-mail you said that Kathy Holtzman
18  belittled you because she called you "DiDi"?
19  A.    DiDi.
20  Q.    Does anybody -- is that a nickname?
21  A.    No.
22  Q.    Okay. Where did it come from, if you know?
23  A.    If I know what?
24  Q.    Do you know where she got that from?
25  A.    My name is Diane, and she just decided to call

Page 292

1   me "DiDi."
2   Q.    Did you tell her you didn't like that?
3   A.    No, I did not.
4   Q.    So how would she have known that you found
5   that belittling?
6         MR. JENNINGS: Objection to form.
7         THE WITNESS: Why would she be as
8   presumptuous as to think she could call someone in a
9   place of business a new nickname that she decided?
10  BY MS. KIVITZ:
11  Q.    Okay. Well, you've referred to her now as the
12  "witch"?
13  A.    But I never called her that to her face.
14  Actually probably other people have. I think Faith
15  did, but I never have.
16  Q.    Okay.
17  A.    No. I was completely respectful to her. I
18  never called her any names. Actually I did a lot of
19  personal favors for her. I did her husband's resume,
20  which -- is that considered NBME property? Should I
21  give it back to you? I have Nate's resume that she
22  had me do.
23        I also filled out a form for her retarded
24  child to be admitted to a special institution. And it
25  took me, like, half a day to do it. I hand wrote it

Page 293

1  for her. You know, I did personal things for her that
2  were not in my job description out of the goodness of
3  my heart.
4  Q.  Now, on November 8 you wrote an e-mail to
5  Barbara Davidson, and you asked her to move your
6  cubicle so you wouldn't sit in front of Kathy.
7  A.  Uh-huh.
8  Q.  I'm asking if you remember this. You wanted
9  to work for Kathy Angelucci but stay in your current
10 position but have Kathy supervise you?
11         MR. JENNINGS: Objection to form.
12         THE WITNESS: I don't remember that.
13 No.
14 BY MS. KIVITZ:
15 Q.  Okay.
16 A.  Who said that? Is that Barbara Davidson?
17 Q.  No. You wrote to Barbara:
18         "I would also like my cubicle moved.
19     There's no reason for me to be sitting in
20     front of Kathy's door."
21 A.  Yeah, I did ask for my cubicle to be moved. I
22 mean, I asked to be moved into another cubicle.
23 Q.  "As far as my working for Kathy Angelucci, I
24     would prefer just to stay in my current
25     Program Assistant position rather than be in

Page 294

1     her group. Also I think she will be difficult
2     to work for because she appears to have no
3     consistent work schedule."
4         Meaning Kathy Angelucci?
5  A.  Oh, yeah. Kathy just had a baby, and then she
6  had a two year old. And actually Kieran was kind of
7  upset. He wound up doing all of Kathy's work. This
8  is kind of new to me because I did stay home and raise
9  my own kids; so I didn't realize that, you know, you
10 could actually be there and not be there. So I'm not
11 really sure how it's going to work.
12 Q.  So what were you asking for?
13 A.  I don't really recall. I mean, I could read
14 that e-mail and see what I was asking for. I think
15 I just wanted to get away from Kathy at that point
16 along with the rest of the Board.
17         MS. KIVITZ: I'll mark this
18 (indicating).
19         (Whereupon the Reporter marked e-mails
20 dated November, 2006, between Diane Rosetsky and
21 Barbara Davidson as Exhibit No. D-24 for
22 identification.)
23 BY MS. KIVITZ:
24 Q.  Your e-mail to Barbara followed Kathy's e-mail
25 to you; correct?

Page 295

1  A.  Yeah. I think so. It looks that way.
2  Q.  Okay. And the three of you had met; correct?
3  A.  Yes. I believe so.
4  Q.  And you were told that continuing your
5  behavior of sharing frustrations about your work
6  issues could result in your being placed on a
7  Performance Improvement Plan. Do you recall that?
8  A.  Where are you at here?
9  Q.  Second full paragraph in the below e-mail.
10 A.  "As you agreed, you will develop project
11 plans." Is that what you're reading?
12 Q.  "As I noted during the meeting."
13 A.  I was reading something else when you were
14 talking. See, she says, "Or elsewhere." Yeah, she
15 was complaining that I went down to HR. So what is
16 your question again?
17 Q.  My question is: Do you recall being told that
18 continuing that behavior could result in your being
19 placed on a PIP?
20 A.  Well, what are you referring to as "that
21 behavior"?
22 Q.  You have to go back to the e-mail. Do you
23 want me to repeat it?
24 A.  Yeah.
25 Q.  Do you want to read it?

Page 296

1  A.  Yeah.
2         "That behavior," meaning the behavior of
3     sharing my frustrations and my work assignments? Is
4     that what you're talking about?
5         "Interpersonal relationships or other
6     observations regarding Test Development
7     management with staff in Test Development or
8     elsewhere."
9  Q.  Okay. Now, you were aware that she was asking
10 you to discuss issues that arose with her as opposed
11 to sharing your frustrations with others; correct?
12 A.  I was aware that she was upset because I went
13 to HR. That's the only thing that I'm aware of.
14 Q.  And what she ended with was:
15         "At any time you should feel comfortable
16     to discuss concerns with Human Resources."
17         Correct? Do you see that?
18 A.  That was after the fact, yes. She's trying to
19 do damage control.
20 Q.  Now --
21 A.  And then she wrote --
22 Q.  -- you responded by writing to Barbara
23 Davidson and saying, "Can you please help me move away
24 from her"?
25 A.  Yes.

Page 297

1   Q.    Okay.  And this was following a meeting that
2   was a mediation-type meeting?
3   A.    I guess so.  You can call it that.  But it was
4   basically Kathy controlling the meeting and saying a
5   bunch of things about me that really weren't true.
6   Q.    Well, you had an opportunity to speak at the
7   meeting too; correct?
8   A.    Yes, I did.  But they don't care what I say.
9   When Kathy left the room, Barbara turned around and
10  said to me, "There's nothing I can do about her.
11  She's too powerful."
12  Q.    I'm not quite sure I understand how you felt
13  that you could be supervised by Kathy Holtzman but sit
14  someplace else but not be supervised by the other
15  person.
16  A.    I didn't say that.
17  Q.    Okay.  What were you asking for then?
18  A.    I wanted to be in her group as another
19  assistant.  I wanted to get out of -- okay.  Because I
20  didn't put -- Kathy and Kathy.  Kathy Angelucci -- I
21  wanted to be moved into her group which Kathy
22  eventually said she was thinking of doing.  I did not
23  say -- I did not expect to be working for anyone else.
24  It's just I wanted to move.
25  Q.    But didn't you say Kathy was too disorganized

Page 298

1   to supervise you?
2          MR. JENNINGS:  Objection to form.
3          THE WITNESS:  I did not say she was
4   disorganized, but she has an inconsistent work
5   schedule.
6   BY MS. KIVITZ:
7   Q.    Okay.
8   A.    It takes a while for her to respond, and I
9   really didn't know if I wanted to be in that position
10  because she was -- first she told me she was back 50
11  percent, then 80 percent.  So I saw the problems that
12  Kieran was having with it, and I didn't know if I
13  wanted to be involved with it.
14  Q.    Did you feel that she was unqualified to
15  supervise you?  Angelucci.
16  A.    Who?  Kathy?
17  Q.    Uh-huh.
18  A.    No, I didn't say that.  She just wasn't there,
19  and when she was there, she was on the phone -- you
20  know, she had other issues.
21  Q.    Okay.  Was there anyone else in the office who
22  was working for a supervisor but sitting in a
23  different unit?
24         MR. JENNINGS:  Objection to form.
25         THE WITNESS:  Actually there were people

Page 299

1   that were way further away from their supervisors than
2   I was.
3   BY MS. KIVITZ:
4   Q.    Were they in other departments?
5   A.    It's not another department.  It's Kathy is
6   here, and Kathy Angelucci -- Kathy Holtzman is here,
7   and Kathy Angelucci is here.  My cubicle is here
8   (indicating).  It's only about twenty feet away.
9   Q.    Okay.
10  A.    It's not like -- there is no other department
11  in there.  Kathy's head of Test Development.  It's all
12  one department.  There are just a lot of group
13  managers, I guess six or seven managers, and then the
14  managers have people working under them.  But there's
15  only one department, one unit.  It's Test Development.
16  Q.    Okay.  Did there come a time when you got your
17  end-of-year performance evaluation that you wrote on
18  it and sent that to somebody?  Your comments?
19  A.    I don't remember.
20  Q.    Okay.
21  A.    I wrote on it for myself.
22  Q.    Okay.  Before I mark this, is this your
23  handwriting (indicating)?
24  A.    Oh, this is when I was -- oh, Barbara must
25  have -- I must have left it in Barbara's office.  Yes,

Page 300

1   that's mine.
2          MS. KIVITZ:  All right.  I'll mark it
3   (indicating).
4          (Whereupon the Reporter marked the 2006
5   Year-End Performance Review as Exhibit No. D-25 for
6   identification.)
7          (Brief recess.)
8   BY MS. KIVITZ:
9   Q.    That's your evaluation?
10  A.    Yes.  This is where my handwriting is on
11  there, and I can't even read it.
12  Q.    That's what I'm asking you.  I can't read your
13  handwriting.  I thought maybe you could read it.
14  A.    Oh, I'll try.
15  Q.    You acknowledge that this is the 2006 Year-End
16  Performance Review; correct?
17  A.    This is the performance review?  Oh, yeah,
18  yeah.  They never gave me a copy of this.  I asked for
19  it, and they wouldn't give it to me.
20  Q.    If you didn't have a copy, how did you have
21  the opportunity to mark it up?
22  A.    That was during the meeting.
23  Q.    You were making notes?
24  A.    I was making notes at the meeting.
25  Q.    Okay.

Page 301

1  A.   And then when I actually asked Barbara
2  Davidson for a copy, they wouldn't give it to me.
3  Q.   Okay.  Well, this will be attached to the
4  deposition; so you'll have it.
5  A.   Okay.
6  Q.   And your attorney has copies of it too.
7  A.   Okay.
8  Q.   But I just want you to -- I can't read your
9  writing.
10 A.   Okay.  "You weren't interested."  She wasn't
11 interested in talking to me through my whole
12 employment there.
13 Q.   All right.  The handwriting at the bottom of
14 Page 1 --
15 A.   Yeah.  It says "You weren't interested."
16 Q.   How about the top of Page 2?
17 A.   Because she didn't take any time with me.  I
18 think "That was because you didn't take time with me."
19 Q.   Okay.  How about the bottom of that page?
20 A.   "Accusing me of being combative."
21 Q.   Is that "evidence, question mark"?
22 A.   Yes.  "Evidence.  I was only in a team
23 environment once."  And then it says "You made me
24 write that letter."  Oh, that was the letter about
25 Barbara Scaramalino.

Page 302

1  Q.   Okay.  How about on Page 3?
2  A.   It says that "She sees no progress."  And I
3  wrote "In what?  I spoke to Tech Services."  I don't
4  know why I wrote that.  I'd have to re-read the whole
5  comment to see.
6  Q.   "Accusing me of" -- is that "disruptive
7  behavior"?
8  A.   Yeah.  I'm not sure why I wrote that.
9  Q.   Well, at the bottom does that say "expose exit
10 interviews"?
11 A.   "Existing"?  It might be "existing."  I'm not
12 sure.  I have no idea actually.  I can't read that
13 one.
14 Q.   Well, what did the term "exit interviews" mean
15 to you on November 21, 2006?
16 A.   "Exit interviews"?  That's not what that says.
17 I think it's "existing interview."  "Interviewers"?
18 Is that what you're asking me?  If that says "exit"?
19 I don't think it says "exit."  It's "existing."
20 Q.   And what did that mean?
21 A.   I don't know.  That's what I'm saying.  I
22 don't know what it says.  I'm not even sure if that
23 says "interview."  It says "existing."  I don't know.
24 I couldn't tell you honestly.
25     MS. KIVITZ:  Okay.  I'll ask that this

Page 303

1  be marked (indicating).
2     (Whereupon the Reporter marked an e-mail
3  dated November 8, 2006, to Diane Rosetsky from Kathy
4  Holtzman as Exhibit No. D-26 for identification.)
5  BY MS. KIVITZ:
6  Q.   Referring to the e-mail we've already
7  referenced, did you ever write an e-mail response to
8  Kathy Holtzman concerning what materials you had or
9  whether you would return them or any response that you
10 recall?
11 A.   No, I don't recall anything.
12 Q.   You said at one point you had spoken to senior
13 management concerning what you perceived as Kathy
14 Holtzman's behavior?
15 A.   Uh-huh.
16 Q.   Do you remember who that was?
17 A.   Barbara Davidson, Aggie Butler.
18 Q.   Do you remember when you met with Aggie?
19 A.   I didn't meet with her formally.  She was just
20 at my desk.  She came by and was talking to me.
21 Q.   Okay.  Do you remember around when that was?
22 A.   No.  Well, when all this was happening.
23 Q.   Do you remember what your complaint was --
24 A.   October.
25 Q.   Okay.

Page 304

1  A.   I think this probably had to do with -- I
2  don't think I went into depth with Aggie.  But, you
3  know, that she knew she could be really difficult to
4  work for.  And she said, "Please don't leave.  You're
5  a really good worker."  You know, she was really nice
6  actually -- Aggie.  And she was empathizing or
7  sympathizing with me.
8      You know, most of this all happened
9  around when I rushed for four days and did this big
10 editing job, you know, to be told I wasn't supposed
11 to do it.  And then Krista and Kathy got into a
12 fight with each other.  So it was all around the
13 same time.
14     There was no occurrence or altercation
15 or anything until after I went down to HR.  Nothing
16 happened.  You got nothing.  Everything was just, you
17 know, okay between me and -- you know, okay in her
18 eyes, you know, between me and Kathy until this
19 editing thing happened and I went to HR.  And that was
20 it.
21     Oh, the other person was Ron Nungster.
22 Q.   Okay.  Did you see him in person or just
23 e-mailed him?
24 A.   Ron I made an important with.
25 Q.   Okay.  Did you meet with him?

Page 305

1  A.   Yes.
2  Q.   Okay. And what did you show him? What did
3  you bring with you when you met with him?
4  A.   He wouldn't let me show him anything. I tried
5  to show him the work that I was doing and that I
6  wanted to apply for another job and I felt she was
7  discriminating against me. And I don't remember
8  exactly -- you know, he got really defensive and all
9  that.
10          And I knew right away -- I knew that,
11 when I came up there, I had it in my mind, "If he
12 doesn't let me show him the work that I did, that it's
13 going to be bad." And he wouldn't look at it.
14 Q.   Okay.
15 A.   He started talking about himself. That's what
16 he started doing.
17 Q.   Okay. Now, you said you used the term
18 "discrimination."
19 A.   Uh-huh.
20 Q.   Do you recall using with anyone the term "age
21 discrimination"?
22 A.   Yes.
23 Q.   Who?
24 A.   Barbara Davidson.
25 Q.   Okay. Now, Barbara Davidson has no record

Page 306

1  whatsoever that you used the term "age." Is there
2  anyone else that you ever used the term "age" with
3  ever?
4          MR. JENNINGS: Objection to form.
5          THE WITNESS: I said it to Faith and
6  Debbie, "We're the older women here, and that's why
7  we're kept in these positions." I didn't use "age
8  discrimination," but I did with Barbara Davidson. And
9  why would she write it? You know, why would she admit
10 to it at this point, you know? She got a look on her
11 face, you know, like, "Uh-oh," as soon as I said it.
12          As a matter of fact, I said it a
13 couple times. I met with her several times. And I
14 said, "Can't you see what she's doing here? We're all
15 the older women that are stuck in this position." And
16 then I said, "This is age discrimination."
17          And she said, "No, it's not. It's" --
18 what did she say? "It's just the way Kathy is," or
19 something like that.
20 BY MS. KIVITZ:
21 Q.   Have you seen the notes of any of the meetings
22 of you with Barbara Davidson that have been produced?
23 A.   No.
24 Q.   Okay. Now, the other thing is at some point
25 you got upset because Kathy Holtzman told you you

Page 307

1  could move laterally to a different department but not
2  necessarily move up to a different department. You'd
3  have to work yourself up.
4  A.   Right.
5  Q.   Did you think there was something wrong with
6  that?
7  A.   Yes, I did.
8  Q.   What?
9  A.   What?
10 Q.   What was wrong with the concept of a lateral
11 move?
12 A.   Because I applied for a promotion and she had
13 promoted other people that had less education than me
14 and had been there the same amount of time as me. And
15 I felt that I deserved to be promoted like she was
16 doing for other people.
17 Q.   Were you aware of any people at the National
18 Board younger, older, blue, white, yellow who had
19 moved laterally to other departments?
20 A.   I think this woman Barbara that Kathy and Dave
21 abused. I'm trying to think of her name. She had a
22 health issue while she was there, but she still works
23 there. Barbara. I can't remember her last name.
24 They would know because she moved to the cubicle at
25 the end, and then she moved to the next building. I

Page 308

1  can't tell you her last name. If I saw it, I would
2  remember.
3  Q.   Okay. Do you remember writing to Debbie
4  Shelmire on October 26 and saying:
5          "In case you're wondering why it's kind
6          of quiet around here, Kathy and I had it out.
7          I wrote her a lengthy e-mail on Monday"?
8  A.   Yes.
9  Q.   Okay. Was that the same e-mail you boasted to
10 Renee Brock you had also written?
11 A.   It might have been.
12 Q.   Okay. Was it the same e-mail that I asked you
13 about on October 23 concerning the edits?
14 A.   I'm not sure. Maybe.
15 Q.   Okay. You also told Faith in October, 2006,
16 that you had applied to over two hundred other jobs at
17 Penn up to, I guess, October 20, 2006. And you
18 claimed you had gotten just the one interview?
19 A.   Right. Maybe.
20 Q.   Okay. Do you remember what any of the other
21 positions were?
22 A.   You want me to recite two hundred positions
23 that I applied to?
24 Q.   No. Do you remember in particular the type
25 of --

Page 309

1  A.   They're all a mixture of IT and grant work,
2  research administration, that kind of thing.  Research
3  administration if you want a blanket coverage of it.
4  Q.   Okay.  Now, you have also submitted, I guess,
5  paperwork to us, showing us your efforts allegedly to
6  find employment since you left the National Board?
7  A.   Uh-huh.
8  Q.   Okay.  And I see that there is a tremendous
9  amount of focus on the University of Pennsylvania and
10  on Temple University?
11  A.   Uh-huh.
12  Q.   Why?
13  A.   Why?  Because I worked in academia before.
14  They pay tuition benefits for your children to go to
15  college.  That's my main reason.  And I can tell you
16  that that's not all of my applications.  I have others
17  to Sanofi Pasteur, Bristol-Myers Squibb, Princeton
18  University, Villanova University, Penn State
19  University.
20         Where else?  There were some other drug
21  companies.  That's not all of them.  That's -- you
22  know, I accumulated a lot of them for you, but there's
23  more.
24  Q.   Okay.  I also notice, though, that you
25  withdrew applications from a number of Web sites?

Page 310

1  A.   Right.
2  Q.   Why would you be withdrawing applications at
3  the same time you're putting in applications?
4  A.   Sometimes -- oh, because at Penn you can't go
5  back.  Like, they ask you a series of questions, and
6  they don't let you get out of the window without a
7  withdrawal.  So, like, while they're asking you the
8  questions, you can see if you're really well-qualified
9  for the job.
10         And if you answer the questions "no,"
11  "no," "no," I mean, you might as well withdraw.  But
12  you have to hit you want to withdraw, or you can't get
13  out if it.  It's the way the system is set up.  And
14  there were very few of them.  Maybe three or four out
15  of a hundred.
16  Q.   Well, no.  Actually I saw more of them.
17  That's why I'm asking.
18  A.   No.  There's not a lot there.  But the only
19  way you can see -- you have to see the system.  When
20  you go into it and you apply for a job, some of the
21  supervisors or the people -- the hiring officers put
22  in a series of questions.
23         And it will be "Can you do this?  Have
24  you done this?  How long did you do this?"  And you
25  can see -- then you start to feel like, "Well, maybe

Page 311

1  I'm not qualified for it."  And then you click out
2  "cancel."  And before you click out "cancel," a window
3  pops up and says "If you click out of here, it will be
4  as a withdrawal."  So it goes in as a withdrawal.
5  Q.   Now, have you applied for any jobs through the
6  old-fashioned way with a cover letter and a resume, or
7  has everything been on line?
8  A.   Mostly been on line.  Jefferson maybe I sent
9  something.  I applied to Jefferson Hospital.  I
10  applied to Fox Chase Cancer Center.  I could just go
11  on and on.  But basically it was on line.  Nobody
12  really sends anything through the mail anymore.
13  Q.   Okay.  What do you feel has been the problem
14  in your getting other work now?
15         MR. JENNINGS: Objection to form.
16         THE WITNESS: The same problem the rest
17  of the world has.
18  BY MS. KIVITZ:
19  Q.   What's that?
20  A.   There's a lot of people applying.  You have to
21  know someone.  You know, the jobs that I have
22  interviewed for -- once I get in there -- and I just
23  went to another one at Penn.  I'm overqualified.  You
24  know, you'll have some young person call you down
25  that's a B.A., a business assistant.  And when you get

Page 312

1  there, they're, like, "Oh, well, you'll be doing a lot
2  of clerical work.  Is that a problem for you?"
3         And I'll say, "Well, yeah.  I kind of --
4  do you see my education?"
5         And they said, "Yeah.  I don't think
6  you're right for this then."  But they call you down
7  there first.
8  Q.   Are you willing to do clerical work?
9  A.   No, I'm not at this point.  No.  I don't want
10  to wind up with the same issue that I had before, you
11  know.  Would you -- are you willing to do clerical
12  work now?
13  Q.   I do clerical work every day, Honey.
14  A.   Okay.  Yeah, but then you charge $300 an hour
15  for it.  So if I could charge $300 an hour for it, I
16  would do it.
17  Q.   Okay.  Let me ask you this:  Do you think that
18  it's possible that your difficulty in finding
19  employment is also based on the fact that you've held
20  sort of different positions and not for very long on
21  your resume?
22         MR. JENNINGS: Objection to form.
23         THE WITNESS: No.  Because I was
24  home for fifteen years with my kids.  There's really
25  only one position that I held for a short period of

Page 313

1  time. The Wistar Institute -- I was there for six,
2  seven years. And I basically stayed home with my
3  kids. So I lasted there fifteen years. Does that
4  count because that's the hardest job I ever did in my
5  life?
6  BY MS. KIVITZ:
7  Q.   But I'm just saying: Do you think it's a
8  factor in the job market? Okay? Do you think there's
9  any possibility that the fact that you've worked for a
10 year and a half at Jeanes and then seven years at
11 Wistar and then stayed home for fifteen years --
12 A.   No. Because I have a friend that goes every
13 five years to a new job. Renee Brock. And you could
14 see on her resume "five years," "five years," "five
15 years," "five years."
16 Q.   You got to let me finish the question. I'm
17 sorry.
18 A.   Okay. Sorry. I was trying to answer it.
19 Q.   Do you --
20 A.   No, I don't. That's my answer.
21 Q.   You can't answer it before I ask it.
22 A.   You already asked it. You said, "Do you think
23 that, because I was in a short -- in a position for
24 seven years and then a year and a half, is that a
25 problem?"

Page 314

1  Q.   Seven years, a year and a half, four months,
2  one year. Do you think that that has hurt you --
3  A.   No.
4       MR. JENNINGS: Hold up.
5       Objection to form.
6  BY MS. KIVITZ:
7  Q.   Have you interviewed anywhere and asked flat
8  out why you didn't get a position?
9  A.   Have I asked them? Yes.
10 Q.   And what have you been told?
11 A.   "You're a really great candidate. We just
12 picked somebody else."
13      I mean, I was the last four -- he had it
14 down from eighty to four -- the doctor at Penn. He's
15 actually a doctor in, I think, psychology or
16 sociology. And he called me from his cabin in Maine.
17 And I was one of four people.
18      And he said -- he had trouble getting
19 his grant, and he hired one person, and he actually
20 called me and said, "You know, if I can, I may call
21 you at a later date for a position once I really
22 secure this grant."
23      So, you know, I've asked people from
24 Human Resource, "How was my interview? How did I
25 present myself?" I just want it for my own

Page 315

1  information. Like, from Drexel I sent an e-mail. I
2  don't normally call people. And I said, "Can you give
3  me some feedback?"
4       And I always got positive. They just
5  say it's just who the person they -- you know, who
6  they have chemistry with or whatever. Who knows? It
7  could be because I'm older and I come in and they
8  don't expect me to be older because I don't have dates
9  on my resume. I mean, I don't really know.
10 Q.   The reasons you're given for not getting the
11 jobs -- are they any different than the reasons you
12 were given when you were at the National Board and
13 applying for positions?
14 A.   I wasn't given any reason from the National
15 Board why I wasn't promoted.
16 Q.   No, no, no. When you were at the National
17 Board and you applied for positions with Temple and
18 Drexel and other places and you were turned down, what
19 I'm saying is are the reasons --
20 A.   I wasn't turned down to all of them. One of
21 them I didn't take. It was soft money. And she said,
22 "Would it be a problem for you working on a grant for
23 two years?"
24      And I said, "Yeah. I have a family."
25 So that was an issue. That's as far as that one went.

Page 316

1  Q.   Which job was that?
2  A.   That was Family Medicine.
3  Q.   Where?
4  A.   At Penn.
5  Q.   Okay. So Family Medicine -- you're saying you
6  had a job offer?
7  A.   She didn't make a formal offer, but she sent
8  me to the B.A., and he said, "Are you going to have an
9  issue if they offer the job to being on soft money and
10 the job may end in two years?"
11      And I said, "Yes. Because right now I'm
12 in a permanent job."
13      And actually when you go to
14 universities, that can be very common. So you have to
15 think before you take it. At this point when you're
16 not working, sure, I'd take it. But when you're
17 working at a job where you're not on soft money, you
18 know, generally I wouldn't apply to the ones that said
19 that.
20 Q.   Have you met with a career counsellor or a
21 vocational expert, anyone who might be able to give
22 you more guidance?
23 A.   Someone that I would have to pay?
24 Q.   Headhunter?
25 A.   Yes. They've sent me on quite a

## Page 317

1   few interviews.
2   Q.   Okay.  Which headhunters have you worked with?
3   A.   I'm trying to remember the girl's name.  Let
4   me think.  I could get them for you if you're really
5   interested.  I still have them on my computer.
6   Actually they should be in there.
7   Q.   Where?
8   A.   They're in those --
9   Q.   Well, I see monster.com, and I see a whole
10  bunch of printouts for Temple and --
11  A.   Yeah.  But you should see some --
12  Q.   -- a couple of --
13  A.   Like, if you see, like, a girl or a guy's
14  name, that is probably -- okay.  It should be in
15  there.  I'm trying to think.  One of them begins with
16  a "J."  Julie?  Jolie?  Does that sound familiar to
17  you?
18  Q.   Located where?
19  A.   I don't know.  They're all done through
20  e-mail.  I think she's in King of Prussia.  One of
21  them.  It was Jolie I think was the name.  And what
22  was the other one?  Advantix or Advance?  I don't
23  know.  If you really are interested, I can get them
24  for you.
25  Q.   Okay.  Now, has your husband taken the

## Page 318

1   position in the Domestic Relations -- and maybe it's
2   not this far along -- that you be tested vocationally
3   to see the type of work you're able to get?
4   A.   You don't know my husband.  No.  He would not
5   suggest anything like that.
6   Q.   Okay.  Is he taking the position that you're
7   capable of working?
8   A.   Oh, yes.  He knows I've been looking for work.
9   Q.   I think I'm done.
10  A.   Really?
11  Q.   Yes.  Let me just talk to her for a minute.
12       (Brief recess.)
13       MS. KIVITZ:  We're done.
14       MR. JENNINGS:  Just for the record, I
15  don't have any questions.  Thank you.
16       (At 4:40 P.M. proceedings were
17  concluded.)
18            - - -
19
20
21
22
23
24
25

## Page 319

1
2            S I G N A T U R E
3
4            I have read the foregoing
5   transcript of my deposition given on October 24, 2007,
6   and it is true, correct, and complete, to the best of
7   my knowledge, recollection, and belief, except for the
8   list of corrections, if any, on the errata sheet
9   herewith.
10            _____
                DIANE ROSETSKY
11
12            _____
13                    DATE
14            - - -
15
16
17
18
19
20
21
22
23
24
25

## Page 320

1
2            C E R T I F I C A T E
3
4            I, Susan K. MacSorley, being a
5   Registered Professional Reporter and Notary Public, do
6   hereby certify that the foregoing oral testimony of
7   Diane Rosetsky was taken stenographically by me on
8   October 24, 2007, after said witness was duly sworn or
9   affirmed prior to the commencement of her testimony,
10  and that this deposition transcript is a true and
11  correct transcript of the same, fully transcribed
12  under my direction, to the best of my ability and
13  skill.
14            I further certify that I am not a
15  relative, employee, or attorney of any of the parties
16  in this action; that I am not a relative or employee
17  of any attorney in this action; and that I am not
18  financially interested in the event of this action.
19
20            _____
21            Susan K. MacSorley, R.P.R.
22            Notary Public in and for the
23            Commonwealth of Pennsylvania
24            My Commission expires June 28, 2011
25