# Exhibit "A"

### Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -           COPY

DIANE ROSETSKY,              :  CIVIL ACTION
         Plaintiff           :
                             :  NO. 07-3167
         vs.                 :
                             :
NATIONAL BOARD OF MEDICAL EXAMINERS :
OF THE UNITED STATES OF AMERICA, INC., :
         Defendant           :

                          - - -

         ORAL DEPOSITION OF DIANE ROSETSKY, taken
before Susan K. MacSorley, Registered Professional
Reporter and Notary Public, held in the law offices of
Troiani/Kivitz, L.L.P., 38 North Waterloo Road, Devon,
Pennsylvania 19333, on Wednesday, October 24, 2007, at
10:07 A.M.

                          - - -


              Susan K. MacSorley, R.P.R.
                 211 Kleyona Avenue
              Phoenixville, Pennsylvania  19460
                      (610) 917-0221
```

### Page 5

         (It is hereby stipulated and agreed by and between counsel for the respective parties that sealing and certification are waived and that all objections, except as to the form of the question, are reserved to the time of trial.)

                          - - -

         DIANE ROSETSKY, having been duly sworn, was examined as follows:
BY MS. KIVITZ:
Q.   Okay. Ms. Rosetsky, have you ever had your deposition taken before?
A.   Not for this.
Q.   In anything?
A.   Yes.
Q.   Okay. Let me just give you a few instructions. You probably heard them before.
A.   Uh-huh.
Q.   The stenographer is going to write down what you say; so it's important that she hear every word that you say. People's inclination is to shake their head or nod. Your response needs to be audible so that she can hear you and then transcribe it.
A.   Okay.
Q.   The other thing I'd like to tell you is, if I ask you a question and it confuses you or you don't

### Page 6

understand it, please tell me, and I'll repeat it in a form that you can understand. Okay?
A.   Okay.
Q.   If I ask you a question and you answered it, I'm going to assume that the answer you gave me is what you intended to give me and that you understood the question. Fair enough?
A.   Yes.
Q.   Okay. You said your deposition had been taken before. Can you tell me in what circumstance that was?
A.   A car accident.
Q.   Okay. Was that an action filed against you or that you filed against somebody else?
A.   They filed against me.
Q.   Okay.
A.   And then there was a real estate case, a termite case on my house that I filed.
Q.   Okay. And when was that?
A.   Oh, God.
         MR. JENNINGS: When was which?
         MS. KIVITZ: The termite case.
         THE WITNESS: Both of these cases are fifteen to twenty years ago.
BY MS. KIVITZ:

### Page 7

Q.   Okay. Do you remember who you sued in the termite case?
A.   It was a realtor.
Q.   Do you remember the name of the realtor?
A.   No, I don't.
Q.   Do you remember --
A.   Harriet. That's all I remember.
Q.   Do you remember if there was a settlement or a judgment in anybody's favor?
A.   There was a settlement in our favor.
Q.   And was that a civil suit?
A.   Yes.
Q.   Are you presently employed?
A.   No.
         MS. KIVITZ: Just for the record, Rufus, so you know, your legal assistant, when she could not agree to continue today's deposition until tomorrow or Friday so that I could attend a funeral, said the reason she couldn't continue it was that Ms. Rosetsky had taken the day off work.
         MR. JENNINGS: I also have depositions all day tomorrow and all day Friday.
         MS. KIVITZ: I'm just telling you the reason that was given to me.
         THE WITNESS: No, actually I had to do

8

1  something for my son, and maybe she was talking about
2  that.
3            MR. JENNINGS:  Well, I told her I was
4  unavailable tomorrow or Friday.
5            MS. KIVITZ:  I'm just telling you the
6  legal assistant had said Ms. Rosetsky had taken the
7  day off from work.
8            MR. JENNINGS:  I don't know who you
9  spoke with and, two, what she said.
10           MS. KIVITZ:  Okay.
11           MR. JENNINGS:  So I can't comment on
12 that.
13 BY MS. KIVITZ:
14 Q.    Ms. Rosetsky, can you tell me if you've been
15 employed at all since the day you left National Board
16 of Medical Examiners?
17 A.    No.  No, I have not been employed.
18 Q.    Okay.  Can you tell me briefly about your
19 background starting with your education?
20 A.    I have an English degree from the University
21 of Pennsylvania.
22 Q.    What year?
23 A.    B.A.  1984.  I have a master's degree in
24 education from 1994 from Arcadia University, which was
25 Beaver at the time.

9

1  Q.    Is that in elementary "ed"?
2  A.    Yes.
3  Q.    Okay.
4  A.    And I have a paralegal certification from
5  Manor College, which I got in 2004.  I got another
6  degree every ten years.
7  Q.    Okay.
8  A.    And I have -- I'm halfway through a Web Master
9  Certification at Penn State, which I did not finish.
10 And I have various and sundry technical IT courses
11 that I've taken.
12 Q.    Okay.  Can you tell me briefly your job
13 history, the different places you've worked and when?
14 A.    I worked at Fox Chase and Jeanes Hospital as
15 pathology transcription manager.  I worked at --
16 Q.    Can you tell me the years also?
17 A.    1986 or '87.  Before I got married.
18 Q.    Okay.  And what year did you get married?
19 A.    1988.
20 Q.    Okay.  And so in '86 or '87, you worked where?
21 A.    Fox Chase/Jeanes Hospital.  The pathology
22 office was combined at the time.
23 Q.    Okay.  And how many years did you work there?
24 A.    About a year to a year and a half maybe.  I
25 don't recall exactly.

10

1  Q.    Okay.  And the reason you left there?
2  A.    I was brought in as a manager, and I wound up
3  doing too much of the transcription work; so it was
4  mutual.  I left, collected Unemployment.
5  Q.    Okay.  Did you feel that the transcription
6  work was beneath your ability?
7  A.    No.
8  Q.    Okay.  Why was it a problem that you were
9  doing too much transcription?
10 A.    Because they were asking me to do double work.
11 And I wound up coming in late.  They weren't paying me
12 for it.  I had to come in at night to answer questions
13 because they were open twenty-four hours, and it was
14 just....  They were having a transition with their
15 executives actually.  A lot of people were leaving.  A
16 lot of the doctors left.  It was a bad situation; so I
17 decided to go somewhere else.
18 Q.    Okay.  And upon leaving there, did you go
19 someplace else?
20 A.    Actually I went back to school.  I got
21 married, went to Beaver College.
22 Q.    Okay.  What is the next employment that you
23 had?
24 A.    I worked for the School District of
25 Philadelphia for a while substitute teaching.

11

1  Q.    Okay.  And what years would that be?
2  A.    It was on and off for, you know, when I was
3  raising my kids.  I had a baby in 1989; so I was a
4  stay-at-home mom mostly for most of that time.  I have
5  three children.
6  Q.    Okay.  Can you just, as best as you can, tell
7  me when you believe you did substitute teaching in the
8  Philadelphia schools? the years?
9  A.    Oh, God.  Maybe 1988, 1989, sometime in the
10 90's.  You sign up with this thing called the "Herb
11 (phonetic) System," and it just calls you.  And if you
12 want to take the job, you take it; if you don't, you
13 don't.
14           I was a long-term substitute at the
15 Spruance School for a few months.  I'm trying to think
16 what year that was.  Actually I did some long-term
17 positions a couple times.  I don't know.  You could
18 call the School District.  Maybe they could tell you.
19 Q.    Okay.  At some point did you go back to
20 full-time employ?
21 A.    No.  I was home with my kids.
22 Q.    Okay.
23 A.    And I was getting my master's degree.
24 Q.    Okay.  At any point did you go back to
25 full-time employ?

```
                                                    12
 1   A.      No.  I worked -- I did some part-time work for
 2   my husband but nothing full time.  I was home with my
 3   kids.
 4   Q.      Okay.
 5   A.      I actually didn't do part-time work for my
 6   husband until he owned a store in 2002, 2001 maybe.
 7   I don't remember when he bought it.
 8   Q.      Okay.  In 2001 or '02 what is the store that
 9   he bought?
10   A.      Checks 54th, Inc.
11   Q.      And what type of business is that?
12   A.      It's a check cash.
13   Q.      Okay.  What sort of work did you do?
14   A.      I just did some background checks on people.
15   I did some legal work, filing when there were bad
16   checks and that kind of thing.
17   Q.      Okay.  And when you say you did a background
18   check, what would you do?
19   A.      I did Internet searches, see if the person's
20   Social Security number was active, found their
21   addresses, looked to see if they had any other check
22   fraud against them.  I had some issues with the Social
23   Security Department where, you know, someone had died
24   and they were still cashing checks.  That kind of
25   thing.
```

```
                                                    13
 1   Q.      Okay.  And when you say you did filing, what
 2   type of filing?
 3   A.      Filing you mean -- in court for civil.  I
 4   would just go to the court and file for civil for
 5   collections.  There were actually some criminal
 6   actions, but he had to do that on his own.
 7   Q.      Okay.  And bad checks are the types of actions
 8   that you would typically be responsible for?
 9   A.      Right.
10   Q.      Okay.  What was your salary?
11   A.      Maybe $80.00 a week.
12   Q.      And how many hours did you work?
13   A.      It varied.  Maybe ten hours, maybe fifteen.  I
14   didn't keep, you know, really good track of it.
15   Whatever it took me to get it done because, you know,
16   you sat on the phone a lot with Philadelphia, trying
17   to get through.
18   Q.      Okay.  And your husband's business is a check
19   cashing agency?
20   A.      Uh-huh.  Yes.
21   Q.      All right.  Do you hold any corporate office
22   in that business?
23   A.      No.  Not at this time.
24   Q.      Okay.  Did you?
25   A.      Maybe for about six months after we bought the
```

```
                                                    14
 1   business, but then I was taken off.
 2   Q.      Okay.  And what was your corporate role at
 3   that time?
 4   A.      I think I was Secretary or Treasurer.
 5   Q.      Do you know why you were taken off?
 6   A.      Yes.  We decided to take me off.  It was just
 7   a decision that we made.
 8   Q.      Okay.  And how many years did you work at
 9   Checks 54th?
10   A.      On and off, you know, while we owned the
11   business.  I guess until maybe I started working at
12   Penn, and then I stopped doing things for him.
13   Q.      Okay.  So '01-'02 to '04?
14   A.      Probably until 2003.  I didn't have time to do
15   anything.
16   Q.      Okay.  Would your income be reflected on your
17   tax returns from those years?
18   A.      Yes.
19   Q.      And following Checks 54th, did you have any
20   other employment?
21   A.      Following Checks 54th?
22   Q.      Or before?
23   A.      Just what's on my resume.  University of
24   Pennsylvania.
25   Q.      Okay.  And when did you work at the
```

```
                                                    15
 1   University?
 2   A.      Oh, no.  And I worked at Cozen O'Connor for
 3   three months, which is not on my resume.  I worked as
 4   a temp at Cozen O'Connor during the summer.
 5   Q.      All right.  And this was before you worked at
 6   Penn or before you worked at the National Board?
 7   A.      Before I worked at Penn.
 8   Q.      Okay.  And did your responsibilities include
 9   clerical work?
10   A.      Clerical what?
11   Q.      Did your responsibilities at Cozen O'Connor
12   include clerical work?
13   A.      I was actually, like, cleaning up data because
14   they bought another law firm and it wasn't compatible
15   with their system.  So that's what I was doing,
16   cleaning up computer data and files on their system.
17   Q.      Did you receive a typing test when you began?
18   A.      I think I did.  Yeah.
19   Q.      Was there any typing involved in the work that
20   you did?
21   A.      Keyboarding, yes.
22   Q.      Okay.  Now, you said you also worked at Penn.
23   Is that the University of Pennsylvania?
24   A.      Yes.
25   Q.      All right.  And when did you work there?
```

16

1  A.     I worked there for a summer from June -- was
2  it May or June of 2004, I think, or 2005. I think
3  2004 until October 1, I think.
4  Q.     Okay. Any other employment? Any other places
5  you worked?
6  A.     No.
7  Q.     And you said you had children. Can you just
8  give me their names and ages?
9  A.     Ross is eighteen and a half, Lonnie is
10 sixteen, and Max is twelve. He's going to be thirteen
11 in December.
12 Q.     Okay. And, Ms. Rosetsky, in your discovery
13 responses in this case, you indicated that you have
14 filed for divorce.
15 A.     Yes.
16 Q.     Can I just ask you when that was?
17 A.     June.
18 Q.     Of '06? '07?
19 A.     '07.
20 Q.     Okay. Are there pleadings in that case in
21 which you have made any representations concerning
22 either your income or your earning capacity?
23 A.     Pleadings?
24        MR. JENNINGS: Object to form.
25 BY MS. KIVITZ:

17

1  Q.     In other words, is there a Divorce Complaint
2  filed?
3  A.     There is a Complaint filed, yes.
4  Q.     Okay. And that is in Montgomery County?
5  A.     Yes.
6  Q.     All right. Is there also a Support or Alimony
7  Complaint filed by you or by your husband?
8  A.     A Support Complaint, or is it in the
9  Complaint?
10 Q.     Is there a request in any Complaint or
11 Petition made by you for either support or alimony?
12 A.     I don't know. I'd have to look. An attorney
13 wrote it, and I really didn't....
14 Q.     All right. Have there been any support or
15 alimony or equitable proceedings in Montgomery County
16 before a Judge or a Master?
17 A.     No. He still lives with me.
18 Q.     Okay. Do you know if he has filed a Petition
19 or Count for any sort of support or alimony from you?
20 A.     No, he has not.
21 Q.     Are you being paid at this point any sort of
22 temporary alimony or support or alimony pendente lite
23 by Mr. Rosetsky?
24 A.     No.
25 Q.     Is he paying all of the household expenses

18

1  associated with living with you?
2  A.     Yes.
3         MS. KIVITZ: Okay. I'm going to ask
4  that this be marked Defense Exhibit 1 and shown to
5  Ms. Rosetsky (indicating).
6         MR. JENNINGS: Do you have a copy for
7  me?
8         MS. KIVITZ: I'm going to have you share
9  it with her.
10        (Whereupon the Reporter marked
11 Ms. Rosetsky's National Board of Medical Examiners
12 Employment Application as Exhibit No. D-1 for
13 identification.)
14 BY MS. KIVITZ:
15 Q.     Ms. Rosetsky, I've shown you your Employment
16 Application that you submitted to the National Board.
17 Do you recall that?
18 A.     Yeah.
19 Q.     Okay. And do you see the Notification and
20 Agreement on the back, certifying that all answers
21 were true, accurate, and complete?
22 A.     Yes.
23 Q.     Okay. You read that at the time before you
24 signed it?
25 A.     I don't know. I may have. Probably not, but

19

1  I had seen what it was.
2  Q.     Do you want to take a minute now and read it?
3  A.     (Complying.)
4         Okay.
5  Q.     All right. Can you describe to me what that
6  is that you just read?
7  A.     It says to me if this is accurate.
8  Q.     Okay. And that is your signature on 9/16/05?
9  A.     Uh-huh. Yes.
10 Q.     Do you see -- if you could, go to Page 2.
11 A.     Yes.
12 Q.     Do you see the "University of Pennsylvania" at
13 the top of the page?
14 A.     Yes.
15 Q.     Okay. Do you see the reason for leaving?
16 A.     Yes.
17 Q.     Can you tell me what you wrote?
18 A.     I wrote "Position eliminated."
19 Q.     Now, was that the reason that you left the
20 University of Pennsylvania?
21 A.     Yes. She did not rehire somebody in my
22 position to the best of my knowledge. She rehired a
23 contract specialist.
24 Q.     I'm sorry. She did not rehire someone in your
25 position?

**20**

1  A.      A staff assistant, no.
2  Q.      Okay.  Did you receive correspondence from the
3  University of Pennsylvania telling you that the
4  position was going to be eliminated?
5  A.      No.  She just told me that, the way that I was
6  functioning, she was not interested in somebody doing
7  databases or technical work and that, the way that the
8  position was described, she was going to change it.
9  Q.      She sent you a letter saying that she was
10 going to be changing --
11 A.      No, she didn't send me a letter.  This was
12 discussed by us when I left.
13 Q.      Okay.  Do you recall --
14 A.      And then I have a letter of recommendation
15 from her.
16 Q.      I appreciate that.  But if you could listen to
17 the question, I think this would go faster.
18         Do you recall receiving correspondence
19 from the University of Pennsylvania at the time your
20 employment was terminated?
21 A.      Correspondence, no.
22         MS. KIVITZ:  Okay.  Would you kindly
23 mark that Defense Exhibit 2 (indicating).
24         (Whereupon the Reporter marked a letter
25 dated September 22, 2004, to Diane Rosetsky from

**21**

1  Elizabeth Bien as Exhibit No. D-2 for identification.)
2         THE WITNESS:  Ah, yes, she did give this
3  to me.  I thought you meant did I receive it in the
4  mail.
5  BY MS. KIVITZ:
6  Q.      Okay.  So on September 22, 2004, you recall
7  receiving this letter, D-2, from Elizabeth Bien at the
8  University of Pennsylvania?
9  A.      Yes.  Un-huh.
10 Q.      Okay.  And am I correct that it does not say
11 the position was eliminated?
12 A.      Yes.  Well, it says "terminated."
13 Q.      Right.  And can you read me the second
14 paragraph in terms of --
15 A.      It says -- sorry.
16 Q.      -- concerning the basis for the termination of
17 employment?
18 A.      "As we discussed, the quality of your
19         interpersonal interactions and the ability to
20         work cooperatively with a diverse constituency
21         did not meet the standards of this office."
22 Q.      Okay.  And that is what led to the termination
23 on September 30?
24         MR. JENNINGS:  Objection to form.
25         THE WITNESS:  Well, that's what she

**22**

1  claimed, but that's not what led to it.  You have to
2  understand that her husband has a multi-million dollar
3  grant there.  And her position was questionable, but I
4  wasn't going to be able to argue with that.
5  BY MS. KIVITZ:
6  Q.      Okay.  What I'm asking you, Ms. Rosetsky, is
7  isn't it true that your position wasn't eliminated?
8  It was terminated?
9         MR. JENNINGS:  Objection to form.
10        THE WITNESS:  I have never said that I
11 was not terminated.  I said the position was
12 eliminated.
13 BY MS. KIVITZ:
14 Q.      Well, why did you say --
15 A.      Because that's what she told me.  She could
16 write whatever she wanted to.  But what she told me,
17 when I was sitting there, was that I was basically
18 overqualified for the position and that she just
19 wanted somebody to organize retreats and that she was
20 going to change the job description.
21 Q.      Okay.
22 A.      And she wrote me a letter of recommendation,
23 which I gave to the Board.
24 Q.      Okay.  Now, in this letter she did not say
25 that you were overqualified for the position, did she?

**23**

1  A.      No, she didn't.
2  Q.      Okay.  And she also did not say that she was
3  going to change the position and just have someone
4  organize retreats or not organize retreats; correct?
5  A.      No.  But she said that to me verbally.
6  Q.      Okay.  But the only correspondence that you
7  received in writing from Ms. Bien was concerning your
8  position being terminated based on your interpersonal
9  interactions and inability to work cooperatively?
10        MR. JENNINGS:  Objection to form.
11        THE WITNESS:  Well, that's what she
12 said.  That was her -- that's what she said because
13 she didn't want to look bad.
14 BY MS. KIVITZ:
15 Q.      I'm sorry?  She said to you that she didn't
16 want to look bad?
17 A.      No.  That's what I'm saying.  I mean, she can
18 say whatever she wants, but have you checked her
19 personnel records?
20 Q.      Well, when you say she didn't want to look
21 bad, I guess I'm asking you just to expand on that.  I
22 don't know what you mean.
23 A.      Because I tried to bring her into the 21st
24 century because her office was really behind the eight
25 ball as far as Internet technology was concerned.  And

24

1  she asked me to make a chart, which is an NIH other
2  support chart, which cross-references all of the money
3  that they received from the government on training
4  grants for all the scientists.
5         And what she asked me to do -- she gave
6  me a two thousand line Excel chart, and it would take
7  me weeks to make the charts that she wanted. So I
8  told her that I could make her a database, that it
9  would take her the push of a button.
10         And she didn't believe that I could do
11 it, but she said, "You know, I don't have anything for
12 you to do this summer; so, you know, if you want to
13 work on that, you can," because they didn't have any
14 retreats or anything.
15         So I produced it. And she wouldn't let
16 me show it to anyone. And I did get to show it to one
17 person, the assistant to a scientist by the name of
18 Skip. I forget his last name. And she loved it. And
19 then the minute after that meeting was over, she said
20 to me, "I don't think you're right for this position."
21         I said, "Why? I just made you something
22 that would have cost you a lot of money to produce."
23         She said, "I don't care," and she went
24 home that day. In the morning she came back and said,
25 you know, "I'm going to terminate your position."

25

1         She did not want the technology near her
2  like Kathy Holtzman, who had the same problem with it.
3  You're talking about two women who were the same age
4  that had no technical skills, you know, that I tried
5  to help. And they were intimidated by it.
6  Q.    So you felt that Elizabeth Bien was
7  intimidated by you?
8         MR. JENNINGS: Objection to form.
9         THE WITNESS: She was intimidated by my
10 skills. She didn't expect it because I'd stayed home
11 for fifteen years with my kids. And I think
12 basically, you know, the issue that I've had with
13 these two positions was they did not expect me to have
14 any technology skills that I had.
15         And they were asking me to make card
16 files and those kinds of things. And when I offered
17 to do something more advanced that they didn't
18 understand and -- actually this woman said to me, "I
19 don't want to have to learn a database."
20         And I told her, "Well, you really don't
21 have to learn anything. It's, you know, the theory of
22 encapsulation. You'll just have to bush a button."
23         And she said, "Oh, no, no. You know, we
24 don't want any of that."
25         And actually there was another girl in

26

1  the office who still works there, and she was
2  interested in what I was doing. And she came down to
3  my office, and Liz got angry at both of us because,
4  even though the girl had nothing to do, she came down
5  and was trying to learn from me.
6  BY MS. KIVITZ:
7  Q.    Okay.
8  A.    You know, it's not always what things look
9  like.
10 Q.    The position at Penn was a
11 technologically-based position, was it not?
12 A.    Yeah. Actually, as I remember the job
13 description said, she wanted somebody to create and
14 maintain databases for the grants in her office. And
15 she wanted --
16 Q.    That did involve technology, did it not?
17 A.    Yes. But when I started to do it, she was
18 freaked by it. And she said, "I just want somebody to
19 do retreats."
20         That was another part of the job, doing
21 retreats, which was setting up luncheons and that kind
22 of thing.
23 Q.    Your position at National Board of Medical
24 Examiners also was a technologically-based position,
25 was it not?

27

1  A.    Part of it. Yeah, it was.
2  Q.    Okay. And that's what you were hired to do
3  among the different roles that you were to perform
4  there?
5  A.    Yes.
6         MR. JENNINGS: Objection to form.
7  BY MS. KIVITZ:
8  Q.    Now, you wrote to Ms. Bien I guess by e-mail
9  on September 23, the day after you got this letter?
10 A.    Uh-huh.
11 Q.    Okay.
12 A.    Did I write to her? Oh, I don't know if I
13 wrote to her. What did I write to her?
14         MS. KIVITZ: I'll ask that this be
15 marked --
16         THE WITNESS: It's over three years
17 ago.
18         MS. KIVITZ: -- as Defense Exhibit 3
19 (indicating).
20         (Whereupon the Reporter marked an e-mail
21 dated 9/23/04 to Liz from Diane as Exhibit No. D-3 for
22 identification.)
23         THE WITNESS: That's one of my e-mails
24 to her.
25 BY MS. KIVITZ:

```
                                                28
 1   Q.      I'd like for you to take a second and take a
 2   look.
 3   A.      (Complying.)
 4           Who's Chambrel?  I don't know anyone by
 5   that name.  And this looks like it's been retyped in.
 6   I don't know anyone by the name of Chambrel.  Oh,
 7   Chambrel?  Yeah.  At this point Liz was going around
 8   to the different offices --
 9   Q.      Wait.  Just read the whole thing first.  Okay?
10   A.      (Complying.)
11           Yeah.  Okay.
12   Q.      All right.  Do you recall sending this --
13   A.      Yes.
14   Q.      -- to Elizabeth Bien?
15   A.      I did send it to her.
16   Q.      Okay.  Do you remember telling her that you
17   managed to get along -- you tried to get along with
18   people as one of the messages in this e-mail?
19   A.      Yes.
20   Q.      Do you remember telling her that you even got
21   along with a Palestinian supporter you shared the
22   office with?
23   A.      That's right.
24   Q.      Do you remember telling her that she perceived
25   you as threatening?
```

```
                                                29
 1   A.      Yes.
 2   Q.      Do you remember telling --
 3   A.      She perceived my skills as threatening.
 4   Q.      Do you remember telling her that you felt your
 5   work performance had outweighed any of the minor
 6   incidents that she referenced?
 7   A.      No.
 8   Q.      Would you look at the fifth paragraph, the
 9   bottom paragraph on the first page?
10   A.      (Complying.)
11           Yes.  It's in quotes because there
12   weren't any incidents.  She got upset when I went --
13   she kept asking me to get some information from one of
14   the physicians, and he never produced it.  So I went
15   to his office, and he was very glad that I was there.
16   And he sat down with me, and I helped him write a
17   letter that he had to write.
18           And she got really angry because I went
19   to his office, that I was being pushy.  I mean, she
20   was at this point -- when people start to feel
21   threatened that your skills are better than theirs,
22   they start picking on you.
23           And I knew this had already started
24   happening.  Same thing that Kathy did, you know, like,
25   with her editing that she didn't know how to write.
```

```
                                                30
 1   And I was trying to help her do some editing that she
 2   asked me to, and then she threw it in the trash can.
 3           But, yeah, this is -- you know, she
 4   started -- they start picking on things.  When they
 5   don't have anything substantial, they'll go around,
 6   and they'll start intimidating other people that are
 7   beneath them, their subordinates, and try to get them
 8   against you.
 9           This is, you know, a tactic that a lot
10   of administrators use.  I know that -- and my brother
11   always says that to me.  He's a top administrator at
12   Dow Jones.  I mean, this is what this woman did, and
13   this is what Kathy did.  They're very similar, same
14   age women, no technology skills, that just did not
15   want any technology near them.
16   Q.      Now, did you ever feel in any other position
17   picked on because someone felt inferior to you or
18   threatened by your skills?
19   A.      No.  I hadn't worked in fifteen years.  So
20   really, you know, I just -- I'm trying to remember if
21   I -- no.
22   Q.      Okay.  Can you look at the first -- top
23   paragraph on Page 2?
24   A.      (Complying.)
25           Uh-huh.
```

```
                                                31
 1   Q.      Do you see how you said you had a strained
 2   relationship with Dr. Cheston?
 3   A.      Yeah.  I was intimidated by Dr. Cheston; he
 4   wasn't intimidated by me.
 5   Q.      Okay.
 6   A.      You got it reversed.
 7   Q.      Well, are these your words:
 8           "The reality of this whole situation
 9           reminds me of a predicament I was in when I
10           worked at Wistar"?
11   A.      Yeah.  I was intimidated by Dr. Cheston.  I
12   worked for him.  But, you know, I didn't get fired, or
13   I didn't have any trouble with him.
14   Q.      Okay.
15   A.      He was just a lot older than me, and it was
16   intimidating to me.
17   Q.      And what did you mean when you said you had a
18   strained relationship with him?
19   A.      That I was afraid to go sit in his office.  I
20   mean, he was nice to me.  He liked me.  I was just in
21   my twenties, and he was in his sixties, and he just
22   made me a little nervous.
23   Q.      When did you work at Wistar?
24   A.      From 1979 to '85 or '86.  I don't remember
25   exactly.
```

### Page 32

```
 1  Q.    And what was your reason for leaving Wistar?
 2  A.    I left Wistar for a variety of reasons, but
 3  basically I moved home. I moved out of town.
 4  Q.    Okay. Meaning you moved to Huntingdon Valley?
 5  A.    No. I moved back to my parents' actually.
 6  Q.    In 1986?
 7  A.    '85 or '86. Yes.
 8  Q.    And where was that?
 9  A.    Philadelphia.
10  Q.    Okay. So --
11  A.    The outskirts of Philadelphia.
12  Q.    Okay. So because you were -- and where on the
13  outskirts of Philadelphia?
14  A.    Pine Road.
15  Q.    Okay. So Pine Road was too far to commute to
16  Penn?
17  A.    I didn't like driving there at that time. I
18  was not a big driver.
19  Q.    And where did you live when you first had
20  taken the job?
21  A.    In town.
22  Q.    Okay. So when you moved from center city to
23  Pine Road, you left Wistar?
24  A.    Yeah. I think that that's when I left. Or I
25  left, like, a few months afterwards maybe because I
```

### Page 33

```
 1  didn't like the driving.
 2  Q.    All right. Is it possible you were asked to
 3  leave?
 4        MR. JENNINGS: Objection to form.
 5        THE WITNESS: No, I was not asked to
 6  leave. Actually this is more complicated than that.
 7  I left on my own.
 8  BY MS. KIVITZ:
 9  Q.    For what reason?
10        MR. JENNINGS: Objection to form.
11        THE WITNESS: Well, actually I left
12  because I didn't like the job that I was in. I left
13  because I didn't like who I was working for. He was
14  sexually harassing me, if you want to know the truth.
15  BY MS. KIVITZ:
16  Q.    Who was that?
17  A.    Kurt Mayer. But I never said anything to
18  anyone.
19  Q.    Okay. Can you tell me what exactly occurred
20  that led you to believe you were being sexually
21  harassed?
22  A.    He was leaning up against me in the office,
23  coming behind the desk. He was, you know, saying
24  different names to me instead of using my regular
25  name.
```

### Page 34

```
 1  Q.    Okay. Now, '79 to '86 time frame, you were
 2  about how old? In your twenties?
 3  A.    Yeah.
 4  Q.    Okay. And Kurt Mayer -- how old was he?
 5  A.    He was in his thirties.
 6  Q.    And what about Dr. Cheston?
 7  A.    Cheston? He must have been in his sixties
 8  maybe.
 9  Q.    Okay. Now, you said you were intimidated by
10  Dr. Cheston because he was older?
11  A.    Uh-huh.
12  Q.    Correct?
13        MR. JENNINGS: Yes?
14        THE WITNESS: Yes.
15  BY MS. KIVITZ:
16  Q.    And --
17  A.    He was nice. I mean, I liked him. He just
18  had a big, fancy office. I used to sit out
19  (indicating), and he could see me, and we used to talk
20  to each other like this. But his old secretary used
21  to come in, and she was always sitting next to him
22  because I knew her. Her name was Sue.
23  Q.    Okay. Now, Kurt Mayer -- can you tell me what
24  his position at Wistar was?
25  A.    Yeah. They brought him in as a new -- I think
```

### Page 35

```
 1  he was development, a development officer or
 2  something, some new position.
 3  Q.    All right. And can you spell his name for me?
 4  A.    I think it was M-a-y-e-r.
 5  Q.    How about Kurt?
 6  A.    K-u-r-t, I think, or C-u-r-t. I think it was
 7  K-u-r-t.
 8  Q.    Okay. Now, when he began to sexually harass
 9  you, what did you do? Who did you talk to about it?
10  A.    Nobody. Those days you didn't tell anybody.
11  You just -- I just decided leave. And actually I met
12  someone about five years afterwards. She had a
13  similar problem with him. Her name was Sharese
14  (phonetic). He was harassing her in some manner.
15  Q.    And her last name?
16  A.    Sharese Kent.
17  Q.    And you said in those days you didn't tell
18  anybody?
19  A.    Huh-uh.
20  Q.    So how long did this harassment go on until
21  you left your position?
22  A.    I don't remember. A few months maybe. Not
23  too long.
24  Q.    Did you leave it for another job?
25  A.    No. I just left.
```

Page 36

```
 1  Q.    Okay. So if you were to say on various job
 2  applications that you left Wistar because you moved,
 3  that wasn't the real reason you left. Am I correct?
 4  A.    No. It's one of the reason why I left.
 5  Q.    But you just said the real reason you left was
 6  because you had been sexually harassed by Kurt Mayer?
 7  A.    Well, one of the reasons was. It was also I
 8  didn't want to drive back and forth. I drove it for a
 9  while back and forth from where my parents live, but
10  you have to come up U.S. 1, and I wasn't a big driver
11  back then.
12  Q.    Well, if you had to say which reason took
13  prominence, which was the more important reason that
14  you decided you couldn't work there anymore? Which
15  would you have said between those two?
16        MR. JENNINGS: Objection to form.
17        THE WITNESS: I'd say they were about
18  equal. I mean, the two between the stress of having
19  the drive on the expressway and Kurt, you know, being
20  really difficult to work with.
21  BY MS. KIVITZ:
22  Q.    Okay. So fifty percent Kurt; fifty percent
23  that the expressway was --
24  A.    Maybe.
25  Q.    -- too hard?
```

Page 37

```
 1  A.    It's subjective what I'm saying but, you know.
 2  Q.    Okay. Do you remember writing to Ms. Bien
 3  again after the 23rd?
 4        MS. KIVITZ: I'll ask that this be
 5  marked Exhibit 4 (indicating).
 6        (Whereupon the Reporter marked an e-mail
 7  dated 9/24/04 to Liz Bien from Diane Rosetsky as
 8  Exhibit No. D-4 for identification.)
 9        THE WITNESS: That's right.
10  BY MS. KIVITZ:
11  Q.    Okay. In this memo a day later, you concluded
12  that she had been right that the two of you would be
13  better off not working together. My first question is
14  what made you change your mind in the interim?
15  A.    I was just appeasing her.
16  Q.    Okay. And why would that be?
17  A.    Well, it's always good to get, you know, a
18  letter of recommendation. So I asked her for one.
19  Q.    Okay. So you didn't agree that the two of you
20  were better off not working together, but you said it
21  so that you might get a letter of recommendation?
22        MR. JENNINGS: Objection to form.
23        THE WITNESS: I don't know. I think
24  that's kind of a crazy question, you know, if I didn't
25  agree or not agree. I mean, if she'd been willing to
```

Page 38

```
 1  work with me, I would have continued to work with her.
 2  If she would have been willing to, you know, see the
 3  value in what I was doing, I was willing to do --
 4        You know, I did hole punching for her.
 5  I did stapling for her. I walked letters across
 6  campus in a hundred-degree heat until I had blisters
 7  on my feet for her, and I didn't complain about any of
 8  the treatment.
 9        I mean, she had a young girl sitting
10  there with a fan blowing on her with her feet up on
11  the desk and sent me out in a hundred-degree weather
12  to have a piece of paper signed all around the campus.
13  And I came home, and my feet were, like, raw. And I
14  didn't say a word to her.
15        And, you know, she was doing these kinds
16  of things at that point because I guess she wanted to,
17  you know, make sure that I knew that, you know, I
18  wasn't beyond doing those things. So I did a lot of
19  clerical stuff for her.
20  BY MS. KIVITZ:
21  Q.    Was hole punching and Xeroxing, the clerical
22  work -- was that part of the job --
23  A.    When you put grants out, everybody kind of
24  does that. But, you know, we weren't always putting
25  out grants at that point. She just kind of -- the
```

Page 39

```
 1  thing with walking around, getting the letter
 2  signed -- that was not part of my job description and
 3  especially in that kind of heat. I don't think you
 4  would have sent a dog out to do that.
 5  Q.    Were you okay with the hole punching and the
 6  Xeroxing?
 7  A.    Yeah. Helping with the grants, you know, that
 8  kind of thing, yeah. I did that at Wistar.
 9  Q.    Did you feel that that utilized all of your
10  skills?
11  A.    Did hole punching utilize my skills? I don't
12  know. Would it utilize yours skills? I mean, you
13  know, my children like to do hole punching sometimes.
14  I mean, obviously that's kind of a ridiculous
15  question.
16  Q.    Did you feel that it was beneath your skills?
17  I'm just trying to understand.
18  A.    Beneath my skills to hole punch? No. I knew
19  how to hole punch. I had that skill.
20  Q.    Did you feel that that was something that you
21  should be doing?
22  A.    When it came to grants crunch, you know,
23  working with grants on a deadline, I always
24  participated in that.
25  Q.    Okay. And the Xeroxing?
```

40

1  A.   Yeah. Everybody did that when it came down to
2  the deadline.
3  Q.   Okay. Now, you said that you said that
4  Ms. Bien was right that the two of you would be better
5  off not working together to appease her; correct?
6  A.   Uh-huh.
7        MR. JENNINGS: Yes?
8        THE WITNESS: Yes. Sorry.
9  BY MS. KIVITZ:
10 Q.   And that was in the hope that she would give
11 you a letter of recommendation?
12 A.   You know, you're kind of between a rock and a
13 hard place. If somebody wants to lie about you to
14 save their own reputation, you know, that's just what
15 you do. It's political although I'm not a political
16 person, but that's what I did.
17 Q.   You also said:
18        "It's a shame that the database, which
19        is an extremely valuable tool for submitting
20        grants, is so close to being finished."
21 A.   Right.
22 Q.   What did you mean by that?
23 A.   She wouldn't let me -- it wasn't completely
24 finished. I mean, I can't explain it if you don't
25 know how to build a database. It's almost like an oil

41

1  painting. It's never really finished until you say
2  it's finished. There's always something to be done.
3        There were a couple functions that had
4  to be put into it, you know, nothing major. Somebody
5  could have -- you know, she had it on the network.
6  Somebody could have picked up on it and finished it
7  for them, but I don't think she ever showed it to
8  anyone because she didn't want to have to use it.
9  Q.   Now, you said in the same memo that you'd be
10 willing to work as an outside consultant and finish
11 it?
12 A.   Right. I said, "Do you want me to finish it?"
13 because I put so much work into it. It's kind of like
14 not being allowed to, like I said -- like, you know,
15 starting a painting and somebody taking it away from
16 you and not being allowed to finish it.
17 Q.   Why did you think they would want you to work
18 as an outside consultant if they had terminated you
19 for not getting along with the staff?
20        MR. JENNINGS: Objection to form.
21        THE WITNESS: I wasn't terminated for
22 not getting along with the staff. That was Liz's way
23 of justifying her not having me work there.
24 BY MS. KIVITZ:
25 Q.   Why did you think that Penn would want to hire

42

1  you as an outside consultant if you had been
2  terminated two days earlier?
3  A.   Because they do it most likely with other
4  people. Depends on who you know there. And, you
5  know, I didn't think it was a big thing.
6  Q.   Did Ms. Bien rehire you in any capacity?
7  A.   No. She just probably buried that database
8  somewhere.
9        MS. KIVITZ: Okay. I'll ask that this
10 be marked as the next exhibit (indicating).
11       THE WITNESS: She actually was causing
12 some trouble for me at Wistar afterwards.
13       (Whereupon the Reporter marked an e-mail
14 dated 1/12/05 to Dr. Rubenstein from Diane Rosetsky as
15 Exhibit No. D-5 for identification.)
16       MS. KIVITZ: Off the record.
17       (Discussion was held off the record.)
18 BY MS. KIVITZ:
19 Q.   Can you first tell me what you mean by she
20 caused trouble for you at Wistar after?
21 A.   I applied for a position there, and I was
22 being considered for it. And the last person I had to
23 interview with was Meanhart (phonetic) Herlyn. I had
24 applied for a job there, and I got through -- I think
25 I got through the first interview.

43

1        And I had to interview with Meanhart
2  Herlyn, and he cancelled on me. And one of the
3  reasons, I'm sure, is because he owns an airplane with
4  Liz Bien's husband, and I'm sure she said something to
5  him.
6        So I sent her a certified letter, on the
7  recommendation of an attorney that I'm friends with,
8  telling her that she's not to discuss my employment
9  there or slander or libel me if I applied for a
10 position because I had a letter of recommendation from
11 her.
12 Q.   All right. Now, after Ms. Bien did not hire
13 you, did you then write a letter --
14       Would you take a look at the next
15 exhibit, please?
16 A.   Yes.
17 Q.   -- to the Executive Vice President for the
18 Health System?
19 A.   No. This is Dr. Rubenstein.
20 Q.   Okay. And what is his position?
21 A.   He's the Dean of the medical school.
22 Q.   Okay. And you wrote to him on what date?
23 A.   I don't know. Is there a date on here?
24       January, 2005.
25 Q.   Okay. So this was several months after you

```
                                                    44
 1  had been terminated?
 2  A.    Yes.  I guess so.
 3  Q.    Okay.  And you started out by saying:
 4              "After much debate, I have decided to
 5         contact you..."?
 6  A.    Right.
 7  Q.    Was that some sort of internal debate or a
 8  debate you were having with someone?
 9  A.    It was an internal debate.
10  Q.    Okay.  And you contacted him also concerning
11  this database?
12  A.    Uh-huh.  I thought he might be interested in
13  it.  Yes.  Then I found out that he doesn't even -- I
14  was told he doesn't even use e-mail and that his staff
15  answers his e-mails.  So the head of this medical
16  school is very non-IT.
17  Q.    All right.  Now, this was after Ms. Bien had
18  made it clear that she was not interested in having
19  this database completed; correct?
20  A.    She never made it clear.
21        MR. JENNINGS:  Objection to form.
22        THE WITNESS:  She never answered me.
23  She said, "I'll consider it."  She sent me an e-mail
24  saying, "I'll consider it.  I'll let you know."
25  BY MS. KIVITZ:
```

```
                                                    45
 1  Q.    Okay.  Did you feel that it was appropriate to
 2  go behind her back and write this letter?  Was she
 3  copied on it?
 4        MR. JENNINGS:  Objection.
 5  BY MS. KIVITZ:
 6  Q.    Let me ask it that way.
 7  A.    Probably not, but I don't think it's going
 8  behind her back.  She doesn't own the medical school.
 9  She's an employee there.
10  Q.    Okay.  So this was someone else at the medical
11  school?
12  A.    This was the head of the medical school,
13  Dr. Rubenstein.
14  Q.    Okay.  Did he respond to you?
15  A.    No.  Because I found out he actually doesn't
16  even read e-mails, I was told.
17  Q.    Okay.  And who told you that?
18  A.    I went in for an interview there.  Actually it
19  was his assistant, and they said that he doesn't use
20  e-mail.  I don't know if he does now.  This is a few
21  years ago.
22  Q.    Okay.  Now, by the way, at Wistar you had or
23  have a friend there by the name of Ruggiero?
24  A.    Michael.  Yes.
25  Q.    Okay.  Was he your direct supervisor when you
```

```
                                                    46
 1  worked at Wistar?
 2  A.    No.  But I had a lot of interaction with him
 3  for the grants.
 4  Q.    Who were your direct supervisors when you
 5  worked at Wistar?
 6  A.    She's not there anymore.  Sara McClain
 7  (phonetic).
 8  Q.    Anybody else?
 9  A.    Dr. Cheston.
10  Q.    Okay.  Anybody besides --
11  A.    Kurt Mayer.
12  Q.    Okay.  Anybody else?
13  A.    Linda Bourbon (phonetic).  She was there for a
14  very short time.  She was terminated.
15  Q.    Okay.  Concerning the sexual harassment back
16  then, you didn't file any sort of E.E.O.C. action
17  then?
18  A.    No.
19  Q.    Okay.  Did you report what Mr. Mayer did to
20  either Sara McClain or Dr. Cheston or the other woman
21  that you named?
22  A.    No.  I wasn't working for them.  I was working
23  for Kurt only in his office.
24  Q.    Okay.  Did you report it to Human Resources?
25  A.    No.  They didn't have that then.
```

```
                                                    47
 1  Q.    Okay.  There was no --
 2  A.    This is before the Judge Thomas thing where
 3  the woman complained of sexual harassment.
 4  Q.    Okay.
 5  A.    This was before all that.
 6  Q.    So in the 80's Wistar had no Human Resources
 7  Department?
 8        MR. JENNINGS:  Objection to form.
 9        THE WITNESS:  They had a Human Resources
10  Department.  I never said that.  They just -- you
11  know, nobody discussed these things with you.
12  BY MS. KIVITZ:
13  Q.    Okay.
14  A.    It was embarrassing more than anything.
15        MS. KIVITZ:  Okay.  I'll ask that this
16  be marked the next exhibit (indicating).
17            (Whereupon the Reporter marked a letter
18  dated July 22, 2005, to Mrs. Alan Gewirtz from Diane
19  Rosetsky as Exhibit No. D-6 for identification.)
20  BY MS. KIVITZ:
21  Q.    Is this July 22, '05, letter the letter to
22  which you referred that you sent to Elizabeth Bien?
23  A.    Yes, it is.  That's exactly what I was
24  explaining to you about with Meanhart Herlyn.  This is
25  the letter I sent her.
```

48

```
 1  Q.     Okay.  Now, is there some reason why you sent
 2  it to her home address and didn't send it to her at
 3  the medical school?
 4  A.     No.  Just wanted to make sure she got it.
 5  Q.     Okay.  Was there some doubt in your mind
 6  whether she would get it at the medical school?
 7  A.     Yes.
 8  Q.     Why?
 9  A.     Because it's inter-office mail.  I just sent
10  it to her personally.  It was a personal issue.  This
11  was not a work issue.  As far as I was concerned, this
12  was a personal issue at this point, her conduct
13  between me and her.  It had nothing to do with Penn.
14  It had to do with her personally.
15  Q.     Well, Penn had terminated you; correct?
16         MR. JENNINGS:  Objection to form.
17         THE WITNESS:  No.  She terminated me.
18  Penn had no idea of the job that I was doing there.
19  BY MS. KIVITZ:
20  Q.     But she was acting on behalf of the University
21  of Pennsylvania; correct?
22         MR. JENNINGS:  Objection to form.
23         THE WITNESS:  No.  She was acting on
24  behalf of herself.
25  BY MS. KIVITZ:
```

49

```
 1  Q.     Your position was -- you were not hired
 2  personally by Elizabeth Bien?
 3  A.     Yes, I was.
 4  Q.     No, no.  My question is:  Who was your
 5  employer on your pay stubs?
 6  A.     It was Penn.  But, you know, Penn is an
 7  aggregation of personalities and people that work
 8  there.
 9  Q.     Okay.  So my question again is:  Why did you
10  not write this letter to Elizabeth Bien, care of Penn?
11  Why did you choose to write it to Mrs. Alan Gewirtz at
12  her home address?
13         MR. JENNINGS:  Objection.  Asked and
14  answered.
15         You can answer again.
16         THE WITNESS:  I don't see the point to
17  you re-asking the question when I already answered it.
18  BY MS. KIVITZ:
19  Q.     I don't believe I got an answer --
20  A.     You did get an answer.
21  Q.     -- which is why I've asked it again.
22  A.     Well, what is the difference where I sent it
23  to?  It got to her.  And it was sent certified mail.
24  It wasn't sent, you know --
25  Q.     No, no, no.  My question is:  You worked for
```

50

```
 1  Penn?
 2  A.     Yeah.
 3  Q.     You were paid by Penn?
 4  A.     Right.
 5  Q.     Why did you choose to write this to Mrs. Alan
 6  Gewirtz at her home address rather than Elizabeth Bien
 7  at the Penn address where you had worked?
 8  A.     Because --
 9         MR. JENNINGS:  I'm going to object.
10  It's been asked and answered.
11         You can answer it once more.
12         THE WITNESS:  Okay.
13         It was a personal issue between her
14  talking to Meanhart Herlyn.  It had nothing to do with
15  the University.  You know, it was her conduct that was
16  unprofessional, and Penn can't stop people from acting
17  in this manner.  And I felt that, you know, it should
18  be sent to her, and I sent it to her the best way that
19  I knew it would get to her.
20  BY MS. KIVITZ:
21  Q.     Okay.  And what happened as a result of your
22  sending this letter?
23  A.     Nothing.
24         MR. JENNINGS:  Objection to form.
25         THE WITNESS:  Nothing that I know of.
```

51

```
 1  BY MS. KIVITZ:
 2  Q.     Well, did you ever receive a response from her
 3  or from Penn?
 4  A.     No.
 5  Q.     Did you ever hire counsel?
 6  A.     No.
 7  Q.     You said before you have a letter of
 8  recommendation --
 9  A.     Yes.
10  Q.     -- from the medical school?
11  A.     Yes.
12  Q.     Who --
13  A.     Elizabeth Bien.
14  Q.     Okay.  And when was that dated?
15  A.     I don't know.  It was maybe a week or so after
16  I was terminated.
17  Q.     Okay.  Was it before the date that you wrote
18  this letter?
19  A.     Yes.  I think so.
20  Q.     Now, you said you would have no trouble hiring
21  legal counsel --
22  A.     Right.
23  Q.     -- to pursue this further.  Did you hire legal
24  counsel?
25  A.     No.  Because I actually got another interview
```

52

1  at Wistar after this. I don't know if she -- I'm sure
2  she didn't continue saying anything. But the damage
3  was already done because Meanhart Herlyn is one of
4  the -- he's Associate Director there. So the damage
5  was already done.
6          MS. KIVITZ: Okay. Would you please
7  mark this as the next exhibit (indicating).
8          (Whereupon the Reporter marked a resume
9  submitted to the National Board as Exhibit No. D-7 for
10 identification.)
11 BY MS. KIVITZ:
12 Q.    Ms. Rosetsky, I'm handing you the resume that
13 you submitted to the National Board when you applied
14 for your original employment. Do you recognize it?
15 A.    Yeah. It looks like my resume. Yep.
16 Q.    Okay. Can you take a look at it, please?
17 A.    Okay. I'm looking at it.
18 Q.    Is everything on the resume true and correct?
19 A.    Yes. It should be. Yep.
20 Q.    Did you work at Fox Chase Cancer Center
21 between 1985 and 1987?
22 A.    I worked in the Jeanes Hospital building and
23 Fox Chase Cancer Center, and Jeanes used the pathology
24 office. Yes.
25 Q.    Okay. And did you work at Wistar between '79

53

1  and '85?
2  A.    Yes. Between '79 and '86 or '79 and '85.
3  Something like that.
4          MS. KIVITZ: I'll ask this be marked the
5  next exhibit (indicating).
6          (Whereupon the Reporter marked a resume
7  submitted to the University of Pennsylvania as Exhibit
8  No. D-8 for identification.)
9  BY MS. KIVITZ:
10 Q.    I'm handing you the resume that you had
11 submitted to the University of Pennsylvania --
12 A.    Uh-huh.
13 Q.    -- in connection with your medical school
14 work.
15 A.    Right.
16 Q.    Now, on this resume you have your paralegal
17 certification as 2003.
18 A.    It's -- okay. It's probably 2004.
19 Q.    Do you know for sure which year it is?
20 A.    I'd have to look. I don't remember. I think
21 it's 2004.
22 Q.    Okay. Going further down, your employment on
23 the Penn resume you included the Checks 54th, Inc.
24 A.    Right.
25 Q.    '99 to present.

54

1  A.    Right.
2  Q.    Do you see that?
3  A.    Uh-huh. Yes.
4  Q.    Were those the actual years, '99 to '04, that
5  you worked at Checks 54th?
6  A.    Yes. To '03 probably.
7  Q.    Beginning in 1999?
8  A.    Whenever he bought the business. It was
9  either 2000 or 1999.
10 Q.    Okay. Was there any reason you didn't include
11 your employment at Checks 54th on the resume that went
12 to the National Board?
13 A.    It wasn't relevant. I tend to just put, like,
14 relevant things. I didn't put Cozen O'Connor on there
15 either because I wasn't looking for paralegal work at
16 that time. So it's more like relevant employment
17 that's on there.
18 Q.    Okay. But this would indicate, at least when
19 you've made statements that you were home for fifteen
20 years before you worked at the National Board, that
21 that is not the case? You were at least working
22 sometime around 1999?
23 A.    No. I never left the house. I worked from
24 home. And when I did work, it was things for my
25 husband that I did while my kids were sleeping and in

55

1  between breast-feedings.
2  Q.    Now, you said your position at Checks 54th was
3  office manager?
4  A.    Right.
5  Q.    Are you suggesting that you were the office
6  manager from home?
7  A.    From home. Sometimes I did his Quick Books
8  and those kinds of things and helped him. It's only a
9  sole proprietorship.
10 Q.    Okay. And, again, the tax return from 1999
11 through '03 or '04 would show how much salary you
12 earned at Checks 54th?
13 A.    Yeah. When he decided to pay me. Yes.
14 Q.    Okay. Now, on your National Board resume, you
15 indicate that you worked at Jeanes from '85 to '87?
16 A.    Right.
17 Q.    And on your Penn resume, you indicate that you
18 worked there from '87 to '89?
19 A.    Right.
20 Q.    Which of those would be correct?
21 A.    You know, this is, like, a really old resume,
22 and I probably just did it off the top of my head
23 because I don't have any, like, pay stubs or anything.
24 Q.    Which is the --
25 A.    And then I finally called and asked when I

Page 56

1  worked there, and I changed it. But the amount of
2  years was six or seven years and then about a year and
3  a half at Fox Chase.
4  Q.    Okay. Wait a minute. Which of the resumes is
5  an old resume?
6  A.    This one (indicating).
7  Q.    The one you're holding now?
8  A.    Yeah.
9         MR. JENNINGS: Well, it's Exhibit 8, to
10 make it clear.
11        MS. KIVITZ: Okay.
12 BY MS. KIVITZ:
13 Q.    But wasn't this exhibit, Exhibit 8, handed in
14 to Penn just less than a year before Exhibit 7 was
15 handed in to the National Board?
16 A.    I don't know what the date is on this.
17 Q.    Well, when did you apply for your employment
18 with the National Board of Medical Examiners?
19 A.    2005 I guess.
20 Q.    And when did you apply for your employment
21 with Penn's medical school?
22 A.    Over a period of years. I have hundreds of
23 applications in there. And you can change this, and I
24 have a lot of resumes in there tailored to different
25 jobs.

Page 57

1  Q.    When did you work there?
2  A.    2004.
3  Q.    Okay. So is it correct that you left the
4  medical school in October, '04, and began with the
5  National Board less than a year later?
6  A.    '04? Yeah. I started at the Board in June of
7  '05 or May of '05.
8  Q.    Okay. So what I'm asking you is why are you
9  calling D-8 an "old resume"?
10 A.    Because it's an older resume. I update my
11 resume, you know, all the time. This is old. This is
12 before I worked at Penn; so you're talking three, four
13 years ago.
14 Q.    Okay. Let me try this. Did you work at
15 Jeanes Hospital from 1985 to 1987, or did you work
16 there from 1987 to 1989?
17        MR. JENNINGS: Objection to form.
18        THE WITNESS: I don't know the exact
19 years. Maybe 1986 to 19 -- I didn't work there in
20 '89, I don't think, because I think my son was born
21 then. But it was a time period of a year and a half
22 in either '86 to '87, somewhere around that.
23        And I didn't have any pay stubs or
24 anything, and they don't seem to have any record of me
25 anymore there. So I don't know exactly when I worked

Page 58

1  there, but I did work there.
2  BY MS. KIVITZ:
3  Q.    Okay. Would you look at the next entry for
4  Wistar?
5  A.    Uh-huh.
6  Q.    Do you see --
7  A.    That's a typo. I told Liz that. That should
8  have been 1979. And when I went into the interview, I
9  actually said to her, "There's a typo."
10        And she said, "Okay." And she changed
11 it.
12 Q.    All right. Well, do you see that on this
13 resume your years say '87 -- I'm sorry -- '76 to '87?
14 A.    Right.
15 Q.    Okay. Can you take a look at D-7?
16 A.    (Complying.)
17 Q.    What do the years for Wistar say there?
18 A.    Yeah. Then I called them, and they said it
19 was '79 to '85.
20 Q.    Okay. So you're saying --
21 A.    You're talking twenty years ago. You expect
22 me to remember the exact dates? And I never kept my
23 resume updated when I was home with my kids.
24 Q.    Okay.
25 A.    It was, you know, in my head just when I

Page 59

1  worked there.
2  Q.    I'm just trying to find out what years you
3  worked at Wistar.
4  A.    This is correct (indicating). I actually
5  called Mike Ruggiero, and he told me it was '79 to
6  '85.
7         MR. JENNINGS: And by "this," you're
8  referring to Exhibit 7?
9         THE WITNESS: Uh-huh.
10        MR. JENNINGS: Is that "yes"?
11        THE WITNESS: Yes.
12 BY MS. KIVITZ:
13 Q.    Okay. Now, when you applied for temporary
14 employment at Cozen O'Connor, one of the questions
15 they had asked you was to describe your proudest work
16 accomplishment.
17 A.    Uh-huh.
18 Q.    Do you remember saying that that was at the
19 School of Medicine because you had created a database
20 on NIH support tables? You took an Excel spreadsheet
21 and converted it to Access.
22 A.    Yes.
23 Q.    Okay.
24 A.    I suppose. If I wrote it -- I don't recall
25 that but....