# Exhibit "A"

116

```
 1  Q.    Did you make them uncomfortable by forwarding
 2  this to either one of them?
 3              MR. JENNINGS:  Objection to form.
 4              THE WITNESS:  You'd have to ask them.
 5  BY MS. KIVITZ:
 6  Q.    Did anyone say anything to you about this
 7  article?
 8  A.    No.
 9  Q.    Did either Debbie or Faith say, "I'm not
10  comfortable doing this"?
11  A.    No.  I didn't send it to Faith, I don't think.
12  I think I just sent it to Debbie.
13  Q.    Do you remember a time that Faith said to you,
14  "Diane, get off your crusade.  I don't want to be
15  involved anymore"?
16  A.    After -- yeah.  After she told me to go down
17  to HR and complain about Kathy.  That's how much she
18  hated Kathy.
19  Q.    Do you remember if Faith told you she didn't
20  want to be involved in your crusade anymore before or
21  after you sent this article to Debbie Shelmire?
22  A.    I don't remember in respect to this article,
23  but I remember her saying that.  But Faith is a good
24  instigator, and then she backs down.
25  Q.    Okay.  Now, when you called your husband and
```

117

```
 1  you said, "Don't send me anything like this," did he
 2  laugh?  What was his reaction?  What did he say?
 3  A.    "Okay."
 4  Q.    And did he laugh?
 5  A.    No.  He just said, "Okay."
 6  Q.    Well, how did you know then that he sent it as
 7  a joke?
 8  A.    Why else would he send it?
 9  Q.    Well, you're saying you construed it as a
10  joke; correct?
11  A.    Yes.
12  Q.    Did you think that, if Kathy Holtzman saw
13  this, she would construe it as a joke?
14  A.    Maybe.  I have no idea.
15             MR. JENNINGS:  Objection to form.
16             THE WITNESS:  She had a little bit of a
17  sense of humor.  She used to send me silly things all
18  the time.  Sent them to all of us.
19  BY MS. KIVITZ:
20  Q.    Okay.  Did you think it was appropriate
21  workplace etiquette to be forwarding an e-mail to your
22  co-worker concerning an employee who shot the boss he
23  wasn't getting along with?
24  A.    Did I think it was appropriate etiquette?  At
25  the time it was not sent for that reason.  It was sent
```

118

```
 1  because -- I thought my husband was an idiot for
 2  sending it, and he's always telling me how busy he is.
 3  And I sent it to Debbie and said, "This is what my
 4  husband has time for when he's supposed to be
 5  working."
 6  Q.    Okay.  I'm going to ask you again if you
 7  thought it was appropriate workplace etiquette --
 8  A.    To forward it?  No.
 9  Q.    -- to send --
10  A.    But that isn't why I forwarded it.  I
11  forwarded it because me and Debbie were discussing
12  my -- something about my husband previously.
13  Q.    Okay.  You acknowledge that it would not be
14  appropriate workplace etiquette to forward something
15  like this as joke or not as a joke; correct?
16  A.    No.  But I had lots of things forwarded to me
17  that were inappropriate at the National Board.
18  Q.    Okay.  I'm just trying to ask you about this.
19  We're still on the same exhibit.
20  A.    Right.
21  Q.    Do you acknowledge that it was inappropriate
22  workplace etiquette to send this whether it was
23  considered a joke or not a joke?
24             MR. JENNINGS:  Objection.  Asked and
25  answered.
```

119

```
 1             You can answer it once more.
 2             THE WITNESS:  I'm not going to answer it
 3  again.
 4             MR. JENNINGS:  Answer it once more.
 5             But that's it.
 6             THE WITNESS:  Okay.
 7             I already told you I did not forward it
 8  in a malicious manner.  It was forwarded because I
 9  didn't think it was appropriate for my husband to have
10  sent it to me.
11  BY MS. KIVITZ:
12  Q.    So you didn't think it --
13  A.    So I was just sharing it --
14  Q.    -- was appropriate to receive it --
15  A.    I was sharing it with these two women that I
16  talked to multiple times during the day and sat next
17  to me.  So I didn't think it was appropriate for him
18  to have sent it to me, and I sent it to them because I
19  thought it was inappropriate.
20  Q.    Okay.
21  A.    But they were my friends.  So that's why I --
22  I thought they were my friends.  Obviously not.  But
23  that's why I sent it.
24  Q.    All right.  So I just want to be clear.
25  Instead of sending a note to your husband not to do
```

**Page 120**

```
 1   this or erasing it and deleting it, instead you
 2   forwarded it on to a co-worker; correct?
 3             MR. JENNINGS:  Objection to form.
 4             You can answer.
 5             THE WITNESS:  I forwarded it to Debbie
 6   to make a point.  Yes.
 7   BY MS. KIVITZ:
 8   Q.    Okay.  Now, you have filed a Complaint in this
 9   action, and you have made certain allegations.  And I
10   just want to be clear that we understand what your
11   allegations are.
12   A.    Uh-huh.
13   Q.    In your Complaint you say at all times
14   relevant plaintiff was supervised by Kathy Holtzman.
15   Now today you've testified that you had other
16   supervisors.  I just want to be clear.
17   A.    I had no other official supervisors.
18   Q.    Okay.
19   A.    Officially Kathy was supposed to be my
20   supervisor, but she did allow other people to give me
21   work to do.  That does not mean that I had other
22   supervisors.
23   Q.    Okay.  You contend in Paragraph 18 that,
24   during the course of your employment, you were
25   subjected to a pattern of discrimination including,
```

**Page 121**

```
 1   but not limited to, being assigned to minor clerical
 2   task not included in your job description?
 3   A.    Yes.
 4   Q.    Can you tell me what each of those minor
 5   clerical tasks were which you contend constituted
 6   discrimination?
 7   A.    Fixing typos for people other than Kathy.
 8   Doing hole punching, copying, for people other than
 9   Kathy.  Just an overall downgrading of what the
10   position was supposed to be.
11   Q.    Okay.  But if Kathy gave you those same jobs
12   to do, that was not discrimination; correct?  Doing
13   them for Kathy was okay?
14   A.    I felt that, in light of the fact that she
15   gave me no substantive work, that she was
16   discriminating against me.
17   Q.    Okay.  Maybe I misunderstood.  You identified
18   three things for me.  And you said if you had to do
19   them for people other than Kathy, that constituted
20   discrimination?
21   A.    I didn't say that I was pleased with doing
22   them for Kathy, and I didn't say it was discrimination
23   by her telling the other people that they could do --
24   you know, things for me.  I felt overall Kathy's
25   manner towards me in not allowing me to be promoted,
```

**Page 122**

```
 1   in giving me inferior work to do with my education was
 2   discriminating.
 3   Q.    Okay.  Let me --
 4   A.    She denied me a promotion and then retaliated
 5   against me, and that's why I'm here.
 6   Q.    Okay.  Ms. Rosetsky, did you consider it
 7   discrimination to fix typos or copy or punch holes if
 8   Kathy asked you to do it for her, for Ms. Holtzman?
 9   A.    Did I consider it?  Not really direct
10   discrimination.  She discriminated against me by not
11   allowing me to be promoted and telling the people that
12   I would have been working for not to hire me and then
13   retaliating against me in a very vicious manner.
14   Q.    Okay.  Listen.  I'm going to ask a question.
15   I know this is hard because I know you have a lot
16   vented up that you want to talk about too.
17   A.    Uh-huh.
18   Q.    But I'm going to ask you really to try to
19   answer my question.  Okay?  When your attorney asks
20   you questions, you're going to talk to your heart's
21   delight.  But when I ask you, I'm going to ask you to
22   try to answer what I'm specifically asking.  Okay?
23   A.    I thought that I was answering what you were
24   asking.
25   Q.    All right.  You also said that it was
```

**Page 123**

```
 1   discrimination when you were denied a promotion for
 2   which you were qualified and the position was
 3   subsequently given to a younger employee.  Can you
 4   tell me exactly what you're referring to there?
 5   A.    I don't know if that position was going to
 6   another employee.  But a young employee, who was there
 7   the same amount of time as me, was promoted into a
 8   manager position above the position that I was
 9   applying for.
10   Q.    All right.  First I want to know --
11   A.    Well, that's not completely accurate.  That's
12   why I'm correcting it.
13   Q.    All right.  So you're saying this is not true:
14   that you were denied a promotion that was given to
15   somebody younger?  That's not true?
16             MR. JENNINGS:  Objection to form.
17             THE WITNESS:  I don't know who was put
18   into that position at this point.
19   BY MS. KIVITZ:
20   Q.    All right.  Let's do it this way.  What
21   position are you talking about there?
22   A.    It was Test Development Associate, and it was
23   advertised as I/II -- I'm not sure of the difference
24   between the two -- which is the same title that I was
25   originally hired in as a temp.
```

**Page 124**

Q. Okay. And when are you suggesting that position was available?
A. When was it available? I saw it on the Web site in -- it was either September or October of 2006.
Q. Okay. And you're saying that there was this Test Development Associate I/II position available. Did you apply for that position?
A. Yes.
Q. Okay. Now, I had seen two jobs you applied for.
A. Uh-huh.
Q. One of them was for Special Projects?
A. It's called "Test Development" -- okay. I'm wrong. It's Test Development Associate for Special Projects. It might have been. I don't remember the exact title except for that it was Test Development Associate.
Q. Okay.
A. And it was either I or II or Special Projects. I think it was Special Projects. You're right.
Q. So you are talking in 18(b) about your application to be a Test Development Special Projects Associate?
A. Test Development Associate for Special Projects.

**Page 125**

Q. Okay. Am I correct that you withdrew that application?
A. After I heard Kathy telling people -- she was sitting right there -- the people I'd been working for not to feel that they should hire me. She was telling them, "Don't hire her."
Q. Okay.
A. So instead of being humiliated and having to interview because the people that were promoted, such as Kieran Hussie and Krista -- I mean, Kieran didn't even have to interview. He was just promoted with no interview.
Q. Okay. I'm going to come back to this. This is my question now, though.
A. Okay. Yes, I withdrew it. I withdrew my application after I knew that Kathy was not going to allow them to hire me because I heard her.
Q. Who did you give your application to?
A. I gave it to -- I think I sent it to Human Resources.
Q. And who was the supervisor for that position?
A. Well, it wasn't clear. It was either -- it might have been -- they were promoting Kieran into manager, and I think they -- and the current manager was Kathy Angelucci. And I think they were going to

**Page 126**

upgrade her to something else. So I don't know whether I would have been working directly for Kieran or for Kathy Angelucci.
Q. Okay. Now, you say the position was subsequently given to a younger employee. Who?
A. No, that's not the position that was given to a younger employee. I don't know who it was given to. That's what I'm telling you. I know that Kieran got that position right before I was there as he was a Test Development Associate for Special Projects. Then he was there the same amount of time as me. He was being promoted into manager. That's what I'm telling you. He was promoted, and I was actually applying for his -- I guess it would have been his position.
Q. All right. So what you're actually saying is the person who had had that position was promoted?
A. He was promoted, yes, into manager, I think. He was supposed to be.
Q. But you are not alleging that the Special Projects Test Development Associate was given to a younger employee?
    MR. JENNINGS: Objection to form.
    THE WITNESS: I don't know that.
BY MS. KIVITZ:

**Page 127**

Q. Okay.
A. I don't know if they ever hired anyone actually.
Q. Okay.
A. All that I know is that she wouldn't let me move into the position.
Q. Okay. So that allegation is not true in the sense that you can't say that the position was given to a younger employee?
A. Right.
Q. Whether it was or wasn't, you don't know?
A. Right.
    MR. JENNINGS: Objection to form.
BY MS. KIVITZ:
Q. Now, you also allege, as evidencing a pattern of discrimination, that you were given the smallest possible salary increase.
A. That was actually retaliation.
Q. Okay. What form of retaliation?
    MR. JENNINGS: Objection to form.
    THE WITNESS: What do you mean, "What form of retaliation?"
BY MS. KIVITZ:
Q. Why was that retaliation?
A. That she took my raise away?

128

```
 1  Q.     That who took your raise away?
 2  A.     Kathy Holtzman.
 3  Q.     Okay.  Now, what raise do you believe you were
 4  getting that was taken away?
 5  A.     I was an excellent employee.  I should have
 6  gotten the top at least.  She had no complaints about
 7  me.  As a matter of fact, Kathy liked good and cheap.
 8  So she had someone with a master's degree that was
 9  really good, that was really cheap, and that's why I
10  was in the position that I was in because I was older
11  and I was good and I was very reliable.  And she liked
12  that, and she wanted to keep me in that position.
13  Q.     Okay.  So you felt you should have been given
14  the top raise.  But no one ever told you you were
15  getting the top raise and it was taken away; correct?
16  A.     Yes.
17         MR. JENNINGS:  Objection to form.
18         THE WITNESS:  I was told because I got
19  my evaluation, and it was really, really poor.  So
20  when you get a poor evaluation, there's raises that go
21  along with that.  So I knew that she was giving me
22  1 percent.
23         And Barbara Davidson told me.  I said,
24  "Barbara, am I going to get a raise?"
25         She said, "She's only giving you
```

129

```
 1  1 percent."
 2  BY MS. KIVITZ:
 3  Q.     Okay.  Now, your evaluation was satisfactory,
 4  was it not?
 5  A.     Whatever.  I don't know.  I don't remember
 6  what the grades were.
 7  Q.     Do you remember what Kathy Holtzman said as to
 8  why it was satisfactory and not unsatisfactory?
 9         MR. JENNINGS:  Objection to form.
10         THE WITNESS:  Whatever she said was
11  after I complained about her to HR, and it was totally
12  untrue.  Every single thing on there she fabricated.
13  BY MS. KIVITZ:
14  Q.     Okay.  Do you remember what she said as to why
15  it was satisfactory --
16  A.     She said it took too long to build a database,
17  which she didn't even want me to build but, you know,
18  told me I could keep working on it.  She knew nothing
19  about databases.  As a matter of fact, I told her to
20  go down to Debbie Brown, who was the Microsoft Access
21  expert, because I had spoken to Debbie on the length
22  of time it was taking.
23         And she said, "You did it in a
24  reasonable -- more than a reasonable amount of time."
25  Q.     Okay.  Is that your understanding of why she
```

130

```
 1  told you your evaluation was satisfactory --
 2  A.     You can read my evaluation --
 3         MR. JENNINGS:  Objection to form.
 4         THE WITNESS:  Why don't you just read it
 5  to me?  You have it.
 6  BY MS. KIVITZ:
 7  Q.     Did you not meet with Kathy Holtzman at the
 8  time you received the end-of-year performance
 9  evaluation?
10  A.     No.  I met with her with Barbara Davidson.  I
11  didn't meet with Kathy alone in her office like
12  everyone else did.  She had me come down to HR and had
13  Barbara Davidson there.
14  Q.     Okay.  And when you received your evaluation,
15  there was also discussion; is that correct?
16  A.     Yes.
17  Q.     Tell me what the process was.
18  A.     I went down to Barbara Davidson's office, and
19  Kathy was there, and Barbara was there.  And we were
20  just talking.  I was talking about, you know, what
21  happened with when I asked for the promotion or
22  whatever.  Then Kathy just gave me the evaluation.  I
23  read it, and it was, like, disgraceful, and it was a
24  bunch of lies.
25  Q.     All right.  What did you do in response?
```

131

1  A.     Nothing.
2         What did I do in response?
3  Q.    Did you make comments?
4  A.     Oh, I e-mailed Barbara. I was pissed off as
5  anybody would be. You know, everything was after
6  October. After I went down to complain about her the
7  first time, she started doing all the things that
8  everybody said she would do. She started manipulating
9  everybody, telling them not to talk to me. She was
10 nasty.
11        You know, she started asking me to
12 account -- doing things that nobody else had to do, to
13 account for every second of my time of what I was
14 doing when. And none of the other employees had to do
15 this.
16        She told people not to talk to me. I
17 was walking down the hallway, and people that had
18 always talked to me, been polite, that I was friendly
19 with -- none of them would even pick their heads up.
20 They were just walking right by me. And I knew,
21 because Faith had told me that she would do that, that
22 Kathy had done that.
23 Q.    All right. Okay. Am I correct that, if your
24 evaluation had been unsatisfactory, there would have
25 been no raise involved with it?

132

1         MR. JENNINGS: Objection to form.
2         THE WITNESS: I have no idea.
3  BY MS. KIVITZ:
4  Q.    Okay. Do you know what an unsatisfactory
5  evaluation results in promotionwise?
6  A.     No.
7  Q.    Raisewise?
8  A.     No. All I know is there is a minimum and a
9  maximum. I mean, I suppose you could get zero. I
10 don't know if you can get zero. I guess it was --
11 1 percent was probably the lowest.
12 Q.    Okay. But you did not get zero; correct?
13 A.     I don't remember. I think I got 1 percent. I
14 don't remember if I was there long enough to even get
15 it.
16 Q.    Do you remember if it was 1 percent or
17 2 percent?
18 A.     It was definitely not 2 percent. Barbara told
19 me it was going to be 1 percent. This is what Barbara
20 Davidson, the Director, told me. "You're only going
21 to get 1 percent." That's what she told me.
22 Q.    Okay.
23 A.     After Kathy left the room, I was sitting
24 there, talking with Barbara.
25 Q.    You said other employees over the age of forty

133

1  were also denied promotions by Ms. Holtzman?
2  A.     Yes.
3  Q.    Okay. Can you identify who you mean by that?
4  A.     Debbie Shelmire and Faith Balsama had
5  repeatedly over the years, even before I was there,
6  tried to move into other positions. And Faith
7  actually told me she went down to complain to HR. And
8  she said, "What do I have? Kathy slime on me, you
9  know, that I can't get out of this position because of
10 Kathy?"
11        So, you know, that was perceived by all
12 of us. We were the three older ladies that were all
13 hired in our forties, and we're all sitting there as
14 Kathy's flunkies that couldn't get out of these
15 positions.
16 Q.    Okay.
17 A.     And the only people that lasted were people --
18 she had three people in my position before me. And as
19 far as I know, two were fired -- three were fired.
20 One was a temp. Two were permanent. They were older
21 women.
22 Q.    Okay. Are you referring to any other
23 employees over the age of forty denied promotions by
24 Ms. Holtzman other than Debbie Shelmire and Faith
25 Balsama?

134

1  A.     I'm trying to think if there was anybody else.
2  No. Because they were the people that I had contact
3  with.
4  Q.    Okay.
5  A.     Or maybe -- who was demoted? What was her
6  name? Barbara -- what was her name? -- who was in the
7  position before me. She was treated really poorly
8  also. I'm not sure how old she was. She was older.
9  She went to work for another department. I can't
10 remember her name.
11 Q.    Okay. Debbie Shelmire, Faith Balsama, and
12 Barbara all still work at the National Board?
13 A.     I don't know. How would I know?
14        THE WITNESS: Do they work there?
15        I don't know. Why are you asking me
16 that?
17 BY MS. KIVITZ:
18 Q.    You're not --
19 A.     I don't talk to them.
20 Q.    You have not had contact with them since you
21 left?
22 A.     No.
23 Q.    Okay.
24 A.     Are you kidding me? They're scared to death
25 of Kathy.

135

1  Q.     You said on October 18 you complained to
2  Barbara Davidson, the Director of Human Resources?
3  A.     Whatever the date was I first went down.
4  Sometime in October.
5  Q.     Was that the same meeting you have described
6  to me concerning the edits and the timing and Kathy
7  Holtzman being angry at Krista?
8  A.     I'm trying to remember. I went down. I don't
9  know whether it was the same meeting where I
10 complained. I said that I wanted to apply for a job.
11 I actually went to Kathy Angelucci first. I e-mailed
12 Kathy Angelucci, which I included in my Complaint I
13 think.
14        And I asked her, "Since you'll be the
15 one that I think will be directly over this position,
16 the Test Development Special Projects, you know, I'm
17 interested in the position." I said, "Do you think I
18 could be qualified and I could apply for it?"
19        And she said, "I don't know anything
20 about it. You'll have to ask Kathy Holtzman."
21        And Kathy Holtzman e-mailed me back and
22 said, "I don't have anything to do with it. You'll
23 have to ask Kathy Angelucci." Now, everybody knows
24 that Kathy Holtzman controls everything in there; so
25 it was definitely Kathy Holtzman.

136

1         And then after that I asked Kathy
2  Holtzman, and she said to me, "I really don't think at
3  this time that you would be, you know, qualified for
4  the position."
5         And I said, "Why not? I learned all
6  these other programs for you. I know Dream Weaver. I
7  can do editing. I know about IT."
8         She said, "I just don't feel that at
9  this time." She says, "I will -- I'm going to move
10 you as Kieran's assistant."
11 I said --
12 "You know, not a Test Development
13 Associate but as Kieran's assistant. I can move you
14 in to work with him, and then you can work your way
15 up." So she was going to give me a lateral move.
16        So I went down to HR, and, you know, I
17 told them about it. They said, "Well, you can still
18 apply."
19        And I said, "Oh, well, I don't need her
20 permission to apply?"
21        And they said, "No, you don't."
22        And I said, "But what are my chances?
23 If she's already telling me and telling Kathy
24 Angelucci you're hiring him, why should I bother?"
25        And she said, "I'm just telling you that

137

1  you can apply without your supervisor's permission."
2         So I applied. And then after I applied,
3  I was sitting in my office, which is about from here
4  to your seat, and she called in --
5         MR. JENNINGS: Just about four or five
6  feet?
7         THE WITNESS: Yeah. Maybe a little bit
8  further.
9         And she called in Kathy Angelucci and
10 Kieran Hussie. And they were discussing it in front
11 of me. Like, she knew I could hear them. And she
12 said, "Don't feel like you have to hire her. I don't
13 feel she's really qualified."
14        And then when they walked out of there,
15 I walked over to Kieran. I said, "Was she telling you
16 not to hire me?"
17        And he said, "Yes, basically."
18        I said, "Was she discouraging you from
19 hiring me, Kieran?"
20        And he said, "Yes."
21 BY MS. KIVITZ:
22 Q.     Okay. Now, you also allege that on
23 November 27, '06, you were terminated without good
24 cause. I assume you meant '06, November 27, 2006?
25 A.     Yeah. It was November -- yeah. December 1

138

1  maybe. November 27, 2006. What did I say?
2  Q.     Well, the Complaint reads '07.
3  A.     Oh, no.
4  Q.     Okay. Now, you recall writing an e-mail to
5  Kathy Holtzman before you were terminated in which you
6  said you weren't going to do your job any longer at
7  the salary which you had been hired?
8  A.     I said something along those lines but not
9  exactly.
10 Q.     Okay. I'll pull it out when I get to it.
11 A.     Oh, I know what I said to her. When she was
12 sitting with Barbara Davidson, she said in front of
13 Barbara Davidson that I was not hired to build
14 databases. And then she wanted me to build a database
15 for --
16 Q.     Wait. Wait. Ms. Rosetsky --
17 A.     I'm trying to answer your question.
18 Q.     My question --
19 A.     What was contained in the e-mail? Why don't
20 you show me the e-mail?
21 Q.     All right. I'm going to show it to you.
22 A.     Okay.
23 Q.     But all my question is is do you remember
24 writing such an e-mail --
25 A.     Not in what you're saying.

139

1  Q.    -- immediately before being terminated?
2  A.    Not containing what you're saying.
3  Q.    Okay.  I will pull it out in fairness to you.
4  A.    Okay.
5  Q.    Okay.  If you did write an e-mail in which you
6  refused to perform your job at the salary for which
7  you were hired, do you believe that would constitute
8  insubordination?
9           MR. JENNINGS:  Objection to form.
10          THE WITNESS:  No.
11 BY MS. KIVITZ:
12 Q.    Okay.
13 A.    Because she told me that I was not hired to
14 build databases and at the same time she asked me to
15 build a database in the same sentence.  You know, she
16 asked me to continue building these sign-in databases.
17 While I was with Barbara Davidson, she told Barbara
18 that I was never hired to do databases.
19          So I said, "So if I wasn't hired -- why
20 are you asking me to do it?"  And I was not being paid
21 on an IT scale.  I mean, I was doing things at an IT
22 scale in my old age that they were being paid double
23 what I was being paid.  And Kathy knew that; so she
24 was really taking advantage of me.
25 Q.    Okay.  Why don't we break for about ten

140

1  minutes, have a piece of pizza, and resume at
2  one o'clock.
3           (Lunch recess.)
4  BY MS. KIVITZ:
5  Q.    Before going through some e-mails, I just want
6  to go revisit something you had said earlier.  When
7  you were talking about leaving your employment at
8  Penn, you said that you had taken a thumb drive with
9  you.  And you made a joke about, "Do you want to see
10 it?" or something like that?
11 A.    No, that's not from Penn.  Oh, yeah.  No.
12 That was from Penn.
13 Q.    Can you just tell me the circumstances of your
14 taking it and what it enabled you to do once you had
15 it?
16 A.    The thumb drive was when I was developing the
17 database at my house.  I worked on it at night.  So
18 actually the copy that I did for Penn I do not have.
19 I only have something that I did that doesn't really
20 function off the network.
21 Q.    Okay.  When you left your employment, did you
22 return the thumb drive to Liz Bien?
23 A.    It's my thumb drive.  I bought it.  They
24 didn't have thumb drives then.  Actually it wasn't a
25 thumb drive.  It was a CD.

141

1  Q.    Okay.
2  A.    And when you copy this database onto the CD,
3  you can't really do anything with it but look at it.
4  It's read only.
5  Q.    Okay.  Did the thumb drive enable you to
6  download materials that you had worked on --
7  A.    There were no thumb drives invented then.  It
8  was a CD only.
9  Q.    Okay.  You said, "Thumb drive."  Believe me, I
10 didn't say that.
11 A.    You're confusing Penn with the National Board.
12 I have my database from the National Board on my thumb
13 drive because I worked on it at home.  And Kathy knew
14 that because she also allowed me to work on it through
15 Citrix, the Citrix system where I could log in from
16 home.
17 Q.    Okay.  And you have that database today;
18 correct?
19 A.    Yes.  But the slides on it are all obsolete
20 slides, though.  It's really nothing that is secret.
21          MS. KIVITZ:  Mr. Jennings, I'll talk to
22 you after the deposition about the return of
23 proprietary materials.
24          THE WITNESS:  There's no way to return
25 it.  It's my thumb drive.  I bought it.  There's

142

1  nothing to return.
2           MS. KIVITZ:  I think that, when the
3  deposition is over, we should speak for a minute.
4           MR. JENNINGS:  All right.  I'll discuss
5  it with you.
6  BY MS. KIVITZ:
7  Q.    All right.  I want to just ask you about a few
8  responses you gave in discovery in this matter.
9  A.    Uh-huh.
10 Q.    I guess this goes again to the Complaint
11 allegations.  In Interrogatory No. 9 what we received
12 from you was that you were denied a promotion and
13 asserts on information and belief the position was
14 given to a younger employee.  Now, I just went through
15 the Complaint with you, and you said, "I don't know
16 who got that position."
17 A.    Right.
18 Q.    So is this Interrogatory Answer similarly
19 incorrect?
20 A.    What Interrogatory?
21 Q.    It says that plaintiff was denied a promotion
22 and asserts on information and belief --
23 A.    Yes.  I don't know who got the job.  As a
24 matter of fact, they may have hired someone, and then
25 I just saw the job advertised again.  I don't know if

143

```
 1  it was the same job, but it looks like it.
 2  Q.      Okay.  I just want to be clear, though, that
 3  that statement is incorrect?
 4  A.      Yes.
 5              MR. JENNINGS:  Objection to form.
 6              THE WITNESS:  It's an error.
 7  BY MS. KIVITZ:
 8  Q.      Okay.
 9  A.      I don't really know.  What I was talking about
10  was Kieran Hussie, who's younger than me and had been
11  there the same amount of time with less education and
12  was promoted.
13  Q.      Okay.  In Interrogatory No. 10 you said:
14              "Plaintiff's salary increase was
15          actually removed.  She received 1 percent out
16          of 10 percent, which plaintiff asserts was
17          certainly the smallest salary increase of
18          any one of her counterparts."
19              I just want to be clear on a couple of
20  things.  You didn't receive any salary increase
21  because the salary increase would have started after
22  you had already been terminated; correct?
23  A.      Right.  But that was the proposed salary
24  increase according to Barbara Davidson.
25  Q.      Okay.  Did you look at any information which
```

144

```
 1  would correlate a finding of satisfactory on your
 2  performance evaluation to a percentage increase?
 3  A.      Say this again?  Did I correlate....
 4  Q.      What are you relying on?  You had said that
 5  there are --
 6  A.      Relying on Barbara Davidson.
 7  Q.      Okay.  You're aware, though, that there are
 8  posted salary increase percentages which are tied into
 9  the performance evaluation?
10  A.      According to Barbara, yes.
11  Q.      Okay.  Are you aware that the salary increase
12  for a satisfactory is actually 2 percent, not
13  1 percent?
14  A.      I was told I was getting 1 percent.  I don't
15  know whatever manipulation the Board wants to do with
16  that.  I was just told it was 1 percent.  And, you
17  know, relative to what the salary increases could have
18  been and how hard I worked and how good of an employee
19  I was, it was retaliation because Faith told me she
20  got the highest.  And I can tell you Faith did not
21  work as hard as I did.
22  Q.      Okay.  And Faith also was how old?
23  A.      Faith's older than me.
24  Q.      Okay.  And she got the highest salary
25  increase?
```

145

```
 1  A.      Yes.
 2              MR. JENNINGS:  Objection to form.
 3  BY MS. KIVITZ:
 4  Q.      What about Debbie Shelmire, if you know?
 5  A.      Debbie told me -- now, this is hearsay, you
 6  know -- that she did not get good salary increases
 7  until Kathy was trying to rally people onto her side.
 8  And the first really good raise that she ever got was
 9  when I went down to HR and all this started.  All of a
10  sudden Kathy started being really nice to Debbie.
11  Q.      So what was Debbie's percentage increase, if
12  you know?
13              MR. JENNINGS:  Objection to form.
14              THE WITNESS:  She didn't tell me, but
15  she was really happy because she'd gotten low
16  increases before.
17  BY MS. KIVITZ:
18  Q.      Okay.  So it's your testimony that your not
19  getting along with Kathy Holtzman somehow bolstered
20  Debbie Shelmire's status in the Department?
21              MR. JENNINGS:  Objection to form.
22              You can answer.
23              THE WITNESS:  According to Debbie,
24  that's what Debbie thought.
25  BY MS. KIVITZ:
```

146

```
 1  Q.      Did she say that to you?
 2  A.      Yes.  She said, "I guess she's trying to rally
 3  support for herself."
 4  Q.      Okay.  Now, did it make you angry that Kathy
 5  Holtzman gave you a poor review and you felt that she
 6  had no technology skills herself?
 7              MR. JENNINGS:  Objection to form.
 8              THE WITNESS:  I told her that she was
 9  unqualified to review the building of the database
10  because she knew nothing about it.  And I asked her to
11  go to IT and talk with Debbie Brown, who I often
12  discussed the database with, on how long it takes to
13  do these things because they look simple on the
14  surface.  But unless you ever built one, you would
15  never know what it took to build one.
16  BY MS. KIVITZ:
17  Q.      In what other areas did you feel that Kathy
18  Holtzman was unqualified to review your work?
19  A.      Just with the IT I would say basically.
20  Q.      Did you feel that she was qualified to review
21  your interactions with others, the quality of your
22  interpersonal communications with co-workers?
23  A.      No.
24  Q.      Okay.  Why was she not qualified to evaluate
25  your performance communicating with others?
```

147

```
 1  A.    Because she was getting executive coaching
 2  because her personality had been so discriminating and
 3  difficult with other people that it would be, like,
 4  you know, the pot calling the kettle black.  You know,
 5  I didn't feel that she was a good judge of character
 6  at all at that point.
 7  Q.    Okay.  But as your supervisor, did she have
 8  the skills necessary to determine whether you were
 9  getting along with other co-workers?
10        MR. JENNINGS:  Objection to form.
11        THE WITNESS:  Well, up until that point,
12  yeah.  She gave me a good review.  I mean, I had a
13  mid-year review, and I got a great review.
14  BY MS. KIVITZ:
15  Q.    Okay.  What was your mid-year review?
16  A.    It was good.
17  Q.    Was there any criticism that you received?
18  A.    I don't remember.  I'm trying to remember.
19  You have it here somewhere.  Why don't you just pull
20  it out, and we'll see?
21  Q.    Did you receive any criticism in terms of your
22  ability to get along with other people?
23  A.    I don't think so.  I don't remember.  It was a
24  good review.
25  Q.    Do you remember which people evaluated you?
```

148

```
 1  A.    Yeah.  Usually you're supposed to pick your
 2  own, but Kathy picked them for me.  Krista Allbee,
 3  Debbie.  You know what?  I don't remember all of them.
 4  She maybe used someone in IT that she pitted me
 5  against.  It was -- who was it?  It was either Debbie
 6  or the Asian girl.  I'm trying to remember her name.
 7        I don't remember the other girl's --
 8  Leslie.  It was either Leslie or Debbie.  I'm not sure
 9  which one.
10  Q.    Okay.  Anybody else that you recall?
11  A.    I think there were five or six people.  I
12  don't remember who the others were.
13  Q.    Okay.
14  A.    That might have been it.
15  Q.    How was the mid-year evaluation presented to
16  you?
17  A.    Did she e-mail it to me?  I'm trying to
18  remember.  I think you just go on line and read it.
19  They have this system.  I'm trying to remember.  I
20  think that's what we did.  We just read it on line.
21  Q.    Was it a summary of people's comments, or did
22  you go on line and read the comments that each person
23  had offered?
24  A.    You could see the comments, but you couldn't
25  see who wrote them.
```

149

```
 1  Q.    Okay.  Did you feel that there was anything in
 2  these comments that was critical of your ability to
 3  get along with others?
 4  A.    There were some issues, but they were caused
 5  by Kathy because Kathy had an ongoing battle with the
 6  IT Department.  And she put me in the middle of it,
 7  and she used to make me write e-mails that I didn't
 8  want to write to people and say things that I didn't
 9  want to write.  So those people took it as, you know,
10  that it was me, and it was Kathy.
11  Q.    Okay.  So, first of all, can you tell me who
12  the -- what the issues were?
13  A.    It was either Leslie or Debbie.
14  Q.    All right.  And do you remember --
15  A.    Actually I got along with Debbie pretty well
16  usually, but I don't know.  A lot of manipulation was
17  going on with this system because I was supposed to --
18  Q.    Remember I asked you to just listen to the
19  question first?
20        Okay.  Do you remember what the issues
21  were that came up in your mid-year evaluation and from
22  who? the specific people who raised them?
23  A.    No.  But you can see them on the network.
24  They probably have them.
25  Q.    You don't remember anything now?
```

150

```
 1  A.    I don't have it memorized.  I just told you.
 2  Now you're asking me the same question again.  I just
 3  told you there may have been an issue with Leslie or
 4  Debbie.  You're supposed to pick your own people to
 5  review you, but in my case Kathy picked people.
 6        And Kathy's very manipulative.  She
 7  manipulates everything in the system to her advantage.
 8  So she was thinking ahead just in case she didn't want
 9  me to be proud of myself.  So all the people that she
10  had pitted me against in the IT Department -- she went
11  and had someone -- and actually someone from the IT
12  team was not supposed to review me.
13        It was supposed to be in the Department.
14  And she had me -- this is what HR told me.  And she
15  had someone in IT review me, and they didn't even work
16  with me.
17  Q.    Didn't you just tell me you couldn't see, when
18  you went on line, who had given you the evaluation?
19  A.    Right.
20  Q.    Just what was written?
21  A.    Right.  But you could see who they were, and
22  you could see the comments.
23  Q.    What do you mean, "You could see who they
24  were"?
25  A.    You could see five names and five comments,
```

```
                                                              151
 1  but you couldn't see -- they weren't matched up.  But,
 2  you know, I could tell who wrote what because somebody
 3  wrote something about computers or whatever.  But it
 4  wasn't that bad.  You know, it was still a good
 5  evaluation.
 6  Q.      Was it your testimony that you only remember
 7  one criticism of your ability to get along with others
 8  out of these five?
 9  A.      Maybe it was Krista and someone from IT.
10  Krista, who is Kathy's patsy.  That's the young,
11  thirty-year-old girl who went from being a production
12  assistant to being a director in five years.
13  Q.      Okay.
14  A.      She was Kathy's patsy.  These people are all,
15  like, afraid for their jobs because of Kathy because
16  she has been known -- there was another lawsuit
17  concerning somebody else that was having problems with
18  Kathy.
19  Q.      What did Krista criticize about you, if you
20  recall?
21  A.      Krista?  Whatever Kathy probably told her to
22  say.  I'm not really sure.
23  Q.      Do you remember what you read at the time?
24  A.      It wasn't that bad.  None of that was bad.  I
25  mean, I got basically a good evaluation.
```

```
                                                              152
 1  Q.      Okay.  Do you remember the criticism part?
 2  A.      No, I don't.
 3  Q.      Okay.  Did it have to do, at least as to
 4  Krista, with your ability to get along with co-workers
 5  or others?
 6          MR. JENNINGS:  Objection to form.
 7          THE WITNESS:  I don't remember.  But I
 8  don't put much merit to it because it's all Kathy
 9  talking.
10  BY MS. KIVITZ:
11  Q.      Okay.
12  A.      Nobody says anything without Kathy telling
13  them to say it.
14  Q.      What about the IT criticism?  Did that have to
15  do --
16          MS. KIVITZ:  Can we go off the record
17  for a second.
18          (Discussion was held off the record.)
19  BY MS. KIVITZ:
20  Q.      Now, the IT criticism -- do you remember what
21  that was?
22  A.      Not exactly.  No.  Why don't you just pull it
23  out?  You have it.  I don't see why you're asking me.
24  It's here somewhere.
25  Q.      Because I want to know your perception of what
```

```
                                                              153
 1  the evaluations are.
 2  A.      But I don't remember.  You're talking two
 3  years ago of something that -- you know, basically I
 4  had a good evaluation, and there were some comments
 5  from people that -- to my feeling, all the -- any
 6  negative comments were created by Kathy Holtzman.
 7          I mean, if you take a look at her
 8  personnel file, I'm sure there's, like, a stack of
 9  complaints against her because I know.  People told me
10  that they complained about her, and they told me that
11  she was going to do this, if I caused any problems,
12  that she was going to do this.
13  Q.      Okay.  Is it your recollection that two out of
14  the five evaluations contained criticism and no
15  others?
16  A.      I think so.  Yeah.  It was just Krista and
17  maybe the IT person, but they weren't that bad of a
18  criticism.  They were, you know -- there were some
19  compliments in there.
20  Q.      Okay.  Now, you also alleged that Kieran
21  Hussie was being paid $6,000 more than you and he --
22  you had more education and comparable technology
23  skills?
24  A.      Yes.
25  Q.      So let me start by saying do you believe your
```

```
                                                              154
 1  technology skills were comparable to Kieran Hussie?
 2  A.      Yes.  I knew different things but....
 3  Q.      Were there things that Kieran Hussie knew that
 4  perhaps you did not know?
 5          MR. JENNINGS:  Objection to form.
 6          THE WITNESS:  At the time, yeah.  But it
 7  was basically Dream Weaver.  And, you know, they had
 8  asked me to learn so many applications that, you know,
 9  she knew that I could have just picked that up and
10  started using it.
11  BY MS. KIVITZ:
12  Q.      Okay.  Other than Dream Weaver were there
13  other technological skills that Kieran Hussie had that
14  you did not?
15          MR. JENNINGS:  Objection to form.
16          THE WITNESS:  I really don't know, but I
17  would say no.  I probably have more skills than him.
18  BY MS. KIVITZ:
19  Q.      Okay.  You said, "Probably."  Is that because
20  you don't know for sure what his technological skills
21  are?
22  A.      Well, you're asking me a question where, you
23  know, you're asking me to suppose that I do know, or
24  you wouldn't be asking me the question.  I mean,
25  you're asking me if Kieran has more skills than me.
```

155

1  That's too broad of a question to answer and something
2  that I would not know.
3       He may use an application at home that I
4  don't know about, and I may use things -- you know, he
5  explained to me, you know, one time when I was talking
6  to him, that, you know, databases were really
7  difficult. He saw what I had done. He was impressed
8  with it.
9       And, you know, databases are a lot
10 harder to do than Web pages. I can tell you that. So
11 that's the best way. I don't know -- I know Kieran
12 doesn't know how to do databases.
13 Q.   But when you said you have the same
14 technological skills --
15 A.   You asked me, "Comparable," and I said,
16 "Comparable," which means I'm at a level at least of
17 Kieran. And I am very capable of learning very easily
18 what Kieran knows, but he probably would have trouble
19 learning what I know.
20 Q.   Now, do you remember completing a harassment
21 questionnaire for the E.E.O.C., which your attorney
22 sent to us?
23 A.   Yes.
24 Q.   Okay. In that questionnaire you claim that
25 you were told by the Director of Human Resources that

156

1  you had to do whatever your supervisor demanded even
2  if she was being unethical or, quote, they would take
3  further action.
4  A.   Yes.
5  Q.   Can you tell me what you're talking about
6  there?
7  A.   Kathy asked me to write e-mails about people
8  that I really didn't want to write, people that were
9  involved with the IT Department, because Kathy thinks
10 that work is a political game. And she did not want
11 to have people like Erik Soijka or Barbara Scaramalino
12 (phonetic) encroaching on her authority in Test
13 Development.
14      And the more technology that you brought
15 into Test Development, there was a big issue with
16 Microsoft Project because there's something called
17 "active directory," where they can actually control
18 how much access you have to things on there and your
19 ability to get information.
20      So at the time -- even before I got
21 there, someone by the name of Joy Bouldin had this
22 same issue with Kathy, and I think that Kathy fired
23 her. Kathy didn't understand how to use Microsoft
24 Project and that you had to use it in a certain
25 manner.

157

1       So she was pitting me against IT and
2  getting me to write e-mails about Barbara Scaramalino
3  and Erik Soijka, who, I think, was Barbara's boss, you
4  know, because she wanted to get rid of Microsoft
5  Project. She didn't want to use it.
6  Q.   Okay. Can I ask one question before you
7  finish that?
8  A.   Uh-huh.
9  Q.   Isn't it true that, before you wrote a memo or
10 corresponded back with IT, that you had gotten an
11 e-mail from Erik Soijka that you described as
12 "juvenile and nauseating" and sent it to Kathy
13 Holtzman?
14 A.   No. I sent it to -- I made those statements
15 to Kathy, not to Erik Soijka.
16 Q.   Correct.
17 A.   Right.
18 Q.   But isn't it true that his e-mail to you is
19 what prompted your opinion that his e-mail was
20 nauseating and juvenile --
21 A.   Right. That was when she had --
22 Q.   -- and you sent that to Kathy Holtzman?
23 A.   Right. That was after -- so what? That was
24 after she already pitted me against him and had me go
25 up there.

158

1  Q.   Okay.
2  A.   She wasn't even there, and she got really
3  pissed off because I went up to his office without
4  her. And then he sent me an e-mail that aggravated
5  me.
6  Q.   Okay.
7  A.   I'm not the first person that she put in
8  between IT and Test Development. I'm, like, the
9  third.
10 Q.   But you took Erik on without Kathy Holtzman?
11 A.   No.
12 Q.   You decided to go there by yourself?
13 A.   No, no, no, no, no, no. And I have an e-mail
14 attesting to this. What happened was Barbara
15 Scaramalino, when Kathy was in Europe, came to my desk
16 and said, "I want you to come upstairs with me now and
17 meet with Erik." I didn't know she was coming, and so
18 my supervisor wasn't there; so I went.
19      And Kathy got really pissed off. And
20 when she came back, she was -- like, she wrote me an
21 e-mail. She was in Florida. She wrote me an e-mail
22 saying, "I'm really upset that you did that. Erik
23 Soijka has a way of twisting things and making them
24 our fault." And that's exactly what's in the e-mail.
25 Q.   Okay. I've seen it. But I just wanted to ask

159
```
 1  you isn't it true --
 2  A.      I didn't --
 3  Q.      Isn't it true that you complained to her about
 4  Barbara coming to your desk, and you also complained
 5  to her about Erik's e-mail, finding it nauseating and
 6  juvenile?
 7  A.      No, I did not.
 8          MR. JENNINGS:  Objection to form.
 9          THE WITNESS:  I did not complain to her
10  about Barbara.  Actually I wrote on the end of my
11  e-mail that I really feel that Barbara was trying to
12  be diplomatic about the situation.  I wasn't upset
13  with Barbara.
14          We kind of were sparring at my desk, but
15  we were on good terms until, you know, Kathy had me
16  write a letter about --
17          And she wrote the letter.  I mean -- and
18  I have an e-mail attesting to that.
19          -- against Barbara Scaramalino.  So
20  Kathy was doing a lot of unethical things and forcing
21  people to say things about people.
22  Q.      Ms. Rosetsky, didn't you complain that, when
23  Barbara came to your desk, it was embarrassing, and
24  other co-workers who were nearby could hear her?
25  Weren't you upset by that at the time?
```

160
```
 1          MR. JENNINGS:  Objection to form.
 2          THE WITNESS:  Actually Kathy said to me
 3  that she heard through the grapevine that Barbara had
 4  come to my desk and that she was loud and that
 5  everybody heard us.  That was Kathy saying that, not
 6  me.
 7  BY MS. KIVITZ:
 8  Q.      Okay.  Was your reaction that you were pleased
 9  that Barbara had done that?
10  A.      I wasn't that upset until Kathy got really
11  angry.  At first I didn't really see it as that bad of
12  a thing, and I was kind of glad to have kind of gotten
13  everything out in the open because, if Kathy was
14  there, it would have gone a different -- she probably
15  wouldn't have allowed me to talk to her.
16  Q.      What about Erik Soijka's e-mail to you that
17  caused you to write to Kathy and to be upset with him?
18  A.      What about the e-mail where --
19          MR. JENNINGS:  Objection to form.
20          THE WITNESS:  -- I had offered him some
21  information that I found on the Internet and he said
22  he didn't --
23  BY MS. KIVITZ:
24  Q.      In other words, did Kathy prompt you to be
25  angry with Erik, or were you angry with Erik and you
```

161
```
 1  told Kathy about it?
 2  A.      No.  Kathy was egging me on, and she was,
 3  like, behind the whole thing, the whole thing from the
 4  beginning.  Even before I got there, she wanted to
 5  sabotage Microsoft Project.  And I spent a lot of time
 6  setting up all these Projects, and all I did was get a
 7  lot of flak from Kathy that it wasn't working right.
 8  People weren't using it.
 9          And I said, "Well, if you let me tell
10  them that they have to use it, let me train people" --
11  she never let me do that.
12  Q.      All right.
13  A.      She never let me go forward with actually
14  getting --
15  Q.      Okay.
16  A.      -- people to use it appropriately.  And she
17  didn't understand how it had to be used --
18  Q.      All right.
19  A.      -- although IT understood how it had to be
20  used.
21  Q.      Let me go back to a question.  Okay?
22  A.      Uh-huh.
23  Q.      When you told the Director of Human Resources
24  that Kathy Holtzman was being unethical, were you
25  referring to Kathy Holtzman telling you to prepare a
```

162
```
 1  memo about Barbara and Erik?
 2  A.      That was one of the things, yeah.  I really
 3  didn't feel -- you know, I thought Barbara was
 4  basically trying to be diplomatic.  And Kathy said,
 5  "Oh, no.  You have to tell -- you know, put down a
 6  tone of voice and put down, you know, what actually
 7  happened.  You have to cover -- you know, basically
 8  cover your ass," and all this stuff.
 9  Q.      Was there anything else you were referring to
10  by her unethical conduct?
11  A.      Besides her asking me to be manipulative and
12  write things about people I didn't really feel, that
13  was basically unethical enough.
14  Q.      All right.
15  A.      I'm not going to commit to saying there was
16  nothing else.  But at this point that's what comes to
17  my mind right now.
18  Q.      All right.  Now, this issue with Erik and
19  Barbara -- this was in April, 2006; correct?
20  A.      It was ongoing.
21  Q.      Why did you wait until October to go to the
22  Director of Human Resources if Kathy Holtzman told you
23  to do something you considered unethical in April of
24  '06?
25  A.      Because that's not what I went to Human
```