# Exhibit "A"

163

1  Resources about. I went to Human Resources about the
2  way that she would not promote me and was not giving
3  me work according to my job description.
4  Q.      All right. Now, earlier you complained about
5  the edits and Krista and the typing; correct?
6  A.      That was in October. Right.
7  Q.      Okay. But here it says, if you were subjected
8  to unwanted harassment, was your employment status in
9  any way threatened if you did not go along?
10 A.      Obviously. Look what happened.
11 Q.      Right. But you said, "I was told by the
12 Director of Human Resources that I had to do whatever
13 my supervisor demanded even if she was being
14 unethical"?
15 A.      Yes.
16 Q.      Okay. And my question to you is that meeting
17 at the earliest was October 18, '06; correct?
18 A.      Yes.
19 Q.      If you felt that you were being asked to do
20 something unwanted or unethical in April, 2006, why
21 did you not complain sooner?
22 A.      Because that wasn't one of my complaints. Why
23 would I complain? Would I want to lose my job? If
24 she already knew that Kathy acted this way -- and she
25 apparently knew. She said --

164

1              Oh, one of the other things that she
2  said to me that is really important is "I can't do
3  anything about Kathy. She has too much power. I
4  can't tell you how they deal with her, you know, that
5  they have problems with her. I can't do anything
6  about it. You just have to do what she says." And
7  she wrote that to me in an e-mail.
8  Q.      Okay. Now, on the same document there's
9  remedy information, and you completed that. And it
10 says:
11             "Other than loss of salary, what money
12       have you lost?"
13             You go through a list.
14 A.      Health insurance, my kids' braces.
15 Q.      Okay.
16 A.      I'm losing my house. I had a second home. I
17 can't pay for it. It's going into foreclosure. What
18 else?
19 Q.      Where is your second house?
20 A.      It's in the mountains.
21 Q.      Where?
22 A.      Lake Naomi.
23 Q.      What's the address?
24 A.      26 Hemlock Circle.
25 Q.      Okay. Is that house being sold as a result of

165

1  the divorce proceeding, or is it being foreclosed on?
2  A.      It's not in foreclosure yet. If I can pay
3  next month, it won't go. But it's not a result of the
4  divorce. It's the result of me not being able to pay
5  for it because, when I got the job at National Board,
6  I refinanced and did some repairs on the house. So I
7  upped the mortgage, and now I can't pay for it.
8  Q.      All right. Is your husband paying for it?
9  A.      We can't afford to pay for it with just his
10 salary. I have another mortgage on a home here, and I
11 have three children to support, and we pay our own
12 health insurance now.
13 Q.      When did you stop paying the mortgage on the
14 Lake Naomi property?
15 A.      I'm late this month. This is the last month.
16 I used up all of my savings paying the mortgage.
17 Q.      So this is the first month that the mortgage
18 has not been paid?
19 A.      We used up our savings. We have no savings.
20 Q.      Who told you that after missing one month's
21 payment the house would be foreclosed next month?
22          MR. JENNINGS: Objection to form.
23          THE WITNESS: I didn't say that it would
24 be foreclosed. I said it's going to go into
25 foreclosure because I don't have any way to pay it

166

1  from now on. We used up -- oh, my -- our son's bar
2  mitzvah cannot be paid for because I used that up to
3  pay for the mortgage.
4  BY MS. KIVITZ:
5  Q.      Have you gotten in hand a foreclosure notice
6  from any lender?
7  A.      No. No. But I will. And when I get one,
8  you'll be the first to know.
9  Q.      Now, you said you're paying $1,500 per month
10 for family health insurance. Am I correct that you
11 did not --
12 A.      It's more than that actually.
13 Q.      -- elect COBRA benefits --
14 A.      No. I did go on COBRA. You have to pick up
15 the exact same policy. You can't change it. So you
16 have to pay exactly what the National Board was paying
17 until it runs out. So after -- I think it was March.
18 Up until March I owed them, like, 5 or $6,000 in
19 arrears for health insurance because you cannot
20 switch.
21             I said, "Can I switch my policy?"
22             And they said, "No." For you to be on
23 COBRA, you have to keep the same exact benefits which
24 was very expensive. And then my husband has
25 preexisting conditions; so we're having a problem

167

1  getting other insurance.
2  Q.     Did you elect COBRA benefits when you left the
3  National Board?
4  A.     Well, yeah. I had no choice. I had to get
5  health insurance.
6  Q.     Did you pay for COBRA benefits?
7  A.     Yes. For three months or four months, and
8  then it runs out.
9  Q.     Okay. What health insurance do you have now?
10 A.     Same. Which we're trying to switch, but it's
11 been difficult because my husband has some preexisting
12 conditions. And when you're not in a group plan, what
13 they make you do is you have to pay a year on one
14 health insurance -- you have to pay two health
15 insurances for a year. You can't get off it.
16 Q.     Okay. Now, you also said you were losing a
17 pension to be determined?
18 A.     Right.
19 Q.     What are you referring to?
20 A.     I would have had a pension at the National
21 Board.
22 Q.     After what period of time?
23 A.     I was pretty close, I think. I don't know.
24 Is it two years?
25 Q.     And you said you were also missing tuition,

168

1  $4,000 per year. What did that refer to?
2  A.     They give a tuition benefit.
3  Q.     Were you in school when you were at the
4  National Board?
5  A.     That was another issue where she discriminated
6  against me. I asked to take some courses, and she
7  said, "No." She meanwhile was letting other people
8  take courses that were completely irrelevant to the
9  job. Debbie was taking, like, social worker courses.
10 I asked to take some IT courses at Drexel, and she
11 said, "No."
12 Q.     Okay. Were you ever enrolled in any
13 program -- tuition program during the entire time you
14 worked at the National Board?
15 A.     No. The only thing she would let me take were
16 in-house IT training.
17 Q.     Okay. You said that you were missing
18 transportation costs to work. Was the National Board
19 paying your transportation costs?
20 A.     Sort of. They were giving me $100 a month for
21 a rail pass or a trail pass.
22 Q.     You said you're missing the cost of
23 orthodonture for your two children?
24 A.     Yes. They were paying for braces, and now
25 they're not; so I have to pay the balance, whatever

169

1  the insurance company isn't paying.
2  Q.     Who paid for braces?
3  A.     The National Board. It's a benefit.
4  Q.     The National Board itself or your insurance
5  coverage? Who paid for orthodonture?
6  A.     The insurance was -- was it United Concordia?
7  Maybe it was United Concordia. It was a dental
8  benefit paid for by the National Board.
9  Q.     Okay. And when I just asked you what
10 coverage you had when the COBRA ended, you said the
11 same coverage.
12 A.     No. When it ends? I have the same health
13 insurance company. It's not the same coverage. I'm
14 mistaken. It's still called "Personal Choice," but
15 it's a very watered down version of it. Like, most of
16 our prescriptions are not paid for, and I have two
17 children on prescriptions that are not being paid for.
18 Q.     And who is currently paying the cost of health
19 care coverage?
20 A.     My charge card.
21 Q.     Is that something that you're seeking to have
22 your husband reimburse in the divorce proceedings?
23 A.     It's our charge card. It's in both our names.
24 Q.     Well, the two of you are presently separated
25 within the same household; correct?

170

1  A.     Yes.
2  Q.     Okay. What I'm asking you: Is that a charge
3  that you're asking for your husband to reimburse?
4  A.     These are just mutual debts that we now have,
5  and I have no idea. I can't answer that question.
6  I'm not my attorney. I don't know what you're allowed
7  to ask for; so I can't answer that question.
8  Q.     Okay. You also said, "Loss of Social Security
9  contributions." What did you mean by that?
10 A.     Well, obviously, since I'm not working, I'm no
11 longer paying into the system. So, you know, when I
12 reach sixty-five or whatever, if we still have a
13 Social Security system, it's going to be less,
14 obviously.
15 Q.     Okay. Have you seen any therapist,
16 psychologist, psychiatrist, or medical doctor since
17 you were terminated or as a result of the termination
18 from the National Board?
19 A.     I have seen my doctor, you know, but I'm not
20 the kind of person that goes to complain.
21 Q.     And who is your doctor?
22 A.     Pam Fenstemacher.
23 Q.     You'll have to spell that.
24 A.     F-e-n-s-t-e-m-a-c-h-e-r.
25 Q.     All right. Have you seen her in reference to

171

```
 1  medical complaints? psychological complaints?
 2  A.      I've seen her in reference to not really --
 3  you know, I didn't really complain to her about, you
 4  know, mental problems.
 5  Q.      Where is she located?
 6  A.      She's at Abington Hospital.
 7  Q.      What type of doctor is she?
 8  A.      She's a general practitioner.
 9  Q.      You said, "I didn't really talk to her about
10  psychological issues."  Do you remember what you saw
11  her for?
12  A.      What I saw my doctor for?  That's personal.
13          THE WITNESS:  Do I have to answer that?
14          MR. JENNINGS:  Ask if it had anything to
15  do with her employment.  If it didn't have anything to
16  do with her employment --
17          MS. KIVITZ:  Well, I tried that.  I did
18  ask that.
19          MR. JENNINGS:  I don't think you asked
20  it that bluntly.
21  BY MS. KIVITZ:
22  Q.      You want to answer that?
23  A.      There were conditions that I have that were
24  exacerbated by unemployment.
25  Q.      All right.  Then I'm going to have to go
```

172

```
 1  further and ask you what conditions were exacerbated.
 2  A.      I had stomach problems, and I was depressed.
 3  Q.      All right.  And you went to see
 4  Dr. Fenstemacher for the stomach problems and the
 5  depression?
 6  A.      Basically, yes.
 7  Q.      Now, you saw the Interrogatory Answers you
 8  filled out in this case that we received; correct?
 9  A.      Right.
10  Q.      Do you recall answering those Interrogatories
11  that you have not seen a doctor as a result of your
12  termination from the National Board?
13          MR. JENNINGS:  Objection to form.  I'm
14  not sure if that was the exact language of the
15  Interrogatory.  I don't have it in front of me.
16          THE WITNESS:  I have seen a doctor.  But
17  like I said --
18  BY MS. KIVITZ:
19  Q.      Related to your termination?
20  A.      Well, these were conditions that were
21  exacerbated by being terminated, but I would have gone
22  to her anyway because she's my doctor.
23  Q.      Okay.  Have you struggled with depression over
24  the years?
25  A.      Not really.  Well, a little bit when I was
```

173

```
 1  younger.
 2  Q.      Okay.  Who did you see in those years?
 3  A.      Her.
 4  Q.      Okay.  Same doctor?
 5  A.      Same doctor.  She contributed it to menopause.
 6  It was after I turned -- in my forties.
 7  Q.      All right.  Do you mind -- because you've said
 8  your stomach problems were exacerbated, I have to ask
 9  you what type of stomach problems.
10  A.      Irritable bowel syndrome, and I also have
11  reflux disease.
12  Q.      Okay.  For these conditions have you seen
13  anyone other than Dr. Pam Fenstemacher?
14  A.      Since I stopped work at the Board?
15  Q.      Before or after.
16  A.      I've been to gastroenterologists in the past.
17  Q.      And can you give me their names, please?
18  A.      I don't remember them.  I really don't.
19  Q.      Do you remember where they're located?
20  A.      It was a long time ago.  Basically it's
21  treated with over-the-counter with -- they're now over
22  the counter.  But for years I had prescriptions for
23  Prilosec, and I've been taking that for a long time.
24  Q.      And who gives you the prescriptions on that
25  now?
```

174

```
 1  A.      They're not prescription anymore.  It's over
 2  the counter.  It used to be from Fenstemacher.
 3  Q.      Okay.
 4  A.      And I had also had a prescription for
 5  something called "Dycyclomine," which is for irritable
 6  bowel syndrome.  It's a prescription from
 7  Fenstemacher.
 8  Q.      Okay.  When is the first time in your life you
 9  had any issue with depression?  How hold were you?
10  A.      In my forties.
11  Q.      Okay.  Do you remember where you were working
12  at the time?
13  A.      I wasn't.  I was home with my kids.  And it
14  wasn't really diagnosed as depression.  She said she
15  felt that it was menopausal symptoms, but at this
16  time, you know, I was really upset with what happened
17  at the Board.
18  Q.      And you went to see her because you were upset
19  at what happened at the Board?
20  A.      Uh-huh.  Yes.
21  Q.      Okay.  We asked you in an Interrogatory, if
22  you were claiming that you had any emotional damages,
23  who you had seen.  And your Answer was:
24              "Plaintiff has not gone to the doctor
25          for the foregoing pain, suffering,
```

175

```
 1           humiliation, depression, and anxiety."
 2           Do you recall giving us that Answer?
 3   A.    Yes.  But there's a reason because these were
 4   conditions that I had, and they come and they go
 5   according to my -- what stress I'm under.  So I did
 6   not completely attribute it to going -- because of the
 7   National Board.  I didn't walk in and say, "I lost my
 8   job, and I'm depressed."  You know, I walked in, and I
 9   said, "You know, I want this and this for these
10   conditions which I have," and that's it.
11   Q.    Okay.
12   A.    It was more, you know, like -- actually, it
13   was, like, a regular checkup that I went in and I
14   talked to her.  And I told her what was going on.
15   Q.    Okay.  We're going to ask you to sign what's
16   called a "HIPAA Release" so that we can get the
17   records from the doctor because a regular subpoena
18   won't be enough.  So don't go anywhere after your
19   deposition.  I'll have one made up.  Okay?
20   A.    Uh-huh.
21           THE WITNESS:  Do I have to have all my
22   medical records released?
23           MR. JENNINGS:  We'll look at what the
24   Release says and then decide what we're going to do
25   with it.
```

176

```
 1           MS. KIVITZ:  I mean, you know, Rufus,
 2   it's your Answer.  "Plaintiff has not gone to the
 3   doctor for the foregoing" --
 4           MR. JENNINGS:  It's not my personal
 5   Answer.
 6           THE WITNESS:  It was my Answer.
 7           MS. KIVITZ:  It's your Verification.
 8           MR. JENNINGS:  It's not my personal
 9   Answer.
10           THE WITNESS:  I mean, I don't have a
11   problem with you seeing that I went to the doctor
12   during -- anytime I went during when I was employed or
13   after, but I'm not going to release my records from
14   before that.
15   BY MS. KIVITZ:
16   Q.    You know, that's actually the Court's
17   determination if we don't agree.
18   A.    Right.  Okay.
19   Q.    It's not yours; it's not mine.
20   A.    Okay.
21   Q.    It goes to the Court.
22   A.    Well, I thought --
23           MR. JENNINGS:  Diane?  Diane?
24           You can argue those issues with me, not
25   with my client.
```

177

```
 1           MS. KIVITZ:  Well, I didn't try.
 2           MR. JENNINGS:  Well, no, you did.  If
 3   you have that issue, you can argue it with me.  You're
 4   not to argue those sort of things with my client.
 5           MS. KIVITZ:  You know, Mr. Jennings, I'm
 6   not the one who answered the Interrogatory that I
 7   haven't gone to the doctor.
 8           MR. JENNINGS:  You can move on with the
 9   deposition, if you like.
10           MS. KIVITZ:  Okay.  But I mean, you
11   know, I'm sitting here dealing with an Interrogatory
12   Answer, and all of a sudden we learn this information
13   contrary to a sworn Interrogatory Answer.  So, you
14   know, don't tell me, "You can't ask this," or "You
15   can't say that."  I mean, give me a break here.
16           MR. JENNINGS:  I'm not saying you can't
17   ask questions.  I am saying don't argue those issues
18   with my client.
19           MS. KIVITZ:  I'm not arguing anything
20   with Ms. Rosetsky.
21           MR. JENNINGS:  You were, and the record
22   will make that clear.  You may continue with your
23   deposition, if you like.
24           THE WITNESS:  I'm just not sure the
25   doctor --
```

178

```
 1           MR. JENNINGS:  Diane?  Diane?  There's
 2   no question pending.
 3   BY MS. KIVITZ:
 4   Q.    You can finish your answer.  I don't mind.
 5           MR. JENNINGS:  No.  There's no question
 6   pending.
 7           THE WITNESS:  Go ahead.  Ask me another
 8   question.
 9   BY MS. KIVITZ:
10   Q.    Okay.  You started to say, "I did not go
11   specifically for this."
12           MR. JENNINGS:  Objection to form.
13           THE WITNESS:  I have ongoing health
14   problems which, when I get stressed out and when
15   things happen to me, they get worse.
16   BY MS. KIVITZ:
17   Q.    Okay.
18   A.    So you asked me, you know, did I go
19   specifically, whatever.  I can't prove to you that,
20   you know, I got diarrhea because I got fired.  But I
21   can surmise that this was, you know, happening to me.
22   So that's why I said I didn't go call up a
23   psychiatrist and say, "I want to come in.  I'm
24   severely depressed."  This is a doctor that I've been
25   with for fifteen years.
```

179

1  Q.   Can you tell me the other periods in your life
2  that you have felt sufficiently stressed that you've
3  had the same symptoms?  You said once during -- in
4  your forties when you were home with the kids.
5  What are other times when you have felt the same type
6  of stress that would bring on these symptoms?
7           MR. JENNINGS:  Objection to form.
8           THE WITNESS:  Well, let me see.  I went
9  about ten years without sleep because I breast fed
10 three kids.  That was really stressful.  And I had
11 stomach problems at that time.  I actually had a
12 blockage.
13          And what other times?  That was probably
14 the worst time in my life.  Oh, I have a child who's
15 disabled; so, you know, that caused me a lot of
16 distress.  And, you know, as he got older and did not
17 develop properly, you know....
18          But we've come to terms with that.  He's
19 a pretty good kid.  He can read and that kind of
20 thing; so it hasn't recently caused me any stress.
21 BY MS. KIVITZ:
22 Q.   Okay.  But your periods of sleeplessness, your
23 period when you were, I guess, pre-menopausal, your
24 son's disability -- all of those have been stressful
25 periods where you've had similar symptoms?

180

1  A.   On and off, yeah.  When I was -- you know,
2  when the kids were younger.
3  Q.   What about other jobs ending?  In other words,
4  when you left Penn or when you left Wistar or when you
5  left --
6  A.   Well, I wasn't happy.  Wistar -- that was so
7  long ago.  You know, when you're a kid, everything --
8  when one door closes, another door opens I looked at
9  that as.  With Penn I wasn't happy.  I mean, she was,
10 like -- you know, it wasn't great obviously.  You
11 know, I come back into the workforce and, you know,
12 because I'm older, people are treating me like all I
13 can do is, you know, change diapers.
14          So, you know, if I came in -- back in
15 the workforce as a young mother, they were all treated
16 royally.  You know, they had their maternity leave and
17 came back and still had their jobs.  I was not being
18 treated that way.
19 Q.   Okay.  My question is:  Did you have any
20 medical symptoms when you left Penn or when you left
21 Wistar or when you left Jeanes?
22 A.   I was upset after Penn.  After Wistar I really
23 couldn't tell you.  You're talking twenty years ago.
24 I don't think I really cared that much.  I mean, I was
25 upset with the way I was being treated by that man,

181

1  but, you know.  But when you're in your twenties, you
2  don't really....
3  Q.   What about your divorce?  Has that caused you
4  any emotional stress?
5  A.   Do you really want me to answer that?
6  Q.   Well, I have to ask you.
7  A.   No.  It doesn't cause me any emotional
8  distress.  I mean, of course.  I mean, I have three
9  children involved.  The divorce -- I mean, everything
10 in the relationship got worse after the money problems
11 got worse and we couldn't pay our health insurance.
12 There's no question that what happened at the National
13 Board absolutely was the coup de grace to my marriage.
14          I mean, you know, I couldn't even pay
15 for my sons' prescriptions.  I mean, I have two
16 children with Tourette syndrome.  I had $900 in unpaid
17 prescriptions that are on my charge card.  I couldn't
18 pay for, you know, the health care.  When you pay for
19 it as a single person on your own, it's not covering
20 like anything.
21 Q.   Ms. Rosetsky, I have seen an e-mail -- I don't
22 have it here but -- where you, I guess, got angry with
23 your husband while you were still at National Board
24 and e-mailed him that you had gotten notices of
25 insufficient funds and, you know, accused him in the

182

1  e-mail of not providing responsibly.
2  A.   He forgot to put the money in?
3  Q.   Yes.
4           Did you have those -- were those
5  financial issues or your ability -- strike that.
6           Were those issues with your husband
7  ongoing?
8           MR. JENNINGS:  Objection to form.
9           THE WITNESS:  No.  We didn't have money
10 issues.  He would just forget to put the money in the
11 bank, and I would get -- and I had things that were on
12 auto pay.  So if you don't put it in before the auto
13 pay, then you get NSF.  And that's what you're
14 referring to.
15 BY MS. KIVITZ:
16 Q.   Okay.  Well, this was while you were still
17 employed at National Board in, I think, the summer?
18 A.   Right.  So, you know, we weren't rich, but we
19 had things under control, you know.  But then when I
20 started working, I kind of upped the ante by
21 renovating one of my houses and that type of thing.
22 Q.   Okay.  Now, I'm going to talk to you later
23 about your efforts to find employment since you've
24 left.
25 A.   Uh-huh.

183

1  Q.   But I just want to be clear on this, and then
2  we can get more into it later. Have you done
3  anything, whether Checks, Inc., under the table,
4  anything since you've left National Board?
5  A.   No, I haven't worked for my husband.
6  Q   Okay. In the same questionnaire on the
7  discipline version of the questionnaire, they asked
8  for all persons in comparable positions who have had
9  performance or conduct problems.
10 A.   What is this for?
11 Q.   In your questionnaire that you filled out,
12 discipline questionnaire. And you indicated Joy
13 Bouldin, B-o-u-l-d-i-n.
14 A.   Yeah. She had the job before me where she had
15 some kind of -- I'm not saying there were discipline
16 problems. I'm saying she had issues with Kathy with
17 Microsoft Project.
18 Q.   Okay. Do you know firsthand what happened
19 with Joy Bouldin?
20 A.   Not firsthand. But Faith and Debbie told me.
21 Q.   Told you what?
22 A.   Told me that Joy was siding with the IT
23 Department, that she was an older black woman, and
24 Debbie felt that she was being treated differently
25 because she was black. And they said that, because

184

1  she was siding with the IT Department, that Kathy just
2  wanted to get rid of her.
3       And that's all that I know of it.
4  Q.   Okay. You don't know of personal knowledge --
5  A.   I never met her because she was gone before I
6  got there.
7  Q.   Okay. Now, you also said you heard from
8  others about Dawn Willis?
9  A.   Yes.
10 Q.   Okay. Again, do you have any personal
11 knowledge --
12 A.   She was gone before I got there. I just know
13 what I heard from Debbie and Faith.
14 Q.   Okay. And what did you hear?
15 A.   You know, that her and Kathy were at odds,
16 that they were, you know, about the same age. She'd
17 been there for fifteen years and that she was
18 terminated. That's all I know. And that there was
19 some kind of a settlement or something. I don't know
20 a lot about it.
21 Q.   In our attachment you said that, of the eight
22 managers or directors under Ms. Holtzman, only three
23 were over forty. Is that correct?
24 A.   I think less than that.
25 Q.   I have "only three are over forty."

185

1  A.   Wait. Connie Murray. Let me think. Connie
2  Murray. She was grandfathered in before Kathy became
3  in charge. Peg Johnson was grandfathered in. She was
4  there before Kathy was in charge. And who was the
5  third person? Is it Sue Jachavino (phonetic)? I
6  don't know if Sue was working for her. I forget. But
7  Sue is older, and Sue was demoted when Kathy came into
8  power.
9  Q.   Okay. Do you know if others have been
10 promoted since you left? People over the age of
11 forty?
12 A.   The only one that -- oh, over the age of
13 forty? No. I know somebody left because she didn't
14 like the way she was being treated. Her name was
15 Jackie.
16 Q.   And what's the last name?
17 A.   I don't know. She was there for, like, not
18 long. I heard she was there -- actually, I was
19 talking to a Human Resource person when I went for a
20 job that knew her, and I don't really know what
21 happened. She was there less than a year. She did
22 complain to me about Kathy.
23 Q.   Who complained to you about Kathy?
24 A.   Jackie.
25 Q.   Do you know of any employee under the age of

186

1  forty who complained about Kathy Holtzman?
2  A.   Probably Chris DeRucci. I just know a lot of
3  people were really unhappy with her. It could have
4  been Sue behind me. You know, I know people went up
5  to Ron Nungster and were complaining about the
6  department since Kathy's been there in the last four
7  years that they -- I don't know.
8       You know, I don't have firsthand
9  knowledge, except I was told by Faith Balsama that
10 Chris DeRucci had complained about her. And that's
11 all I know. She's actually one of the managers.
12 Q.   Okay.
13 A.   She's in her mid-thirties, I think.
14 Q.   Okay. So you would agree that, of people who
15 complained about Kathy Holtzman generally, they were
16 both under forty and over forty?
17      MR. JENNINGS: Objection to form.
18      THE WITNESS: I don't really know. The
19 only one I really know of is Chris DeRucci. I mean,
20 you'd have to go through her personnel file. I mean,
21 she's no Mother Teresa, but she's a very manipulative
22 woman.
23      She kept everything segregated. Like,
24 she had certain people in certain jobs of one age and
25 certain people in another job of other ages. That's

187

1  the way that it was there. She only promoted -- I do
2  know that no one got promoted there that was older
3  that I saw when I was there.
4        She promoted Krista Allbee, like I said,
5  who was thirty years old and wasn't even there -- she
6  was in Chicago -- you know, to a position, you know,
7  from kindergarten to twelfth grade with not having to
8  do anything in between.
9  BY MS. KIVITZ:
10 Q.    Is it true that there were also people under
11 the age of forty who did not get promoted?
12        MR. JENNINGS: Objection to form.
13        THE WITNESS: I don't know.
14 BY MS. KIVITZ:
15 Q.    Can you think of any?
16 A.    People under forty who did not get promoted?
17        MR. JENNINGS: Objection to form.
18        THE WITNESS: I have no idea because
19 most of the people that I talked to there were in my
20 peer group, and they were the two women sitting on
21 either side of me. And we were all in our forties
22 except for Faith, who was now going into her fifties.
23 BY MS. KIVITZ:
24 Q.    Okay. I'm going to mark some of these, but
25 I'm going to try not to mark all of them so the

188

1  deposition transcript is not, you know, ninety million
2  pages long.
3  A.    Okay.
4  Q.    So I'm going to ask you if you remember this.
5  But in fairness, if you need to see anything I ask you
6  about, I'm happy to mark it. Okay?
7  A.    You're going to go through all those
8  (indicating)?
9  Q.    Well, some of them, the stickered ones.
10        Do you remember that in March, '06, you
11 wrote an e-mail to Kathy Holtzman because Krista had
12 brought you some items and she wanted you to fix
13 twenty pages of commas and spelling errors?
14 A.    Uh-huh.
15 Q.    You complained to Kathy Holtzman?
16 A.    Yes.
17 Q.    Do you recall, at the end of this March 20
18 e-mail, you said:
19        This was around 3:30.
20        "It's still on my desk to be finished.
21        I would like to know what is expected of me
22        with respect to these situations. Obviously,
23        it's your call"?
24 A.    Right.
25 Q.    Do you remember saying that?

189

1  A.    Uh-huh.
2        MR. JENNINGS: Yes?
3        THE WITNESS: Yes.
4  BY MS. KIVITZ:
5  Q.    What did you mean by "Obviously, it's your
6  call"?
7  A.    Krista was not my supervisor and was giving me
8  work to do, which basically she should have been doing
9  herself because she was just sitting there, talking to
10 people, doing nothing, and she handed that to me. So,
11 you know, I said to Kathy, "I'm supposed to be working
12 for you, Kathy. Am I supposed to be fixing typos for
13 Krista?"
14        So I said, "It's your call. If you want
15 me to do it, I'll do it, but I'm not happy about it,
16 and I don't feel" -- you know, I didn't really feel
17 that I should be doing that.
18 Q.    Okay. And what was Kathy's response?
19 A.    Well, she called me into her office and said,
20 "You know, do you feel it's below you, you know?"
21        And I said, "You know, no. I'll do it
22 if you want me to." Well, what I really felt was, "Do
23 you think it's below you?" I mean, Kathy has one
24 third of my education also I should say. So, you
25 know, I felt that it was not my place to be fixing

190

1  typos as a secretary for Krista. I wasn't hired to do
2  that.
3  Q.    Okay. But did Kathy Holtzman tell you that
4  was part of what you were being asked to do?
5  A.    No.
6  Q.    Okay.
7  A.    But I did it. I said, "I'll do it if you want
8  me to."
9  Q.    Okay. And did you do it?
10 A.    Yeah, I did it.
11 Q.    All right. Do you remember writing an e-mail
12 on March 21 in which you said:
13        "Sorry I said -- Sorry," it looks like,
14        "what I said yesterday because it was late
15        when I wrote the e-mail"?
16 A.    No.
17 Q.    No. Do you remember saying that:
18        "When we went over my role profile, you
19        asked me what I don't like to do"?
20 A.    Uh-huh.
21 Q.    "And I couldn't think of anything"?
22 A.    Right.
23 Q.    Okay. And then you said:
24        "Well, fixing typos for anyone besides
25        you and Dave is something I didn't expect to

191

```
 1             be doing"?
 2   A.        Yes.
 3   Q.        You said:
 4                  "I'm looking forward to working with
 5             Kathy, Kieran, and Krista"?
 6   A.        Uh-huh.
 7   Q.        "But I presumed it was with them, not just for
 8             them"?
 9   A.        Yes.
10   Q.        Was that your perception that, by fixing
11   someone else's work, it meant that you were working
12   only for them and not with them?
13   A.        Yes.  I wasn't allowed to give them any of my
14   work to fix.  I wasn't allowed to do any work.
15   Q.        Okay.  Do you remember then saying about Kathy
16   Angelucci:
17                  "I haven't had a problem working with
18             anyone, but you need to have some redeeming
19             quality.  I never even got a 'hello'" -- I'm
20             sorry.  Strike that.
21                  Let me repeat it so it's correct.
22                  "I haven't had a problem working with
23             anyone, but you need to have some redeeming
24             quality.  I never even got a 'hello' or a
25             smile from Krista all day."
```

192

```
 1   A.        Right.  Krista didn't talk to me or say, "Good
 2   morning," or anything to me.  She just dumped work on
 3   my desk.
 4   Q.        Okay.  You then said:
 5                  "You said, when you interviewed me, you
 6             needed someone that doesn't get insulted
 7             easily.  Well, I don't."
 8   A.        Right.
 9   Q.        Do you believe that you don't get insulted
10   easily?
11   A.        Right.  Kathy asked me that.  "Do you get
12   insulted easily?"
13                  And I said, "Is that a premonition of
14   what's to come?"  Apparently it was.
15   Q.        Okay.  Now, we've talked about Erik Soijka
16   and --
17   A.        Leslie and Debbie.
18   Q.        Right.
19                  MS. KIVITZ:  Let me mark this one
20   (indicating).
21                  (Whereupon the Reporter marked an e-mail
22   dated April 6, 2006, to Kathy Holtzman from Diane
23   Rosetsky as Exhibit No. D-16 for identification.)
24   BY MS. KIVITZ:
25   Q.        Do you want to take a second?
```

193

```
 1   A.        No.  Because I remember this.
 2   Q.        Okay.  Do you remember bringing to Kathy
 3   Holtzman's attention how this whole development with
 4   Erik Soijka and Barbara had occurred?
 5   A.        Say it again?
 6   Q.        Okay.  Do you now remember -- does this
 7   refresh your memory that you brought this whole Erik
 8   Soijka issue to Kathy Holtzman's attention to begin
 9   with?
10   A.        No, I didn't bring this to her attention.
11   This was ongoing.  This is when Barbara came and took
12   me up to Erik Soijka's office when Kathy was in
13   Florida.  There was already tension and problems way
14   before this.  That's why she came and took me to Erik
15   Soijka's office.  I didn't start this.  This started
16   way before I was there.
17                  And, you know, both Debbie and Faith
18   said, "This thing with Microsoft Project started way
19   before you, and Joy Bouldin had the same problem that
20   you had with Kathy, Microsoft Project, and being in
21   between IT and her."
22   Q.        Okay.  Tell me what you meant by:
23                  "So after this half-hour discussion,
24             it's still up in the air.  And Erik Soijka got
25             a lesson about technology and the evolution of
```

194

```
 1             the office end users from some former domestic
 2             goddess."
 3   A.        Yeah.  So?
 4   Q.        Just tell me what you meant by that.
 5   A.        I was talking to him about the technology and
 6   how we were using it down in our office.  And I called
 7   myself a "former domestic goddess," not Erik Soijka
 8   and not Kathy.  I was referring to myself.  And this
 9   letter was not to Erik Soijka.  It was to Kathy.  And
10   this was, you know -- I don't know.  It didn't have
11   much meaning to it at all.
12                  I mean, Erik thought that I didn't know
13   anything about the technology and that, you know, the
14   end user portion of it -- that we were in the wrong.
15   This was between him and Kathy on how the end users
16   were going to use Microsoft Project.  Okay?
17                  So I told him basically that I had
18   studied the situation and that I did know what I was
19   talking about but that I did not completely agree with
20   her in the way she was doing things but that I let him
21   know that I knew what I was doing.  So that's all that
22   that meant.
23   Q.        Okay.
24   A.        And I still think it's funny.
25   Q.        Okay.  And when you say he got a lesson about
```

195

1  technology from you --
2  A.    Right.
3  Q.    -- what does that mean?
4  A.    Because Erik Soijka told me he didn't know
5  that much about Active Directory, which is what we
6  were talking about. So I went, and I researched it,
7  and I sent him some articles on it. He had admitted
8  that he was out of touch with what was going on in
9  Test Development. He had no idea.
10            It was Leslie and Barbara Scaramalino
11 and Debbie Brown. So when we went up to Erik's
12 office, he really had no idea what was going on.
13 Q.    Did you feel that your technological skills
14 were comparable to his, surpassed his --
15 A.    I have no idea what Erik Soijka's are; so this
16 was just in jest. I mean, you're kind of
17 nit-picking into things which were tongue in cheek
18 obviously.
19 Q.    Well, was it tongue in cheek when he wrote you
20 the e-mail and you said that you found it juvenile and
21 nauseating?
22 A.    No. That was just, you know, what I felt.
23 But I didn't say that to him. I said it to Kathy. So
24 what's the difference?
25 Q.    What did you mean when you sent Kathy an

196

1  e-mail in April saying:
2            "Soijka doesn't work for Joe Crick. He
3            works for the guy with the little white hot
4            pants"?
5  A.    Oh, there was a guy that I didn't know who he
6  was down in the -- we have a gymnasium, and he came
7  into the gym wearing little short white pants. And it
8  was really inappropriate, and he kind of, like, laid
9  down in front of me on a ball and was stretched
10 backwards. And he came, and he did it a couple times
11 in front of me when I was on the elliptical.
12            And I said something to Kathy, and she
13 said, "Well, who was it?"
14            "I have no idea."
15            But then I saw him come up one day and
16 walk in front of me, and I said, "There he is."
17            And she said, "Oh, he's one of the
18 Vice Presidents."
19            So I didn't know his name; so I said,
20 "The guy in the white pants."
21            MS. KIVITZ: I'll ask that this one be
22 marked (indicating).
23            (Whereupon the Reporter marked e-mails
24 dated April 11, 2006, between Kathy Holtzman and Diane
25 Rosetsky as Exhibit No. D-17 for identification.)

197

1  BY MS. KIVITZ:
2  Q.    Is this the e-mail, on the bottom part of the
3  page, that you wrote to Kathy Holtzman concerning Erik
4  Soijka on April 11, '06?
5  A.    What did you ask me? If I saw this e-mail
6  before? Yes.
7  Q.    Okay. When you say that:
8            "I have to wonder if Joe Crick is a more
9            secure administrator and interested in doing
10           the right thing instead of trying to just look
11           like he is in charge."
12           Are you suggesting here that Soijka was
13 not secure and was not interested in doing the right
14 thing?
15 A.    I don't see the relevancy of this. I'm just
16 wondering why you're asking me about --
17            MR. JENNINGS: Diane, just answer the
18 question.
19            THE WITNESS: I don't think that Erik
20 Soijka, like I said before, knew what was going on.
21 BY MS. KIVITZ:
22 Q.    Okay. Well, you said here that decisions were
23 based on not liking to be told what to do?
24 A.    Yes. I thought his decisions were based -- he
25 wrote an e-mail to me. Do you have that one where he

198

1  wrote an e-mail to me or -- I think he wrote it to me
2  and Kathy -- where he didn't want my input and he
3  wasn't -- because I had sent him some articles off
4  the Internet about how Active Directory could be
5  used.
6            I kind of researched it because he said
7  that he had to research it, that he wasn't sure, and
8  that he wasn't interested. He said he didn't want
9  me -- I don't remember. Something about, you know,
10 "doesn't care what it said" or whatever.
11            He didn't care what it was. He didn't
12 seem to care whatever information I sent him, and I
13 thought it was kind of rude that I went to the trouble
14 to find the information for him.
15 Q.    Okay. Was it your impression that he didn't
16 like you telling him what to do?
17 A.    I wasn't telling him what to do. I was giving
18 him information, and he didn't want my input.
19 Q.    Okay. Why did you then say:
20           "It is obvious his decisions were based
21           solely on not liking to be told what to do"?
22 A.    Because he had issues with Kathy trying to
23 tell him how they were going to use Microsoft Project.
24 And Kathy and I had had a lot of discussions over
25 this, and that's what I was referring to. She wanted

```
                                                    199
 1   to know -- you know, she would constantly be going
 2   back and forth with him over how much information that
 3   they had to give them off of Microsoft Project.
 4   Q.     Okay.
 5   A.     And he did not want my input on how different
 6   ways that Active Directory could be used.  Active
 7   Directory is actually, like, the security system for
 8   it.  And he didn't know how to use it, and he said he
 9   wasn't familiar with it, that he was kind of removed
10   as an administrator.
11          So Kathy had said to me many times that,
12   you know -- she didn't like Erik Soijka, and she wrote
13   to me an e-mail something to that effect.  "He twists
14   things.  You know, be careful what you say to him."
15          So that's what that was about.
16   Q.     Okay.  And you sent that e-mail to Kathy
17   basically saying, you know, "What do we do here?"
18   A.     Yeah.  I just wanted her to know what went on
19   because she was upset because she hadn't been there.
20   Q.     And this was during the period when you and
21   Kathy Holtzman, at least in your testimony, were still
22   getting along; correct?
23   A.     Yeah.  She had no complaints with me.
24   Q.     And you had no complaints at this time;
25   correct?
```

```
                                                    200
 1   A.     No, I didn't say that.
 2          MR. JENNINGS:  Objection to form.
 3          THE WITNESS:  I didn't say that.  I
 4   didn't complain to anyone but....
 5   BY MS. KIVITZ:
 6   Q.     Okay.  But you trusted her enough that you
 7   forwarded the e-mail of someone that you found
 8   juvenile and nauseating to get input from her;
 9   correct?
10   A.     I didn't forward it to her.  I think it was
11   written to both of us.
12   Q.     Okay.  In any event, you consulted her for her
13   input in terms of how to deal with Soijka; correct?
14   A.     No.  I wasn't supposed to deal with him
15   anymore.  She had told me to -- before I said anything
16   to Erik Soijka, including the information that I had,
17   I asked her first, "Can I send this to Erik Soijka?"
18          And she said, "Yes."
19   Q      Okay.  Look at the top e-mail on that.
20   A.     (Complying.)
21          Uh-huh.
22   Q.     Isn't that when Kathy told you not to go out
23   on your own until you and she had spoken?
24   A.     Yes.  But we did speak.
25   Q.     Okay.  But didn't you send the first e-mail to
```

```
                                                    201
 1   Kathy, seeking her input?
 2   A.     Yeah.  But I didn't send anything to Erik
 3   Soijka.  I sent it to Kathy.
 4   Q.     Correct.  But I'm just saying --
 5   A.     I don't understand the point here.
 6   Q.     Am I correct that you valued her consultation
 7   enough that you forwarded this to Kathy Holtzman?
 8   A.     No, I didn't value her consultation.  I knew
 9   that Kathy could get really nasty if you did anything
10   without her --
11          She was a control freak.  Okay?
12          -- if you did anything without asking
13   Kathy first, and everybody knew that.  Even Dave
14   Swanson, who was supposed to be her superior -- he
15   constantly went in and asked Kathy what to do in front
16   of me.  She was controlling everything, not Dave.
17   Dave was supposed to be in control, but Kathy was.
18   Q.     Okay.
19   A.     So that's why I did this.  I didn't do
20   anything without asking Kathy first.  She knew every
21   single thing that I did except for when I went up to
22   the meeting with Barbara Scaramalino when she was in
23   Florida because I just felt under pressure to go with
24   Barbara.
25          She was one of the managers.  She said,
```

```
                                                    202
 1   "Let's go.  We're going upstairs to talk to Erik
 2   Soijka."
 3   Q.     Was this around the time that Kathy Holtzman
 4   asked you to prepare a memorandum, sort of setting
 5   forth the interactions?
 6   A.     The memorandum about Barbara?  Yeah, it was
 7   around this time.
 8   Q.     Okay.
 9   A.     I think it was -- yeah.  You should have that
10   memorandum.
11   Q.     Okay.  Now, you did compose such a memo;
12   correct?
13   A.     With Kathy's help, yes.
14   Q.     Okay.  And at least at that time April 11/12,
15   you did not complain to anyone about being asked to do
16   so; correct?
17   A.     I did.  I said something to Faith.
18   Q.     Okay.  Did you ever say to Kathy Holtzman,
19   "Gee, I'm uncomfortable doing this"?
20   A.     Yes.
21   Q.     Did you?
22   A.     I kind of said, "You know, I really don't want
23   to put -- do I really have to put this stuff in
24   there?"
25          And she's, like, "Yes.  You need to put
```

203

1  tone of voice and, you know, that Barbara was
2  yelling."
3              And I said, "Well, she wasn't really
4  yelling. We were just kind of talking."
5              "You need to put in, you know, certain
6  things."
7              She definitely was bullying me into
8  putting things in the e-mail that I did not want to
9  put in there.
10 Q.    Okay. Now, did you have some concern that
11 Erik Soijka and his department would be angry at
12 either you or Kathy or your department for a
13 professional disagreement?
14 A.    I already knew he was angry with the
15 department way before I got there; so I just did what
16 Kathy wanted me to do.
17 Q.    Okay. Did you feel that the memo was in part,
18 if not in full, directed at sort of protecting your
19 department?
20 A.    I was -- you know, it was, like, a chess game
21 for Kathy. You know, whatever chess move Kathy was
22 making at that point, you know, that's the way she
23 looked at everything. It wasn't a business
24 atmosphere. It was a circus.
25             You know, it was just, like, Kathy was

204

1  all about being in charge, being manipulative, not
2  producing quality work, not getting the best people to
3  do the jobs, you know, the best people for the jobs.
4  She was all about everything had to be her way, which
5  is why they got her an executive coached named Kenny.
6              I'll say it again. You know, she
7  discriminated against people. You know, that's the
8  way that she was, and I was afraid for my job just
9  like everybody else was. Faith and Debbie -- Debbie
10 was a single mother. She was scared to death of
11 losing her job.
12             And Faith was the sole support of her
13 Vietnam vet husband whose business was going under.
14 So, you know, the two of them on either side of me
15 constantly told me, "Be careful of her. You know,
16 this is the way that she is."
17             They kept telling me they wanted to get
18 out of this job. They applied for other jobs. And
19 Faith always called it "Kathy slime" that she
20 couldn't get out of there. Kathy wouldn't let
21 her out of the position.
22             So I'm telling you that whatever went on
23 here -- this is part of Kathy's manipulation of
24 everyone. That's what it is. And when you have
25 children and you have a job that depends on it -- I

205

1  stayed there as long as I could and, you know, be
2  stomped on and, you know, belittled and whatever.
3              I stayed there as long as I could. And
4  when I saw that there was a job that I could do and I
5  could do really well and that she could have just put
6  me into without me having to interview, I went for it.
7  And the only reason that she didn't do it was because
8  I'm older and she just wanted to deal with younger
9  people.
10             Everybody was younger. That's what she
11 did. She just felt like, you know, "Let's keep the
12 old ladies in the secretary positions." That's what
13 she was doing.
14 Q.    Now, I guess this question goes to Kathy
15 Holtzman and Elizabeth Bien. When you look back on
16 your employment at Penn and the National Board, both
17 jobs of which you've lost --
18 A.    Right.
19 Q.    -- and you know that both Penn and the
20 National Board would deny that there was any form of
21 discrimination or retaliation --
22 A.    Uh-huh.
23 Q.    -- my question to you is: Do you ever think
24 there were things that you could have done
25 differently?

206

1  A.    No.
2              MR. JENNINGS: Objection to form.
3              THE WITNESS: There was nothing I could
4  have done differently. If people are in charge of
5  you -- and this is not a secret to the rest of the
6  world -- they want a drone. They want somebody that's
7  going to be not as qualified as they are, not to put
8  in any ideas or be creative or anything like that.
9              First of all, with Elizabeth Bien I was
10 not hired full time at that time. I was in a
11 probationary period. And so the job was not really
12 clear cut what it was. But I just will say that, you
13 know, when your husband has a multi-million dollar
14 grant at the University of Pennsylvania and they hand
15 you a $100,000 job and the people that are working for
16 you are just "yessing" you to death, that's just the
17 way that it was.
18             And did I run into two people like this
19 in a row? Yeah, I did.
20 BY MS. KIVITZ:
21 Q.    But let me ask you this, Ms. Rosetsky: If you
22 feel that a supervisor wants a drone in a position and
23 doesn't want any creativity or things of that nature,
24 why would you ever apply for any position in which
25 you're an assistant?

207

1  A.    That's a ridiculous question because a job
2  description is never, you know, going to be completely
3  what you're going to be doing.  How did I know, when I
4  came in there, that I'm not going to be doing what the
5  job description is?  I mean, the job description was
6  what I looked at.
7          Just because it's called an
8  "assistant" -- I mean, look at a nurse practitioner.
9  What are you?  You're a nurse.  So, you know, you're
10 still going to get paid less and be pushed around by
11 the doctors.  Why do you take the job?  Because there
12 are other aspects of the job that you hope it will end
13 up being okay.  That is not what happened.
14         They are not the only people that
15 discriminated against you.  When I go in even now, you
16 know, they talk to me on the phone, and they say I'm
17 qualified.  You know, I'm not saying that I don't get
18 hired because, you know, I come in and they see a
19 fifty-year-old woman.
20         I mean, I don't know if Kathy is unique,
21 you know, what she did.  I'm sure she isn't.  That's
22 why we have E.E.O.C. laws.  Did she do it?  Yeah,
23 there's no question that she did it.  Did she do it to
24 other people?  I don't think there's any question that
25 she did it to other people either, that she keeps

208

1  people in a position, you know, according to age and
2  who's easier to manipulate.
3          So there's no question.  Why did I take
4  the job?  I needed a job just like you have a job.
5  That's a ridiculous question.
6  Q.    What I'm asking you, though, Ms. Rosetsky, is
7  don't you also see a pattern of your being
8  terminated --
9  A.    No.
10 Q.    -- for not getting --
11 A.    No.
12 Q.    -- along with people?
13 A.    No.  I see a pattern --
14         MR. JENNINGS:  Objection to form.
15         THE WITNESS:  I see a pattern of society
16 where they discriminate against people for age, and
17 that's why we have E.E.O.C. laws.  That's what I see.
18 BY MS. KIVITZ:
19 Q.    But I'm asking you if you think it's
20 coincidental that --
21 A.    Two times don't make a pattern.  So you need
22 to go back and review your statistics.  Okay?
23 Q.    Okay.  But you've also referenced problems
24 that you had at Wistar and problems --
25 A.    I didn't have problems at Wistar.

209

1  Q.    -- you had at the National Board.
2  A.    I had no problems at Wistar.  Go review my
3  personnel records.  They had no problems.  Actually I
4  was promoted.  If you'll look, I started out as an
5  Editorial Assistant, and I was promoted to Assistant
6  Manager.  And then I was the Executive Assistant to
7  the Associate Director.  I was promoted in there; so I
8  don't know what you're talking about.
9  Q.    Okay.  The only thing I'm asking you is if you
10 ever question whether your own behavior and
11 intolerance of some of the people you worked
12 with --
13 A.    No.  I never questioned --
14 Q.    -- was a factor in your termination?
15         MR. JENNINGS:  Objection to form.
16         THE WITNESS:  I was never intolerant of
17 people, and I was really nice to everyone.  It's Kathy
18 that had the executive coach, not me.
19 BY MS. KIVITZ:
20 Q.    Okay.  I'm going to move on.
21         MR. JENNINGS:  Let's take a little
22 break.  Five, ten minutes.
23         MS. KIVITZ:  Okay.
24         (Brief recess.)
25         MS. KIVITZ:  I just want to put on the

210

1  record that an issue arose, while the witness was
2  still under oath, that we raised with Counsel
3  concerning a thumb drive.  And I wanted to come in and
4  ask questions without the witness being prepared
5  pursuant to the Hall case as well as the Federal
6  Rules.
7          Mr. Jennings walked the witness outside
8  of the conference room and outside of the office in
9  order to have a conference with her, and I want that
10 clear so that there is a record of it.  It was
11 before -- it was in the middle of questioning and
12 before we were about to question concerning what we
13 had discussed during the break.
14         MR. JENNINGS:  And just for the record,
15 there was no question pending, and obviously the Hall
16 decision only affects discussions of substantive
17 testimony at a deposition.  It's also a fairly old
18 decision.  It is not really binding in terms of
19 precedent.  And the Federal Rules do not address the
20 issue of discussions between counsel and a deponent
21 concerning nonsubstantive testimony.
22         So you can proceed with questioning.
23         MS. KIVITZ:  I just want to say that the
24 Federal Rules memorialize the principles that were
25 enunciated in the Hall decision.  And they're

211

1    memorialized in the Federal Rules of Civil Procedure.
2             MR. JENNINGS: And the Hall decision
3    does not apply in this case.
4             THE WITNESS: It's getting warm in here.
5             MS. KIVITZ: There was going to be a
6    question pending of which Counsel was aware.
7             MR. JENNINGS: And may I also say for
8    the record that in a break Defense Counsel addressed
9    two issues with me, one concerning a HIPAA Release and
10   one concerning a return of documents or a file on a
11   flash drive.
12            I told Counsel I would speak to my
13   client about it, and they refused to give me the
14   opportunity to discuss the issues which they arose.
15            MS. KIVITZ: Because there was an issue
16   with a --
17            MR. JENNINGS: Excuse me. I have not
18   finished.
19            If Counsel wished to ask those
20   questions, they could very well have waited until --
21   to address them with me.
22            You can go ahead and question --
23            MS. KIVITZ: Because there was an issue
24   concerning a violation of confidentiality concerning
25   the National Board's materials, we felt that it was

212

1    important enough to proceed without any separate
2    guidance for the witness. And because of that, we
3    believe very strongly that the Federal Rules have been
4    violated as well as the principles enunciated in the
5    Hall decision.
6             MR. JENNINGS: And if Counsel feels that
7    strongly, I encourage her to file a motion.
8             THE WITNESS: Kathy knew I took this
9    stuff home.
10            MR. JENNINGS: There's no question
11   pending, Diane.
12            THE WITNESS: Okay.
13   BY MS. KIVITZ:
14   Q.    My question, Ms. Rosetsky, is: Once you left
15   the National Board, you still have that thumb drive.
16   Am I correct?
17   A.    It's my thumb drive. Yes.
18   Q.    Okay. And what is on the thumb drive?
19   A.    A lot of things: music, documents of my own,
20   letters, pictures of my children, different things.
21   Q.    Okay. What from the National Board of Medical
22   Examiners? What materials are on the thumb drive?
23   A.    To be honest with you, I don't even know if
24   it's still on there. How's that? I mean, it was on
25   there at one time. I haven't looked at it for a

213

1    really long time. So, you know, it's got some things
2    on it, a lot of pictures.
3    Q.    All right. We are --
4    A.    To be honest with you, I probably have a copy
5    of it. No one's ever seen it. I haven't tried to
6    sell it. I haven't done anything with it. It's just
7    there. There was no intention to do anything with it.
8    I'm not making any money off of it, and nobody's seen
9    it but me.
10            I doesn't mean anything to anybody but
11   me. And, you know, it's just there because it's on my
12   hard drive probably on my laptop, and that's it.
13            MS. KIVITZ: Okay. We are asking -- and
14   there's no way we can now know this for sure,
15   Mr. Jennings, because the testimony has been diluted
16   by the conference in the interim. But we are asking
17   that the thumb drive be submitted to you in exactly
18   the status it is now.
19            And if it becomes an issue at to whether
20   Judge Del Sole needs to take a look at other materials
21   on it that may or may not be redacted, so be it. But
22   we're asking that it not be deleted and that it be
23   made in -- whatever is on it now be maintained, not
24   deleted, not altered in any way, and made available.
25            MR. JENNINGS: Can we go off the record

214

1    for a second?
2             MS. KIVITZ: No, we can't.
3             MR. JENNINGS: Okay. Do you have a
4    computer here she can plug it into?
5             MS. KIVITZ: Yeah. Sure.
6             MR. JENNINGS: Fine. Give us a
7    computer. Let us sit. She will transfer the file to
8    a computer of your choice. Obviously I'm not going to
9    let you watch her transfer the file. I will be there,
10   as an officer of the court, to make sure the file is
11   not modified in any way.
12            MS. KIVITZ: I'd rather it be the Court.
13   That's my concern.
14            THE WITNESS: You're making a big deal
15   over obsolete slides that they used to teach
16   physicians how to write questions. There is nothing
17   confidential within this database, nothing. I'm not
18   using it to sell it. The while thing --
19            MR. JENNINGS: Diane? Diane? There is
20   no question pending.
21            And, Counsel, if you have an issue, you
22   can address it with me unless you have a specific
23   question.
24            THE WITNESS: It's a waste of time --
25            MR. JENNINGS: Diane? Diane? I'm

215

1  instructing you not to --
2        MS. KIVITZ: If the thumb drive is here
3  and available, what I'd rather is that we put an
4  agreement -- we make a stipulation on the record, we
5  keep it --
6        Wait. Just listen.
7        -- that we agree not to review it absent
8  the Court intervening or being present, that you
9  obviously agree not to review it, that it remain
10 intact, and we all stipulate to that. And
11 Judge Del Sole can enter it as an Order.
12       But then we can see what's on it that is
13 relevant to the National Board of Medical Examiners
14 without any tampering by anyone.
15       MR. JENNINGS: She's testified as to
16 what may or may not be on it. And I am telling you
17 that, if you give me access to a computer in this
18 office right now, she will transfer any and all files
19 relevant to the National Board of Medical Examiners to
20 that computer and then delete them from the flash
21 drive.
22       THE WITNESS: Can I ask her a question?
23       MR. JENNINGS: No.
24       MS. KIVITZ: How long would it take?
25       MR. JENNINGS: It's a flash drive. Very

216

1  little time. It's a U.S.B. connection.
2        THE WITNESS: If I have it on there, I'm
3  not sure.
4  BY MS. KIVITZ:
5  Q.    How long would it take?
6  A.    Not long.
7        MR. JENNINGS: Couple minutes.
8        THE WITNESS: If it lets me. Do you
9  have Microsoft Access on your computer?
10       MS. KIVITZ: Yes.
11       THE WITNESS: Do you have Office
12 Professional?
13       MS. KIVITZ: Yes.
14       THE WITNESS: It might let me. I don't
15 know. Sometimes, because of the security on it, it
16 doesn't let you copy it. I could try.
17       MS. KIVITZ: Yeah. I would say let's
18 finish the questioning. We'll give it a shot. If
19 not, we can put something on the record.
20       MR. JENNINGS: I'll state for the
21 record, if that does not work, Ms. Rosetsky will
22 transfer a copy of the file to me in uncorrupted form.
23 I will immediately transfer it to you in uncorrupted
24 form. And upon signal from you, she will delete it
25 from her computer and from any other drive it is

217

1  sitting on.
2        MS. KIVITZ: The device is here today;
3  correct?
4        MR. JENNINGS: She's not sure.
5  BY MS. KIVITZ:
6  Q.    The device itself -- is that here today?
7  A.    I have a thumb drive with me, but I'm not sure
8  what's on it. I had it at one point on there.
9  Q.    Right.
10       MS. KIVITZ: So we could also agree, if
11 it's not transferable, that the device itself --
12 nobody transfers it to anything. We simply have the
13 device for now, and then when we need to play it, we
14 can do it with the Court being privy to it, if
15 necessary.
16       MR. JENNINGS: No, we're not agreeing to
17 give you the thumb drive.
18       THE WITNESS: You can't have my thumb
19 drive. It's got other personal things on it.
20       MR. JENNINGS: Diane? Diane? Unless
21 there's a question pending --
22       THE WITNESS: Okay. Sorry.
23       MS. KIVITZ: I mean, here's my problem.
24       MR. JENNINGS: Apparently you don't
25 trust me with the thumb drive. Why should I trust you

218

1  with the thumb drive?
2        MS. KIVITZ: Because what I'm saying is
3  we would put a stipulation on the record punishable by
4  contempt and sanctions.
5        MR. JENNINGS: Fine. I'll take the
6  thumb drive.
7        THE WITNESS: Okay. You need to turn
8  down the air conditioner now because there's no air in
9  there. I'm getting really hot, and I'm menopausal.
10 Would you turn down the air a little bit? There's no
11 air in here. You guys are producing too much hot air.
12       MR. JENNINGS: I'll take the thumb
13 drive. I'm not going to stipulate that you get it.
14 If you do not trust me with the thumb drive, you know,
15 you can explain to Judge Del Sole why you don't trust
16 me with the thumb drive.
17       MS. KIVITZ: I mean, my problem is I
18 wanted to go on the record with this issue, and you
19 insisted on conferencing contrary to the Federal
20 Rules. So I have lost some modicum of trust.
21       MR. JENNINGS: I did absolutely nothing
22 contrary to the Federal Rules.
23       MS. KIVITZ: You did. And now --
24       MR. JENNINGS: I did absolutely nothing
25 contrary to the Federal Rules.