# Exhibit "A"

219

1   MS. KIVITZ:  All right.  We will --
2   MR. JENNINGS:  Point to the specific
3   section of any rule that I violated.
4   MS. KIVITZ:  All right.  We will see if
5   the thumb drive can be transferred onto a computer at
6   the close of the deposition.  I want to move on.
7   MR. JENNINGS:  Go ahead.
8   BY MS. KIVITZ:
9   Q.    All right.  Ms. Rosetsky --
10  A.    Yes.
11  MS. KIVITZ:  I'm going to ask that this
12  be marked as the next exhibit (indicating).
13  THE WITNESS:  Call me "Diane."
14  (Whereupon the Reporter marked an e-mail
15  dated November 22, 2006, to Kathy Holtzman from Diane
16  Rosetsky as Exhibit No. D-18 for identification.)
17  BY MS. KIVITZ:
18  Q.    Would you take a look at that, please?
19  A.    Yes.  (Complying.)
20        Okay.
21  Q.    Do you recall drafting that e-mail to Kathy
22  Holtzman?
23  A.    Yes.
24  Q.    Okay.  And that e-mail followed your year-end
25  evaluation?

220

1   A.    Yes.
2   Q.    Okay.  And you attached to that the role
3   profile title that you had drafted and published?
4   MR. JENNINGS:  Objection to form.
5   THE WITNESS:  Because Kathy brought the
6   wrong one.  There was actually one with a similar
7   title, but it was not in her department.  So that's
8   what that meant.  She brought the wrong one.
9   BY MS. KIVITZ:
10  Q.    Okay.  Do you remember what she did bring?
11  what it was called?
12  A.    You know what?  I have it at home.  I might
13  have it with me.  It would take me a while to find it.
14  It was actually a Program Assistant, Test Development
15  Program Assistant for Test Services, I think, or, you
16  know, Test Services where they actually go out to the
17  site, I think.
18  Q.    Okay.
19  A.    You know, that reminds me.  Yeah, there was
20  something that was almost the exact title, and Kathy
21  brought it down, and then I told her that was not it.
22  Q.    Okay.  And am I correct also that on the role
23  profile that you did draft in terms of the various
24  factors where it said "Responsibility for People and
25  Performance," there was none?  Is that correct?  If

221

1   you go to 5.1?
2   A.    There were none.
3   Q.    Okay.  And then same thing under 6.2,
4   "Supervisory/Management Responsibility"?
5   A.    None.
6   Q.    Okay.  So is it safe to say that you knew from
7   the beginning yours was not a managerial or
8   supervisory position?
9   A.    Yes.
10  Q.    Okay.  Now, you said to Kathy Holtzman in this
11  e-mail:
12        "I am not going to complete any further
13        work on the databases."
14  MR. JENNINGS:  Objection to form.
15  THE WITNESS:  Well, it's out of context.
16  BY MS. KIVITZ:
17  Q.    Okay.  Why don't you in your own words tell me
18  what you said and what you meant?
19  A.    When I went to my review, Kathy was -- let me
20  see how to put this.  When I went down to the review,
21  Kathy both said that my databases were taking me too
22  long to build and she didn't know how good they were.
23  But on the other hand -- and that's what most of the
24  negative feedback was on my review.  And then after
25  the review, she tells me that she wants me to build

222

1   another database.
2         And also in front of Barbara Davidson
3   during that review, she said, "I didn't hire you to
4   build databases."  So here she didn't hire me -- I
5   wasn't being paid an IT scale.  She criticized the
6   databases with having absolutely no idea anything
7   about what databases are or how they're constructed.
8         And so I told her, "At this point, you
9   know, you're telling me I wasn't hired to do it.  You
10  tell me I don't know what I'm doing.  It's taking me
11  so long.  So I'm not going to do it anymore, you know,
12  unless you move me into another position and pay me
13  what other people are being paid to do this.  You
14  know, I'm being discriminated against here."
15  Q.    Okay.
16  A.    That's what I meant.
17  Q.    Okay.  Now, you also said to her:
18        "This will avoid another poor
19        performance rating for me in the future as you
20        lack the qualifications to evaluate my skills
21        in this area."
22  A.    Yes.
23  Q.    What did you mean by -- strike that.
24        You knew that Ms. Holtzman was your
25  direct supervisor; correct?

223

```
 1   A.      Yes.
 2   Q.      And she was your only direct supervisor;
 3   correct?
 4   A.      No.  I think Dave was supposed to be also, but
 5   I'm not sure.
 6   Q.      Well, we went to your -- the allegation in
 7   your Complaint before, and you've told me that you
 8   alleged that Kathy Holtzman was your only direct
 9   supervisor.
10   A.      She is.  She doesn't let Dave say anything.
11   Q.      And that was true in the Complaint?
12   A.      I guess.
13   Q.      Okay.  So you knew she was your supervisor.
14   What did you mean saying to your boss, "...you lack
15   the qualification to evaluate my skills in this area"?
16   A.      Exactly that.  She doesn't know anything about
17   IT.  She could barely use Microsoft Word.  So she was
18   trying to evaluate something.  She's telling me that I
19   took too long.  I couldn't even get her to look at it.
20   I sent her e-mails.
21           I said, "Why don't you please give me
22   some feedback on this database and see if I'm going in
23   the right direction with it."
24           She said, "You're going to need to sit
25   down with me and go over it.  I don't know how to work
```

224

```
 1   it."  You know, she was very intimidated by it.  I did
 2   this a couple times.  And then in the end, when she
 3   wanted to retaliate against me, all of a sudden she's
 4   a database expert.  You know, she's telling me --
 5           I told her -- you know, I said to her
 6   verbally, "Why don't you involve Debbie Brown in
 7   this?  She's the only expert on Microsoft Access in
 8   this building that I know."  There might be some
 9   others.
10           But, you know, she had no -- everything
11   that she wrote on my evaluation she had no idea what
12   she was talking about: how long it took, what was
13   involved with it, you know, the scope of what it could
14   do.  She just was all in retaliation.
15   Q.      Okay.
16   A.      So that's what I meant.  She was unqualified.
17   It's like if I asked you to translate something from
18   Chinese.  Could you do it?
19   Q.      Okay.  But if Kathy Holtzman was your only
20   boss, who did you expect to evaluate you?
21   A.      To evaluate my databases?
22   Q.      Your work.
23   A.      Dave.  Dave had -- you know, Dave loved the
24   databases that I built.  He was just afraid of Kathy.
25   Dave could have had input with this, but --
```

225

```
 1   Q.      Understand my question.  You've alleged in
 2   your Complaint that the only person you reported to
 3   was Kathy Holtzman, your direct supervisor.  Who did
 4   you expect to evaluate your work?
 5           MR. JENNINGS:  Objection.  Asked and
 6   answered.
 7           THE WITNESS:  Yeah.  I mean --
 8           MR. JENNINGS:  You can answer it one
 9   more time.
10           THE WITNESS:  You know, sometimes when
11   you are at a job and you're doing things for someone,
12   like --
13           Let me give you an example.
14           -- someone that's managing a project,
15   you have people working for you, and you don't
16   necessarily know all the applications as well as the
17   people that work for you know them.
18           You can do, like, a mock-up or a story
19   board of what you want and what you want the database
20   to do, but you don't know how to build that database.
21   So Kathy didn't know at that level -- she knew kind of
22   what the database was going to do.  It was going to
23   catalog her slides.
24           As far as how long it took to build and
25   how it was working, she never got involved with it.
```

226

```
 1   And she had no skills to evaluate it.  I mean, it's,
 2   like, you can't know everything.  You have to have
 3   people working for you.
 4           But don't criticize my work, without
 5   going to someone that does know what I'm doing, and
 6   give me a poor review just to retaliate against me
 7   because I went to HR.  I mean, she had no way -- like
 8   I said, can you translate Chinese?  No.  But you could
 9   hire somebody to help you with a Chinese client.
10   Q.      Okay.  But then you said to her:
11           "If you want me to continue my work for
12           you, I expect to be compensated" --
13   A.      Right.
14   Q.      -- "at a salary of at least $60,000."
15           Correct?
16   A.      Right.
17           MR. JENNINGS:  Objection to form.
18   BY MS. KIVITZ:
19   Q.      Now, you were aware that at least the base on
20   your position before any increase or other issue was
21   $50,000; correct?
22   A.      I don't know what the base is.  There's
23   actually a chart on line where you can see where it
24   goes from here to here.  I mean, I don't really --
25   Q.      Okay.  Well, your starting salary had been
```

227

1   what?

2   A.      Twenty-seven-and-something cents an hour.

3   Q.      Okay.  And annually that was roughly $50,000;

4   correct?

5   A.      Roughly?

6   Q.      I think it was.

7   A.      Yeah.

8   Q.      I think I've seen something that it was

9   50,000.

10  A.      Roughly.

11  Q.      Okay.  So, in effect, you were basically

12  saying, "I won't do this job for 50,000.  If you want

13  me to do it, pay me 60,000"; correct?

14          MR. JENNINGS:  Objection to form.

15          THE WITNESS:  I asked for a promotion,

16  and that's what I was referring to.

17  BY MS. KIVITZ:

18  Q.      Okay.  But it was more than asking --

19  A.      She took away my raise because I went down to

20  HR to complain.  And what she used against me was what

21  I had taken home, worked on overtime for her, and

22  broken my back to do.  And then she used it against

23  me.  So whatever I said I meant.  If she wanted me to

24  continue working in this manner, she had to stop

25  discriminating against me in the manner she was.

228

1   Q.      Okay.  But I just want to be clear.  What this

2   read -- and you said, "I mean what I said," and I

3   agree with that.

4   A.      I'm not here for the termination.  I'm here

5   because I was not promoted and because I was

6   retaliated against terribly.  For the last amount of

7   time I was there, it was awful.  That's what I'm here

8   for.  Whether or not I decided --

9   Q.      What do you mean you're not here for the

10  termination?

11  A.      Well, you know, I was terminated, and they're

12  saying that I refused to do my job.  I asked for

13  another position in there, not only for a promotion.

14  I said, "Can you just move me to another department?"

15  because they knew how difficult she was being.

16          They said, "We can't do that," although

17  they had done it before for other people.  And that's

18  what I'm here for.  I was not promoted because I was

19  older.  That's what I'm here for.  And I was

20  retaliated against when I complained about that.

21  Q.      Okay.  But when you say you're not here for

22  the termination, are you saying, "I agree they should

23  have terminated me based on this e-mail"?

24  A.      No, I'm not saying that at all.

25  Q.      Okay.  Well, then what do you mean you're not

229

1   here for the termination?

2   A.      Because my primary complaint was that -- what

3   started this whole thing was that she promoted other

4   people, would not promote me, was not giving me the

5   respect or, you know, the work that was in my job

6   description.

7           She was trying to keep me and the other

8   old ladies in line.  And when I went down to

9   complain -- and I was not the only one to complain

10  about this -- she started doing all kinds of things to

11  me.  And I had the e-mail that I sent to you what she

12  was doing.

13  Q.      Okay.  But I still don't understand what you

14  mean by "I am not here because of the termination."

15  What do you mean by that?

16  A.      Well, my main complaint is that she

17  discriminated against me for the promotion and that

18  after that her retaliation was that she got me fired.

19  Q.      But you said to me -- and I'm still trying to

20  understand what you meant by "I'm not here because of

21  the termination.  I'm here because of other things."

22  A.      Well, what started was the discrimination,

23  not being promoted, and the retaliation.  So I guess,

24  you know, I misspoke if the termination is part of the

25  retaliation.

230

1   Q.      Okay.  Now, you said to her in this e-mail:

2           "If you would like me to continue my

3           innovative work, I expect to be compensated

4           for this level of performance."

5   A.      Right.

6   Q.      "This would require a change to an information

7           technology type-title at a salary of at least

8           $60,000."

9   A.      Right.

10  Q.      "If not, I am sure that Technology Services

11          could build anything you need."

12  A.      Right.

13  Q.      Okay.  Didn't you feel that you were inviting

14  the National Board to terminate you and have

15  Technology Services build them whatever they needed?

16          MR. JENNINGS:  Objection to form.

17          THE WITNESS:  She had already decided to

18  fire me.  Barbara, you know, made that clear.

19  BY MS. KIVITZ:

20  Q.      Well, you had just received a modest promotion

21  at your evaluation, had you not?

22  A.      No.  Where did you get that from?

23  Q.      Well, you were deemed satisfactory, and you

24  were going to receive a 2 percent increase in your

25  salary, were you not?

231

```
1              MR. JENNINGS: Objection to form.
2              THE WITNESS: No. That's a lie. First
3  of all --
4  BY MS. KIVITZ:
5    Q.    Well, you think it was 1 percent.
6    A.    I was told by Barbara Davidson that it was
7  1 percent. And do you consider that a promotion?
8  That's a slap in the face when everybody else is
9  getting, you know, 8 and 10 percent. How dare you.
10   Q.    Well, my information is 2 percent.
11             But I'm saying the day before or a short
12 time before you wrote this e-mail, you had been
13 advised that you would be receiving a raise, had you
14 not?
15   A.    No, I was not. No.
16   Q.    But you knew with the satisfactory evaluation
17 it would be accompanied by a modest raise, did you
18 not?
19             MR. JENNINGS: Objection to form.
20 BY MS. KIVITZ:
21   Q.    You've testified to that.
22             MR. JENNINGS: Objection to form.
23             THE WITNESS: 1 percent to me is not a
24 raise. You figure it out.
25 BY MS. KIVITZ:
```

232

```
1    Q.    Is 1 percent more than zero percent?
2    A.    You need to look at this in the
3  comparison of what she was doing. This is 200 percent
4  retaliation. She knew it. She did it intentionally.
5  There's no one else -- you show me someone else that
6  got 1 percent in there.
7    Q.    Okay. Is 2 percent more than 1 percent?
8              MR. JENNINGS: Objection to form.
9              THE WITNESS: It's nonsense. I'm not
10 going to answer it
11 BY MS. KIVITZ:
12   Q.    Okay. Do you know what 2 percent of
13 50,000 is?
14   A.    2 percent of 50,000?
15             MR. JENNINGS: Objection to form.
16             THE WITNESS: Yes.
17 BY MS. KIVITZ:
18   Q.    What is it?
19   A.    $1,000.
20             MR. JENNINGS: You can do the math.
21             THE WITNESS: 1,000 divided by three
22 hundred fifty-six days a year. How much would that
23 give me?
24 BY MS. KIVITZ:
25   Q.    Okay. So --
```

233

```
1    A.    Fifty cents a day more. Thank you.
2    Q.    So you wrote this the day after you knew you
3  would be receiving a $1,000 annual increase?
4              MR. JENNINGS: Objection to form.
5              THE WITNESS: No.
6  BY MS. KIVITZ:
7    Q.    Well, when did you write it?
8    A.    Didn't I write it the same day?
9    Q.    Okay. I'm sorry. You wrote this the same day
10 then that you knew you were receiving a $1,000 annual
11 increase?
12   A.    Well, I'll tell you what. If the jury thinks
13 that out of 10 percent I got a 1 percent --
14             MR. JENNINGS: Diane? Diane? Please
15 just answer the question.
16             THE WITNESS: I don't consider that an
17 increase. Okay? That was done in retaliation after I
18 worked overtime, was not paid for it, never was late,
19 hardly out at all, did all of my work perfectly. This
20 whole thing was in retaliation, and I would swear on a
21 stack of Bibles and on the lives of my children that
22 this is what this woman did. Okay?
23 BY MS. KIVITZ:
24   Q.    Okay. But, Ms. Rosetsky, didn't you, when you
25 wrote this e-mail, really tell your supervisor you
```

234

```
1  weren't going to do this work anymore?
2    A.    I was not going to do the work that she gave
3  me a negative review for. Yes. She was criticizing
4  me. And I think anybody else that saw this clearly
5  what happened where I was criticized by an English
6  person that doesn't speak Chinese for my Chinese, you
7  know, diction --
8    Q.    Okay.
9    A.    You know, it was ridiculous. The whole thing
10 was in retaliation. And for me to have to keep
11 repeating myself --
12   Q.    Okay.
13   A.    It's retaliation. That's all.
14   Q.    Now, the database work that you were doing was
15 part of your role profile; correct?
16   A.    Yes.
17   Q.    Okay. So wasn't this a way of saying, "I'm
18 not going to work on the database anymore, plus I'm
19 not going to do clerical work for you either"? I
20 mean, didn't you really say both things?
21             MR. JENNINGS: Objection to form.
22             THE WITNESS: Actually she told me, when
23 I was in HR that same day, that I was not hired to do
24 databases. She said it in front of Barbara Davidson.
25 So after she said that, I said, "If you want me to do
```

235

```
 1    databases, pay me on an IT scale, and I'll do it."
 2    BY MS. KIVITZ:
 3    Q.    Okay.  But I'm just looking at your words.
 4    A.    You're going to have to ask her why she said I
 5    was not hired to do databases, that I was taking too
 6    long, and whatever else.  I wish you would pull out
 7    the -- her criticism of me.  You know, why don't you
 8    pull that out and read that because that's really
 9    helpful what she did.
10          A woman that knows nothing about what I
11    was doing decided that I wasn't doing it right but
12    that she still wanted me to do it but for, you know,
13    a fraction of what the other people were doing it for.
14    Q.    Okay.  But --
15    A.    And that's all I'm going to say about it.  And
16    I think I've made myself really clear.
17    Q.    Well, I appreciate your clarity, but I just
18    want to understand this.
19    A.    You understand it.  I'm finished.
20    Q.    Excuse me?
21    A.    I'm finished with that question.
22    Q.    Okay.  I'll ask you another one.  That's my
23    job at a deposition.  You understand that?
24    A.    Okay.
25              MR. JENNINGS:  Well, Counsel, please do
```

236

```
 1    not argue with my client.  You may ask her questions.
 2    You may not argue with her.
 3              MS. KIVITZ:  Mr. Jennings, I think I've
 4    been rather patient under the circumstances.
 5              MR. JENNINGS:  That does not give you --
 6    please do not argue with my client.
 7    BY MS. KIVITZ:
 8    Q.    Ms. Rosetsky, you were looking for other
 9    employment throughout the time that you worked at the
10    National Board, were you not?
11              MR. JENNINGS:  Objection to form.
12              THE WITNESS:  Once in a while I sent out
13    resumes towards the end.
14              MR. JENNINGS:  My objection is the word
15    "throughout" is vague.  It implies she was looking for
16    work since day one.  If you'd like to clarify a
17    specific time frame, I'll remove the objection.
18              THE WITNESS:  I had resumes that were
19    still pending from other places.
20    BY MS. KIVITZ:
21    Q.    Okay.  Where were some of the places you were
22    looking?
23    A.    A majority of them were University of
24    Pennsylvania.
25    Q.    Okay.  Now, you had been terminated from the
```

237

```
 1    University of Pennsylvania just the summer before;
 2    correct?
 3    A.    Yes.  And my supervisor told me to -- "You may
 4    look for other jobs at Penn."
 5    Q.    Okay.  But did you think it might be more
 6    fruitful to look other places also where you had not
 7    been previously terminated?
 8    A.    No.  It didn't matter because there's so many
 9    different Human Resource Departments there and
10    different colleges.  It's very dispersed.
11    Q.    Okay.
12    A.    And I had a recommendation from her.  So, you
13    know....
14    Q.    Where were some of the other places you
15    looked?
16    A.    Drexel, drug companies, all different places.
17    Q.    Okay.  When did you decide that you did not
18    want to stay at the National Board?  What month would
19    you say?
20    A.    October.
21    Q.    Of what year?
22    A.    Let's say it was about October when she
23    just -- you know, she just really started getting out
24    of hand.
25    Q.    Okay.  Isn't it true that you actually began
```

238

```
 1    looking much earlier than October for another
 2    position?
 3    A.    No, not really.  I think most people send out
 4    sporadic resumes, just fishing.
 5              MS. KIVITZ:  Do you want to mark that
 6    (indicating).
 7              (Whereupon the Reporter marked e-mails
 8    dated June 6 and June 21, 2006, between Diane Rosetsky
 9    and Temple and Drexel as Exhibit No. D-19 for
10    identification.)
11    BY MS. KIVITZ:
12    Q.    All right.  I'm showing you an e-mail sent out
13    June 6 -- a couple of them, and then another one sent
14    June 21.  Do you see those?
15    A.    Right.
16    Q.    Can you tell me what they are?
17    A.    They are from a doctor at Penn.
18    Q.    Who is a doctor at Penn?
19    A.    No, she's not.  She's a Director of Finance at
20    Penn, Marie Nanashee.
21    Q.    Right.  Is it Penn, or is it Drexel?
22    A.    This is Penn or Drexel?  Oh, it's Drexel.
23    Okay.
24    Q.    All right.  So is it correct that you had
25    applied for a position with Drexel back in June, 2006?
```

239

1  A.     I may have applied even before that.  I mean,
2  it could have just been in their database.
3  Q.     Okay.  And you had an interview --
4  A.     Uh-huh.
5  Q.     -- in June?
6          MR. JENNINGS:  Is that "yes"?
7          THE WITNESS:  Yes.
8  BY MS. KIVITZ:
9  Q.     Okay.  And that was during a period of time,
10 at least that you've indicated, you were not unhappy
11 at the National Board?
12         MR. JENNINGS:  Objection to form.
13         THE WITNESS:  I did not indicate that.
14 BY MS. KIVITZ:
15 Q.     Okay.
16 A.     You asked me when did I decide to start
17 looking for other jobs?
18 Q.     Right.  You told me October.
19 A.     Yeah, generally.  But I still sent out some
20 other resumes.  I didn't say I didn't.
21 Q.     Okay.
22 A.     Well, this one actually probably was really
23 old.  It may have been from the September before.
24 Sometimes it takes them six months to get to you.
25 Q.     Okay.

240

1  A.     And I'm thinking that's what happened here
2  because it says I needed to attach an updated resume
3  because it was old and outdated.
4  Q.     All right.  But you --
5  A.     This is from before I worked at the Board.
6  Q.     All right.  But you accepted the interview;
7  correct?
8  A.     Yes.
9  Q.     Okay.  And you had a job interview on June 6?
10 A.     Uh-huh.  Yes.
11 Q.     Okay.  Now, could you look at the next page?
12 A.     Yes.
13 Q.     This was a Temple position?
14 A.     Uh-huh.
15         MR. JENNINGS:  Is that "yes"?
16         THE WITNESS:  Yes.
17 BY MS. KIVITZ:
18 Q.     And is that also a position you applied for?
19 A.     Yes.  But it was probably a long time ago
20 because they're asking for an updated resume.
21 Q.     All right.  And that was also in June of 2006?
22 A.     Yes.  And I never went to any interviews at
23 Temple.
24 Q.     Okay.
25         MS. KIVITZ:  And then I guess we'll mark

241

1  this the next exhibit (indicating).
2          (Whereupon the Reporter marked an e-mail
3  dated August 22, 2006, to HospitalMedicine.org from
4  Diane Rosetsky as Exhibit No. D-20 for
5  identification.)
6  BY MS. KIVITZ:
7  Q.     Can you tell me what that is?
8  A.     Actually I'm not really sure where this is
9  from.  "HospitalMedicine.org."  It could have been a
10 headhunter that contacted me.  I don't know.
11 Q.     All right.  And what date was that?
12 A.     Was this?  August.
13 Q.     Okay.  During the time period that you worked
14 at the National Board, did you ever stop looking for
15 another position that might be --
16 A.     I wasn't actively looking, but, you know, I
17 think that anyone that's not self-employed continually
18 sends out resumes.  I mean, I know most of my friends
19 do that.  I mean, if somebody finds something better,
20 you take it.  If not, you stay where you are.  I
21 didn't know it was against the law.
22 Q.     Now, there also came a time that Kathy
23 Holtzman asked you to start keeping track of your
24 hours?
25 A.     That was after I complained at HR.  She

242

1  started singling me out.
2  Q.     Do you remember when it was that she asked you
3  initially to keep track?
4  A.     Yes.  It was after I went down to complain to
5  HR.  She sent me an e-mail that very day.  "I want to
6  know exactly what you're doing hour to hour.  I want
7  you to start billing your time."  She never asked me
8  to do any of this before.
9  Q.     Okay.  And did there also come a time when she
10 asked you not to discuss your issues with her with
11 other employees in the office?
12 A.     Yes.  And she also said to me, "I don't want
13 you discussing" -- after we came back from HR, she
14 said, "I don't want you discussing these issues with
15 anyone."  And what she was referring to was she didn't
16 want me discussing these issues with HR.  That's what
17 she was talking about.
18 Q.     Okay.  But was there also a time that she
19 asked you specifically not to discuss issues that you
20 and she were having with other employees?
21         MR. JENNINGS:  Objection.  Asked and
22 answered.
23         You can answer it once more.
24         THE WITNESS:  After we had the meeting
25 and she was called to HR, that's when she said that to

243

```
 1   me.  And I took it as referring to the fact that she
 2   didn't want me talking about her to HR.
 3   BY MS. KIVITZ:
 4   Q.      Okay.  After you had the discussion with her
 5   about not talking to other employees, did you stop
 6   talking to either Faith Balsama or Debbie Shelmire
 7   about your grievances with Kathy Holtzman?
 8   A.      Actually I asked Debbie what was going on
 9   because she -- Kathy called both Faith and Debbie into
10   her office -- and this was as per Debbie Shelmire --
11   and asked them to sign off and write bad things about
12   me, and they refused.  So I did somewhat talk to them
13   about what was going on.  Kathy tried to get them to
14   write negative things about me, and they both refused.
15   Q.      All right.  Now, I know in November you had
16   forwarded the shooting article to Faith Balsama and
17   Debbie Shelmire.
18   A.      Uh-huh.
19              MR. JENNINGS:  Objection to form.
20   BY MS. KIVITZ:
21   Q.      But did you also have other e-mails to either
22   one of them concerning your communications with Kathy
23   Holtzman?
24   A.      Maybe.  I don't remember.
25   Q.      Was it after she specifically asked you not to
```

244

```
 1   bother other employees with these issues?
 2              MR. JENNINGS:  Objection to form.
 3              THE WITNESS:  I don't remember.  If you
 4   have e-mails, then you can show them to me.
 5   BY MS. KIVITZ:
 6   Q.      Okay.
 7   A.      Actually as I recall, Faith came up to me and
 8   asked me what was going on several times, and so did
 9   Debbie.
10   Q.      Was it after a time that Kathy Holtzman had
11   asked you not to speak to other people?
12   A.      Yes.  They came up to me and started asking me
13   questions.
14   Q.      Did you speak to them?
15   A.      I don't remember.
16              Well, obviously I must have said
17   something.  I said, "I just had a meeting.  That's
18   all."
19   Q.      Did you e-mail Faith Balsama?
20              MR. JENNINGS:  Objection to form.
21              THE WITNESS:  Did I e-mail Faith?
22   Faith, who was spraying the holy water on Kathy's
23   office every time she wasn't there?  This is true.  I
24   don't remember, to tell you the truth.
25   BY MS. KIVITZ:
```

245

```
 1   Q.      Okay.  Do you remember e-mail communications
 2   between you and Faith on November 8, 2006, where Faith
 3   told you basically before that, "I'm not on your
 4   crusade"?
 5   A.      Now she wasn't on my crusade.  Right.
 6   Q.      Okay.
 7   A.      First she was on my crusade and encouraged me
 8   to go down to HR and complain about Kathy.  And all of
 9   a sudden when it was raise time, she wasn't on my
10   crusade.
11   Q.      Okay.  And do you remember she -- you wrote to
12   her on November 8 and said, "It's not a crusade.  She
13   was going too far.  Remember she threw my edits in the
14   trash.  She belittled me with copying and sorting"?
15   A.      Right.
16   Q.      "She was disrespectful."
17   A.      Right.
18   Q.      Do you remember that?
19   A.      I don't remember, but it's possible.
20   Q.      Okay.  And do you remember that Faith turned
21   around and said:
22              "You need -- it's like poker.  You need
23          to know when to show them and when to hold
24          them.  Now you're on your way to the OK Corral
25          shoot-out."
```

246

```
 1   A.      She probably said that because -- actually
 2   yes.
 3   Q.      You remember that?
 4   A.      She did say that, and that really showed her
 5   colors a lot, what she was really about.
 6   Q.      Okay.  Do you remember your response was:
 7              "I kept my mouth shut with an almost
 8          identical situation at Penn, and look where
 9          that got me.  I had nothing to lose.  Either
10          way she was making this situation very
11          uncomfortable for me."
12   A.      Right.
13   Q.      Okay.  So when you say you kept your "mouth
14   shut with an almost identical situation at Penn," what
15   did you mean there?
16   A.      When I worked for Liz Bien, it was the same
17   thing that happened with the technology.  And, you
18   know, she just figured I was some diaper changer that
19   had come back to work, and she just wanted me to
20   organize her luncheons.  And she became intimidated by
21   the technology and just wanted me to do clerical work
22   and that kind of thing.
23              And I never said anything.  I just went
24   along with it.  And no matter what I did and how much
25   work I did --
```

247

```
1              It was like I had the same feeling where
2    I keep taking work home and felt like I was working,
3    working, working.  I was doing her database.
4              -- they didn't care.  All they cared
5    about -- they didn't care about the quality of
6    work or how the department was.  All they cared about
7    was how it looked for them being in charge and them
8    making the decision and them being the creative ones.
9              And I kept my mouth shut.  It doesn't
10   matter when you keep your mouth shut.  If the person,
11   you know, has made a decision that you're maybe a
12   threat to their position or you're not submissive
13   enough that, you know, something's going to happen.
14   And that's the same feeling I was getting.  Whether or
15   not you are an excellent worker, it doesn't matter.
16   People just don't really seem to care.  Certain
17   people.
18   Q.    Okay.  Now, do you remember when Faith said to
19   you that same day:
20              "Your crusade has gone too far now.  You
21              need to back off and move on.  I think that
22              the damage that's been done is permanent, and
23              I don't want to be involved in this mess"?
24   A.    Uh-huh.
25              MR. JENNINGS:  Is that a "yes"?
```

248

```
1              THE WITNESS:  Yes.
2    BY MS. KIVITZ:
3    Q.    Did you stop e-mailing her after that time?
4    A.    I don't remember.  She came over to my desk
5    and was talking to me, and we had a little argument
6    for the first time.  We had actually been really good
7    friends, but, you know, it was, like, you know, what
8    Kathy had done to my predecessors, turning people
9    against them.
10             So, you know, basically people are
11   worried about their salaries especially, like, Debbie
12   and Faith, who don't have any other income.  So, you
13   know, they will go where the money is, and that's the
14   way people are, and I'm not.  I'm a very -- you know,
15   I don't know how, but I still haven't lost my ideals,
16   and the rest of the world has.
17   Q.    Okay.  Do you know what Faith meant when she
18   said to you that same day:
19             "You still have your power of free will
20             choice which can influence your destiny"?
21             Do you know what she was referring to?
22   A.    Yes.  That if I wanted to stay there and be an
23   idiot and, like, you know, just be complacent with
24   doing a job that wasn't effective or I was
25   overqualified for, that I would just sell out for the
```

249

```
1    money and just stay there for the money.  That's what
2    it means to me.
3    Q.    So, hadn't you sent her first an e-mail that
4    talked about "powerful Mars, the planet of surprises
5    and breakthroughs"?  Do you recall that?
6    A.    No.  That would be her sending it to me.
7    Faith is a religious fanatic and, like, a
8    spiritualist.  So I don't think I sent that.
9              MS. KIVITZ:  Do you want to mark this
10   (indicating).
11             THE WITNESS:  I'm not superstitious.
12             (Whereupon the Reporter marked e-mails
13   dated November 8, 2006, between Diane Rosetsky and
14   Faith Balsama as Exhibit No. D-21 for identification.)
15             THE WITNESS:  Oh, I copied her my
16   horoscope.  I didn't write this.  This is a cut and
17   paste from a horoscope.
18   BY MS. KIVITZ:
19   Q.    Okay.  And what was the reference "powerful
20   Mars"?  Was that --
21   A.    I have no idea because I don't understand
22   astrology.  I was giving it to her for her to explain
23   it to me.  She was into that stuff.
24   Q.    Okay.  Didn't you mean by that that you were
25   out there and you were taking on Kathy Holtzman and
```

250

```
1    you were going to be powerful?
2              MR. JENNINGS:  Objection to form.
3              THE WITNESS:  No.  I'm true to myself.
4    That's the only one that I'm true to.  I'm just being
5    true to my ideals and my beliefs.  And I'm a person
6    that doesn't sell out for money like the other two
7    did.
8              They were suffering -- those two people
9    that I worked with.  Faith was crying at times often
10   while I was there by the way Kathy treated her and
11   spraying holy water in her office.  Debbie was totally
12   depressed.  She hated her job.  She consistently
13   stated how she wanted to get away from Kathy and how
14   she had applied for other jobs and she couldn't get
15   out of that position.
16             And I said, "You know, did you ever
17   think that it's because we're all older?  We're all
18   the same age here.  Look at the three of us.  We're
19   all in our forties, and we can't get out of this
20   position here."
21             So that's what it meant.  I am true to
22   myself.
23   BY MS. KIVITZ:
24   Q.    Okay.  Now, you have a friend Renee Brock?
25   A.    Yes.
```

251

```
 1    Q.      Okay.  And she wrote a reference for you?
 2   She's an attorney in-house someplace?
 3    A.      Yes.
 4                MS. KIVITZ:  Okay.  Would you mark this,
 5   please (indicating).
 6                (Whereupon the Reporter marked e-mails
 7   dated October 24, 2006, between Diane Rosetsky and
 8   Renee Brock as Exhibit No. D-22 for identification.)
 9   BY MS. KIVITZ:
10    Q.      Let's go to the first one first, the one at
11   8:51 in the morning.
12    A.      Uh-huh.
13    Q.      Can you read that?
14    A.      "Well, will see if they finally drop a house
15            on her."
16    Q.      No, no,no, no.  The bottom one first, 8:51.
17    A.      "Well, the shit hit the fan yesterday.  'My
18            boss,'" in quotes, "sent me an e-mail full of
19            crap, and I sent one back about five hundred
20            words that basically I wasn't going to take
21            her derisive comments and condescending
22            assignments anymore."
23    Q.      Okay.  First of all, why did you put "boss" in
24   quotes?
25    A.      Why did I put "boss" in quotes?
```

252

```
 1    Q.      Yes.
 2    A.      Because I don't consider someone that acts
 3   with the ethics and morals of this person to be really
 4   a boss to anyone.
 5    Q.      Okay.  But she really was your supervisor at
 6   the National Board; correct?
 7                MR. JENNINGS:  Objection.  Asked and
 8   answered.
 9                THE WITNESS:  Yes.  But she didn't
10   belong being -- you know, she just was not morally and
11   ethically the type of person that should have been in
12   that position.  And I didn't like calling her a "boss"
13   because I didn't have any respect left for her the way
14   that she operated.
15   BY MS. KIVITZ:
16    Q.      Okay.  Do you want to read the next part?
17    A.      "I had a prescheduled meeting that afternoon,
18            and I walked in and asked if we still had the
19            meeting.  She said she really didn't have
20            anything to say and that I should not have
21            used the e-mail to voice my feelings and that
22            I was disrespectful."
23                Yeah.  She didn't like e-mail traces.
24   So I was told by Faith to make sure that I use the
25   e-mail when I discuss anything with her so that
```

253

```
 1   there's a record of it.  And that's what I did.
 2    Q.      Okay.  The next line?
 3    A.      "Ha!  She then came out and addressed the
 4            issue of the database that had taken me six
 5            months to build, that I was to work with her
 6            assistant and fine tune it.
 7                "I never felt so good in my life.  I had
 8            nothing left to lose once she said maybe I
 9            should start looking for another job.  Hey,
10            I'm not going anywhere.  I spoke to one of the
11            senior management, and they are aware of the
12            problems she is causing here.  There have been
13            many complaints.  I should have done this when
14            I was at Penn.  I just send all my
15            communications with her to HR."
16    Q.      Okay.  So you felt it was a better strategy,
17   when you didn't like your supervisor, to deal with HR
18   rather than the supervisor?
19    A.      I tried to deal with her, and then after that
20   didn't work, I went to HR at Faith's suggestion
21   several times.  "Go to HR."  So I went to HR.
22    Q.      And in second-guessing what happened at Penn,
23   you felt that, instead of dealing directly with
24   Elizabeth Bien, you should have started dealing with
25   HR?
```

254

```
 1    A.      Right.  Uh-huh.
 2    Q.      And when you said, "Hey, I'm not going
 3   anywhere," what did you mean by that?
 4    A.      That I wasn't going to quit, that I was going
 5   to try to stay there and see if I could get another
 6   position.
 7    Q.      Well, hadn't you already been looking for a
 8   job, as you said, on and off for really the full year?
 9    A.      Not seriously.  No.  I mean, every job that I
10   ever had I've sent out resumes while I was there.  I
11   think everyone does that unless you own your own law
12   firm, of course.
13    Q.      Okay.  But you had sent out resumes, and you
14   had gone to some interviews; correct?
15    A.      I went to, I think, one interview.
16    Q.      Which one?
17    A.      Drexel.  I'm trying to remember.  I think I
18   had an interview at Drexel.
19    Q.      Did you have any interviews at Penn during --
20    A.      Actually I think I did have an interview -- I
21   think one interview at Penn.
22    Q.      When was that?
23    A.      I don't remember.
24    Q.      Does August sound about right?
25    A.      Maybe.
```

255

1  Q.    Okay.  Do you remember which department that
2  was?
3  A.    Family Medicine.
4  Q.    Okay.  And you interviewed at Drexel in June?
5  A.    Uh-huh.
6  Q.    Did you interview anywhere else?
7  A.    No.  I don't think so.
8  Q.    Would you have interviewed at Temple if they
9  had offered you an interview?
10          MR. JENNINGS:  Objection to form.
11          THE WITNESS:  Yes.
12 BY MS. KIVITZ:
13 Q.     Okay.  So I'm curious why you said, "I'm not
14 going anywhere," if you actually were looking to
15 leave?
16          MR. JENNINGS:  Objection to form.
17          THE WITNESS:  I don't understand the
18 question.
19 BY MS. KIVITZ:
20 Q.     Well, let me go back and ask you this way:
21 What did you mean by "I have never felt so good in my
22 life"?
23 A.     Because I stood up for myself for someone that
24 I knew was doing something wrong to me and
25 inadvertently would cause problems in my family life.

256

1  And that's it.
2  Q.    Okay.  And you felt so good about it that you
3  told your good friend Renee Brock what you had done;
4  correct?
5  A.    Yes.
6  Q.    Okay.
7  A.    Because I held it in for a while there, what
8  was going on.
9  Q.     Okay.  And she wrote back with some
10 suggestions maybe to work from home and do consulting
11 and things like that?
12 A.     Uh-huh.  Right.
13 Q.     Okay.  And what did you write back to her that
14 same day?  Just the first line.
15 A.     "Well, will see if they finally drop a house
16 on her," and in parentheses, "my boss."
17 Q.     What did you mean by that?
18 A.     Well, it's from the "Wizard of Oz."  When
19 someone's like a witch, you know, the house was
20 dropped on her.  I just meant that finally, after all
21 the complaints and all the people -- four people that
22 had been in my job, that maybe the administration
23 would finally stand up to her.
24 Q.     Okay.  Did you agree with Renee Brock that
25 women are harder to work for than men?  Women

257

1  supervisors?
2  A.     Did I agree with her?  I had never worked for
3  a man; so, you know, I really didn't have any --
4  couldn't give her any input on that.
5  Q.     Well, didn't you work for Dr. Cheston at
6  Wistar?
7  A.     Oh, yeah, I did work for him.
8  Q.     And Kurt Mayer?
9  A.     Yeah.  I forgot that.  That's twenty years
10 ago.  I guess I really didn't take that into account.
11 But, no, I didn't necessarily agree with her.  I
12 just --
13 Q.     Okay.  So your reference to finally dropping a
14 house on her meant that she was a witch, you know; so
15 it was an analogy to "Wizard of Oz," that she was a
16 witch?
17 A.     Yes.
18 Q.     Okay.
19 A.     I didn't call her the "B" word.
20 Q.     Okay.  And you felt good because you had stood
21 up to the witch?
22 A.     I just was going home and feeling terrible
23 about myself, taking it out on my family.  It was not
24 a healthy situation for me to be in, to be treated
25 like this and allow somebody to do it when I was -- I

258

1  felt like I was working, working, and working, and
2  bringing work home and trying to please this woman,
3  and there was no pleasing her.
4  Q.     When Kathy Holtzman asked you to start to give
5  her an idea of the time you were spending on projects
6  at the end of October, '06, how many times do you
7  recall that she wrote to you and asked you to give her
8  back an accounting of your time?
9  A.     Two or three times.
10 Q.     Okay.  Could it have been more than that?
11 A.     It could have been.  I don't remember.
12 Q.     Okay.  How many times did you give her an
13 accounting of your time, if you remember?
14 A.     A couple times, but each time she wasn't happy
15 with it.  It wasn't detailed enough.  That's all I
16 remember of it.  And I said to her, "How come I'm the
17 only one that has to do this?  And all of a sudden
18 after working here all this time and after I
19 complained to HR, all of a sudden you're treating me
20 like this?"
21 Q.     Did Kathy Holtzman have some concern that you
22 were also spending too long on certain projects?
23 A.     No.
24          MR. JENNINGS:  Objection to form.
25          THE WITNESS:  Not until after I went to

259

1   HR.  As a matter of fact, I tried to get her to look
2   at what I was doing to make sure I was going in the
3   right direction, and she refused to look at it.  She
4   never had time.  And also she was yelling at me that I
5   wasn't allowed to come in her office.  I wasn't
6   allowed to talk to Dave.
7               She yelled at me down the hallway
8   because I was talking to Dave.  She said, "You're not
9   allowed to talk to Dave."  And then after I went to HR
10  and I told them that, all of a sudden I get this
11  e-mail that "And you can go to Dave if you have a
12  problem."
13              But I'm not the only one that she did
14  that to.  She yelled at Faith and Debbie -- Faith that
15  she's not allowed to talk to Dave.  I think she said
16  this to Debbie too.  Anything -- you know, even though
17  he was supposed to be the head of everything, you
18  weren't allowed to talk to Dave, which I don't
19  understand.
20              And Dave used to come out and talk to
21  me, and she used to get pissed off.  There was a rumor
22  going around.
23  BY MS. KIVITZ:
24  Q.      Did Kathy Holtzman ever attempt to improve the
25  working relationship between the two of you?

260

1   A.      Not until I went to HR.
2   Q.      Okay.  Accepting that that's your perception,
3   what did she do after you went to Human Relations to
4   try to improve communications between the two of you?
5               MR. JENNINGS:  Objection to form.
6               THE WITNESS:  She started harassing me,
7   telling people not to talk to me.  She called Faith
8   and Debbie into her office and tried to get them to
9   write negative things about me.  She started trying to
10  make me -- I wasn't allowed to talk to anybody in the
11  hallway or anywhere else.
12              I was being treated, I felt, sort of
13  like when I was teaching elementary school.  That's
14  the way I was being treated, like I was six years old.
15  BY MS. KIVITZ:
16  Q.      Okay.  My question was:  Accepting your
17  perception for the moment that she tried to improve
18  communications and the working relationship between
19  the two of you after October 18, 2006, what do you
20  recall Kathy doing to improve the relationship?
21  A.      Nothing.
22  Q.      Okay.
23              MS. KIVITZ:  I'll ask that that be
24  marked (indicating).
25              (Whereupon the Reporter marked e-mails

261

1   dated October, 2006, between Diane Rosetsky and Kathy
2   Holtzman as Exhibit No. D-23 for identification.)
3   BY MS. KIVITZ:
4   Q.      Before I ask you any questions about this
5   document, do you recall her offering to meet with you
6   on a weekly or other basis to discuss issues?
7   A.      Yeah.  When I came in the first time, she
8   said, "I don't want to talk to you," and she told me
9   to go out.  And that was in the e-mail.
10  Q.      Do you recall her offering to meet with you on
11  a regular basis?
12  A.      Yes.  She offered, but we didn't.
13  Q.      Do you recall her ever trying to explain to
14  you what her edits meant on the project that you've
15  described?  The edits to the edits?
16  A.      No.  It wasn't an issue of meaning.  It was an
17  issue of -- you know, you would have to just see two
18  comparisons I could give you, which I have actually.
19  And I think they're in one of the e-mails there.  A
20  comparison of how she wrote and how I edited it.
21  Q.      Okay.  I'm not asking you about the merits of
22  who's a better editor.  I'm asking you what efforts
23  Kathy Holtzman made, after you complained to HR, to
24  try to improve communications between the two of you.
25  A.      She didn't.  She just -- the way that she went

262

1   about it I construed as further harassment.
2   Q.      Okay.  What was harassing to you other than
3   her asking you not to speak to other employees about
4   the issues you were having with her?
5   A.      What was harassing?  No one was talking to me
6   anymore, people that I had spoken to.
7   Q.      Well, you were still e-mailing --
8               MR. JENNINGS:  Please let her finish her
9   answer.
10              THE WITNESS:  No.  There were other
11  people.  There were four hundred people that worked
12  there.  And, you know, as I walked through the
13  hallway, they weren't allowed to talk to me.  Peg
14  Johnson, Jackie, the other people in Client Programs,
15  the other Client Programs Manager.  You know, they
16  weren't talking to me.
17              I mean, it was -- you don't have to be a
18  rocket scientist to see why people are afraid to talk
19  to you.  And she kept asking me to write down every
20  second of what I was doing so that I couldn't do
21  anything.
22              It was -- like, when I would switch from
23  one thing to the next, she wanted me to write down
24  exactly what I was doing.  And no one else was
25  expected to do that except for me.  I construed it as

263

1  harassment.
2  BY MS. KIVITZ:
3  Q.    Okay.  I think what your answer -- you said,
4  "I construed it as harassment."  Can you agree, at
5  least from her perception of it, that it wasn't
6  harassment?  It was a way to keep track of your time?
7          MR. JENNINGS:  Objection to form.
8          THE WITNESS:  No.
9  BY MS. KIVITZ:
10  Q.    Okay.  You can't even see that; correct?
11  A.    No.  I can't because I was being singled out.
12  And being singled out is harassment.
13  Q.    Okay.  Was there anyone in your unit of which
14  you're aware who was going to talk to other people
15  outside of the unit and showing them Kathy Holtzman's
16  edits and asking if they agreed with them?  Was anyone
17  else doing the same type of things you were doing?
18  A.    How would I know?
19          MR. JENNINGS:  Objection to form.
20  BY MS. KIVITZ:
21  Q.    Do you know of anyone?
22  A.    No.
23  Q.    Okay.
24  A.    But I didn't go outside the unit.
25  Q.    Okay.  Well, you said you went to some of the

264

1  editors; correct?
2  A.      They're in my unit.  One sits behind me.  One
3  was a senior manager who also agreed with me that my
4  editing was -- she said, "But get used to it because,
5  you know, Kathy -- whatever she says has to go whether
6  it's good or not."
7  Q.      Was anyone else going to the editors, when
8  Kathy was editing their work, to complain about
9  Kathy's edits of their work?
10          MR. JENNINGS:  Objection to form.
11          THE WITNESS:  I don't understand that.
12  You have to say it again.
13  BY MS. KIVITZ:
14  Q.      Okay.  You took Kathy's edits of your work and
15  brought them to show to editors to prove that you
16  could do better work?
17  A.      No.  What I did was I brought the work before
18  I edited it.  I didn't bring Kathy's edits.  I brought
19  the work before it was edited and after I edited it.
20  I did not show anyone Kathy's edits of my edits.  It
21  was before Kathy and after I had edited it.
22  Q.      Okay.  Wasn't your complaint to Barbara
23  Davidson that Kathy had edited your changes?
24  A.      No.
25  Q.      Re-worked the changes that you had done?

265

```
 1   A.      No, that wasn't the complaint.  The complaint
 2   was that she wouldn't let anyone use my edits --
 3   Q.      Okay.
 4   A.      -- even though I saw afterwards that they had
 5   learned a lesson from me.  And I saw the style of the
 6   editing from Kathy Angelucci especially was mine.
 7   Q.      Okay.  How do you know that someone else
 8   thought your edits were better if you didn't also show
 9   them Kathy's work?
10   A.      I did show them Kathy's work.  I didn't show
11   them Kathy's editing of my work.  She wrote these
12   bubbles that went into the tutorial, and then I was
13   asked to edit them by Krista.  And I edited them, and
14   Krista had no problem with them.
15           Then Kathy was, like, "Who did this?"
16           And she said, "I gave it to Diane."
17           And she, you know, went ballistic.
18   Q.      Okay.  Now, my question is:  Was anybody else
19   in Test Development taking Kathy's work and running to
20   the editors to ask if they liked Kathy's work or they
21   liked that person's work better?
22   A.      I have no idea.
23           MR. JENNINGS:  Objection to form.
24   BY MS. KIVITZ:
25   Q.      Okay.  Is it fair to say that you were the
```

266

```
 1   only one who was engaging in that type of conduct?
 2           MR. JENNINGS:  Objection to form.
 3           THE WITNESS:  No, it's not fair to say.
 4   And also I didn't tell anybody which one was mine and
 5   which one was hers.
 6   BY MS. KIVITZ:
 7   Q.      Okay.  But my question isn't whose edits were
 8   better.  My question is:  Weren't you the only one who
 9   was challenging Kathy Holtzman's writing in that way
10   and running to the editors?
11           MR. JENNINGS:  Objection to form.
12           THE WITNESS:  I have no idea.  That's my
13   answer.
14   BY MS. KIVITZ:
15   Q.      Do you know of anyone else who was doing it?
16   A.      I have no idea.  I don't have -- I don't know.
17   Q.      Okay.  Do you think that your time with the
18   editors was also taking time away that you could be
19   working on other jobs within your role profile?
20   A.      No.  Because I didn't have any other jobs that
21   she was giving me.
22   Q.      Well, you've testified to several including
23   the database work?
24   A.      Right.  This was the job I was given, to do
25   the editing.
```

267

```
 1   Q.      But you had other jobs at the same time?
 2   A.      Well, yes.  They were ongoing.  Nothing that
 3   she paid any attention to.
 4   Q.      Okay.  But wasn't your time spent with the
 5   editors taking away from time you could spend on other
 6   projects?
 7   A.      No.  I did it at lunch.
 8   Q.      Okay.  And who did you meet with during the
 9   lunch hour?
10   A.      Maybe Sue that sat behind me and Peg Johnson.
11   Q.      Okay.  And what is Sue's last name?
12   A.      I don't know.  It's a long name.  Something
13   with a "C."  It's an Italian long name.
14   Q.      Okay.  Now, if you could go back to the
15   e-mails that were in front of you, take a look at
16   them.
17   A.      (Complying.)
18           Yes.  I attached this to my Complaint.
19   Q.      All right.  Now, this e-mail from you to Kathy
20   on October 23 --
21           MR. JENNINGS:  Which page are you on?
22           MS. KIVITZ:  Page 1.
23           THE WITNESS:  Okay.
24   BY MS. KIVITZ:
25   Q.      Was that the e-mail that you were referring to
```

268

```
 1   in your e-mail to Renee Brock, that you had written a
 2   long e-mail and you felt so good?  Or was that a
 3   different e-mail?
 4   A.      I don't know.
 5   Q.      Okay.  And this contained your grievances;
 6   correct?
 7   A.      Yes.
 8   Q.      Did you put everything in this memo that
 9   bothered you at the time?
10   A.      I don't know.
11   Q.      All right.  Would you take a look at it?
12   A.      (Complying.)
13           Just about.  Pretty close.  I can't say
14   that it was everything, but it looks like a lot of it.
15   Q.      Okay.  Can you just -- the e-mail above
16   that --
17   A.      "Flex B video screens"?
18   Q.      Yeah.
19   A.      Yes.
20   Q.      Do you see how that was sent from you to
21   "diane1120@comcast.net"?
22   A.      Yes.
23   Q.      Is that your home?
24   A.      Yes.
25   Q.      And what did you send?
```

269

1   A.      What did I send?

2   Q.      What did you forward home?

3   A.      This (indicating).

4   Q.      Okay.  And you did that on October 23, 2006?

5   A.      Uh-huh.  Yes.

6   Q.      And was that before or after you had met with

7   Counsel?

8   A.       That was before.  I didn't meet Rufus until I

9   was not working there anymore.

10  Q.      Did anybody tell you to start to forward

11  e-mails home?

12          MR. JENNINGS:  Just in case, I'm going

13  to object and instruct you don't answer that to the

14  extent it deals with an attorney other than me because

15  I don't know.  I don't know, but I just want to make

16  sure I give you that warning.

17          THE WITNESS:  There's a lot of people

18  that do it.  Debbie Shelmire forwarded her e-mails and

19  different things.  You know, I wasn't the only one

20  that was doing it.  Yes, somebody said you could

21  forward your e-mails.

22          Actually one of the IT people told me to

23  forward my e-mails because, if you get personal

24  e-mails there -- he actually used NIH -- not NIH --

25  the NBME Web site as his e-mail address.  He didn't

270

1   really use the personal one.  He only used it to, you

2   know, like, forward things to his house.  So basically

3   when he gave out his e-mail for personal and business,

4   it was the Board's e-mail.

5   BY MS. KIVITZ:

6   Q.      Okay.  What were the attachments?  Do you see

7   that?

8   A.      Yeah.  I don't know if the attachments were

9   actually attached.  That was -- you know, sometimes if

10  you forward an e-mail, the attachments -- they get

11  taken off by Outlook Express.  So I just probably just

12  forwarded it for this.

13          But what those are are the demo files

14  that Kieran probably sent to me for editing.  They

15  were the demo files, Flex B video screens.  Yeah,

16  that's what that is, the tutorial.

17  Q.      Okay.  And that would all be proprietary

18  information; correct?

19  A.      Right.  But I don't think it came to me.

20  Like, if you forward something -- like, you can send

21  something, but if you forward it, it doesn't -- the

22  attachments don't always go with it.

23  Q.      Okay.  Well, did you get those attachments at

24  home?

25  A.      I couldn't tell you.  I have a thousand

271

1   e-mails on my system or more.

2   Q.      Okay.  But you would agree with me that the

3   actual tutorial is proprietary?

4           MR. JENNINGS:  Objection.  Asked and

5   answered.

6           You can answer it one more time.

7           THE WITNESS:  I was asked to work on it

8   from home; so I don't know what to tell you.  Krista

9   said, "Finish it by Thursday."

10  BY MS. KIVITZ:

11  Q.      This goes to our concern on the here and now.

12          MR. JENNINGS:  Objection.  Is that a

13  question?

14          THE WITNESS:  I don't think that I have

15  this.

16          MR. JENNINGS:  I'm going to object.

17  There's no question pending.  There's nothing to

18  answer.

19          THE WITNESS:  Okay.

20  BY MS. KIVITZ:

21  Q.      All right.  Look at the next page, Page 2.

22  A.      (Complying.)

23          Uh-huh.

24  Q.      Kathy's e-mail to you.

25  A.      Yes.  I remember this one.

272

1   Q.      Why do you remember that?

2   A.      Because it was nonsense.  All these people

3   were sitting there, and they heard her, especially

4   Kieran and Krista, telling me to edit, not just cut

5   and paste.  There were witnesses there at the meeting.

6   This was the first meeting she ever let me go to

7   because it was after I complained about her to HR that

8   she wasn't involving me in anything.

9           So she decided to let me go to a

10  meeting, and then she's telling me all I was supposed

11  to do was cut and paste other people's editing.  And

12  that's not what Kieran heard and not what Krista

13  heard.  And that's why Krista gave me the editing to

14  do when Kathy was away and why Kieran was working with

15  me.

16  Q.      Okay.  But do you see that Kathy said you had

17  misconstrued your role in the project?

18  A.      Misconstrued?

19  Q.      Misconstrued.

20  A.      Yeah, I see it, but I didn't misconstrue it.

21  She's just backtracking to make it look like I wasn't

22  supposed to do anything.

23  Q.      Okay.  Did you disagree with her that at least

24  one of your roles in the project was to provide

25  support for the team as Project Assistant?