# Exhibit "A"

273

1  A.    All she has to do is edit. I don't know what
2  other support there was.
3  Q.    Okay.
4  A.    Cutting and pasting.
5  Q.    Did you agree with that or disagree?
6  A.    I don't know --
7            MR. JENNINGS: Can you please rephrase
8  it?
9            THE WITNESS: Rephrase it. What do you
10 mean by "support"? I mean, support people by editing?
11 Yes.
12 BY MS. KIVITZ:
13 Q.    Okay. Do you support people by other than
14 editing too?
15           MR. JENNINGS: Objection to form.
16           THE WITNESS: "Do you support other
17 people by" -- I suppose so.
18 BY MS. KIVITZ:
19 Q.    Okay. Were you insulted that she told you it
20 was never her intention for you to play a lead role on
21 the project?
22 A.    Well, considering that was, you know, what her
23 idea of a lead role was, you know, yes, because I was
24 supposed to be working with them on this project.
25 Q.    Okay.

274

1  A.    She was the only lead role. Kathy doesn't
2  allow anyone to be a lead role. Everybody there was
3  subordinate to her. She was a leader, and we were all
4  supporting her.
5  Q.    Okay. Now, she said to you she was surprised
6  that you had the impression you would be doing the
7  editing, but you presented a good case about your
8  background, and it was reasonable to let you try. Do
9  you see that?
10 A.    Yes.
11 Q.    Okay. She viewed it as a good opportunity for
12 you to learn about an important new product and see
13 what you could do with editing; correct?
14 A.    That's what she said.
15           MR. JENNINGS: Objection to form.
16           THE WITNESS: Trying to be
17 condescending, yes.
18 BY MS. KIVITZ:
19 Q.    Now, why is that condescending that that would
20 be a good opportunity for you to learn?
21 A.    Because she knew that I'm a trained editor, I
22 graduated from the University of Pennsylvania with an
23 English degree, and that I had a lot of Web site
24 experience, that I had a lot of IT experience. And
25 there was nothing for me to try.

275

1            I mean, I could have written that entire
2  tutorial, but I was editing it. And it's Kathy-isms.
3  This is where, you know, Kathy belittles people. This
4  is a tactic that she used. I'm sure you can see by
5  the way that it's written that this was to be
6  condescending and treat me like a six year old.
7            She was giving me an opportunity to
8  learn about an important new product? I understood
9  the flexible blueprinting more than she did. I had
10 seen it before, and I went on the Internet, and I
11 studied about it. And they thought they were the only
12 ones doing it, and they weren't.
13           So, you know, no, I wasn't learning
14 anything from her.
15 Q.    Did you give her any credit that, you know,
16 she had been an editor with the National Board for
17 many years more than you had? Did you think that you
18 should give her any deference in terms of what she had
19 learned at the time at National Board about the way it
20 edited?
21           MR. JENNINGS: Objection to form.
22 BY MS. KIVITZ:
23 Q.    Do you understand that question?
24 A.    No, I don't.
25 Q.    Okay. Did you feel that she was entitled to

276

1  any deference as a National Board-trained editor over
2  the many years?
3  A.    Yes. But this was not item editing. She had
4  edited items. This was a tutorial for an application
5  for physicians to use on line. It was not the same
6  thing as editing an item. When you do documenting for
7  an application, it's a different ball game, and she
8  had no experience in documenting instructions to use
9  an application.
10           This is the "help" files basically.
11 Well, when you go into "help," you know, when you hit
12 "help" on Microsoft Word or there's a tutorial in
13 there, this is what this was. And you're talking
14 about someone that didn't even know how to use most of
15 Microsoft Office.
16 Q.    Would you go to the third page, bottom, middle
17 paragraph?
18 A.    Uh-huh.
19 Q.    When this first started, do you remember that
20 she said to you:
21           "As we discussed, I appreciate all of
22           the work you did on the editing. I know from
23           personal experience how hard it is to deal
24           with having others change your work after
25           you have put so much of your heart and soul

277

```
 1            into it"?
 2   A.    She didn't even look at most of it.  I must
 3   have edited -- there were binders this big
 4   (indicating) that I took home with me, like, two or
 5   three of them.
 6            MR. JENNINGS:  And just for the record,
 7   the witness is indicating approximately eight inches.
 8            Would you agree, Counsel?
 9            MS. KIVITZ:  Sure.
10            THE WITNESS:  About the size of a phone
11   book.  How's that?
12            And she only looked at a little bit of
13   it until she went ballistic and found out that I had
14   edited it.  And I was told that she was yelling at
15   Krista for allowing me to do it.  She never looked at
16   the rest of it.  All the work that I did -- she would
17   not even look at it.
18            And then I saw them using my style and
19   technique for dialog into journalistic-style editing
20   instead of conversational or prose.  And then she got
21   pissed off because she saw that I did it.  But they
22   weren't pissed off enough not to use my work but just
23   not give me credit for it.
24            And, you know, they were smart enough to
25   start -- you know, Kathy Angelucci and Krista -- to
```

278

```
 1   see the technique because it's not really that hard to
 2   pick up.  So they took, like, the first binder, and
 3   Krista read through it and had no problem with it.
 4            Kathy saw it, wouldn't look at any of
 5   the rest of the binders, and starting putting it back
 6   to the way that it was.  And Kieran and I were looking
 7   at it, and it was, like -- we were both, like,
 8   appalled.
 9   BY MS. KIVITZ:
10   Q.    Do you see where she said she'd be happy to
11   talk to you afterwards to meet and go over the changes
12   she made?
13   A.    Yes.
14   Q.    Did you ever come to her and say, "Let's meet
15   and talk about those changes"?
16   A.    She never had time for me.  When I walked in
17   her office, she would tell me to get out, that I
18   wasn't allowed to come in without permission.  You
19   know, I asked to meet with her, and she was not
20   interested in my work.
21   Q.    Was there any e-mail that you can point to
22   where you followed up and said, "I'd like to meet with
23   you concerning -- to discuss the changes"?  That you
24   can point to?
25   A.    I don't know.  I probably said something to
```

279

```
 1   her.  I'm sure that I said something to her.  And all
 2   she said was, "You were only supposed to cut and
 3   paste."
 4   Q.    Okay.
 5   A.    And it's clear in the first e-mail that she's
 6   saying that I misconstrued what I was supposed to do.
 7   And then she backtracks and said, you know, "I was
 8   happy to give you a chance to learn something by
 9   editing."  First she says I've misconstrued my role,
10   and then she's saying I was supposed to edit.  Which
11   is it?  I was or I wasn't?
12   Q.    Now, after you met with Barbara Davidson
13   October 18, you were still receiving assignments from
14   Kathy Holtzman to do other projects for the
15   department; correct?
16   A.    Not really.  I was still working on the same
17   things that I've been working on.
18   Q.    All right.  Weren't you asked around
19   October 25 to work on an Access database that Krista
20   had requested based on your expertise with Access?
21   A.    Right.
22   Q.    Okay.  And then you were asked to focus on a
23   second project concerning user testing?
24   A.    User testing?  I'm trying to remember.
25   Q.    With Faith.  What needed to be adjusted, if
```

280

```
 1   anything.
 2   A.    I don't know what you're talking about.
 3   Q.    Okay.  Do you remember --
 4   A.    Oh, okay.
 5   Q.    "I'd like you to work with Faith" --
 6   A.    Faith was finally --
 7   Q.    -- on user testing to see what needs to be
 8         adjusted, if anything."
 9   A.    Finally, after me working on the database and
10   her refusing to look at it, she let Faith try to use
11   it, and Faith loved it and wrote her an e-mail saying
12   what a great tool that it was.
13   Q.    Okay.
14   A.    That was my database.  It wasn't user testing.
15   It was my database.
16   Q.    Okay.  Would you say that those assignments
17   were within your role profile?
18   A.    I suppose so.
19   Q.    Okay.  So you were still receiving assignments
20   within your role profile?
21   A.    They weren't new assignments.  They were from
22   before I went down to HR.  Those assignments I had --
23   I had kind of started the one on the database with
24   Krista.  I had sort of started it before that, but
25   then she gave me that editing to do too.
```

281

1  Q.      Okay.  Do you remember objecting --
2  A.      Actually Dave gave that to me.  Excuse me.
3  Kathy did not give that assignment to me.  The
4  database for -- what I was doing was making a database
5  for the responses from the physicians who critiqued
6  the items questions that were going to be actively put
7  in the NBME item pool.  And it was Dave that I was
8  working with.  It wasn't her.
9  Q.      Okay.  Do you remember, when you were being
10 asked to respond again to how much time you were
11 putting into projects, responding to Kathy that you
12 didn't want to do it because what she was asking you
13 to do would take as much time to track as it does to
14 build a database?
15 A.      Yes.
16 Q.      Okay.  So were you essentially refusing to
17 account for your time?
18 A.      No.  I told her how much time I worked on the
19 database, but she wanted me to break it down, which
20 she didn't understand, you know, how much time writing
21 select queries, how much time, you know, with the
22 story board, how much time with the user interface,
23 changing colors, changing fonts, how much time
24 changing the menus.  I mean, she wanted me to write
25 all this down.  It was ridiculous.

282

1  Q.      But isn't it true that, after you did give her
2  a breakdown on October 31, 2006, you did not ever
3  really give her a breakdown of your time again in this
4  format at least?
5          MR. JENNINGS:  Objection to form.
6          THE WITNESS:  I don't remember.
7          MR. JENNINGS:  Why don't you mark it as
8  an exhibit so she can see the format?
9          THE WITNESS:  That wasn't the format.
10 The format was supposed to be an Excel chart that she
11 wanted me to make.  She wanted me to make an Excel
12 chart and start filling it in as I was working, like,
13 minute by minute, which was harassment.
14 BY MS. KIVITZ:
15 Q.      All right.  So you never did an Excel chart?
16 A.      Yeah, I did.  She has it.
17 Q.      Okay.  And the October 31 breakdown of your
18 day time -- okay? -- how many days it took you to do
19 the project -- did you ever give that to her again?
20 Did you ever break down your time again?
21 A.      After I had worked on this database, she
22 wanted me to break down what I had done in the past
23 four or five months on each thing after the fact.  You
24 know, then she decided, "Okay.  When you built this
25 database, how much time did you spend on user

283

1  interface?  How much time did you spend cleaning up
2  the Power Point slides?"
3          After everything was almost done, then
4  she's asking me to backtrack, and I said, "I can't do
5  that.  It's impossible."
6  Q.      Okay.
7  A.      And besides I didn't work on that all the
8  time.  Sometimes I was, you know, doing copying for
9  clients and managers.  I was doing different things.
10 It was a ridiculous request, and it was pure
11 harassment.
12 Q.      Okay.  But it was a request that had come from
13 your supervisor; correct?
14 A.      Right.  That I could not fulfill and that no
15 human could have fulfilled honestly.  I could have
16 lied, but I'm not a liar.
17 Q.      Okay.  So it was your intention not to comply
18 with that question because you thought it was silly;
19 correct?
20         MR. JENNINGS:  Objection to form.
21         THE WITNESS:  No.  I couldn't do it
22 honestly is what I thought.  I could never have done
23 it.  It was impossible.  How can you go back -- why
24 don't you tell me how long it took you to cook dinner
25 last Sunday and the steps that it took while you were

284

1  cooking dinner?  How long did it take you to crack the
2  egg?  You know, it was impossible.
3          I mean, if she wanted me to do that, she
4  should have started it from when I first started
5  working there on the database.
6  BY MS. KIVITZ:
7  Q.      But did it ever occur to you to record your
8  time contemporaneously with the project?
9  A.      I was not required to do that, and she never
10 required me to do that.
11 Q.      Okay.  But if you did do that, that would be
12 an easier, simpler way to break down your time
13 afterwards; correct?
14         MR. JENNINGS:  Objection to form.
15         THE WITNESS:  I don't understand what
16 you're asking me.
17 BY MS. KIVITZ:
18 Q.      In your scenario, if you wrote down how much
19 time the cooking took at the time you cooked, it would
20 be easy to compile that information a week later;
21 correct?
22         MR. JENNINGS:  Objection to form.
23         THE WITNESS:  To break it down if you
24 can break it down?  You know, if you want me to show
25 you how to build a database, I can show you, and then

285

1  you can decide for yourself if you can break it down.
2  BY MS. KIVITZ:
3  Q.     Okay. So is the reason you refused to do it
4  because you thought it was silly or because it was too
5  time consuming or something else?
6          MR. JENNINGS: Objection to form.
7          THE WITNESS: It was impossible.
8  BY MS. KIVITZ:
9  Q.     Why impossible?
10 A.     I already told you. It was something that was
11 done months before, and then she was asking me to
12 backtrack on it. And I actually called the IT
13 Department, and I told her to call the IT Department
14 and talk to Debbie Brown.
15         I said, "Debbie, do you have to write
16 your time down when you're working with Microsoft
17 Access on how much you spent on each part of it?"
18         She said, "It's impossible to do that.
19 I wouldn't be able to do that. I'm not required to do
20 it."
21 Q.     Okay.
22 A.     She bills clients who, you know, she does
23 things for around the building. And I specifically
24 told Kathy to, "You know, go confer with Debbie
25 Brown." What she's asking me to do -- "There's not an

286

1  IT person in the world that's going to do that for
2  you. It's close to impossible."
3  Q.     Did there come a time when you were no longer
4  authorized to work at home?
5  A.     No. Oh, yeah. Finally, after I went down to
6  HR and complained about her, she decided that I wasn't
7  supposed to work from home, that I wasn't allowed to
8  although she knew that I had before previously.
9  Q.     Okay. Do you remember being asked, if you
10 have any materials at home, please return them to the
11 office immediately and remove any NBME files from your
12 personal computer?
13 A.     Yes.
14 Q.     Did you do that?
15 A.     From my personal computer? The only thing I
16 have on there is the database. That's it.
17 Q.     Okay. Did you return the materials you had at
18 home?
19 A.     Yeah. They're all there.
20 Q.     Well, I mean, we've talked about this at
21 length today. You still have the thumb drive;
22 correct?
23 A.     Yeah. But that's not NBME's. That's my thumb
24 drive.
25 Q.     But it's NBME's materials on your thumb drive;

287

1  correct?
2  A.     That she knew that I had used to take stuff
3  home to work on it.
4  Q.     Right. But when she asked you on November 8
5  to return the information to the office immediately,
6  did you ever -- before today did you ever do that?
7  A.     Everything has been returned. I mean, what
8  you're talking about is digital information that --
9  you know, I can erase it, but, you know, I don't
10 physically have their files or their passwords to get
11 into their files or the Power Point slides that I
12 printed out. Everything was there at my desk when I
13 left.
14 Q.     Now, there were also two positions within the
15 National Board that you applied for and then withdrew
16 your applications?
17         MR. JENNINGS: Objection to form.
18         THE WITNESS: Yes.
19 BY MS. KIVITZ:
20 Q.     Can you tell me about each of them and why you
21 chose to withdraw your application?
22         MR. JENNINGS: Objection to form.
23         THE WITNESS: I don't remember the first
24 one. But the second one was the one where Kathy told
25 them not to hire me. So instead of being humiliated

288

1  through an interview with people that I knew and
2  worked with every day, I withdrew it.
3  BY MS. KIVITZ:
4  Q.     Okay. And which one was that?
5  A.     That was the Test Development Associate for
6  Special Projects.
7  Q.     And what about -- there was a case developer
8  position you applied for. Why did you withdraw that
9  one?
10 A.     I'm trying to remember. I don't remember. I
11 think that's the same one that Faith applied for. I
12 don't really remember why I withdrew or if I actually
13 formally applied for it.
14         Did I formally apply for it? I don't
15 remember.
16 Q.     I think you did and then withdrew it.
17 A.     Okay.
18 Q.     We have two applications that you submitted
19 and then withdrew.
20 A.     Okay. I don't remember why I withdrew it. It
21 might have been during this time of turbulence where I
22 just withdrew it.
23 Q.     All right. And the Special Projects
24 position you withdrew, at least in your opinion,
25 because you felt you might not get it?

289

1   MR. JENNINGS: Objection to form.
2   THE WITNESS: I knew I wasn't going to
3   get it because she intimidated them into not hiring --
4   Kieran expressed to me how scared he was of Kathy.
5   And when he was at meetings with her, he said he
6   couldn't think and that, you know, she was very
7   intimidating. And, you know, he's a really nice guy,
8   and she was just, you know, sitting there and being
9   nasty to everyone.
10  BY MS. KIVITZ:
11  Q.   All right. And Kieran is under the age of
12  forty?
13  A.   Kieran is under the age of forty.
14  Q.   Okay. And you felt that he was --
15  A.   Afraid of Kathy, yes.
16  Q.   -- equally afraid of Kathy?
17  A.   I'm not afraid of Kathy. I just don't like
18  her anymore because I see what kind of person she is.
19  I'm not afraid of her at all. That was the issue.
20  She wanted people to be afraid of her. Once you got
21  one foot in the grave, you're not afraid of much of
22  anything.
23  Q.   At some point you came to believe that Kathy
24  had to give you her permission for you to apply for
25  another job?

290

1   A.   I wasn't sure. Yeah.
2   Q.   Okay. And is it correct that she clarified
3   for you that you did not need her permission to apply?
4   A.   After I went to HR. But I had already asked
5   her about the position, and she was promoting people
6   without even interviewing, like Kieran and Kathy
7   Angelucci. You know, they didn't even interview.
8   They were just put into the job.
9        And me -- she's telling me, "Oh, well,
10  you know, I don't think you're right for it."
11       So then I went down to HR, and they
12  said, "Well, you can still apply." And then, you
13  know, after I heard her talking to Kieran and Kathy
14  about me, I just thought, "You know, why should I
15  humiliate myself? They're not going to hire me."
16  Q.   Now, you were also interested in a business
17  analyst position at some point?
18  A.   Right.
19  Q.   Were your qualifications appropriate for that
20  position, if you know?
21  A.   I don't know. I mean, you know, I was hoping
22  that they were. I was trying to learn UML. So, you
23  know, I was hoping to maybe go in the position. I
24  spoke to one of the other business analysts about it
25  who -- she didn't have a degree in any of it either.

291

1   She just was learning it on the job.
2        But Faith and I were actually discussing
3   it, and she said, "Kathy -- she's just going to give a
4   bad reference. You're never going to get that job."
5   Q.   But my question is: Do you know if your
6   qualifications independent of Kathy Holtzman were
7   appropriate for the position?
8   A.   They could have been. I wasn't exactly sure.
9   I mean, there was nothing -- you know, one thing I do
10  know is that I know how to learn.
11  Q.   Okay. You did not submit a formal application
12  for that position?
13  A.   I don't remember. I may have.
14       Did I?
15  Q.   Not that I've seen.
16  A.   Okay. I really can't remember.
17  Q.   In one e-mail you said that Kathy Holtzman
18  belittled you because she called you "DiDi"?
19  A.   DiDi.
20  Q.   Does anybody -- is that a nickname?
21  A.   No.
22  Q.   Okay. Where did it come from, if you know?
23  A.   If I know what?
24  Q.   Do you know where she got that from?
25  A.   My name is Diane, and she just decided to call

292

1   me "DiDi."
2   Q.   Did you tell her you didn't like that?
3   A.   No, I did not.
4   Q.   So how would she have known that you found
5   that belittling?
6        MR. JENNINGS: Objection to form.
7        THE WITNESS: Why would she be as
8   presumptuous as to think she could call someone in a
9   place of business a new nickname that she decided?
10  BY MS. KIVITZ:
11  Q.   Okay. Well, you've referred to her now as the
12  "witch"?
13  A.   But I never called her that to her face.
14  Actually probably other people have. I think Faith
15  did, but I never have.
16  Q.   Okay.
17  A.   No. I was completely respectful to her. I
18  never called her any names. Actually I did a lot of
19  personal favors for her. I did her husband's resume,
20  which -- is that considered NBME property? Should I
21  give it back to you? I have Nate's resume that she
22  had me do.
23       I also filled out a form for her retarded
24  child to be admitted to a special institution. And it
25  took me, like, half a day to do it. I hand wrote it

293
1  for her.  You know, I did personal things for her that
2  were not in my job description out of the goodness of
3  my heart.
4  Q.     Now, on November 8 you wrote an e-mail to
5  Barbara Davidson, and you asked her to move your
6  cubicle so you wouldn't sit in front of Kathy.
7  A.     Uh-huh.
8  Q.     I'm asking if you remember this.  You wanted
9  to work for Kathy Angelucci but stay in your current
10 position but have Kathy supervise you?
11            MR. JENNINGS:  Objection to form.
12            THE WITNESS:  I don't remember that.
13 No.
14 BY MS. KIVITZ:
15 Q.     Okay.
16 A.     Who said that?  Is that Barbara Davidson?
17 Q.     No.  You wrote to Barbara:
18            "I would also like my cubicle moved.
19            There's no reason for me to be sitting in
20            front of Kathy's door."
21 A.     Yeah, I did ask for my cubicle to be moved.  I
22 mean, I asked to be moved into another cubicle.
23 Q.     "As far as my working for Kathy Angelucci, I
24            would prefer just to stay in my current
25            Program Assistant position rather than be in

294
1  her group.  Also I think she will be difficult
2  to work for because she appears to have no
3  consistent work schedule."
4        Meaning Kathy Angelucci?
5  A.     Oh, yeah.  Kathy just had a baby, and then she
6  had a two year old.  And actually Kieran was kind of
7  upset.  He wound up doing all of Kathy's work.  This
8  is kind of new to me because I did stay home and raise
9  my own kids; so I didn't realize that, you know, you
10 could actually be there and not be there.  So I'm not
11 really sure how it's going to work.
12 Q.     So what were you asking for?
13 A.     I don't really recall.  I mean, I could read
14 that e-mail and see what I was asking for.  I think
15 I just wanted to get away from Kathy at that point
16 along with the rest of the Board.
17            MS. KIVITZ:  I'll mark this
18 (indicating).
19            (Whereupon the Reporter marked e-mails
20 dated November, 2006, between Diane Rosetsky and
21 Barbara Davidson as Exhibit No. D-24 for
22 identification.)
23 BY MS. KIVITZ:
24 Q.     Your e-mail to Barbara followed Kathy's e-mail
25 to you; correct?

295
1  A.     Yeah.  I think so.  It looks that way.
2  Q.     Okay.  And the three of you had met; correct?
3  A.     Yes.  I believe so.
4  Q.     And you were told that continuing your
5  behavior of sharing frustrations about your work
6  issues could result in your being placed on a
7  Performance Improvement Plan.  Do you recall that?
8  A.     Where are you at here?
9  Q.     Second full paragraph in the below e-mail.
10 A.     "As you agreed, you will develop project
11 plans."  Is that what you're reading?
12 Q.     "As I noted during the meeting."
13 A.     I was reading something else when you were
14 talking.  See, she says, "Or elsewhere."  Yeah, she
15 was complaining that I went down to HR.  So what is
16 your question again?
17 Q.     My question is:  Do you recall being told that
18 continuing that behavior could result in your being
19 placed on a PIP?
20 A.     Well, what are you referring to as "that
21 behavior"?
22 Q.     You have to go back to the e-mail.  Do you
23 want me to repeat it?
24 A.     Yeah.
25 Q.     Do you want to read it?

296
1  A.     Yeah.
2         "That behavior," meaning the behavior of
3  sharing my frustrations and my work assignments?  Is
4  that what you're talking about?
5         "Interpersonal relationships or other
6         observations regarding Test Development
7         management with staff in Test Development or
8         elsewhere."
9  Q.     Okay.  Now, you were aware that she was asking
10 you to discuss issues that arose with her as opposed
11 to sharing your frustrations with others; correct?
12 A.     I was aware that she was upset because I went
13 to HR.  That's the only thing that I'm aware of.
14 Q.     And what she ended with was:
15         "At any time you should feel comfortable
16         to discuss concerns with Human Resources."
17         Correct?  Do you see that?
18 A.     That was after the fact, yes.  She's trying to
19 do damage control.
20 Q.     Now --
21 A.     And then she wrote --
22 Q.     -- you responded by writing to Barbara
23 Davidson and saying, "Can you please help me move away
24 from her"?
25 A.     Yes.

Page 297

Q. Okay. And this was following a meeting that was a mediation-type meeting?
A. I guess so. You can call it that. But it was basically Kathy controlling the meeting and saying a bunch of things about me that really weren't true.
Q. Well, you had an opportunity to speak at the meeting too; correct?
A. Yes, I did. But they don't care what I say. When Kathy left the room, Barbara turned around and said to me, "There's nothing I can do about her. She's too powerful."
Q. I'm not quite sure I understand how you felt that you could be supervised by Kathy Holtzman but sit someplace else but not be supervised by the other person.
A. I didn't say that.
Q. Okay. What were you asking for then?
A. I wanted to be in her group as another assistant. I wanted to get out of -- okay. Because I didn't put -- Kathy and Kathy. Kathy Angelucci -- I wanted to be moved into her group which Kathy eventually said she was thinking of doing. I did not say -- I did not expect to be working for anyone else. It's just I wanted to move.
Q. But didn't you say Kathy was too disorganized

Page 298

to supervise you?
    MR. JENNINGS: Objection to form.
    THE WITNESS: I did not say she was disorganized, but she has an inconsistent work schedule.
BY MS. KIVITZ:
Q. Okay.
A. It takes a while for her to respond, and I really didn't know if I wanted to be in that position because she was -- first she told me she was back 50 percent, then 80 percent. So I saw the problems that Kieran was having with it, and I didn't know if I wanted to be involved with it.
Q. Did you feel that she was unqualified to supervise you? Angelucci.
A. Who? Kathy?
Q. Uh-huh.
A. No, I didn't say that. She just wasn't there, and when she was there, she was on the phone -- you know, she had other issues.
Q. Okay. Was there anyone else in the office who was working for a supervisor but sitting in a different unit?
    MR. JENNINGS: Objection to form.
    THE WITNESS: Actually there were people

Page 299

that were way further away from their supervisors than I was.
BY MS. KIVITZ:
Q. Were they in other departments?
A. It's not another department. It's Kathy is here, and Kathy Angelucci -- Kathy Holtzman is here, and Kathy Angelucci is here. My cubicle is here (indicating). It's only about twenty feet away.
Q. Okay.
A. It's not like -- there is no other department in there. Kathy's head of Test Development. It's all one department. There are just a lot of group managers, I guess six or seven managers, and then the managers have people working under them. But there's only one department, one unit. It's Test Development.
Q. Okay. Did there come a time when you got your end-of-year performance evaluation that you wrote on it and sent that to somebody? Your comments?
A. I don't remember.
Q. Okay.
A. I wrote on it for myself.
Q. Okay. Before I mark this, is this your handwriting (indicating)?
A. Oh, this is when I was -- oh, Barbara must have -- I must have left it in Barbara's office. Yes,

Page 300

that's mine.
    MS. KIVITZ: All right. I'll mark it (indicating).
    (Whereupon the Reporter marked the 2006 Year-End Performance Review as Exhibit No. D-25 for identification.)
    (Brief recess.)
BY MS. KIVITZ:
Q. That's your evaluation?
A. Yes. This is where my handwriting is on there, and I can't even read it.
Q. That's what I'm asking you. I can't read your handwriting. I thought maybe you could read it.
A. Oh, I'll try.
Q. You acknowledge that this is the 2006 Year-End Performance Review; correct?
A. This is the performance review? Oh, yeah, yeah. They never gave me a copy of this. I asked for it, and they wouldn't give it to me.
Q. If you didn't have a copy, how did you have the opportunity to mark it up?
A. That was during the meeting.
Q. You were making notes?
A. I was making notes at the meeting.
Q. Okay.

301

1  A.  And then when I actually asked Barbara
2  Davidson for a copy, they wouldn't give it to me.
3  Q.  Okay.  Well, this will be attached to the
4  deposition; so you'll have it.
5  A.  Okay.
6  Q.  And your attorney has copies of it too.
7  A.  Okay.
8  Q.  But I just want you to -- I can't read your
9  writing.
10 A.  Okay.  "You weren't interested."  She wasn't
11 interested in talking to me through my whole
12 employment there.
13 Q.  All right.  The handwriting at the bottom of
14 Page 1 --
15 A.  Yeah.  It says "You weren't interested."
16 Q.  How about the top of Page 2?
17 A.  Because she didn't take any time with me.  I
18 think "That was because you didn't take time with me."
19 Q.  Okay.  How about the bottom of that page?
20 A.  "Accusing me of being combative."
21 Q.  Is that "evidence, question mark"?
22 A.  Yes.  "Evidence.  I was only in a team
23 environment once."  And then it says "You made me
24 write that letter."  Oh, that was the letter about
25 Barbara Scaramalino.

302

1  Q.  Okay.  How about on Page 3?
2  A.  It says that "She sees no progress."  And I
3  wrote "In what?  I spoke to Tech Services."  I don't
4  know why I wrote that.  I'd have to re-read the whole
5  comment to see.
6  Q.  "Accusing me of" -- is that "disruptive
7  behavior"?
8  A.  Yeah.  I'm not sure why I wrote that.
9  Q.  Well, at the bottom does that say "expose exit
10 interviews"?
11 A.  "Existing"?  It might be "existing."  I'm not
12 sure.  I have no idea actually.  I can't read that
13 one.
14 Q.  Well, what did the term "exit interviews" mean
15 to you on November 21, 2006?
16 A.  "Exit interviews"?  That's not what that says.
17 I think it's "existing interview."  "Interviewers"?
18 Is that what you're asking me?  If that says "exit"?
19 I don't think it says "exit."  It's "existing."
20 Q.  Okay.  And what did that mean?
21 A.  I don't know.  That's what I'm saying.  I
22 don't know what it says.  I'm not even sure if that
23 says "interview."  It says "existing."  I don't know.
24 I couldn't tell you honestly.
25          MS. KIVITZ:  Okay.  I'll ask that this

303

1  be marked (indicating).
2           (Whereupon the Reporter marked an e-mail
3  dated November 8, 2006, to Diane Rosetsky from Kathy
4  Holtzman as Exhibit No. D-26 for identification.)
5  BY MS. KIVITZ:
6  Q.  Referring to the e-mail we've already
7  referenced, did you ever write an e-mail response to
8  Kathy Holtzman concerning what materials you had or
9  whether you would return them or any response that you
10 recall?
11 A.  No, I don't recall anything.
12 Q.  You said at one point you had spoken to senior
13 management concerning what you perceived as Kathy
14 Holtzman's behavior?
15 A.  Uh-huh.
16 Q.  Do you remember who that was?
17 A.  Barbara Davidson, Aggie Butler.
18 Q.  Do you remember when you met with Aggie?
19 A.  I didn't meet with her formally.  She was just
20 at my desk.  She came by and was talking to me.
21 Q.  Okay.  Do you remember around when that was?
22 A.  No.  Well, when all this was happening.
23 Q.  Do you remember what your complaint was --
24 A.  October.
25 Q.  Okay.

304

1  A.  I think this probably had to do with -- I
2  don't think I went into depth with Aggie.  But, you
3  know, that she knew she could be really difficult to
4  work for.  And she said, "Please don't leave.  You're
5  a really good worker."  You know, she was really nice
6  actually -- Aggie.  And she was empathizing or
7  sympathizing with me.
8           You know, most of this all happened
9  around when I rushed for four days and did this big
10 editing job, you know, to be told I wasn't supposed
11 to do it.  And then Krista and Kathy got into a
12 fight with each other.  So it was all around the
13 same time.
14          There was no occurrence or altercation
15 or anything until after I went down to HR.  Nothing
16 happened.  You got nothing.  Everything was just, you
17 know, okay between me and -- you know, okay in her
18 eyes, you know, between me and Kathy until this
19 editing thing happened and I went to HR.  And that was
20 it.
21          Oh, the other person was Ron Nungster.
22 Q.  Okay.  Did you see him in person or just
23 e-mailed him?
24 A.  Ron I made an important with.
25 Q.  Okay.  Did you meet with him?

305

```
 1   A.    Yes.
 2   Q.    Okay.  And what did you show him?  What did
 3   you bring with you when you met with him?
 4   A.    He wouldn't let me show him anything.  I tried
 5   to show him the work that I was doing and that I
 6   wanted to apply for another job and I felt she was
 7   discriminating against me.  And I don't remember
 8   exactly -- you know, he got really defensive and all
 9   that.
10             And I knew right away -- I knew that,
11   when I came up there, I had it in my mind, "If he
12   doesn't let me show him the work that I did, that it's
13   going to be bad."  And he wouldn't look at it.
14   Q.    Okay.
15   A.    He started talking about himself.  That's what
16   he started doing.
17   Q.    Okay.  Now, you said you used the term
18   "discrimination."
19   A.    Uh-huh.
20   Q.    Do you recall using with anyone the term "age
21   discrimination"?
22   A.    Yes.
23   Q.    Who?
24   A.    Barbara Davidson.
25   Q.    Okay.  Now, Barbara Davidson has no record
```

306

```
 1   whatsoever that you used the term "age."  Is there
 2   anyone else that you ever used the term "age" with
 3   ever?
 4             MR. JENNINGS:  Objection to form.
 5             THE WITNESS:  I said it to Faith and
 6   Debbie, "We're the older women here, and that's why
 7   we're kept in these positions."  I didn't use "age
 8   discrimination," but I did with Barbara Davidson.  And
 9   why would she write it?  You know, why would she admit
10   to it at this point, you know?  She got a look on her
11   face, you know, like, "Uh-oh," as soon as I said it.
12             And as a matter of fact, I said it a
13   couple times.  I met with her several times.  And I
14   said, "Can't you see what she's doing here?  We're all
15   the older women that are stuck in this position."  And
16   then I said, "This is age discrimination."
17             And she said, "No, it's not.  It's" --
18   what did she say?  "It's just the way Kathy is," or
19   something like that.
20   BY MS. KIVITZ:
21   Q.    Have you seen the notes of any of the meetings
22   of you with Barbara Davidson that have been produced?
23   A.    No.
24   Q.    Okay.  Now, the other thing is at some point
25   you got upset because Kathy Holtzman told you you
```

307

```
 1   could move laterally to a different department but not
 2   necessarily move up to a different department.  You'd
 3   have to work yourself up.
 4   A.    Right.
 5   Q.    Did you think there was something wrong with
 6   that?
 7   A.    Yes, I did.
 8   Q.    What?
 9   A.    What?
10   Q.    What was wrong with the concept of a lateral
11   move?
12   A.    Because I applied for a promotion and she had
13   promoted other people that had less education than me
14   and had been there the same amount of time as me.  And
15   I felt that I deserved to be promoted like she was
16   doing for other people.
17   Q.    Were you aware of any people at the National
18   Board younger, older, blue, white, yellow who had
19   moved laterally to other departments?
20   A.    I think this woman Barbara that Kathy and Dave
21   abused.  I'm trying to think of her name.  She had a
22   health issue while she was there, but she still works
23   there.  Barbara.  I can't remember her last name.
24   They would know because she moved to the cubicle at
25   the end, and then she moved to the next building.  I
```

308

```
 1   can't tell you her last name.  If I saw it, I would
 2   remember.
 3   Q.    Okay.  Do you remember writing to Debbie
 4   Shelmire on October 26 and saying:
 5             "In case you're wondering why it's kind
 6             of quiet around here, Kathy and I had it out.
 7             I wrote her a lengthy e-mail on Monday"?
 8   A.    Yes.
 9   Q.    Okay.  Was that the same e-mail you boasted to
10   Renee Brock you had also written?
11   A.    It might have been.
12   Q.    Okay.  Was it the same e-mail that I asked you
13   about on October 23 concerning the edits?
14   A.    I'm not sure.  Maybe.
15   Q.    Okay.  You also told Faith in October, 2006,
16   that you had applied to over two hundred other jobs at
17   Penn up to, I guess, October 20, 2006.  And you
18   claimed you had gotten just the one interview?
19   A.    Right.  Maybe.
20   Q.    Okay.  Do you remember what any of the other
21   positions were?
22   A.    You want me to recite two hundred positions
23   that I applied to?
24   Q.    No.  Do you remember in particular the type
25   of --
```

309

A. They're all a mixture of IT and grant work, research administration, that kind of thing. Research administration if you want a blanket coverage of it.
Q. Okay. Now, you have also submitted, I guess, paperwork to us, showing us your efforts allegedly to find employment since you left the National Board?
A. Uh-huh.
Q. Okay. And I see that there is a tremendous amount of focus on the University of Pennsylvania and on Temple University?
A. Uh-huh.
Q. Why?
A. Why? Because I worked in academia before. They pay tuition benefits for your children to go to college. That's my main reason. And I can tell you that that's not all of my applications. I have others to Sanofi Pasteur, Bristol-Myers Squibb, Princeton University, Villanova University, Penn State University.
  Where else? There were some other drug companies. That's not all of them. That's -- you know, I accumulated a lot of them for you, but there's more.
Q. Okay. I also notice, though, that you withdrew applications from a number of Web sites?

310

A. Right.
Q. Why would you be withdrawing applications at the same time you're putting in applications?
A. Sometimes -- oh, because at Penn you can't go back. Like, they ask you a series of questions, and they don't let you get out of the window without a withdrawal. So, like, while they're asking you the questions, you can see if you're really well-qualified for the job.
  And if you answer the questions "no," "no," "no," I mean, you might as well withdraw. But you have to hit you want to withdraw, or you can't get out if it. It's the way the system is set up. And there were very few of them. Maybe three or four out of a hundred.
Q. Well, no. Actually I saw more of them. That's why I'm asking.
A. No. There's not a lot there. But the only way you can see -- you have to see the system. When you go into it and you apply for a job, some of the supervisors or the people -- the hiring officers put in a series of questions.
  And it will be "Can you do this? Have you done this? How long did you do this?" And you can see -- then you start to feel like, "Well, maybe

311

I'm not qualified for it." And then you click out "cancel." And before you click out "cancel," a window pops up and says "If you click out of here, it will be as a withdrawal." So it goes in as a withdrawal.
Q. Now, have you applied for any jobs through the old-fashioned way with a cover letter and a resume, or has everything been on line?
A. Mostly been on line. Jefferson maybe I sent something. I applied to Jefferson Hospital. I applied to Fox Chase Cancer Center. I could just go on and on. But basically it was on line. Nobody really sends anything through the mail anymore.
Q. Okay. What do you feel has been the problem in your getting other work now?
  MR. JENNINGS: Objection to form.
  THE WITNESS: The same problem the rest of the world has.
BY MS. KIVITZ:
Q. What's that?
A. There's a lot of people applying. You have to know someone. You know, the jobs that I have interviewed for -- once I get in there -- and I just went to another one at Penn. I'm overqualified. You know, you'll have some young person call you down that's a B.A., a business assistant. And when you get

312

there, they're, like, "Oh, well, you'll be doing a lot of clerical work. Is that a problem for you?"
  And I'll say, "Well, yeah. I kind of -- do you see my education?"
  And they said, "Yeah. I don't think you're right for this then." But they call you down there first.
Q. Are you willing to do clerical work?
A. No, I'm not at this point. No. I don't want to wind up with the same issue that I had before, you know. Would you -- are you willing to do clerical work now?
Q. I do clerical work every day, Honey.
A. Okay. Yeah, but then you charge $300 an hour for it. So if I could charge $300 an hour for it, I would do it.
Q. Okay. Let me ask you this: Do you think that it's possible that your difficulty in finding employment is also based on the fact that you've held sort of different positions and not for very long on your resume?
  MR. JENNINGS: Objection to form.
  THE WITNESS: No. Because I was home for fifteen years with my kids. There's really only one position that I held for a short period of

313

1  time. The Wistar Institute -- I was there for six,
2  seven years. And I basically stayed home with my
3  kids. So I lasted there fifteen years. Does that
4  count because that's the hardest job I ever did in my
5  life?
6  BY MS. KIVITZ:
7  Q.     But I'm just saying: Do you think it's a
8  factor in the job market? Okay? Do you think there's
9  any possibility that the fact that you've worked for a
10 year and a half at Jeanes and then seven years at
11 Wistar and then stayed home for fifteen years --
12 A.     No. Because I have a friend that goes every
13 five years to a new job. Renee Brock. And you could
14 see on her resume "five years," "five years," "five
15 years," "five years."
16 Q.     You got to let me finish the question. I'm
17 sorry.
18 A.     Okay. Sorry. I was trying to answer it.
19 Q.     Do you --
20 A.     No, I don't. That's my answer.
21 Q.     You can't answer it before I ask it.
22 A.     You already asked it. You said, "Do you think
23 that, because I was in a short -- in a position for
24 seven years and then a year and a half, is that a
25 problem?"

314

1  Q.     Seven years, a year and a half, four months,
2  one year. Do you think that that has hurt you --
3  A.     No.
4        MR. JENNINGS: Hold up.
5        Objection to form.
6  BY MS. KIVITZ:
7  Q.     Have you interviewed anywhere and asked flat
8  out why you didn't get a position?
9  A.     Have I asked them? Yes.
10 Q.     And what have you been told?
11 A.     "You're a really great candidate. We just
12 picked somebody else."
13        I mean, I was the last four -- he had it
14 down from eighty to four -- the doctor at Penn. He's
15 actually a doctor in, I think, psychology or
16 sociology. And he called me from his cabin in Maine.
17 And I was one of four people.
18        And he said -- he had trouble getting
19 his grant, and he hired one person, and he actually
20 called me and said, "You know, if I can, I may call
21 you at a later date for a position once I really
22 secure this grant."
23        So, you know, I've asked people from
24 Human Resource, "How was my interview? How did I
25 present myself?" I just want it for my own

315

1  information. Like, from Drexel I sent an e-mail. I
2  don't normally call people. And I said, "Can you give
3  me some feedback?"
4        And I always got positive. They just
5  say it's just who the person they -- you know, who
6  they have chemistry with or whatever. Who knows? It
7  could be because I'm older and I come in and they
8  don't expect me to be older because I don't have dates
9  on my resume. I mean, I don't really know.
10 Q.     The reasons you're given for not getting the
11 jobs -- are they any different than the reasons you
12 were given when you were at the National Board and
13 applying for positions?
14 A.     I wasn't given any reason from the National
15 Board why I wasn't promoted.
16 Q.     No, no, no. When you were at the National
17 Board and you applied for positions with Temple and
18 Drexel and other places and you were turned down, what
19 I'm saying is are the reasons --
20 A.     I wasn't turned down to all of them. One of
21 them I didn't take. It was soft money. And she said,
22 "Would it be a problem for you working on a grant for
23 two years?"
24        And I said, "Yeah. I have a family."
25 So that was an issue. That's as far as that one went.

316

1  Q.     Which job was that?
2  A.     That was Family Medicine.
3  Q.     Where?
4  A.     At Penn.
5  Q.     Okay. So Family Medicine -- you're saying you
6  had a job offer?
7  A.     She didn't make a formal offer, but she sent
8  me to the B.A., and he said, "Are you going to have an
9  issue if they offer the job to being on soft money and
10 the job may end in two years?"
11        And I said, "Yes. Because right now I'm
12 in a permanent job."
13        And actually when you go to
14 universities, that can be very common. So you have to
15 think before you take it. At this point when you're
16 not working, sure, I'd take it. But when you're
17 working at a job where you're not on soft money, you
18 know, generally I wouldn't apply to the ones that said
19 that.
20 Q.     Have you met with a career counsellor or a
21 vocational expert, anyone who might be able to give
22 you more guidance?
23 A.     Someone that I would have to pay?
24 Q.     Headhunter?
25 A.     Yes. They've sent me on quite a

317

1  few interviews.
2  Q.    Okay.  Which headhunters have you worked with?
3  A.    I'm trying to remember the girl's name.  Let
4  me think.  I could get them for you if you're really
5  interested.  I still have them on my computer.
6  Actually they should be in there.
7  Q.    Where?
8  A.    They're in those --
9  Q.    Well, I see monster.com, and I see a whole
10 bunch of printouts for Temple and --
11 A.    Yeah.  But you should see some --
12 Q.    -- a couple of --
13 A.    Like, if you see, like, a girl or a guy's
14 name, that is probably -- okay.  It should be in
15 there.  I'm trying to think.  One of them begins with
16 a "J."  Julie?  Jolie?  Does that sound familiar to
17 you?
18 Q.    Located where?
19 A.    I don't know.  They're all done through
20 e-mail.  I think she's in King of Prussia.  One of
21 them.  It was Jolie I think was the name.  And what
22 was the other one?  Advantix or Advance?  I don't
23 know.  If you really are interested, I can get them
24 for you.
25 Q.    Okay.  Now, has your husband taken the

318

1  position in the Domestic Relations -- and maybe it's
2  not this far along -- that you be tested vocationally
3  to see the type of work you're able to get?
4  A.    You don't know my husband.  No.  He would not
5  suggest anything like that.
6  Q.    Okay.  Is he taking the position that you're
7  capable of working?
8  A.    Oh, yes.  He knows I've been looking for work.
9  Q.    I think I'm done.
10 A.    Really?
11 Q.    Yes.  Let me just talk to her for a minute.
12        (Brief recess.)
13        MS. KIVITZ:  We're done.
14        MR. JENNINGS:  Just for the record, I
15 don't have any questions.  Thank you.
16        (At 4:40 P.M. proceedings were
17 concluded.)
18              - - -